# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TEAMSTERS LOCAL 456 PENSION FUND, ET AL., Individually and On Behalf of All Others Similarly Situated,<br><br>        Plaintiffs,<br><br>vs.<br><br>UNIVERSAL HEALTH SERVICES, INC., ALAN B. MILLER, and STEVE G. FILTON,<br><br>        Defendants. | Case No. 2:17-cv-02817-LS<br><br>**CLASS ACTION**<br><br>Judge Lawrence F. Stengel<br><br>JURY TRIAL DEMANDED |

**AMENDED CLASS ACTION COMPLAINT**
**FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

<u>**TABLE OF CONTENTS**</u>

I. NATURE OF THE ACTION ............................................................................................1

II. INTRODUCTION .........................................................................................................2

III. JURISDICTION AND VENUE ....................................................................................8

IV. PARTIES ......................................................................................................................8

    A. Lead Plaintiffs ...............................................................................................8

    B. Defendants .....................................................................................................9

        1. Defendant Universal Health Services, Inc. ........................................9

        2. Defendant Alan B. Miller .................................................................10

        3. Defendant Steve G. Filton .................................................................12

V. OVERVIEW OF THE FRAUD .....................................................................................13

    A. Prior to the Class Period, Defendants Had Long Been on Notice of UHS's
       History of Utilizing Unethical and Unconscionable Practices to Prioritize
       Profits at the Expense of Patient Care ..........................................................13

        1. Investigations and *Qui Tam* Lawsuits Regarding UHS Facilities
           Across the Country Allege UHS Was Engaged in Fraudulent
           Practices to Admit, and Unlawfully Detain, Psychiatric Patients.............13

        2. CTW Writes Letters to UHS's Board Raising Red Flags About the
           Behavioral Division's Admission Practices.............................................17

        3. UHS's Psychiatric Facilities Become the Subject of Escalating
           Federal Civil and Criminal Investigations, Which Defendants
           Dismiss and Downplay .............................................................................20

    B. Throughout the Class Period, Defendants Misled Investors By Repeatedly
       Touting the Behavioral Division's High Occupancy Levels, Length of
       Stay, and Other Key Metrics, Claiming They Were Attributable to
       Burgeoning Demand for its Psychiatric Services ....................................24

        1. Defendants' Scheme Artificially Inflated A Crucial Metric for the
           Behavioral Division: Patients' Average Length of Stay..........................27

        2. Defendants Consistently Tracked, Reported, and Artificially
           Inflated Other Key Metrics Pertaining to UHS's Occupancy Levels ........29

VI.    THE TRUTH EMERGES ...................................................................................31

       A.     The December 7, 2016 *BuzzFeed* Investigative Report Exposes
              Defendants' Illicit Admissions Scheme .................................................31

              1.     UHS Manipulated and Fabricated Patient Symptoms in Order to
                     Institutionalize Patients .............................................................32

              2.     "Don't Leave Days On The Table": UHS Directs Facilities To
                     Keep Patients Admitted For As Long As Their Insurance Will Pay .........35

              3.     UHS Deliberately and Dangerously Understaffed Its Facilities In
                     Order To Increase Profit Margins ...............................................38

       B.     UHS's Stock Price Plummets In The Wake Of The *BuzzFeed* Article, But
              Defendants Emphatically Deny The Report's Findings and Assure
              Investors That the Accusations Have No Merit ......................................39

       C.     In The Ensuing Months, The Truth Is Fully Revealed ..........................44

VII.   FORMER UHS EMPLOYEES INDEPENDENTLY CORROBORATE THE
       ACCOUNTS IN THE *BUZZFEED* REPORT ....................................................49

       A.     Former UHS Employees Confirm UHS Facilities Engaged in Improper
              Admission Practices .........................................................................50

       B.     Former Employees Confirm That The "Don't Leave Days On The Table"
              Mantra Governed Admissions Practices At UHS Facilities Nationwide ..............54

       C.     Former Employees Confirm The Company's Widespread and Intentional
              Understaffing of its Facilities ..............................................................58

VIII.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS .........61

       A.     March 2015 Health Care Conferences .................................................62

       B.     Statements Regarding 2015 First Quarter Earnings ..............................64

       C.     Statements Regarding 2015 Second Quarter Results ...........................67

       D.     Statements Regarding 2015 Third Quarter Results ..............................69

       E.     Statements Regarding 2015 Fourth Quarter and Annual Results .........71

       F.     Statements Regarding 2016 First Quarter Results ...............................74

       G.     Statements Regarding 2016 Second Quarter Results ...........................77

       H.     Statements Regarding 2016 Third Quarter Results ..............................80

I.     Defendants' Response To The BuzzFeed Report ...................................................82

J.     Statements Regarding 2016 Fourth Quarter and Annual Results ..........................84

K.     Statements Regarding 2017 First Quarter Results .................................................86

IX.    ADDITIONAL ALLEGATIONS OF SCIENTER...........................................................89

X.     LOSS CAUSATION........................................................................................................100

XI.    PRESUMPTION OF RELIANCE..................................................................................104

XII.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE ..............................................................................105

XIII.  CLASS ACTION ALLEGATIONS ...............................................................................106

XIV.  COUNTS AGAINST THE DEFENDANTS ..................................................................108

      COUNT I ..........................................................................................................................108

      COUNT II .........................................................................................................................110

XV.   PRAYER FOR RELIEF ..................................................................................................112

XVI.  JURY DEMAND .............................................................................................................112

# I.    NATURE OF THE ACTION

1.    Lead Plaintiffs Teamsters Local 456 Pension Fund ("Local 456 Pension Fund") and the Teamsters Local 456 Annuity Fund ("Local 456 Annuity Fund" and, together with Local 456 Pension Fund, the "Lead Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following upon personal knowledge as to themselves and their acts, and upon information and belief as to all other matters, based upon the ongoing investigation of their counsel.  Many of the facts related to Lead Plaintiffs' allegations are known only by Defendants, or are exclusively within Defendants' custody or control.  Lead Counsel's investigation included, among other things: (i) a review of public filings by Defendant Universal Health Services, Inc. ("UHS" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) presentations, press releases, media and analyst reports made by or about the Company; (iii) transcripts of UHS's conference calls with analysts and investors; (iv) publicly available data relating to the Company's securities; (v) interviews with former employees of the Company; (vi) consultations with relevant experts; and (vii) other materials and data concerning the Company.  Lead Plaintiffs believe that substantial additional evidentiary support for their allegations will be developed after a reasonable opportunity for discovery.

2.    Lead Plaintiffs assert claims under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, against Defendant UHS and Defendants Alan B. Miller ("Miller") and Steve G. Filton ("Filton" and, together with Miller, the "Individual Defendants", and together with UHS, "Defendants"), and under Section 20(a) of the Exchange Act against the Individual Defendants, on behalf of all investors who purchased or otherwise acquired UHS publicly traded common stock between March 2, 2015 and July 25, 2017, inclusive (the "Class Period").

## II.  **INTRODUCTION**

3.      At the heart of this securities fraud class action lies a fraudulent scheme in which UHS preyed upon some of the most vulnerable members of society and violated their trust in order to illicitly bolster the Company's financial results.   Defendants' misconduct was reprehensible:   UHS mental health facilities across the country manipulated and fabricated patient intake assessments—including by falsely coding them as "suicidal"—in order to admit thousands of patients for psychiatric care that was not medically necessary.   Once these patients were admitted, UHS would then use the same tactics to keep patients locked up, regardless of medical necessity, for as many days as insurance would cover.   Defendants' scheme plagued the entirety of the Company's operations.   Indeed, numerous high-level former UHS employees have independently corroborated Defendants' unlawful practices, and confirmed the Company's mantra: "Don't leave days on the table"—a reference to a Company-wide directive to not discharge a patient "early," *i.e.*, before their approved insurance days had been used up, with no regard for medical necessity.

4.      UHS is by far the largest provider of behavioral health services in the United States, owning and operating over 200 facilities in the country, representing approximately 40% of the entire industry.   Throughout the Class Period, UHS reported strong results principally attributable to its critical Behavioral Division, which generated over $4 billion in net revenues every year, and accounted for approximately 70% of the Company's earnings.   To assure investors of the strength and stability of that business, Defendants closely monitored—and publicly reported to investors—a series of financial metrics specifically designed to create the impression that UHS's facilities were operating at peak capacity.   Thus, Defendants reported what they called "incredibly stable" and "very reliable" occupancy rates for its facilities of 75%

or more—rates which Defendants represented were the "ideal" occupancy levels for maximum profitability. Defendants also highlighted to investors numerous other metrics that directly bore on how many patients UHS was admitting, how many aggregate days patients were spending in its inpatient facilities, and its net revenues per patient day.

5. One of the most critical metrics UHS publicly reported—if not <u>the</u> most critical— was its average length of stay ("ALOS"), meaning the average number of days each patient spent in its facilities. Indeed, Defendant Filton consistently made clear to investors just how important ALOS was to the Company's success, stating: "95%-plus of our reimbursement in the behavioral space is on a per-diem basis, that is, payers pay us for the number of days that a patient is in the facility. <u>And obviously if they spend less days in a facility, then we're going to be paid less for a single admission</u>."

6. Defendants further assured investors that UHS patients who were admitted into its facilities met the Company's medical qualifications for admission, and that demand for UHS's inpatient facilities was so strong that the Company was forced to turn away thousands of patients who otherwise qualified for admission. Indeed, Defendant Filton repeatedly boasted that the Company was "<u>turning away a measurable number of patients</u>" who "<u>me[t] clinical admission criteria</u>," stressing: "<u>Honestly, if we could snap our fingers . . . we'd probably add another couple of thousand beds tomorrow. We think there is that much demand</u>."

7. As was ultimately revealed, however, Defendants' positive statements about UHS's strong, stable and reliable financial results, the Company's adherence to clinical admission criteria, and the unrelenting demand for UHS's services, were materially false and misleading. In reality, UHS was only able to report such strong financial results because its behavioral health facilities across the country were doing the exact opposite of what the

Company said they were doing: namely, admitting and holding thousands of patients for psychiatric treatment when such treatment was not medically necessary.

8.     Significantly, UHS's senior officers—including the Individual Defendants—were well aware of UHS's unlawful practices. Even prior to the start of the Class Period, these executives were confronted with a plethora of red flags that, at minimum, put them on notice that UHS was admitting and treating psychiatric patients even when not medically necessary. These cold, hard facts included the following: (1) numerous patients, UHS employees and doctors had sued the Company, alleging that UHS was fraudulently admitting patients and holding them when not medically necessary; (2) influential shareholders had written to the Company's Board of Directors, presenting compelling independent analyses that UHS admitted, and coded as "suicidal," far more patients than its competitors; and (3) in 2013, the Office of Inspector General issued subpoenas to fifteen UHS facilities and launched an investigation under the False Claims Act. Significantly, that investigation expanded during the Class Period into a joint civil and criminal investigation brought by the DOJ Criminal Frauds Section, which encompassed 12.5% of the Company's facilities across nine different states, and, critically, targeted *UHS as a corporate entity*, not just its individual facilities. However, each time questions were raised about UHS's practices, the Individual Defendants denied any wrongdoing; claimed that these were merely sporadic incidents that were not reflective of the Company's business practices; and repeatedly assured investors that the complaints and investigations would have no impact on UHS's business and operations.

9.     The truth regarding Defendants' fraud was partially revealed in a December 7, 2016 investigative report published by *BuzzFeed News* ("BuzzFeed"), a leading digital media company that in recent years has become known for its in-depth investigative reporting. As

BuzzFeed revealed that day, in an extraordinarily detailed 30-page exposé on the Company's business practices, for years UHS had been engaging in a widespread and deliberate scheme to increase its bottom line by coaxing unwitting patients through its doors; manipulating and fabricating patient testimonials to make them appear dangerous to themselves or others (including by routinely and falsely coding patients as "suicidal"); and then admitting them into the Company's facilities—often involuntarily—for as many days as their insurance would provide reimbursement, regardless of the true medical necessity for the admission, or the appropriate length of the stay.

10. BuzzFeed also made clear that these practices were neither isolated incidents, nor committed by a handful of rogue employees. To the contrary, they were practices that existed Company-wide, and were known to and orchestrated by UHS's most senior officers. The BuzzFeed report was the culmination of a comprehensive, year-long investigation into UHS, and featured, among other striking details:

- Interviews with 175 current and former UHS employees—including numerous senior officers, division heads and 18 CEOs or heads of hospitals;

- 120 additional interviews with patients, industry experts, and government investigators;

- Analysis and review of a "cache" of internal UHS emails and documents;

- Details of "flash meetings" that were regularly and independently conducted at UHS facilities across the country, the primary purpose of which was to discuss the "days left on the table" metric and press employees "to try to use up those days";

- UHS executives' monitoring of each facilities' "conversion rate"—*i.e.*, the percentage of callers who actually came in for psychiatric assessments and were "converted" to patients—a metric bearing no nexus whatsoever to medical necessity; and

- The first-hand accounts of numerous patients, doctors, administrators, hospital heads, and other UHS employees from facilities across the country, all of which independently corroborated Defendants' central role in the fraud.

11.     In the wake of these disturbing revelations, UHS stock plummeted 12% in a single trading day, from $126.37 on December 6, 2016 to $111.36 on December 7, 2016, wiping out $1.5 billion in market capitalization.  Significantly, however, as Defendants had done throughout the Class Period, they emphatically denied any wrongdoing, claiming that the accounts in the BuzzFeed report were "overly anecdotal," and assured investors that the allegations in the report and the escalating government investigations were meritless and would have no effect on the Company's business.

12.     Despite Defendants' denials, after the BuzzFeed report, Defendants' scheme began to unravel.  On December 9, 2016, two days after the BuzzFeed report, Senator Charles Grassley (R., Iowa), the Chairman of the Senate Judiciary Committee, and Senator Elizabeth Warren (D., Mass.) publicly called for the federal government to investigate the allegations in the report and hold UHS accountable for any wrongdoing.  On April 26, 2017, for the first time in eighteen months, the Company reported that its average length of stay had unexpectedly declined, but claimed that such decline was an isolated occurrence.  Then, on May 23, 2017, BuzzFeed published another exposé on the Company, revealing, among other things, that the federal criminal investigation had expanded *again*, to include the FBI and the Department of Defense, and that the focus of the investigation also included the submission of false claims to TRICARE, the insurance plan for active military.

13.     On July 25, 2017, after trading hours, the full scope of the fraud was revealed.  For the second consecutive quarter, Defendants reported a significant decline in the Company's critical length of stay metric, which resulted in disappointing revenue growth and a downgrade of the Company's guidance for the year.  Finally, Defendants were forced to acknowledge that the decline was not an isolated occurrence, but a developing "trend" of "more aggressive"

behavior from insurers, who had undoubtedly gotten wind of Defendants' illicit practices and were no longer willing to reflexively authorize longer lengths of stay. Defendants admitted that, under this increased pressure, they could hold patients only for as long as was clinically appropriate (*i.e.*, what UHS should have been doing all along). Notably, Defendants revealed that government scrutiny had recently increased, and disclosed, for the first time, that the "crux" of the federal government's four-year criminal investigation "was that patients were either inappropriately admitted or their length of stay was inappropriately longer than it needed to be."

14.     On this news, UHS stock price dropped dramatically, plummeting over $10-per share from $122.90 on July 25, 2017, to $112.88 on July 26, 2017.

15.     To date, the federal civil and criminal investigations are continuing. Plaintiffs' independent investigation has confirmed the truth of what BuzzFeed reported. Indeed, the independent testimonials from former employees discussed in this complaint further corroborate the pervasiveness of the UHS fraud and the central role of the Individual Defendants. These employees—who worked at Company facilities across the country, and often in senior positions—stated, among many other incriminating accounts, that "[i]f an insurance company gave you so many days, you were expected to keep the patient there that many days"; that UHS would train employees on "tactics for admitting people," recalling patients who were "coaxed," "bullied or scared" into saying the "magic word" that would justify an admission; that the scheme was "organized by corporate" and "definitely trickled down" from senior UHS officers; and that the BuzzFeed report was "spot on: that's exactly what we did."

16.     Investors who purchased UHS common stock at artificially-inflated prices during the Class Period have suffered substantial losses from Defendants' violations of the federal securities laws. This action seeks redress on behalf of these aggrieved shareholders.

### III. JURISDICTION AND VENUE

17.     The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

19.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  UHS maintains its U.S. headquarters in King of Prussia, Pennsylvania, which is situated in this District, and a substantial part of the acts and conduct that constitute the violations of law complained of herein, including the preparation and/or dissemination to the public of materially false and misleading information, occurred in this District.

20.     In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

### IV. PARTIES

#### A.     Lead Plaintiffs

21.     Lead Plaintiff Local 456 Pension is one of the nation's largest multi-employer defined benefit pension plans with approximately $4 million in assets and 6500 participants across the country. As set forth in its certification submitted herewith, Local 456 Pension purchased UHS common stock on the New York Stock Exchange ("NYSE") during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.  On April 17, 2017, the Honorable Philip S. Gutierrez of the Central District of California

appointed Local 456 Pension as Co-Lead Plaintiff for the Class pursuant to 15 U.S.C. § 78u-4(a)(3)(B). *See Heed v. Universal Health Services, et al.*, No. 2:16-CV-09499-PSG-JC (C.D. Cal.), ECF No. 36.

22. Lead Plaintiff Local 456 Annuity is a defined contribution plan. Currently, Local 456 Annuity manages approximately $180 million in assets on behalf of approximately 1,900 participants. As set forth in its certification submitted herewith, Local 456 Annuity purchased UHS common stock on the NYSE during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein. On April 17, 2017, the Honorable Philip S. Gutierrez of the Central District of California appointed Local 456 Annuity as Co-Lead Plaintiff for the Class pursuant to 15 U.S.C. § 78u-4(a)(3)(B). *See Heed v. Universal Health Services, et al.*, No. 2:16-CV-09499-PSG-JC (C.D. Cal.), ECF No. 36.

**B.      Defendants**

**1.      Defendant Universal Health Services, Inc.**

23. Defendant UHS owns and operates hospitals across the country. Its two major lines of business are its acute care hospitals, which provide general and emergency care, and its Behavioral Division, which provides inpatient and, to a lesser degree, outpatient psychiatric care. These business segments each comprise roughly 50% of UHS's revenues. However, during the Class Period, the Behavioral Division dominated the Company's earnings, accounting for approximately two-thirds, or nearly 70%, of UHS's EBITDA.

24. During the Class Period, UHS's Behavioral Division owned over 200 of the 500 total freestanding inpatient psychiatric facilities in the United States, with facilities located across 37 states and in Washington, D.C. UHS is by far the leading provider of behavioral health services in the United States, operating 1 in 5 psychiatric beds in America, with a 20% market

share of the $20 billion behavioral health industry in the country.  For example, in 2015 and 2016, the Behavioral Division generated $4.31 billion and $4.43 billion in net revenues, respectively, and as Defendants have stated:  "[A]fter you get past our $4 billion of revenues, the market becomes a lot smaller and a lot more fragmented fairly quickly.  The next largest providers are probably in the billion dollar range."  Approximately one-third of the Behavioral Division's revenues are derived from government payers, such as Medicare, TRICARE, and Medicaid, with the remaining two-thirds deriving from commercial payers.

25.     UHS is a Delaware corporation, and maintains its U.S. headquarters at 367 South Gulf Road, King of Prussia, Pennsylvania 19406.  UHS common stock trades on the NYSE under the ticker symbol "UHS."

### 2.      Defendant Alan B. Miller

26.     Defendant Miller is the founder of UHS and the Company's Chairman of the Board and CEO since 1978, and he served as the Company's President until 2009.  Miller was also a member of the Executive Committee and the Finance Committee.  According to the Company's Schedule 14A filed with the SEC on April 6, 2017, Miller beneficially owned 5,163,885 shares of the Company's Class A common stock, 8,521,475 shares of the Company's Class B common stock, and 661,688 shares of the Company's Class C common stock.  Miller beneficially owned over $980 million of the Company's Class B common stock (which was publicly traded on the NYSE) during the Class Period.   The Schedule 14A further stated that "the family of Alan B. Miller holds more than 95% of the shares of Class A and Class C Common Stock, which is entitled to elect 80% of the entire Board of Directors and constitutes more than 50% of our aggregate voting power."

27.     In 2015, Defendant Miller received $20,477,031 in compensation from the Company, including $1,568,310 in salary, $1,500,022 in stock awards, $12,553,430 in option awards, $3,434,599 in non-equity incentive plan compensation, and $1,370,948 in all other compensation.  In 2016, Defendant Miller received $19,867,748 in compensation, including $1,600,061 in salary, $1,500,069 in stock awards, $14,024,359 in option awards, $1,360,053 in non-equity incentive plan compensation, and $1,338,607 in all other compensation.

28.     Pursuant to the Executive Incentive Plan, for 2015 and 2016, "each executive officer is entitled to receive between 0% and 250% of that executive officer's target bonus based, either entirely or in part, on the Company's achievement of a combination of: (i) a specified range of target levels of adjusted net income per diluted share attributable to UHS; and (ii) a specified range of target levels of return on capital (adjusted net income attributable to UHS divided by quarterly average net capital) for the years ending December 31, 2016 and 2015."

29.     For 2015, Defendant Miller received an annual incentive bonus of 219% of his annual salary.  In 2016, Miller received an annual incentive bonus of 85% of his annual salary.

30.     Notably, an April 2017 *Axios* article entitled "The Richest CEO In The Hospital Industry," stated that, "based on the amount of stock and option awards that actually vested, Defendant Miller "made more than $51.3 million in 2016."  The article further noted that Miller's son, Marc Miller, who serves as President of UHS, made $7.2 million in 2016.

31.     During the Class Period, Defendant Miller reviewed, approved, and signed UHS's quarterly and annual filings with the SEC on Forms 10-Q and 10-K, which contained materially false and misleading statements and omissions.  In addition, Defendant Miller participated in industry, investor and earnings calls in which materially false and misleading statements and omissions concerning UHS were disseminated.

### 3. Defendant Steve G. Filton

32.     Defendant Filton became Executive Vice President and CFO of the Company in 2003, and was elected Secretary in 1999.  According to the Company's Schedule 14A filed with the SEC on April 6, 2017, Filton beneficially owned 432,492 shares of the Company's Class B common stock.  Filton beneficially owned over $50 million of the Company's Class B Common Stock during the Class Period.

33.     In 2015, Defendant Filton received $2,721,954 in compensation, including $566,022 in salary, $1,489,390 in option awards, $619,794 in non-equity incentive plan compensation, and $17,443 in all other compensation.  In 2016, Defendant Filton received $2,533,102 in compensation, including $584,606 in salary, $1,663,907 in option awards, $248,458 in non-equity incentive plan compensation, and $17,433 in all other compensation.  Additionally, in 2016, Filton sold 15,000 shares of the Company's Class B common stock, receiving over $2 million in proceeds.

34.     As with Defendant Miller, 100% of Defendant Filton's annual incentive bonuses for 2015 and 2016 were determined using corporate performance criteria.  In 2015, Filton received as an annual incentive bonus 110% of his annual base salary.  In 2016, Filton received as an annual incentive bonus 43% of his annual base salary.

35.     During the Class Period, Defendant Filton reviewed, approved, and signed UHS's quarterly and annual filings with the SEC on Forms 10-Q and 10-K, which contained materially false and misleading statements and omissions.  In addition, Defendant Filton participated in industry, investor and earnings calls in which materially false and misleading statements and omissions concerning UHS were disseminated.

## V. OVERVIEW OF THE FRAUD

### A. Prior to the Class Period, Defendants Had Long Been on Notice of UHS's History of Utilizing Unethical and Unconscionable Practices to Prioritize Profits at the Expense of Patient Care

36. Prior to the start of the Class Period, Defendants had long been on notice that UHS's facilities across the country were utilizing fraudulent practices to increase the Behavioral Division's inpatient admissions and maximize its revenues. Indeed, among other things, in the years preceding the Class Period: (i) numerous *qui tam* lawsuits were filed against the Company by patients and former employees of UHS facilities across the country alleging that the Company was unlawfully increasing inpatient admissions, and holding patients longer than medically necessary, to maximize profits; (ii) a prominent investment group representing institutional investors had written detailed letters directly to the Company, which were based on independent analyses and specifically questioned UHS's illicit admissions practices; and (iii) the federal government had instituted a coordinated civil and criminal investigation of an expanding list of UHS's behavioral facilities, ultimately including the UHS corporate entity itself.

### 1. Investigations and *Qui Tam* Lawsuits Regarding UHS Facilities Across the Country Allege UHS Was Engaged in Fraudulent Practices to Admit, and Unlawfully Detain, Psychiatric Patients

37. In the years immediately preceding the start of the Class Period, UHS became the subject of investigations and numerous *qui tam* whistleblower lawsuits filed against the Company by former employees and patients at UHS-owned inpatient psychiatric facilities across the country. These lawsuits alleged, among other abuses, that UHS facilities were engaged in a systemic, fraudulent practice of admitting patients regardless of medical need, and manipulating or even fabricating their symptoms to justify detaining them for longer stays—all in an effort to maximize insurance reimbursements and thus generate higher revenues for the Company. They include at least the following:

38.    In 2010, Dr. Steven Klotz, a former psychiatrist at the Roxbury Treatment Center in Pennsylvania, filed a *qui tam* lawsuit against the Company alleging that, in order for the Company to increase its occupancy levels, UHS "<u>falsely and fraudulently coded patients as suicidal, when the chart did not reflect a likelihood of patient suicide</u>."  He further alleged that UHS's internal audit employees would advise caregivers on how to maximize insurance reimbursements.

39.    In 2011, an investigation of UHS-owned Hartgrove Hospital in Chicago by the Illinois Department of Children and Family Services and the Department of Psychiatry at the University of Illinois ("UIC")—which was based on random observations of staff-patient interactions over an eight-month period, interviews with hospital employees (including the CEO and senior managers of the facility), and a review of 12,000 pages of internal documents— concluded that Hartgrove intentionally and habitually overfilled the facility, while deliberately maintaining "woefully inadequate" staffing levels, "<u>so that UHS corporate officials could take advantage of the opportunity to maximize profits</u>."  Specifically, the report stated that "UHS Hartgrove officials had been routinely exceeding its licensed bed capacity since 2007," which included "jam[ming] as many kids into the units as they could get away with":

> [O]ver the course of several years hundreds of mentally ill children – DCFS wards and non-wards alike – slept on rollaway cots in an overcrowded and frequently chaotic psychiatric hospital so that UHS corporate officials could take advantage of the opportunity to maximize profits.

40.    Significantly, the report made clear that these and other issues were not limited to Hartgrove Hospital, or even to UHS facilities in Illinois.  To the contrary, the report stated: "During the course of the review, the UIC team learned about troubling reports suggesting a <u>pattern of quality of care issues, harm to patients or major healthcare fraud charges involving UHS-operated facilities in a dozen other states</u> beyond Illinois: Virginia, Tennessee,

Pennsylvania, North Carolina, California, South Carolina, Massachusetts, Connecticut, Texas, Nevada, Arkansas and Missouri."

41.     In July 2011, relators filed a *qui tam* lawsuit against UHS alleging numerous improper practices at Arbour Health System in Massachusetts, including, among other things, that UHS failed to comply with state regulations requiring sufficient qualified psychiatric staff, that the facility billed Medicare and Medicaid for services that were not rendered, that the facility misrepresented the credentials of its psychiatric staff, and that these practices resulted in the death of a patient.  While the District Court in Massachusetts dismissed the action, stating that it failed to state a claim under the False Claims Act, the First Circuit reversed, holding that UHS's failure to disclose that it was submitting claims for services rendered by unqualified staff constituted fraudulent practices falling under the purview of the Act.

42.     In 2012, UHS settled two separate *qui tam* lawsuits filed by former employees of Marion Youth Center in Virginia.  The first, which was filed in 2007 by a group of former therapists at the facility, alleged that the facility engaged in various unlawful practices to increase its bottom line, including "provoking ('escalating') residents so that the resident's reaction would serve to justify a longer length of stay in order to increase the Medicaid reimbursement for that resident," "deliberately understaffing the Youth Center," and "delaying the discharge of residents who were ready for discharge in order to increase Medicaid reimbursement."  Federal and Virginia state authorities ultimately joined in the case, which resulted in a $6.85 million settlement.

43.     The second *qui tam* lawsuit was filed in July 2010 by Barbara Jones, the director of education at Marion Youth Center.  Jones alleged that the facility's management team told employees "that the census [the number of patients at the facility] of the Youth Center must be

kept up" and "therefore discharges needed to be delayed, even though the Clinical Director []
told [the center's CEO] that the continued retention of some of the residents could not be
justified clinically, and that they had been ready for discharge." Jones' complaint also described
"the admission of residents who did not meet the criteria for admission, simply to get the
additional Medicaid monies." UHS settled the case for an undisclosed amount.

44. In June 15, 2012, five former nurses at Verdugo Hills Hospital in California filed
suit against UHS. As with the other lawsuits, the plaintiffs alleged that they were instructed to
accept all new patients to the facility regardless of bed availability, and to hold the overflow
patients in the emergency room. They further alleged that the facility's director instructed nurses
to engage in "negative charting," meaning the nurses were to "make notes in patients' charts
using exaggerated buzz words like 'agitated,' 'irritated,' 'aggressive,' 'resisting,'
'uncooperative,' etc.," because "doing this increases the amount of money the government would
pay for the patient's care." UHS settled the case in 2013.

45. Additionally, on September 6, 2013, two former therapists at the National Deaf
Academy in Florida filed suit against UHS, alleging, in addition to various patient abuses and
excessive use of physical restraints, that the facility "falsified patient records, or instructed
employees to falsify patient records, to misrepresent that therapy sessions occurred when they
actually did not" and that it "unnecessarily admitted patients or unnecessarily detained them" so
it could bill insurers. The facility, plagued by several lawsuits alleging episodes of violence and
abuse, ultimately closed for good in January 2016.

46. Significantly, in response to the *qui tam* lawsuits, UHS downplayed that there
were any serious issues, or that they reflected any problems with the Company's business
practices. Indeed, as set forth below, when sophisticated market participants raised questions

about the actions, the Company dismissed them as merely "sporadic" complaints at a "small minority" of facilities, and noted that any issues were "always remedied."

### 2. CTW Writes Letters to UHS's Board Raising Red Flags About the Behavioral Division's Admission Practices

47.     On April 8, 2014, Change to Win Investment Group ("CTW")—a federation of unions representing nearly 5.5 million members that works with pension funds to hold publicly traded companies accountable for corporate fraud and abuses—sent a letter to UHS's Board raising serious questions about the Behavioral Division's admissions practices, based on its independent analysis of Company-wide data.

48.     Specifically, the letter stated that CTW's "independent analysis of Medicare data" showed that "UHS free-standing inpatient psychiatric facilities ('IPFs') <u>utilize the suicide ideation code</u>"—a code that justifies admitting or detaining patients in psychiatric facilities against their will—"<u>much more frequently than other free-standing IPFs</u>."  The letter explained that "following UHS's acquisition of [PSI][1] in 2010, <u>the former PSI facilities experienced a dramatic increase in their utilization of the suicide ideation code</u>."  This increase was statistically significant, from below the average for non-UHS facilities to many times that average after the UHS acquisition.  The letter included the following graph illustrating this data:

---

[1] "PSI" refers to Psychiatric Solutions, Inc., which is "the largest standalone operator of freestanding psychiatric inpatient facilities with 94 facilities in 32 states, Puerto Rico, and the U.S. Virgin Islands."  *See* http://ir.uhsinc.com/phoenix.zhtml?c=105817&p=irol-newsArticle&ID=1496680.



49.     The letter also included additional graphs showing that for fiscal year 2010 (before PSI was acquired by UHS), only 7 of PSI's facilities had suicidal ideation rates above the 80th percentile nationally, "which is the level identified by the OIG as indicating a significant outlier at risk of billing errors."   In contrast, after the acquisition, by 2012, <u>71% of former PSI facilities</u>—or 37 out of 52—had suicidal ideation rates above the national 80th percentile level:





50.     CTW further commented that "this pattern of extremely high suicidal ideation rates is particularly troubling because it <u>seems consistent with allegations made by a former UHS doctor in 2010</u>," referencing the *qui tam* lawsuit filed against the Company by Dr. Klotz alleging that: "UHS 'falsely and fraudulently coded patients as suicidal, when the chart did not reflect a likelihood of patient suicide.'"

51.     CTW called for, among other things, a separate compliance committee to oversee compliance issues and quality of care at the Company (a task that was currently housed within the Board's Audit Committee). CTW also noted that "[d]espite having a substantial share of its facilities above the 'red flag' 80th percentile for suicidal ideation diagnoses . . . and despite a steadily intensifying investigation by federal authorities, UHS's board has not disclosed any efforts by itself or the Audit Committee to determine if UHS's unusually high level of suicidal ideation diagnoses . . . may be generating excessive regulatory compliance risks for the company and its long-term shareholders."

52.     In response to CTW's letter, precisely as UHS had done in response to the various *qui tam* lawsuits and the federal investigations, the Company dismissed any claims that it was involved in wrongdoing. UHS responded to CTW by asserting that CTW's "analysis of UHS

billing practices did not imply any significant, unaddressed risks going forward, and that the creation of a separate, dedicated compliance committee was unnecessary." UHS further insisted that the compliance issues CTW had identified were "sporadic," occurred only in a "minority of our facilities," and that "[w]hile a small minority of our facilities may encounter sporadic regulatory compliance issues, those matters are always remedied." UHS further claimed it had "never had a facility lose its license or Medicare/Medicaid certification"—even though, as CTW pointed out, UHS had disclosed earlier that month that River Point's Medicare and Medicaid payments were suspended by CMS.

> **3.** **UHS's Psychiatric Facilities Become the Subject of Escalating Federal Civil and Criminal Investigations, Which Defendants Dismiss and Downplay**

53. Despite UHS's assurances that the Company did not engage in unlawful practices, in 2013, the United States government began to investigate several of UHS's facilities. UHS disclosed in its 2013 Form 10-K that the Office of the Inspector General ("OIG") had issued subpoenas to fifteen of UHS's behavioral health facilities operating in several different states, certain of which the DOJ Civil Division and other state authorities were also investigating.

54. This investigation subsequently expanded in scope to include both a federal civil and <u>criminal</u> investigation. As UHS disclosed in its 2014 Form 10-K filed on February 26, 2015, UHS was advised in October 2013 that the DOJ's Criminal Frauds Section, upon receiving a referral from the DOJ Civil Division, <u>had opened a criminal investigation</u> of two UHS facilities. In February 2014, the DOJ Criminal Frauds Section expanded this investigation to include a third UHS facility. UHS also disclosed that, in April 2014, one of the three facilities under federal criminal investigation—River Point Behavioral Health in Florida—had its payments suspended by Medicare and Medicaid (a suspension that would persist throughout the Class Period). Tellingly, however, even while disclosing the existence of the investigation, UHS

provided a barebones, cryptic explanation of its subject, stating only that: "The DOJ has advised us that the civil aspect of the coordinated investigation in connection with the behavioral facilities named above is a False Claims Act investigation focused on billings submitted to government payers in relation to services provided at those facilities."

55.     On March 31, 2015, one month into the Class Period, UHS filed a Form 8-K with the SEC disclosing that the DOJ's pending criminal investigation had again expanded— significantly, ***to encompass the UHS corporate entity itself***.  Specifically, UHS disclosed that it had been notified that "the investigation conducted by the [DOJ] Criminal Frauds Section had been expanded to include UHS as a corporate entity arising out of the coordinated investigation of the facilities described above and, in particular, Hartgrove Hospital"—*i.e.*, the same hospital at which the 2011 UIC investigation had discovered numerous intentional unethical and unlawful practices by UHS at the expense of patient care in order to maximize its profit margins.  UHS also revealed that the coordinated federal criminal and civil investigation now included at least 25 of its 200 behavioral health facilities in the United States—or approximately 12.5% of its facilities nationwide—located in nine different states that spanned the country.  Specifically, UHS disclosed that the investigation included:

  a.     Central Florida Behavioral Hospital (Florida)

  b.     National Deaf Academy (Florida)

  c.     River Point Behavioral Health (Florida)

  d.     University Behavioral Health (Florida)

  e.     Wekiva Springs (Florida)

  f.     Coastal Harbor Treatment Center (Georgia)

  g.     St. Simons by the Sea (Georgia)

h.      Turning Point Care Center (Georgia)

i.      Hartgrove Hospital (Illinois)

j.      Riveredge Hospital (Illinois)

k.      River Rock Academy and Residential Treatment Center (Illinois)

l.      Streamwood Behavioral Health (Illinois)

m.      Arbour Hospital (Massachusetts)

n.      Arbour-Fuller Hospital (Massachusetts)

o.      Arbour-HRI Hospital (Massachusetts)

p.      Pembroke Hospital (Massachusetts)

q.      Westwood Lodge (Massachusetts)

r.      Keys of Carolina (North Carolina)

s.      Old Vineyard Behavioral Health (North Carolina)

t.      Friends Hospital (Pennsylvania)

u.      Roxbury Treatment Center (Pennsylvania)

v.      Behavioral Hospital of Bellaire (Texas)

w.      Salt Lake Behavioral Health (Utah)

x.      Harbor Point Behavioral Hospital Health Center (Virginia) (f/k/a The Pines Residential Treatment Center, including the Crawford, Brighton and Kempsville campuses).

56.     In response to the federal investigations, UHS again downplayed any concerns, and emphatically assured investors that UHS operated in accordance with the law, with the "highest standards" possible, and that the investigation would not in any way impact the Company's business practices.  Thus, for example, at the May 13, 2015 Bank of America Merrill

Lynch Healthcare Conference, Defendant Filton confirmed that the expansion of the federal criminal investigation was not having any impact on the Behavioral Division's business, stating that "we've changed our practices very little," and that UHS was at all times "making sure that patients meet criteria" for admission and treatment.

57.     Defendants' assurances had the intended effect.  For example, UBS expressed confidence in the Company's representations, stating UHS's "[p]sych results remain solid despite ongoing investigations."  The report also cited the Behavioral Division's strong revenues in noting that "ongoing gov't inquiries over the past two years [are] still having little impact on day-to-day ops."

58.     As a result of the events described above, at the outset of the Class Period, Defendants knew that (i) based on investigations by independent entities, numerous UHS facilities across the country were allegedly engaging in a chronic practice of overfilling, and deliberately understaffing, psychiatric facilities in order to maximize the Company's profits; (ii) a number of *qui tam* lawsuits had been filed against UHS with regard to facilities in different states across the country, each alleging that the Company was engaged in a fraudulent practice of manipulating patients' symptoms to admit them even if they did not need inpatient psychiatric care, and detaining them for longer than medically necessary in order to maximize insurance reimbursements; (iii) the DOJ's coordinated civil and criminal investigation of UHS's facilities, which pertained to its billing practices, was intensifying, growing in both its breadth and severity; and (iv) that CTW, a sophisticated investor organization that works with institutional investors, had raised several serious questions regarding the Company's billing practices based on independent analyses of Company-wide data—and specifically, UHS's unusually excessive

and dramatically high use of the suicide ideation code, which permitted UHS to admit, and detain, patients against their will.

59.     However, during the Class Period, Defendants made no mention of any of the Behavioral Division's widespread improper and unethical practices.  Instead, Defendants urged investors to focus on the Behavioral Division's high and steady occupancy levels, its rising inpatient admission metrics, its stable length of stay metric, and its increasing revenues—all of which Defendants falsely claimed were driven by burgeoning demand for UHS's psychiatric services.  These statements were false.  As would be revealed by the end of the Class Period, Defendants were artificially and fraudulently manufacturing the Behavioral Division's high occupancy levels and so-called "demand" for its psychiatric services through an illicit scheme to admit as many insured patients as it could into its inpatient facilities regardless of whether they met the clinical criteria for admission, locking them in until their insurance payments ran out, while deliberately, and grossly, understaffing those facilities in order to maximize their returns from the scheme.

**B.      Throughout the Class Period, Defendants Misled Investors By Repeatedly Touting the Behavioral Division's High Occupancy Levels, Length of Stay, and Other Key Metrics, Claiming They Were Attributable to Burgeoning Demand for its Psychiatric Services**

60.     Both before and during the Class Period, UHS touted the Behavioral Division as exhibiting "very steady, very reliable" revenue growth, amounting to approximately 5%-6% or more every year.  UHS told investors that its dual segment model (*i.e.*, its separate acute and behavioral lines of business)—and particularly, the significant contribution to its revenues of the steadily thriving Behavioral Division—differentiated it from its peers in the hospital industry, who were far more susceptible to the "economically sensitive" acute care business.  As Defendant Filton stated to investors during a May 6, 2015 investor conference:

[The U.S. Behavioral business] has been, as you know and anyone who follows the company or the industry knows, a very steadily reliably performing business for a number of years now, including during a very difficult period through the recession when healthcare services in general I think were under great pressure both from a volume and a payer mix perspective. The behavioral business, and our Behavioral business in particular, really tended to be largely immune from those two very significant headwinds that troubled a lot of others in the healthcare services industry.

61.     Accordingly, throughout the Class Period, Defendants repeatedly boasted that the Behavioral Division had a solid ten-year track record of maintaining occupancy rates in its inpatient psychiatric facilities at or above 75%, which Defendants claimed was the "ideal" occupancy level for maximum capacity and maximum profitability. Defendants assured investors that the Behavioral Division would continue to steadily maintain those high occupancy levels—despite UHS's aggressive acquisition of new psychiatric facilities, and its aggressive addition of new beds to its existing facilities—because of burgeoning demand for its psychiatric services.

62.     For example, at an investor conference on March 11, 2015, Defendant Miller described the Behavioral Division's 75% occupancy level as a "key statistic" that demonstrated to investors that the business was "solid":

[T]his is obviously one of the key statistics, the occupancy rates are . . . at 75%. So with high occupancy, continued growth—and you'll see some of the slides later where we have been building additional beds every place we can and we have a lot of demand within our own network. 75% is pretty high and with low bad debt, high occupancy, great need for mental health services in the future, it's quite a solid business and we have been pretty much a pioneer in it.

63.     Defendants further emphasized that the Behavioral Division's ability to maintain occupancy levels at or above 75% was the result of increasing demand for UHS's inpatient psychiatric care—demand that was rising so rapidly, the Company could hardly keep up with it, no matter how many beds it added or how fast it added them. For example, at a May 6, 2015 conference, Defendant Filton stated:

We continue to operate at relatively high occupancy rates in our Behavioral business, in the high 70%s, 77%, 78% pretty consistently, despite the fact that we're adding beds at the rate certainly in the last year or two at about 500 or 600 new beds a year.  Honestly, if we could snap our fingers or I could snap my fingers, we'd probably add another couple of thousand beds tomorrow.  We think there is that much demand.

64.     Importantly, patients could be admitted into one of UHS's psychiatric facilities only if they met one of three clinical criteria:  they were deemed a danger to themselves (*i.e.*, suicidal), a danger to someone else, or gravely disabled.  Thus, when Defendants spoke of burgeoning "demand" for UHS's inpatient psychiatric services, they were referring to a purported overabundance of patients who had "appropriate insurance" and who met the medical criteria necessary for admission and treatment.

65.     To emphasize just how strong demand from this patient population was, Filton explained that the Company was not engaging in any marketing efforts to "drum up new patients"—it instead was struggling to keep up with already existing, "demonstrated demand" by patients who "meet clinical admission criteria."  Indeed, at a May 18, 2015 investor conference, Filton claimed that the level of demand for UHS's psychiatric services was so strong that the Company was routinely forced to "turn[] away a measurable number of patients" who "meet clinical admission criteria":

I think what it demonstrates is that we're filling the beds that we're adding pretty much at the same pace as we're adding them . . . And despite the fact that we're adding beds, despite the fact that our capacity and our occupancy numbers are high, we still, by our own measures, are turning away a measurable number of patients.  ***And these are patients who meet clinical admission criteria*** . . . They have appropriate insurance and we simply, in a particular day, et cetera, that they present for admission, don't have space for them in a facility or in the facility that they presented to.  So we think the demand is still there.

66.     Defendants maintained their story of burgeoning demand for UHS's inpatient psychiatric services throughout the Class Period.  For instance, Filton continued to tout the

Behavioral Division's steadily high occupancy rates—which, true to Defendants' story, had remained above the 75% threshold—on the Company's April 28, 2016 earnings call:

> [Y]ou will see that our occupancy percentage in the behavioral business in that sort of high-70%, 76%, 77% range, has really been very consistent, I would say, for the last seven years or eight years. And what that means is that during that period, we've been adding beds fairly aggressively. And, obviously, the implication is we are filling those beds as quickly as we're adding them and maintaining our occupancy percentage. The reason we're adding beds with a 76% occupancy level is because in markets and in situations, we're clearly turning away patients because of volume constraints. And the economics of it are such that after you turn away more than just a handful of patients, it almost always makes sense to add beds. And so we continue to do that . . . I think we think that the overall demand for behavioral has been strong, continues to be strong. We're going to add beds to meet that.

67. However, Defendants' statements were false. Indeed, rather than "turning away" patients that "me[t] clinical admission criteria," Defendants were doing the exact opposite: admitting as many insured patients into UHS's psychiatric facilities as they could, regardless of whether those patients met clinical admission criteria, and fraudulently detaining them until their insurance payments ran out, regardless of medical necessity.

### 1. Defendants' Scheme Artificially Inflated A Crucial Metric for the Behavioral Division: Patients' Average Length of Stay

68. Another key metric tracked by Defendants and investors that was critically important to the Behavioral Division's business was the "average length of stay," or the average number of days patients spent at UHS's inpatient psychiatric facilities. This was a crucial metric because the longer patients' average length of stay in UHS's facilities, the stronger the Company's occupancy levels, and the higher UHS's net revenue per inpatient admission. Indeed, at the November 13, 2013 Credit Suisse Healthcare Conference, Defendant Filton specifically highlighted the importance of this metric, stating: "95%-plus of our reimbursement in the behavioral space is on a per-diem basis, that is, payers pay us for the number of days that a

patient is in the facility.  And obviously if they spend less days in a facility, then we're going to be paid less for a single admission."

69.     During the Class Period, Defendants highlighted to investors that while in prior years the Behavioral Division had experienced pressure on its average length of stay, by 2015, the metric was stabilizing, bolstering the business' revenue growth.  For example, at a May 13, 2015 conference, Defendant Filton explained the significant upside for the Behavioral Division if the average length of stay metric were to level out, asserting to investors that the Behavioral Division realizing this upside was a matter of "when" and not "if":

> [W]hatever point that length of stay dynamic levels off, that's a pretty significant pickup just in terms of leveling off, because if you look at it, our Behavioral admissions have been growing on average somewhere in the 6% to 7% range, and our Behavioral patient days have been growing only like 1% to 2%, and the gap between those two metrics is the effective compression of the amount of time that patients spend in the hospital once they're admitted.  So if that length of stay levels off then in theory our revenue should pick up by 300 basis points to 400 basis points just from the continued growth in our admissions.  So that's a fairly significant tailwind that at least as we think about it is more just a function of predicting it's timing and it's more of an – when something happens as opposed to if.

70.     Coincidentally, only a month after Defendant Filton made these statements to investors, the Behavioral Division's average length of stay began to level out.  As Defendant Filton stated at a June 18, 2015 conference:

> I think in Q4 of last year and Q1 of this year, our behavioral revenue growth has crept up some and exceeded, I think, 6% in both of those periods.  And I think the improvement is a by-product of a stabilization to some degree of that length of stay pressure . . .

71.     In fact, as shown below, the Behavioral Division's publicly-reported average length of stay "leveled off" by the third quarter of 2015, and then remained remarkably stable quarter after quarter for the next eighteen months.

| Quarter | Average Length of Stay ("ALOS") | ALOS for the Same Quarter the Prior Year (Same Facility) |
|---------|--------------------------------|----------------------------------------------------------|
| Q1 2015 | 12.4 days | 12.8 days |
| Q2 2015 | 12.5 days | 12.9 days |
| Q3 2015 | 12.5 days | 12.5 days |
| Q4 2015 | 13.2 days | 13.2 days |
| Q1 2016 | 12.7 days | 12.7 days |
| Q2 2016 | 12.8 days | 12.8 days |
| Q3 2016 | 12.9 days | 12.9 days |
| Q4 2016 | 13.4 days | 13.5 days |

72. Defendants' reported stability in this metric was, however, false and misleading. Patients' "average length of stay" in UHS facilities was remarkably stable not because of high demand for longer stays in inpatient psychiatric facilities, or because patients met clinical criteria for longer stays, but as a direct result of Defendants' illicit scheme. Indeed, a key part of Defendants' scheme was that, once UHS facilities had coaxed insured patients through their doors, the facilities would manipulate—or even fabricate—patients' symptoms to justify detaining them until their insurance reimbursements ran out. Indeed, as numerous former UHS employees stated, the Company's mantra was "Don't leave days on the table." Thus, at the same time Defendants were prominently reporting the Behavioral Division's stable average length of stay as a marker of the business' success, they were fraudulently inflating that metric by engaging in unlawful acts toward UHS's vulnerable patient population.

### 2. Defendants Consistently Tracked, Reported, and Artificially Inflated Other Key Metrics Pertaining to UHS's Occupancy Levels

73. The Behavioral Division's occupancy rate was so critical to its business that Defendants also tracked, and highlighted to investors, other key metrics (on a same facility basis)

that directly bore on its occupancy levels, and how profitable they would be. These metrics included (i) adjusted inpatient admissions, *i.e.*, how many patients were admitted into UHS's psychiatric facilities; (ii) net revenue per adjusted inpatient admission; (iii) the aggregate number of patient days spent in UHS's inpatient facilities ("adjusted patient days"); and (iii) net revenue per adjusted patient day.

74. True to Defendants' narrative about the "very steady, very reliably" performing Behavioral Division, as shown in the chart below (showing these metrics, as tracked and reported by the Company, on a same-facility basis), Defendants consistently reported steady increases in each of these metrics virtually every quarter (as compared to the same quarter the prior year) during the Class Period.

| Period | Adjusted Inpatient Admissions | Net Revenue Per Adjusted Inpatient Admission | Adjusted Patient Days | Net Revenue Per Adjusted Patient Day | Net Revenues |
|--------|------|------|------|------|------|
| Q1 2015 | +6% | +0.4% | +2.6% | +3.7% | +6% |
| Q2 2015 | +4.2% | +0.5% | +0.6% | +4.1% | +5% |
| Q3 2015 | +1.6% | +3.1% | +1.6% | +3.1% | +5% |
| FY 2015 | +2.9% | +1.8% | +1.2% | +3.4% | +5% |
| Q1 2016 | +1.4% | +1.8% | +1% | +2.2% | +4% |
| Q2 2016 | -0.3% | +2.4% | +0.2% | +1.9% | +2% |
| Q3 2016 | +1.3% | +1.2% | +1.1% | +1.5% | +2.7% |
| FY 2016 | +1% | +1.4% | +0.9% | +1.5% | +3% |

75. UHS also highlighted the steady increases in these metrics in its annual results, citing them as key drivers of the significant growth in its huge revenues. However, the Behavioral Division's steadily-increasing adjusted inpatient admissions, adjusted patient days, and net revenue per adjusted patient day—resulting in high occupancy levels and steadily increasing revenues—were not attributable to consistent, burgeoning demand for the Behavioral Division's psychiatric services, as Defendants had repeatedly claimed to investors. They were

instead artificially inflated by Defendants' illicit admissions practices and chronic understaffing of facilities nationwide, all in order to maximize their returns by any means necessary.

## VI.  THE TRUTH EMERGES

### A.  The December 7, 2016 *BuzzFeed* Investigative Report Exposes Defendants' Illicit Admissions Scheme

76.  On December 7, 2016, BuzzFeed published a more than 30-page long exposé entitled "Intake:  Locked on the Psych Ward," which profiled the widespread unlawful and unethical practices in UHS's psychiatric facilities.  BuzzFeed is a digital media leader that, in recent years, has become known for its investigative reporting, led by a dedicated team that includes six Pulitzer Prize winners.  BuzzFeed's report was the result of an extensive yearlong investigation of UHS facilities across the country.  The investigation was based on "interviews with 175 current and former UHS staff, <u>including 18 executives who ran UHS hospitals</u>," and "more than 120 additional interviews with patients, government investigators, and other experts; and a cache of internal documents."

77.  What BuzzFeed's investigation revealed was shocking.  Specifically, the report detailed (i) UHS's unethical practice of manipulating patients' statements and symptoms in order to label them as suicidal or dangerous, justifying their involuntary admission and detention; (ii) the Company's improper actions to lengthen patients' lengths of stay so as to not leave any "days on the table" with respect to insurance reimbursement, including by manufacturing symptoms; and (iii) UHS's habitual, and intentional, understaffing of its facilities across the country in order to maximize Defendants' returns from the scheme.

78.  Significantly, the report made clear, and specifically showed, that UHS's practices were not "sporadic," isolated instances that occurred only in a "small minority of [its]

facilities." They were instead ongoing, widespread, and pervasive Company-wide practices that were directed by the highest levels of UHS's corporate management.

### 1. UHS Manipulated and Fabricated Patient Symptoms in Order to Institutionalize Patients

79.     In its December 2016 report, BuzzFeed described how UHS had developed a business model in which it would "turn[] patients into profits" by "lock[ing] them in[,] [b]ill[ing] their insurer[,] [then] kick[ing] them out." Among the main tactics UHS utilized was advertising "free mental health assessments" over the phone, designed to get patients through its doors—and then lock them in by any means necessary. The article made clear that UHS knew about, and encouraged, this conduct, detailing how "<u>UHS tracked . . . each facility's 'conversion rate': the percentage of callers who actually came in for psychiatric assessments, then the percentage of those people who became inpatients</u>." As Karen Ellis, a former counselor at Salt Lake Behavioral in Utah, commented to BuzzFeed: "They keep track of our numbers as if we were car salesmen." Other former admissions and clinical staff told BuzzFeed that they were "under pressure to admit not just [patients who needed treatment], but almost anyone who had insurance—especially when there were open beds."

80.     In order to "lock patients in," UHS facilities would do so literally. As explained to BuzzFeed by Lauren Singer, a former employee at Highlands Behavioral in Colorado: "If someone came in voluntarily, <u>I wasn't allowed to let them out of the door</u>." UHS would then "assess" the patient, which in practice meant coaxing the patient into stating that he or she had suicidal thoughts (which was one of the three criteria UHS could use to justify admission, whether voluntary or not). Another former UHS admissions employee echoed Singer's statement, stating to BuzzFeed that "[t]he goal when you're on the phone with someone is to

always get them into the facility within 24 hours" and "the reason for getting them into the facility is that once they stepped foot in, they are behind locked doors."

81.    For example, the BuzzFeed report described the case of a young accountant named Allison who called Centennial Peaks Hospital in Colorado to inquire about outpatient treatment options. However, the facility told Allison that in order to learn about those options, she had to come into the facility for an assessment. While there, the counselor insisted upon completing a formal evaluation of Allison, pressing her about whether she had thought about suicide in the last 72 hours. When Allison responded that she had had some depressive thoughts earlier in the week that had since passed, "the counselor told Allison they were going to hold her against her will." According to BuzzFeed, the counselor's evaluation stated: "Patient reported thoughts of suicidal ideation within the last 72 hours, thus she was admitted."

82.    This was a common practice across UHS facilities. According to BuzzFeed, UHS admissions workers learned how to "turn even passing statements that people made during assessments into something that sounded dangerous." For example, according to a former clinician at Salt Lake Behavioral interviewed by BuzzFeed, "intake assessments might start with the straightforward question: 'Have you ever thought about suicide?'," followed by the far more leading question: "If you had a plan, how would you do it?" As BuzzFeed noted, "[a]lmost any answer could then be recorded as a plan." BuzzFeed stated that this was what happened to Allison, as the counselor who evaluated her noted that "OD on pills" was "always her plan," but "Allison told [BuzzFeed] she mentioned pills during the assessment only to describe some of the brief thoughts she sometimes had—not anything close to an actual plan." BuzzFeed reported that when Allison was discharged, "the doctor stated, 'During the initial two days of hospitalization it was clear that [Allison] had no intent or plan of wanting to harm herself.'"

83.     Former UHS admission worker Lacey Wilkinson (who worked in the admissions department at Millwood in Texas) explained to BuzzFeed that "suicidal ideation could justify almost any admission," and so it was "one of those go-to formulas" that would ensure "everything gets paid for."  In the case of Samantha Trimble, even after she requested to be let go—and called the local police, who agreed Trimble was not a danger to herself or others, and that her rights were being violated—Millwood did not release her.  When it ultimately did release her the following day, the doctor who discharged her noted that there was "no reason to hold Trimble against her will, because she was not suicidal or homicidal."  Trimble subsequently sued UHS for negligence and false imprisonment.

84.     BuzzFeed's report also echoed CTW's findings sent to UHS's board in 2014 that, based on an analysis of UHS Medicare claims from 2009 forward, "UHS hospitals steadily increased the frequency with which they described patients as experiencing suicidal ideation," and "[b]y 2013, the code for suicidal ideation appeared in more than half of all of the Medicare claims submitted by UHS hospitals"—"four and a half times the rate for all non-UHS psychiatric hospitals."  The BuzzFeed article also stated that in the first year after UHS acquired 100 psychiatric hospitals from PSI, "[PSI's] use of the billing code for suicidal ideation in Medicare claims shot way up—more than sixfold overall."  According to a billing manager at a PSI facility interviewed by BuzzFeed, after UHS bought the facility, her superiors wanted employees to "build the severity level as much as we could" because "[i]f you're suicidal, a threat to yourself, you're more acute, and it would better support admission."

85.     BuzzFeed provided the following graph illustrating the increase in the use of the suicide ideation code across UHS facilities, and in PSI facilities after UHS bought PSI:



**2. "Don't Leave Days On The Table": UHS Directs Facilities To Keep Patients Admitted For As Long As Their Insurance Will Pay**

86. The BuzzFeed report also revealed that, as part of the illicit admissions scheme, "[t]wo dozen current and former employees from 14 UHS facilities across the country told [BuzzFeed] that the rule was to keep patients until their insurance ran out in order to get the maximum payment." The article made clear that the allegations came not from low-level employees, but from some of the Company's most senior employees, including numerous hospital heads. As BuzzFeed reported, "[t]hree former heads of UHS hospitals claimed their divisional vice president, Sharon Worsham, repeated a mantra: 'Don't leave days on the table'—meaning UHS employees were ordered not to discharge a patient before the number of days authorized by their insurer for reimbursement had run out.

87.     Rick Buckelew, a former CEO of a UHS facility in Texas, told BuzzFeed that it was "common practice" that "[i]f an insurance company gave you so many days, you were expected to keep the patient there that many days." This practice was widespread across UHS's facilities. The BuzzFeed report stated that "[e]mployees of UHS hospitals from Utah to Pennsylvania said this message trickled down to staff and doctors through 'flash' meetings," the primary purpose of which was, according to more than 20 executives and managers who attended those meetings in 12 states, "to review how many [insurance-approved] days [patients] have and to try to use up those days." The managers leading these meetings would demand explanations for any "early discharge" if patients "still ha[d] days left."

88.     BuzzFeed also obtained internal UHS documents that directly corroborated the accounts of these senior employees. For example, BuzzFeed obtained a 2014 "strategic plan" from Paul Sexton, CEO of Highlands in Colorado. In that plan, Sexton stated that the hospital would "develop and implement a plan to increase average length of stay" in order to meet its financial goals, a strategy that was echoed by other executives BuzzFeed interviewed. Indeed, this strategy was openly utilized by River Point Behavioral in Florida (one of the entities subject to the DOJ Criminal Frauds Section investigation, and the one that had its Medicare and Medicaid payments suspended indefinitely in April 2014). According to BuzzFeed, the hospital's top executive, Gayle Eckerd, instituted ten days "as the 'guideline' for how long to keep patients," regardless of their condition. As BuzzFeed noted, ten days was coincidentally also "the length of time for which Medicare will pay the full daily rate without requiring the hospital to get approval." According to BuzzFeed, "Eckerd's efforts succeeded"—in the year she took over as CEO of the facility, the number of Medicare patients who stayed for ten days or more jumped from 37% to over 70%.

89.     Significantly, in its response to the BuzzFeed report, the Company did not deny that Eckerd had instituted this guideline.  Nor did UHS contend that Eckerd operated without the Company's knowledge in instituting this rule, or that Eckerd was in any way not authorized to act in this fashion.  To the contrary, UHS defended the practice as being beneficial for patients and in accordance with Company policy, *i.e.*, there was nothing wrong with automatically holding every single patient for a minimum of ten days, regardless of whether that was medically necessary.

90.     Hospital managers were expected to pass the message of "not leaving days on the table" along to doctors, who were to find any reason to justify a longer stay.  In a 2014 internal email BuzzFeed obtained from a high-ranking UHS executive, Division Vice President Susan Worsham, a Highlands staff psychiatrist stated he was "deeply disturbed about the efforts to extend length of stay," describing how "[d]octors are publicly shamed by asking them to justify discharging a patient 'early' before the end of their insurance authorization."  A former manager of Salt Lake Behavioral described patients' confusion at being kept longer than necessary, stating employees "were just encouraged to talk them into staying as long as insurance would cover"— including by using threats, such as threatening mothers "to call child protective services and have the patient's children removed from her care."

91.     The BuzzFeed report also described how UHS facilities would go as far as seeking court orders to increase patients' lengths of stay.  At River Point Behavioral in Florida, an unemployed veteran, Michael Pruitt, was brought to the facility under the Baker Act, which allows authorities in Florida to send someone for an involuntary psychiatric examination for up to 72 hours.  Although Pruitt repeatedly told River Point during the assessment that he was not suicidal, when the 72 hours were up, River Point did not release him.  It instead filed a court

petition to hold him longer, with the filing of the petition itself giving the hospital the legal right to detain him until he had a court hearing. Three former UHS therapists told BuzzFeed that filing these petitions "became standard practice" at UHS facilities, stating: "The rule of thumb is: If you come in under a Baker Act, we're going to file a petition, and then figure out what the days situation is" with the patient's insurance company. BuzzFeed's investigation showed that the year before UHS bought River Point, it filed only 238 petitions for involuntary commitment—four years later, that number had grown *by over 400%*, to 1,362.

### 3. UHS Deliberately and Dangerously Understaffed Its Facilities In Order To Increase Profit Margins

92. The December 2016 BuzzFeed report also revealed severe, and widespread, understaffing at UHS facilities, stating that "[s]everal people who ran UHS hospitals said corporate bosses pushed them to cut their hospitals' staff further and further each year, regardless of the impact on employees' safety or on their ability to care for the people being admitted." The article noted that numerous UHS facilities had been cited by federal regulators for understaffing, including UHS hospitals in Texas, Georgia, Florida, Louisiana, and Mississippi.

93. Nancy Smith, a former corporate director of clinical services at UHS, told BuzzFeed that the staffing at the UHS hospitals she supervised was so inadequate it was "almost criminal" and "so unsafe." Smith commented to BuzzFeed that the "focus on minimal, minimal staffing, at the same time that they kept talking quality, just seemed so hypocritical," causing her to retire.

94. Rebecca Palmer, who worked at a UHS facility in Kentucky, told BuzzFeed that "[i]f we didn't have beds, it doesn't matter – just go ahead and admit [patients] anyway." She described children "sleeping in the dayroom on rubber mats" and in the "seclusion rooms," which were supposed to contain patients who had become dangerous. Indeed, the BuzzFeed

article noted that in 2014, federal inspectors discovered that at River Point Behavioral in Florida, there were "more patients than beds. They discovered vinyl mattresses tucked in a closet and on the floors of some patient rooms."

95.     Doctors and other clinical staff told BuzzFeed that they "juggled such heavy caseloads that they met with patients for only a few minutes each time, not nearly enough time to properly evaluate people with challenging psychiatric conditions." Yet "pressure to admit more patients was so great" that "they did so even if the hospital was already at capacity, thinning resources even further."

96.     UHS's practice of understaffing led to woefully substandard care, and dangerous conditions, including patient deaths. The BuzzFeed article described the case of Carson Mangines, a 22-year old patient at Highlands Behavioral in Colorado who was admitted for his opiate addiction. After admission, a doctor prescribed him fentanyl, a synthetic, and far more potent, form of heroin. Mangines quickly became overmedicated, resulting in his death from acute fentanyl toxicity. Although the night staff was supposed to check on patients every fifteen minutes, when Mangines' body was found in the morning, he had been dead for hours. When police questioned the Highlands staff about the incident, they stated they were inadequately trained and that the facility was understaffed.

**B.     UHS's Stock Price Plummets In The Wake Of The *BuzzFeed* Article, But Defendants Emphatically Deny The Report's Findings and Assure Investors That the Accusations Have No Merit**

97.     After BuzzFeed published its December 7, 2016 investigative report revealing Defendants' fraudulent scheme, UHS's share price dropped precipitously, plummeting 12% in a single day and wiping out $1.5 billion in market capitalization. By the time the market closed, UHS shares of common stock were trading at $111.36 per share, a $15-per share decline.

98.     In response to BuzzFeed's report, Defendants emphatically rejected any claim that they were improperly admitting patients.  On December 8, 2016, the Company issued a press release asserting that BuzzFeed's story "miss[ed] the mark" and was an "inaccurate portrayal of UHS's behavioral health operations."   The same day, Defendant Filton spoke at an investor conference, stating "nothing about the fundamental trajectory of our business has changed," and dismissing the BuzzFeed report as "overly anecdotal."

99.     However, the BuzzFeed article immediately attracted the attention of senior members of Congress and regulators.  On December 9, 2016, Senator Charles Grassley (R., Iowa), the Chairman of the Senate Judiciary Committee, wrote a letter to the Department of Health and Human Services, requesting an update on the federal government's investigation of UHS, stating: "The pattern of conduct described by the [BuzzFeed article] paints a picture of greed and raises serious questions about patient safety."   The same day, Senator Elizabeth Warren (D., Mass.) commented to BuzzFeed:  "People seeking mental health services deserve high-quality treatment—not abuse at the hands of companies that are locking patients up to turn a profit and defraud taxpayers."   She added:  "The Department of Justice must put an end to these shameful practices for the safety of patients both here in Massachusetts and across the country."   Rep. Joe Kennedy III, of Massachusetts, echoed these statements, stating:   "The continued allegations of abuse, neglect, fraud and worse at UHS hospitals suggest a pattern of misconduct and harm to patients.  Stories from their patients and staff alike allude to an emphasis of profits over treatment and care."

100.     On December 14, 2016, BuzzFeed reported that UHS's stock fell another 7% as a result of the fallout from its exposé on the Company, wiping out a total of $2.4 billion in the Company's market capitalization in a single week.  Specifically, BuzzFeed explained that the

stock had fallen again because of a Raymond James report that downgraded UHS stock from "Outperform" to "Market Perform." Raymond James' rationale for doing so was "an escalation in events surrounding last week's *BuzzFeed* article." The report stated that "the entrance of the venerable Senator Grassley into the mix takes the political risk to a more dangerous level." Coupled with "the ongoing OIG investigation," the report concluded that "the risk-reward is no longer compelling."

101. Notwithstanding the fact that the federal criminal investigation of UHS was continuing to expand, throughout 2017, the Company continued to tell investors that the BuzzFeed article had no merit, and was having no impact on the Company's business. Thus, on March 1, 2017, when the Company announced its annual and fourth quarter results for 2016, Defendant Filton downplayed the impact of BuzzFeed's revelations to investors. Filton claimed "we see no material evidence that the BuzzFeed article has had an impact on us," and that there had not been any change in the Company's conversations with the government in connection with the ongoing federal criminal investigations:

> [W]e filed our 10-K last night, and if you read the legal disclosure section, you'll see that there's really no change to the disclosure there, which I think is an indication that our conversations with the government and the activity with the government has also not changed . . . in any measurable way since the BuzzFeed article came out.

102. Despite Defendants' denials, the BuzzFeed article had focused a spotlight on the Company's supposedly "ideal" occupancy rates and other length of stay and operational metrics. On March 28, 2017, CTW sent another letter to UHS's board, following up on concerns it had raised in its April 2014 letter. CTW referenced again the concerns it had raised regarding Company-wide data showing that "UHS free-standing inpatient psychiatric facilities do utilize the suicidal ideation code much more frequently tha[n] comparable facilities owned and operated by competitors." The letter stated: "With three years' worth of additional data available, we can

see that the trends we observed in 2014 have continued unabated. As we can see in Figure 1 [excerpted below], UHS freestanding psychiatric facilities have continued to admit patients under a suicidal ideation diagnosis much more frequently than its competitors."



103. CTW's March 2017 letter also provided a graph that wholly undermined UHS's November 23, 2016 response to allegations in the BuzzFeed report about its patients' lengths of stay. Specifically, UHS had misleadingly claimed in its response to BuzzFeed that UHS's "average LOS did not exceed the national average in any measured patient segment, including children, adolescents, adults, and older adults."

104. However, CTW's letter showed that UHS had failed to disclose that, if broken down by *length of stay* rather than by type of patient, UHS dwarfed its competitors in one key category: patients with lengths of stay of 6-12 days, *i.e.*, the typical length of stay for acute psychiatric patients, which were the most lucrative patients due to their higher paying commercial, TRICARE, or Medicare insurance. Specifically, the letter stated: "Figure 4 [excerpted below] compares the frequency of different lengths of stay in UHS facilities to other

privately operated free-standing psychiatric facilities, <u>and there appears to be a clear clustering of above average frequency at UHS for lengths of stay between 5 and 13 days</u>."



105. On April 21, 2017, CTW sent a letter to UHS shareholders advising them of these same points, and urging shareholders to not re-elect director Lawrence S. Gibbs. In the letter, CTW highlighted its findings regarding the suicidal ideation code:

> <u>UHS starkly diverges from its competitors in a number of its admission practices</u>. A former UHS psychiatrist has alleged in a pending quit tam lawsuit that UHS manipulates patient diagnosis and treatment decisions in order to increase admissions and maintain a high occupancy level. This psychiatrist specifically identified excessive use of the suicidal ideation or "suicidal thoughts" diagnosis… <u>Our analysis of Medicare claims data from 2006 to 2015 shows that in fact UHS facilities have admitted patients under a suicidal ideation diagnosis much more frequently than its competitors</u>. Moreover, the data indicate that following UHS' acquisition of [PSI] in 2010, the rates of suicidal ideation admissions from those facilities increased dramatically.

106. CTW also told shareholders that, despite UHS's response to BuzzFeed's report that its average length of stay metric was no different from that of its competitors, UHS's

facilities' patients with lengths of stay of between 6-12 days—which is, again, the typical length of stay for higher revenue acute psychiatric care, and, as CTW pointed out, the maximum length of stay before Medicare's reimbursement rates significantly drop—far exceeded the number of those patients at facilities owned by its competitors: "We find that lengths of stay at UHS facilities diverge sharply from industry averages – they have many fewer short or very long stays, but are <u>far above average in stays of 6-12 days, the maximum length of stay before Medicare's per diem rate declines sharply</u>."

### C.  In The Ensuing Months, The Truth Is Fully Revealed

107.   On April 11, 2017, BuzzFeed published another exposé on the Company—this time on the Shadow Mountain facility in Oklahoma.  This report detailed a riot that occurred at the facility between patients and staff in February 2015, which employees and regulators attributed to the Company's woefully inadequate staffing levels.  The report also "echoed the findings of BuzzFeed's December investigation" in that a former Shadow Mountain marketing director, Mari Samuelson, told BuzzFeed that "she got only one directive from [the facility's CEO]: '<u>Just fill the beds</u>.'"  As a result, the facility was known as "the trash can unit," because it was "where they threw whoever they wanted."  Samuelson also stated that the facility's CEO closely tracked how many patients each doctor was admitting, and that if a doctor's numbers fell, he would "really push the doctors" and "all of a sudden their numbers would go up."  Additionally, two psychiatrists at the facility claimed that "if the number of patients in the hospital dropped too low, then <u>there was special scrutiny around discharging patients before their insurance ran out</u>."

108.   On April 17, 2017—as a result of BuzzFeed's April 11, 2017 report on Shadow Mountain—BuzzFeed reported that Senator Grassley had called for a federal probe into the facility.  Citing "a pattern of conduct that is extremely concerning and casts a dark cloud over

UHS's ability to properly care for its patients," Senator Grassley asked the Department of Health and Human Services to report back to him on "what steps your office is taking to investigate UHS for the aforementioned abuses." Senator Grassley also asked the Joint Commission, an organization that accredits hospitals (and accolades from which UHS relied on to dispute allegations in BuzzFeed's December 2016 exposé), to explain how it came to award a "Gold Seal of Approval" to Shadow Mountain for the quality of its care. On May 11, 2017, the Joint Commission sent inspectors to Shadow Mountain in response to the senator's request, and issued it a "preliminary denial of accreditation." It told Senator Grassley that it had concluded that the facility posed an "immediate threat to life."[2] On the news of Senator Grassley's renewed involvement, UHS's stock dropped, from $122.00 on April 17 to $119.89 the following day.

109. With the Company's business practices under increased scrutiny, the federal civil and criminal investigations began to take their toll on the Company's profitability. Nevertheless, Defendants continued to deny any issues with UHS's business.

110. On April 25, 2017, the Company announced its first quarter results for 2017. For the first time in over a year, the Company reported a decline in the Behavioral Division's average length of stay of -2.2%, coupled with same-facility net revenue growth of only 1.4%. When asked why length of stay was declining after it had been remarkably stable for over a year, Defendant Filton downplayed the issue, stating it was not "indicative of a continuing trend." He otherwise suggested the decline was not unique to UHS, since "our public peer announced a similar decline." When analysts asked if there was anything new to report about the ongoing

---

[2] In the months since his initial letter, Grassley has issued additional letters criticizing both the response of UHS and the Joint Commission, and has requested additional actions regarding the Shadow Mountain facility, including as recently as a September 18, 2017 letter to the Joint Commission requesting details regarding the various problems identified at the Shadow Mountain facility.

federal criminal investigation, Filton stated: "[T]here's really nothing sort of a status update regarding the large government investigation. There's really nothing new there."

111. However, on May 23, 2017, BuzzFeed published an article revealing that the federal criminal investigation of UHS had expanded again, this time to include the FBI and the Department of Defense:

> BuzzFeed News has exclusively learned that the [federal criminal] investigation has since broadened to include the FBI and the Department of Defense, which is scrutinizing UHS's billings to TRICARE, the insurance plan for active military and their families.

112. The article also revealed that yet another UHS-owned facility, Brooke Glenn Behavioral in Pennsylvania, was engaging in the same unlawful practices BuzzFeed had described in its December 7, 2016 report:

> Two nurses from [Brooke Glen] said they had direct experience with the company holding patients longer than necessary to collect higher insurance payments. They recalled telling doctors that patients were safe to be discharged, but that the doctors would ask when their 'last covered day' was – the last day Medicare, Medicaid, or their private insurance would pay for – and discharge them then, regardless of their condition.

113. Brandi George, one of the nurses BuzzFeed interviewed who had worked at Brooke Glen for three years, stated doctors would alter nurses' notes on patients to explain the extended time. She stated: "They'll admit people just to fill a bed." The other nurse, Valerie Riling (who had worked at the facility for two years), stated: "If [patients are] on Medicare or Medicaid, they'll milk it."

114. Finally, BuzzFeed pointed out that while the Company had previously disclosed in its SEC filings the existence of the federal civil and criminal investigations by the OIG and the DOJ, and that the civil aspect of the investigation was about the False Claims Act, it had never "provided any details about the criminal investigation nor has it disclosed that the Department of Defense is among the agencies investigating the company."

115.    In response to this news, UHS's stock dropped an additional 2.3%, from $118.84 on May 23, 2017 to $116.06 at the close of trading on May 24.

116.    On July 25, 2017, in a press release issued after market close, and on an earnings call conducted the following morning, the Company was finally forced to admit the truth: namely, that the ongoing investigations and reports illuminating Defendants' misconduct had resulted in a dramatic and deleterious effect on UHS's revenues and earnings.  On this day, the Company reported its second quarter results.  For the second consecutive quarter, the Behavioral Division's average length of stay had declined, by -2.2%.  In turn, same-facility revenue growth was less than expected, at only 2.2% (a far cry from the Company's 5% target)—indicative of the revelation of UHS's illicit practices having a material effect on the Company's financial results.  As a result of the Company now having reported six months of disappointing results, it downgraded its guidance for the year.

117.    For the first time, Defendants admitted that this decline was not an isolated occurrence, or "fluke."  It was, instead, a developing "trend," and a direct result of "more aggressive behavior on the part of payers," including Medicaid and commercial payers, regarding the lengths of stay they were willing to authorize.  In other words, it was a direct result of payers getting wise to Defendants' fraudulent scheme to collect higher insurance reimbursements from them in the absence of medical necessity.  Significantly, Defendants also clarified that the length of stay decline was in the Company's acute psychiatric business—*i.e.*, the more lucrative 6-12 day stay patient population with higher paying insurance highlighted in CTW's letter—as opposed to its residential, and exclusively Medicaid, patient population.

118.    Defendant Filton admitted to investors that, in this new atmosphere, UHS was having difficulty holding patients any longer than what "was clinically appropriate":

I think that this is a push and pull sort of dynamic, the payers are always pressuring providers for, in our minds, the lowest possible length of stay and again, the ultimate decision, I think, comes down to a question of clinical appropriateness and certainly on our end, that's being made by a treating psychiatrist . . . Obviously, we suggested, or I suggested at the end of Q1 that we would hope to be able to potentially impact length of stay in Q2 <u>if it was clinically appropriate</u> and that really didn't happen.

119. With respect to the federal criminal investigation, Defendants informed investors that "the level of engagement with the government, the frequency and the scope of our conversations and contacts have increased over the last few months." Defendants then disclosed, *for the first time*, that the "crux" of the federal criminal investigation was exactly what BuzzFeed had reported nearly eight months earlier: Defendants' alleged illicit scheme to admit as many patients as it could into UHS's psychiatric facilities regardless of medical necessity, and lock them in until their insurance reimbursements ran out. Specifically, Defendant Filton stated:

[W]e believe that <u>the crux of the government's point of view was that patients were either inappropriately admitted or their length of stay was inappropriately longer than it needed to be</u>, or their clinical treatment was inappropriate. We, I think, have said from the outset that we didn't necessarily share the government's point of view at all . . . But that's the nature of these investigations . . . .

120. Investors therefore learned, for the first time, that despite the Company's repeated denials, and its failure to disclose any facts at all about the four-year federal criminal investigation (aside from its existence)—*which had expanded to include the UHS corporate entity itself*—this investigation had been focused all along on the exact widespread unethical and illegal conduct BuzzFeed's December 2016 exposé had described.

121. In response, the Company's stock plummeted over $10-per share, from $122.90 on July 25, 2017, to $112.88 on July 26.

122. Analysts reported that the Company's disappointing results were a direct result of the sudden and unexpected decline in the Behavioral Division's average length of stay metric. As a July 25, 2017 Deutsche Bank report stated: "The company lowered its full year 2017 EPS

guidance range by 2.5%—based on our discussion with management, weakness was largely, if not entirely, due to <u>continued length of stay pressure in the Behavioral Health segment</u>."

123. Similarly, on July 26, 2017, RBC reported that, for the Behavioral Division, "<u>LOS issue sinks quarter and full year</u>." The report stated:

> Today's sell-off reflected the market's anticipation of a solid quarter after fairly strong results through the first two months that clearly evaporated in the final month. That, combined with the relatively newer LOS issue, led to an 8% sell-off . . . [T]he unexpected pressure on length-of-stay in the acute psych business . . . was enough to cause a miss and guide-down.

124. A July 27, 2017 Leerink report also highlighted the Behavioral Division's sudden length of stay decline, stating: "[P]ayors are actively pressuring LOS which is slowing UHS's [Behavioral Health] recovery and a driver of the lower guidance. The company stated the LOS decline was . . . from more aggressive payor pressures in BH acute volumes."

125. Notably, Defendants did not admit, and to date still have not admitted, to engaging in, and orchestrating, the illicit admissions scheme itself. As of the filing of this complaint, the federal criminal and civil investigations—which, as set forth above, now include the FBI and the Department of Defense—remain ongoing.

## VII.     FORMER UHS EMPLOYEES INDEPENDENTLY CORROBORATE THE ACCOUNTS IN THE *BUZZFEED* REPORT

126. Numerous former UHS employees[3] of UHS facilities across the country have provided accounts that independently corroborate the details of Defendants' illicit scheme revealed by BuzzFeed's year-long investigation. They also confirm BuzzFeed's report that UHS's illicit practices were longstanding, ongoing, widespread, and directed by the highest levels of UHS corporate management.

---

[3] Former UHS employees are referred to herein as "FE __" and are referenced in the feminine form to maintain their confidentiality.

127.    Former UHS employees confirmed that UHS facilities engaged in widespread improper admission practices, misleading patients and fabricating symptoms to justify institutionalizing them.

128.    For instance, FE 1[4], a former Corporate Director of Clinical Services for UHS in Texas, Michigan, and Oklahoma, stated that UHS's "upper" level employees pressured hospitals to keep "census" numbers high (*i.e.*, the number of patients at the facility), and that there was a "big push" to keep the beds full.  FE 1 stated there was an "understanding" within the Company to engage in unethical practices in order to accomplish this goal.

129.    According to FE 2[5], a Masters-Level Clinician at Brynn Marr Hospital in North Carolina, the facility instilled "money, money, money" into employees' minds, and "basically brainwash[ed] us to have a business, as opposed to help[ing] people."  She further commented that UHS would "rip us a new one" if the "census"—meaning the number of patients at the facility—was not up to par.

130.    FE 3[6], an admissions worker at Highlands Behavioral in Colorado, stated that the intake staff was pressured constantly about volume and keeping the beds full, and that the CEO of the facility, Paul Sexton, "reminded [her] of a used car salesman" and would track the facility's numbers on a daily basis.

---

[4] FE 1 was a Corporate Director of Clinical Services for UHS, a corporate divisional level position, and was assigned to several facilities across Texas, Michigan and Oklahoma.  She worked for UHS for nearly two years before retiring, remaining at UHS for "as long as [she] could stand it."

[5] FE 2 worked at Brynn Marr Hospital, a UHS facility in North Carolina, as a Masters-Level Clinician in the admissions department, from May 2015 to August 2016.

[6] FE 3 was a former evening shift admissions worker at Highlands Behavioral Health System in Colorado from June 2014 to December 2014.

131. Various former UHS employees also stated that the Company closely tracked the "conversion rate," or the number of patient inquiries and assessments that were turned into admissions. FE 1 stated that every morning there were meetings during which there were discussions about how many assessments had been converted into admissions. FE 4[7], who managed the intake department at Springwoods Behavioral Health in Arkansas, also described a regional supervisor who regularly checked her "conversion rate."

132. A former Staffing Coordinator and House Supervisor at Shadow Mountain Behavioral Hospital in Oklahoma, FE 5[8], recalled that during a staff meeting, the facility's CEO, Mark Kistler, discussed a patient who had not been admitted to the facility. In response to an inquiry of "What if that patient went home and killed themselves?," Kistler commented: "First of all, what if we lost the money?" Another former employee who worked at Millwood Hospital in Texas, FE 6[9], stated that UHS would make "secret shopper" calls, which were rated for "asking [the patient] if they had insurance or not, getting them scheduled, getting them there."

133. Several former employees also independently corroborated UHS facilities' practice of "locking patients in." For example, FE 6 described that at Millwood, patients would be "locked in an eight-by-ten room with nothing" for the initial assessment. Patients would then "be bullied or scared into signing away [their] rights," or enticed to do so by being falsely told they could "sign out at any time" if they signed in voluntarily. Similarly, FE 3 recalled that "if

---

[7] FE 4 managed the intake department at Springwoods Behavioral Health in Arkansas for several years, from 2009 to 2014.

[8] FE 5 worked at Shadow Mountain Behavioral Hospital in Oklahoma as a Staffing Coordinator and House Supervisor from July 2013 to December 2016.

[9] FE 6 worked at Millwood Hospital in Texas in the admissions department from approximately 2013 to 2015.

someone wanted out, I wasn't allowed to let them out until they were evaluated by a clinician"—even if the patient had come to the facility voluntarily.

134.     In terms of the assessments themselves, former employees confirmed UHS's practice of manipulating patients' symptoms to make them seem suicidal or dangerous in order to justify admission.  For example, FE 5 stated that intake employees at Shadow Mountain in Oklahoma "could kind of control the conversation and get [patients] to say the magic word" that would require admission.  She said "if they could pry enough and make something into any reason" to admit the patient, they would do so, especially in acute care situations (*i.e.*, for patients that were often commercially insured and would yield higher revenues per day for UHS).  FE 5 described this practice as "<u>kind of like loading the gun and you're hoping that [the patient will] pull the trigger [and] justify your reason</u>" for institutionalizing them.  FE 5 stated this was "manipulation of the system" that could result in "great personal gain."

135.     FE 6 described similar procedures at Millwood in Texas, stating that "Larry" from UHS corporate would "coach" the staff on "<u>tactics for admitting people</u>."  She also stated that if a potential patient had an appointment but did not show up, facility employees were pressured to "go back and touch base" with the patient, as the facility's CEO was "obsessive about trying to get the patient to come in."

136.     Former UHS employees also described a tiered admission policy based on the patient's insurance (*i.e.*, on the rate of reimbursement).  For instance, FE 2 stated that at Brynn Mar Hospital in North Carolina, there "was a sheet in our office showing how much each insurance paid," and "that was our guide."  The sheet showed that while Medicare paid approximately $400 per day, a commercial insurer would pay double that rate at $800 per day, and TRICARE, the military insurer, would pay approximately $2,000 per day.  FE 2 stated the

hospital required its employees to admit TRICARE and commercially insured patients first. If the beds were "at a good number," employees were told to "push off" admitting Medicaid patients until the "very last minute" and wait for a TRICARE or commercially insured patient. According to FE 2, these practices went "straight up to UHS," and that they were well known throughout the corporate hierarchy.

137.     FE 3 described a similar guide sheet in the intake area at Highlands in Colorado showing each insurance company's daily reimbursement rates. She stated that Highlands' CEO told employees that the facility wanted "commercial payers" over Medicaid patients because commercial payers' reimbursements were better, stating this practice was "blatant all the time… oh, Medicaid patient, put that to the side."

138.     As for uninsured patients, FE 6 said that, at Millwood, she was instructed by her director and supervisor to give preference to insured patients, a directive that "came from corporate." Millwood would thus "weed out" patients without insurance. Although it was illegal to deny a transfer based on a patient's insurance, FE 6 indicated that staff would find another reason to deny the transfer, whether by drumming up a medical reason or stating that "the acuity is too high on the unit." She stated that with regard to uninsured patients that would call the facility about getting help, the staff was instructed to tell them about other resources, "anything to keep them from coming to our facility." She further said it was understood across the facility that you "deny, deny, deny" patients unless they had insurance.

139.     UHS former employees confirmed that the illicit admission practices were directed by UHS corporate. FE 6 attested that "everything that went on was organized by corporate, and the directors of the facility answered to corporate." She stated that UHS corporate would constantly pressure Millwood employees to increase the number of patients

being admitted, and that it was "<u>very much involved in the day to day activities of the facility</u>," making it "impossible to see how [corporate] wouldn't know" about the illicit admissions practices at UHS facilities across the United States.

140.    FE 7—who worked for UHS for five years and was the CEO of Austin Lakes Hospital in Texas from 2012 through 2014—also described how UHS corporate's office "tracked everything" through a number of electronic systems, including one known as "MS4." FE 7 stated that, through that system, corporate officers would routinely track several metrics pertaining to admissions, including the number of assessments that resulted in admissions (*i.e.*, the facility's "conversion rate"). FE 7 indicated that UHS corporate was so hands-on in its approach that its "<u>strict oversight and scrutiny</u>" created a paranoia that "<u>trickled all the way down to the floor staff</u>."

**B.    Former Employees Confirm That The "Don't Leave Days On The Table" Mantra Governed Admissions Practices At UHS Facilities Nationwide**

141.    The "don't leave days on the table" mantra was not an isolated directive. In fact, former UHS employees corroborated that the Company's admission practices abided by this edict in facilities across the country.

142.    For instance, FE 7, CEO of Austin Lakes Hospital in Texas, first heard the "days left on the table" mantra during a conference call with Sharon Worsham, the UHS Division Vice President mentioned in the BuzzFeed article. FE 7 explained that this was a metric closely tracked by UHS through "MS4," the electronic data system the UHS corporate office had continuous access to. FE 7 gave the example of an insurance company that initially approved five days at the facility for patients, but was known to give an extra four days after a utilization review (*i.e.*, after reviewing whether the patients' symptoms justified a longer stay). In that circumstance, at the outset, the Utilization and Review staff would enter nine insurance-approved

days into the MS4 system. If the patient was discharged after five days, UHS corporate would note that the facility was not utilizing the total number of insurance-approved days, *i.e.*, there were four days "left on the table." FE 7 emphasized that "[i]f an insurance company gave you so many days, you were expected to keep the patient there that many days."

143.     Numerous other former employees described the pressure from UHS to "not leave days on the table" with respect to discharging patients. For instance, FE 1 stated that UHS corporate directed employees to "maximize days" of patients' stays at UHS facilities, and not leave "days on the table," stressing that discharging a patient a day "early" would "eliminate a day of reimbursement." She described patients' discharge dates as being dictated by the number of days approved by their insurance—not their actual health condition. FE 1 stated that if there were "days on the table," the patient would stay at the facility.

144.     FE 2 stated that the UHS facility she had worked at would keep patients longer: "if they could keep them longer, they kept them." She stated "patients that honestly didn't need to be there" would be kept because "they looked good on paper," as the facility sought to "squeeze" a few more days out of patients even if they did not need any help. She also explained that commercially insured patients in particular were kept for a longer period of time, even though "they seemed perfectly stabilized." FE 2's general reaction to the BuzzFeed article was that it was "spot on: that's exactly what we did."

145.     FE 3 too stated she was familiar with the phrase "days left on the table," and described it as "how much of the visit is paid for or authorized by insurance." She stated that, at Highlands in Colorado, "[t]ypically, patients would stay for the number of days authorized by insurance," regardless of whether it was "medically necessary." In other words, the longer an insurance company would authorize, the longer the patient would stay at Highlands.

146.     FE 5 described how at Shadow Mountain, she could recall "hundreds of patients that were long overdue [for discharge], they should've been gone, but . . . <u>they're not dry yet</u>," referring to the amount of time at the facility the patient's insurance would cover.

147.     FE 8,[10] who managed the Utilization Review department at Salt Lake Behavioral, also recalled the "don't leave days on the table" directive, describing it as the number of days remaining that a patient was authorized by insurance to stay at the facility.  FE 8 stated that Nancy MacGregor, the facility's CFO, routinely encouraged the facility to keep patients longer than necessary.  She explained that if a patient was ready to be discharged after two days, but had been authorized for a four-day stay, she would get push back because there were two "days left on the table."  FE 8 also mentioned the daily "flash" meetings referenced in the BuzzFeed article, during which they discussed pending discharges and whether there were "days on the table."  FE 8 described the meetings as "census driven," and not about patient care.  FE 8 stated the CFO did not like more than two discharges per day because there were approximately two admissions per day, and she did not want the facility's numbers to decrease.

148.     Former UHS employees also detailed that the Company's facilities would not only manipulate patients' statements and symptoms in order to justify longer stays, in many cases they would *completely fabricate them.*

149.     For instance, according to FE 1, in order to "max out days," UHS employees were instructed to make patients seem sick—*i.e.*, document something negative.  She explained that, in the psychiatric setting, it is "<u>easy to muck around and play with symptomology</u>."  FE 1 also reported that, as part of her job duties, she would read "clinical notes."  When she compared those notes to the "criteria" for longer stays, she would find "huge" disconnects.

---

[10] FE 8 managed the Utilization Review department at Salt Lake Behavioral in Utah for nearly two years.

150.    FE 8 recalled an instance when MacGregor, the CFO at Salt Lake Behavioral, stated during a "flash" meeting that a patient needed to be depressed and then prescribed anti-depressants to "get two more days" out of the patient's stay at the facility.  FE 8 said MacGregor's instruction was direct, not subtle, and occurred during open discussion with others present.

151.    FE 9[11], who worked as a Mental Health Technician at Old Vineyard Behavioral in North Carolina, likewise said that staff would "almost trick" potential patients into saying things that could justify extra time at the hospital.  "They're being honest with their doctor and all of a sudden, they're put on for an extra few days."  FE 9 stated that the average length of stay at Old Vineyard was seven to ten days, and that staff would "try to give a clinical reason" to keep patients that long.

152.    FE 5 also confirmed BuzzFeed's reporting that UHS facilities would routinely obtain court orders to hold patients longer.  FE 5 said that adults were harder to hold than children or adolescents, because they have "more rights," but if someone did not want to be admitted, the facility "would just get a court order to hold them.  That was a common practice." When asked if she thought these involuntary holds were motivated by the patient's medical needs or by financial gain, FE 5 responded "financial all day."

153.    The former employees confirmed that detaining patients longer than medically necessary was widespread at UHS and directed by UHS corporate.  For example, FE 8 stated these practices were unquestionably implemented across UHS facilities nationwide, as other facilities' Utilization Review personnel were directed to come to Salt Lake Behavioral to learn

---

[11] FE 9 was a Mental Health Technician at Old Vineyard Behavioral Health in North Carolina from approximately June 2012 to August 2014.  She described her job as "being responsible for monitoring and keeping tabs" on patients.

about them from FE 8 because her facility's numbers were good. The former employees also uniformly stated that these practices originated from UHS corporate. As FE 8 explained, these practices "<u>definitely trickled down</u>" from the higher ups, who visited her facility periodically to review statistics pertaining to admissions and length of stay.

154.    FE 8 also stated that the CFO at her facility "was getting pressure from corporate monthly," describing monthly "over/under" meetings with UHS corporate, during which they discussed the number of days over or under a patient's insurance-authorized length of stay. FE 4, who ran the intake department at Springwoods Behavioral Health in Arkansas, also described constant pressure to keep up the census and not leave "days on the table," stating this pressure "would have come from corporate."

**C.    Former Employees Confirm The Company's Widespread and Intentional Understaffing of its Facilities**

155.    As BuzzFeed made clear in its detailed report, UHS also chronically understaffed its facilities to maximize profits. Once again, the facts show that UHS's most senior officers were well-aware of this deliberate understaffing throughout the Class Period.

156.    For instance, a March 25, 2015 letter from the Oklahoma Health Care Authority ("OHCA") stated that OHCA found chronic understaffing among nurses; violations of regulations requiring staffing ratios of one staff to eight patients overnight and one to six during the day—instead, Shadow Mountain had ratios of as poor as one employee for every 22 patients; insufficient staff coverage and experience; and multiple other issues. In November 2016, OHCA terminated the Medicaid contract for one of Shadow Mountain's campuses. The letter stated: "[E]ven after additional documentation was provided to OHCA, it was clear that Shadow Mountain was non-compliant with the minimum staffing requirements including multiple

instances where the proper ratio of staff to patients was not met and, most alarming, instances where acute units were left with no RN coverage for all or part of a shift."

157.    Other UHS facilities across the country received similar citations to Shadow Mountain during the Class Period.

  a) On April 22, 2015, CMS found that Timberlawn Mental Health System in Texas did not have adequate staff. "[T]he facility failed to provide adequate numbers of registered nurses and mental health workers on the Dual/Psychiatric Adult units to create and maintain a therapeutic mileu." As a result of continued noncompliance, CMS terminated the facility from the Medicare program in August 2015.

  b) On October 2, 2015, OHSA cited Pembroke Hospital, located outside of Boston, for hazardous conditions, stating "[e]mployees have been assaulted suffering bodily injuries while providing care to patients." The letter stated OHSA had logged 24 incidents in 2014, and 13 incidents in 2015. In the notes of the employee interviews, employees stated that "[s]ometimes there is only one [mental health technician] on overnight," and "[m]ore staffing may help." Another employee "reported she did not always feel safe because of staffing." Still another commented that "[w]eekends the place is barebones staffed with a census of 100 patients." OSHA thus recommended that the hospital "increase staffing levels on the acute units and other units where attacks are occurring." In December 2015, UHS disclosed that the DOJ investigation had been expanded to include UHS Massachusetts facilities, including Pembroke Hospital.

  c) On July 11, 2016, OSHA inspected Brooke Glen Behavioral Hospital in Pennsylvania. OSHA cited the hospital for a "serious" hazard, namely that RNs and mental health technicians, "during the course of deescalating aggressive patients or while trying to prevent patients from injuring themselves are exposed to serious physical injuries such as from bites, bruises or strains and sprains." OSHA noted that, among other things, the hospital needed to "[d]etermine the appropriate number of staff needed in each unit based on acuity of the workplace violence hazard to ensure a safe workplace" and "[e]nsure the staffing levels are met daily and on each shift." Notably, Brooke Glen was the facility from which BuzzFeed interviewed two nurses in its May 23, 2017 report on UHS, who stated that the facility was grossly understaffed and had a practice of admitting and detaining patients regardless of medical necessity.

158.    As these reports and regulatory citations demonstrate, UHS's chronic understaffing was not contained to any particular facility, or to any particular markets. It was,

instead, longstanding, widespread, ongoing, and an intentional strategy utilized by UHS to maximize its profits—and a strategy UHS *continued to engage in*, despite increasing public and regulatory scrutiny.

159.     Indeed, former UHS employees also confirmed that UHS understaffed and closely tracked the amount spent per occupied bed, including staff salaries, through the "MS4" database. UHS was therefore acutely aware of how staffing costs affected its profit margins, on a per-patient basis (focusing far less so, if at all, on whether its staffing levels were sufficient to provide adequate care to patients).

160.     Former UHS employees also described widespread instances of pronounced understaffing in order to maximize profits, to the point where staff and patients were placed in dangerous positions.  For instance, FE 9, the mental health technician at Old Vineyard in North Carolina, stated that her facility was often intentionally over capacity, with the expectation that a patient would vacate a bed often going unfulfilled.  She stated that, as a result, patients would have to sleep in the "Quiet Room," necessitating a drain on staff from other areas of the hospital (since the Quiet Room had a one-to-one staff-to-patient ratio mandate).

161.     According to FE 1, habitual understaffing was the biggest contributor to the poor quality of care at UHS facilities.  Her impression was that patients were being "warehoused" until the drugs kicked in, and then discharged.  She described the quality of care as "Walmart-level" treatment, "as minimal as you could get."

162.     FE 2 stated that, at Brynn Marr Hospital in North Carolina, "safety was an issue all the time," but patient safety was not the "goal," as "money and business" always came first. As an example, FE 2 said the facility would only have one clinician working in the middle of the

night.  FE 2 also stated that while federal law mandated that the facility maintain a certain level of RNs and doctors to patient, the facility did not meet this ratio.

163.    Several former employees also confirmed that, to the extent there was any shortage of psychiatric staff, it was due to a diminishing pool of psychiatric medical staff willing to work at UHS facilities as a result of its unethical practices.  For example, FE 2 stated that because Brynn Marr had no RNs that wanted to work there, it hired licensed vocational nurses instead and had RNs "sign off" for them.  FE 3 stated that, at Highlands, the "turnover of employees" was "huge because people were really unhappy, they didn't agree with what went on" with respect to the improper and unethical practices, "and they got fed up with it."  FE 10[12], a former Admissions Counselor at Salt Lake Behavioral, also described a high rate of turnover, particularly among the doctors, who complained that they felt pressure to keep patients longer than they needed to be there.

164.    All told, the numerous former employees cited in the BuzzFeed report, as well as the additional employees contacted during Plaintiffs' investigation, all independently corroborate that Defendants engaged in a massive, Company-wide and reprehensible admissions scheme at UHS facilities across the country.  Defendants' fraud preyed upon the Company's patients, while materially misleading shareholders throughout the Class Period.

## VIII.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

165.    Throughout the Class Period, Defendants issued a steady drumbeat of statements emphasizing a single theme:  the Behavioral Division's reliable and consistent operating metrics set UHS apart from its peers in the hospital industry, and demand for the Company's highly

---

[12] FE 10 was a former Admissions Counselor at Salt Lake Behavioral Center in Utah, where she worked for five years, leaving in October 2015.  The facility was owned by UHS for her final two years of working there.

profitable Behavioral Division was so strong that UHS literally could not add beds fast enough to meet it. Defendants repeatedly emphasized that the burgeoning demand for the Behavioral Division's psychiatric services was from patients who had "appropriate insurance" and met the clinical criteria for admission (*i.e.*, they were legitimately suicidal, a danger to others, or gravely disabled)—and that demand from this patient population was so strong the Company was routinely forced to turn thousands of these patients away.

166. Defendants' statements were false. In reality, the Behavioral Division's purportedly strong results were artificially inflated by Defendants' illicit scheme in which they directed UHS psychiatric facilities across the country to admit as many patients as they could— regardless of whether those patients met clinical admission criteria—and to keep those patients admitted until their insurance payments ran out, with no regard for medical necessity. Defendants also deliberately and grossly understaffed and overfilled UHS's psychiatric facilities, at the expense of patient care, all in a concerted effort to maximize their profits from the scheme.

A.      **March 2015 Health Care Conferences**

167. On March 2, 2015, the Company participated in the Cowen & Co. Health Care Conference. During the conference, Defendant Filton stated that the Behavioral Division was "a CFO's ideal business" because it was "very steady, very reliable." Filton emphasized that, for the last seven years and counting, the Behavioral Division had "very, very steady" and "very high" occupancy rates, explaining that UHS's Behavioral Division became the "industry leader" when it reached 85% occupancy and was forced to aggressively add capacity to avoid "turning away a significant number of appropriately insured and appropriately diagnosable patients.":

> [The Behavioral Division has] very high occupancy rates, very good margins and those two are clearly related as our hospitals run at high occupancy rates that lends them to be much more efficient, and we take advantage of that to a degree that we can by continuing to add capacity . . .[I]n about 2004, 2005, we realized

that at 85% or so occupancy that our behavioral facilities [were] running on average, we[] [were] actually turning away a significant number of appropriately insured and appropriately diagnosable patients. And at that point, we really became sort of an industry leader in adding new capacity . . . now our occupancy rates level off, and effectively we're adding beds [and] as quickly as we're adding beds we're filling those beds. And you can see our occupancy rates remain very, very steady for the last six or seven years despite the fact that we've continued to aggressively add beds.

168. Defendant Miller made similar claims on March 11, 2015, at the Barclays Capital Health Care Conference. Specifically, he asserted that despite the Company aggressively building additional capacity to make room for all of the "appropriately diagnosable" patients it was being forced to turn away, it was still maintaining remarkably high occupancy rates at 75% (what Miller described as a "key statistic" for the Behavioral Division):

[T]his is obviously one of the key statistics, the occupancy rates are…at 75%. So with high occupancy, continued growth…we have been building additional beds every place we can and we have a lot of demand within our own network.

169. Defendants' statements in paragraphs 167 through 168 were false and misleading. First, Defendants' statements that they were "turning away a significant number of appropriately insured and appropriately diagnosable patients" is false and misleading because they created the materially false impression that Defendants only admitted patients who were "appropriately diagnosable" when in fact the opposite is true. Indeed, rather than turning away patients who were "appropriately diagnosable," Defendants were actually fraudulently admitting thousands of patients who were not "appropriately diagnosable," solely to boost the Company's bottom line. Second, the Behavioral Division's strong financial results, including occupancy rates and ALOS, were artificially inflated by Defendants' widespread scheme to illicitly admit as many patients as they could into UHS's psychiatric facilities across the country, regardless of whether those patients met clinical admission criteria, locking them in until their insurance payments ran out.

### B. Statements Regarding 2015 First Quarter Earnings

170.    On April 27, 2015, UHS issued its earnings press release for the first quarter of 2015.  Defendants again touted strong growth in the Behavioral Division.  The Company reported steady and significant increases in the Behavioral Division's same facility net revenues, adjusted inpatient admissions, adjusted patient days, net revenue per adjusted patient day, and net revenue per adjusted admission.

**First Quarter 2015**

| Metric (Same Facility) | Percentage Growth |
|---|---|
| Net Revenues | +6% ($60 million) |
| Adjusted Inpatient Admissions | +6% |
| Adjusted Patient Days | +2.6% |
| Net Revenue Per Adjusted Patient Day | +3.7% |
| Net Revenue Per Adjusted Inpatient Admission | +0.4% |

171.    The Company also reported consistently high occupancy levels above 75%, an average length of stay that was continuing to stabilize, and an increase in operating margins.

**First Quarter 2015**

| Metric (Same Facility) | Current Year | Prior Year |
|---|---|---|
| Occupancy | 77% | 76% |
| ALOS | 12.4 days | 12.8 days |
| Operating Margins | 28.6% | 27.7% |

172.    These financial results were also included in the Company's Form 10-Q signed by the Individual Defendants and filed with the SEC on May 8, 2015, and discussed by Defendant Filton during the Company's Q1 2015 earnings call on April 28, 2015.

173.    Defendants' statements in paragraphs 170 through 172 were false and misleading. All of these metrics depended on two things:  how many patients UHS admitted to its behavioral health facilities, and how long it kept those patients.  Accordingly, each of these metrics was

artificially inflated by Defendants' widespread scheme to illicitly admit as many patients as they could into UHS's psychiatric facilities across the country, regardless of whether they met clinical admission criteria, and then locking them in until their insurance payments ran out, regardless of medical necessity.

174.  On March 31, 2015, the Company disclosed that the DOJ's Criminal Frauds Section had notified the Company that it was expanding its investigation of a growing list of at least 25 UHS psychiatric facilities nationwide to ***include the UHS corporate entity itself***.  At the May 13, 2015 Bank of America Merrill Lynch Health Care Conference, an analyst asked Defendant Filton about whether the federal investigations were focused on patients' lengths of stay, and if so, whether the Company had adjusted its practices as a result of the government scrutiny.  In response, Filton stated that "we don't know exactly what the government's full concerns are," but asserted that to the extent they were about length of stay, the Company was not curtailing any of its practices as a result of government scrutiny:

> [W]e've changed our practices very little[.]  I think we're certainly are kind of refocused on them because [of] the investigation[,] just making sure that patients meet criteria et cetera, but at the end of the day, we still believe that the length-of-stay compression is largely a payer driven initiative, not something we're doing to ourselves.

175.  This statement was false.  First, Defendants understood that the federal investigations directly concerned UHS's admission practices, and UHS's "length of stay."  Indeed, the federal civil and criminal investigation of UHS's facilities, numbering over 12.5% of its facilities nationwide, had already been ongoing—and escalating—for two years, expanding in March 2015 to include the UHS corporate entity itself.  Second, Defendants were not "making sure that patients meet criteria" for admission into UHS's inpatient psychiatric facilities, or for longer stays in those facilities.  As stated above, they were doing the exact opposite:  Defendants were directing UHS facilities across the country to admit as many patients as possible and detain

them until their insurance payments ran out, with no regard whatsoever as to whether those patients met clinical admission criteria or needed extended inpatient psychiatric care.

176.     In the months that followed Defendants' disclosure of the escalating federal criminal investigation of the Company, Defendants continued to tout "very high" and "very stable" occupancy rates, and virtually insatiable demand for its behavioral health services, by patients who "me[t] clinical admission criteria."   For example, at the May 6, 2015 Deutsche Bank Health Care Conference, Defendant Filton said:

> We continue to operate at relatively high occupancy rates in our Behavioral business, in the high 70%s, 77%, 78% pretty consistently, despite the fact that we're adding beds at the rate certainly in the last year or two at about 500 or 600 new beds a year.  Honestly if we could snap our fingers or I could snap my fingers, we'd probably add another couple of thousand beds tomorrow.  We think there is that much demand . . . [A]ll the trends in demand that continue to be very robust, lead me to believe that this trajectory of being able to add beds at this relatively healthy clip should continue for certainly the foreseeable future.  And by that, I mean maybe the next three years or five years.

177.     At the same May 6, 2015 conference, Filton asserted that the Company was not engaging in any marketing efforts to "drum up new patients"—it instead was struggling to keep up with already existing, "demonstrated demand" from patients with an "admissible diagnosis." Filton explained that the Company measured demand in terms of "deflections," or the number of insured patients who met clinical admission criteria that UHS was forced to turn away because its facilities were at capacity:

> We're really not projecting gaining market share or going out and being able to drum up new patients, but really for the most part building and expanding capacity where there is demonstrated demand.  So we keep track of a statistic or metric that we call deflections, which are patients who in some form or another apply, if you will, for admission . . . . they have perfectly appropriate insurance, they have an admissible diagnosis . . . they clearly need treatment, but we have to turn them away for some sort of lack of capacity.  And we have thousands of deflections every year.  And we're building beds or we target the expansion of beds in those facilities that have a significant number of deflections and effectively there's built-in pent-up demand.

178.    Similarly, at the May 18, 2015 UBS Global Health Care Conference, Filton emphasized the Company's "incredibly stable occupancy rate," the demand for UHS's services, and the fact that the Company's existing and prospective patients "meet clinical admission criteria":

> [I]f you look at our occupancy numbers in the behavioral segment, we've been really since, I would say, 2006-2007 period, running [at an] incredibly stable occupancy rate in the high-70%s, in that sort of 77%, 78% range.  And we've been doing that and running those stable occupancy numbers despite the fact that we continue to add beds at a pretty healthy clip.  And so I think what that suggests, I mean, more than suggest, I think what it demonstrates is that we're filling the beds that we're adding pretty much at the same pace as we're adding them.  And honestly, quite frankly, we're trying to accelerate the pace at which we're adding beds because I think we believe the demand is there.  And despite the fact that we're adding beds, despite the fact that our capacity and our occupancy numbers are high, we still, by our own measures, are turning away a measurable number of patients.  And these are patients who meet clinical admission criteria . . . They have appropriate insurance and we simply, in a particular day that they present for admission, don't have space for them in a facility or in the facility that they present to.  So we think the demand is still there.

179.    Defendants' statements identified above were false and misleading.  Specifically, Defendants were not admitting patients "who met the clinical requirements for admission," but were instead directing UHS facilities across the country to admit as many patients as they could and detain them until their insurance payments ran out, regardless of whether those patients met clinical admission criteria.  The "demand" cited by Defendant Filton purportedly supporting the Behavioral Division's strong growth profile was therefore artificially manufactured by Defendants' widespread unlawful conduct.

### C.    Statements Regarding 2015 Second Quarter Results

180.    On July 30, 2015, UHS issued its earnings press for the second quarter of 2015.  The Company again reported strong growth for the Behavioral Division, with steady and significant increases in same facility net revenues, adjusted inpatient admissions, adjusted patient days, net revenue per adjusted patient day, and net revenue per adjusted inpatient admission.

**Second Quarter 2015**

| Metric (Same Facility) | Percentage Growth |
|---|---|
| Net Revenues | +5% ($50 million) |
| Adjusted Inpatient Admissions | +4.2% |
| Adjusted Patient Days | +0.6% |
| Net Revenue Per Adjusted Patient Day | +4.1% |
| Net Revenue Per Adjusted Inpatient Admission | +0.5% |

181.　　The Company also reported steady occupancy levels above 75%, an average length of stay that was continuing to stabilize, and consistently high operating margins.

**Second Quarter 2015**

| Metric (Same Facility) | Current Year | Prior Year |
|---|---|---|
| Occupancy | 77% | 77% |
| ALOS | 12.5 days | 12.9 days |
| Operating Margins | 28.5% | 28.4% |

182.　　These metrics were reiterated in the Company's Form 10-Q signed by the Individual Defendants and filed with the SEC on August 7, 2015, and discussed by Defendant Filton during the Company's Q2 2015 earnings call on July 31, 2015.

183.　　Defendants' statements in paragraphs 180 through 182 were false and misleading. All of these metrics depended on two things: how many patients UHS admitted to its behavioral health facilities, and how long it kept those patients. Accordingly, each of these metrics was artificially inflated by Defendants' widespread scheme to illicitly admit as many patients as they could into UHS's psychiatric facilities across the country, regardless of whether they met clinical admission criteria, and then locking them in until their insurance payments ran out, regardless of medical necessity.

### D. Statements Regarding 2015 Third Quarter Results

184.     On October 27, 2015, the Company issued a press release announcing its financial results for the third quarter of 2015.  UHS reported ongoing growth in the Behavioral Division, including steady and significant increases in same facility net revenues, adjusted admissions, adjusted patient days, net revenue per adjusted patient day, and net revenue per adjusted inpatient admission.

### Third Quarter 2015

| Metric (Same Facility) | Percentage Growth |
|---|---|
| Net Revenues | +5% ($48 million) |
| Adjusted Inpatient Admissions | +1.6% |
| Adjusted Patient Days | +1.6% |
| Net Revenue Per Adjusted Patient Day | +3.1% |
| Net Revenue Per Adjusted Inpatient Admission | +3.1% |

185.     The Company also reported stable occupancy levels at 75%, a now stable average length of stay (that would remain so quarter after quarter for eighteen months, until the publication of the December 2016 BuzzFeed report), and stable, high operating margins.

### Third Quarter 2015

| Metric (Same Facility) | Current Year | Prior Year |
|---|---|---|
| Occupancy | 75% | 75% |
| ALOS | 12.5 days | 12.5 days |
| Operating Margins | 27.5% | 27.6% |

186.     The Company's financial results and other metrics were reiterated in its Form 10-Q signed by the Individual Defendants and filed with the SEC on November 6, 2015, and discussed by Defendant Filton during the Company's Q3 2015 earnings call on October 28, 2015.

187.     Defendants' statements in paragraphs 184 through 186 were false and misleading. All of these metrics depended on two things:  how many patients UHS admitted to its behavioral health facilities, and how long it kept those patients.  Accordingly, each of these metrics was artificially inflated by Defendants' widespread scheme to illicitly admit as many patients as they could into UHS's psychiatric facilities across the country, regardless of whether they met clinical admission criteria, and then locking them in until their insurance payments ran out, regardless of medical necessity.

188.     On December 3, 2015, at the Bank of America Merrill Lynch Leveraged Finance Conference, Defendant Filton made clear that UHS ran its mental health facilities much like an airline or hotel – the key was to get as many "passengers" or "guests" into the facility as possible.  Thus, at that conference, Defendant Filton again claimed that the Behavioral Division was steadily maintaining an "ideal" occupancy rate of 75% or above, and that demand was driven by patients with "admissible clinical criteria":

> We operate our facilities at relatively high occupancy rates.  And as a consequence, relatively high margins because I suggest to people that the hospital business in many ways is sort of like the airline or the hotel business . . . [A]s our occupancy rates go up, so do our margins . . . [W]e have a view that probably the ideal occupancy rate in this business is somewhere in the low to mid-70%-s.  And so, when we were at 85% about ten years ago, we're turning away a lot of patients at that point because obviously if we're averaging 85%, it means there's a lot of days when we're at 90% and 95% and even 100% occupancy . . . [I]t's difficult for facilities to really run at something close to full occupancy.  So, at 85% occupancy, we're turning patients away who have admissible clinical criteria as well as appropriate insurance and that's not really a position we like to be in.

189.     Similarly, at the January 13, 2016 J.P. Morgan Health Care Conference, Defendant Filton touted "high" and "steady" occupancy rates despite the Company's aggressive addition of beds:

> We operate our behavioral facilities at fairly high occupancy rates.  We have occupancy rates that have pretty steadily for the last six years or seven years been in the mid to upper 70% range . . . We've been adding beds at an average clip in

the last few years of about 600 beds or 800 beds a year. I think we'll continue at that clip again for the foreseeable future.

190. The statements in paragraphs 188 through 189 were false and misleading. Specifically, Defendants were not admitting patients "who met the clinical requirements for admission," but were instead directing UHS facilities across the country to admit as many patients as they could and detain them until their insurance payments ran out, regardless of whether those patients met clinical admission criteria. The "demand" cited by Defendant Filton purportedly supporting the Behavioral Division's strong growth profile was therefore artificially manufactured by Defendants' widespread unlawful conduct.

**E.    Statements Regarding 2015 Fourth Quarter and Annual Results**

191. On February 25, 2016, UHS issued its earnings press release for the fourth quarter and full year 2015.

192. For the fourth quarter, UHS continued to report growth in the Behavioral Division, with steady increases in same facility net revenues, adjusted inpatient admissions, adjusted patient days, net revenue per adjusted patient day and net revenue per adjusted inpatient admission.

### Fourth Quarter 2015

| Metric (Same Facility) | Percentage Growth |
|---|---|
| Net Revenues | +3.6% |
| Adjusted Inpatient Admissions | +0.2% |
| Adjusted Patient Days | +0.7% |
| Net Revenue Per Adjusted Patient Day | +2.5% |
| Net Revenue Per Adjusted Inpatient Admission | +3.1% |

193. The Company reported similarly strong results in these key metrics for the full year 2015.

**Annual 2015**

| Metric (Same Facility) | Percentage Growth |
|---|---|
| Net Revenues | +5% ($195 million) |
| Adjusted Inpatient Admissions | +2.9% |
| Adjusted Patient Days | +1.2% |
| Net Revenue Per Adjusted Patient Day | +3.4% |
| Net Revenue Per Adjusted Inpatient Admission | +1.8% |

194.     For the fourth quarter, the Company also reported a remarkably stable average length of stay for the second quarter in a row, high occupancy levels, and high operating margins.

**Fourth Quarter 2015**

| Metric (Same Facility) | Current Year | Prior Quarter |
|---|---|---|
| Occupancy | 74% | 74% |
| ALOS | 13.2 days | 13.2 days |
| Operating Margins | 27.1% | 27.9% |

195.     While the Company's fourth quarter occupancy levels were slightly lower than 75% (at 74%), UHS was known to be a seasonal business with lower volumes during the holiday season (indicated by the prior year's occupancy level also being at 74%).  As shown in the Company's annual results, the Behavioral Division's occupancy levels for the full year remained above 75%.  The Company otherwise reported a slight decline in the annual average length of stay for the year, as that metric had been stabilizing in the first two quarters of 2015.

**Annual 2015**

| Metric (Same Facility) | Current Year | Prior Year |
|---|---|---|
| Occupancy | 76% | 75% |
| ALOS | 12.7 days | 12.9 days |
| Operating Margins | 27.9% | 27.9% |

196. The Company's financial results and other metrics were reiterated in its Form 10-K signed by the Individual Defendants and filed with the SEC on February 25, 2016, and on the Q4 2015 earnings call on February 26, 2016 by Defendant Filton.

197. The statements in paragraphs 191 through 196 were false and misleading. All of these metrics depended on two things: how many patients UHS admitted to its behavioral health facilities, and how long it kept those patients. Accordingly, each of these metrics was artificially inflated by Defendants' widespread scheme to illicitly admit as many patients as they could into UHS's psychiatric facilities across the country, regardless of whether they met clinical admission criteria, and then locking them in until their insurance payments ran out, regardless of medical necessity.

198. At the Cowen and Company Health Care Conference on March 7, 2016, Defendants continued to trumpet the Behavioral Division's "very high" and consistent occupancy rates, that "over the last decade" had been 75% or higher:

> I think probably the other dynamic worth noting is <u>the very high occupancy rate that we operate at, 76%</u>. And we have operated over the last decade or so right around 76%, 77% occupancy in our behavioral division

199. Defendant Filton otherwise repeated that the Company had aggressively added capacity when its occupancy levels had reached 85% in prior years, explaining yet again that demand from patients who met clinical criteria was so strong that the Behavioral Division could not afford to be at occupancy levels much higher than 75%:

The problem is and what we realized when we were operating at 85% occupancy is that we were turning away a large number of patients because of a lack of beds. So, we had patients who met the clinical requirements for admission, who were adequately insured, but we were turning them away because we didn't have an available bed for them.

200.    Defendant Miller also touted the Behavioral Division's "very high occupancy" at the Barclays Capital Global Health Conference on March 11, 2016, stating there was "[v]ery high occupancy in behavioral, 76%, and the margins are about 27-point something."

201.    The statements identified at 198 through 200 above were false and misleading. The Behavioral Division's occupancy levels were not the result of burgeoning demand by qualified patients, but of Defendants' illicit scheme.  Specifically, Defendants were not admitting patients "who met the clinical requirements for admission," but were instead directing UHS facilities across the country to admit as many patients as they could and detain them until their insurance payments ran out, regardless of whether those patients met clinical admission criteria. The "demand" cited by Defendants purportedly supporting the Behavioral Division's high occupancy levels and strong growth profile was therefore artificially manufactured by Defendants' widespread unlawful conduct.

**F.      Statements Regarding 2016 First Quarter Results**

202.    On April 27, 2016, the Company issued its earnings press release for the first quarter of 2016.  UHS again reported solid growth in the Behavioral Division on a same facility basis, with steady increases in same facility net revenues, adjusted inpatient admissions, adjusted patient days, net revenue per adjusted patient day and net revenue per adjusted inpatient admission.

**First Quarter 2016**

| Metric (Same Facility) | Percentage Growth |
|---|---|
| Net Revenues | +4% ($37 million) |
| Adjusted Inpatient Admissions | +1.4% |
| Adjusted Patient Days | +1% |
| Net Revenue Per Adjusted Patient Day | +2.2% |
| Net Revenue Per Adjusted Inpatient Admission | +1.8% |

203.    The Company also reported steadily high occupancy levels above 75%, a stable average length of stay, and high operating margins.

**First Quarter 2016**

| Metric (Same Facility) | Current Year | Prior Year |
|---|---|---|
| Occupancy | 76% | 77% |
| ALOS | 12.7 days | 12.7 days |
| Operating Margins | 27.8% | 28.4% |

204.    The Company's financial results and other metrics were reiterated in its Form 10-Q signed by the Individual Defendants and filed with the SEC on May 6, 2016, and on the Q1 2016 earnings call on April 28, 2016 by Defendant Filton.

205.    The statements in paragraphs 202 through 204 were false and misleading. All of these metrics depended on two things: how many patients UHS admitted to its behavioral health facilities, and how long it kept those patients. Accordingly, each of these metrics was artificially inflated by Defendants' widespread scheme to illicitly admit as many patients as they could into UHS's psychiatric facilities across the country, regardless of whether they met clinical admission criteria, and then locking them in until their insurance payments ran out, regardless of medical necessity.

206.    On the April 28, 2016 earnings call, Defendant Filton remained bullish on behavioral health, again citing enormous demand for the segment's services:

> [Y]ou will see that our occupancy percentage in the behavioral business in that sort of high-70%, 76%, 77% range, has really been very consistent, I would say, for the last seven years or eight years.  And what that means is that during that period, we've been adding beds fairly aggressively.  And obviously, the implication is we are filling those beds as quickly as we're adding them and maintaining our occupancy percentage.  The reason we're adding beds with a 76% occupancy level is because in markets and in situations, we're clearly turning away patients because of volume constraints . . . [T]he overall demand for behavioral has been strong, continues to be strong.  We're going to add beds to meet that.

207.    At conferences during the following months, Defendants continued to aver that demand was strong, and that the Company's behavioral health facilities were turning away patients.  For example, at the May 23, 2016 UBS Global Health Care Conference, Defendant Filton stated:

> [S]ince the third quarter of 2015, we've seen our admission growth become more muted in the behavioral division.  And as we have done our own analysis and then really drill down as to why that's happening, I think we've concluded, consistently, time and time again, that the biggest issue by far is simply the fact that the demand remains strong and that, in many of our markets, we're actually turning patients away.

208.    The statements in paragraphs 206 through 207 were false and misleading.  The Behavioral Division's high occupancy levels were not the result of burgeoning demand by qualified patients, but of Defendants' illicit admissions scheme.  Specifically, rather than "turning away" qualified patients because of "volume constraints," Defendants were doing the exact opposite:  they were directing UHS facilities across the country to admit as many patients as they could and detain them until their insurance payments ran out, regardless of whether those patients met clinical admission criteria.  The "demand" cited by Defendants purportedly supporting the Behavioral Division's high occupancy levels and strong growth profile was therefore artificially manufactured by Defendants' widespread unlawful conduct.

**G.** **Statements Regarding 2016 Second Quarter Results**

209. On July 26, 2016, the Company again reported strong results for the Behavioral Division. However, while growth in the business' key metrics was still robust (showing steady increases in same facility net revenues, adjusted patient days, net revenue per adjusted patient day, and net revenue per adjusted inpatient admission), the segment's overall growth profile was muted due to, for the first time during the Class Period, a *decrease* in adjusted admissions of -0.3% on a same facility basis.

### Second Quarter 2016

| Metric (Same Facility) | Percentage Growth |
|---|---|
| Net Revenues | +2% ($22 million) |
| Adjusted Inpatient Admissions | -0.3% |
| Adjusted Patient Days | +0.2% |
| Net Revenue Per Adjusted Patient Day | +1.9% |
| Net Revenue Per Adjusted Inpatient Admission | +2.4% |

210. The Company otherwise continued to report steadily high occupancy levels above 75%, a remarkably stable average length of stay, and consistently high operating margins.

### Second Quarter 2016

| Metric (Same Facility) | Current Year | Prior Year |
|---|---|---|
| Occupancy | 77% | 77% |
| ALOS | 12.8 days | 12.8 days |
| Operating Margins | 28.1% | 28.7% |

211. The Company's financial results and other metrics were reiterated in its Form 10-Q signed by the Individual Defendants and filed with the SEC on August 5, 2016, and during the Company's Q2 2016 earnings call on July 27, 2016 by Defendant Filton.

212.     The statements in paragraphs 209 through 211 were false and misleading.  All of these metrics depended on two things:  how many patients UHS admitted to its behavioral health facilities, and how long it kept those patients.  Accordingly, each of these metrics was artificially inflated by Defendants' widespread scheme to illicitly admit as many patients as they could into UHS's psychiatric facilities across the country, regardless of whether they met clinical admission criteria, and then locking them in until their insurance payments ran out, regardless of medical necessity.

213.     On the Company's July 27, 2016 earnings call, in an effort to explain away the sudden decrease in inpatient admissions, Defendant Filton blamed a so-called national psychiatric staffing shortage that was temporarily preventing the Company's behavioral health facilities from satisfying the purportedly unending demand:

> I think beginning in the third quarter of last year, we began to clearly see the shortage of clinicians . . . as hampering our ability in certain facilities . . . to admit all the patients who were being presented to us for admission . . . So I think that the softer volumes in Q2 were somewhat disappointing to us as well, but largely expected.

214.     This explanation was repeated in the Company's Form 10-Q filed with the SEC:

> In certain markets in which we operate, the ability of our behavioral health facilities to fully meet the demand for their services has been unfavorably impacted by a shortage of clinicians which includes psychiatrists, nurses and mental health technicians which has, at times, caused the closure of a portion of available bed capacity.

215.     Indeed, on the earnings call, Defendant Filton suggested that the psychiatric staffing shortages were the *entire* reason the Company was not meeting its growth targets in behavioral health:

> [W]e're basically showing fattish volumes as compared to that 3% or 4% increase that we were anticipating.  And I think we believe that that entire gap and that entire difference can be attributed to the shortage of clinicians and that if we're able to solve and resolve that problem, we should be able to get back to that sort

of 5% overall revenue growth level and that 3% to 4% volume growth level that we anticipated originally.

216.    Analyst reports released after the earnings call show that analysts accepted Filton's explanations and reassurances.  For example, a July 28, 2016 Barclays report stated:

> The volume weakness and margin slippage again reflected a challenging comp and a shortage of psychiatrists and related clinical staff in certain markets, resulting in turning away patients from some facilities.  We expect to see some margin expansion in 2H16 UHS has undertaken a number of initiatives to mitigate the issue and expects improvement later in the year, which combined with easier comps should help drive an acceleration in SS revenue growth and margin expansion.

217.    In fact, however, Defendants' statements cited in paragraphs 213 through 215 were false and misleading.  The Behavioral Division's inpatient admissions were under pressure not because of a so-called national staffing shortage, but because of the escalating federal criminal investigation of the Company and increasing payer scrutiny due to Defendants' widespread illicit scheme.  Defendants' statements were false and misleading for the additional reason that the Behavioral Division was not experiencing such robust demand that it was being forced to turn qualified patients away due to insufficient staff, nor was its staffing levels being affected by any national shortage.  Defendants were instead artificially manufacturing "demand" by directing UHS facilities across the country to admit as many patients as they could regardless of medical necessity, keeping them in until their insurance payments ran out, while deliberately and grossly understaffing those facilities in a concerted effort to maximize their profits from the scheme.

218.    At the September 7, 2016 Robert W. Baird & Co. Global Healthcare Conference, Defendant Filton continued to emphasize that demand was strong and the segment would soon return to its prior levels of growth:

> [W]e've been coming off a multiyear period with pretty robust behavioral volumes.  And then they, in the last 12 months or so, have moderated to kind of a

flat to maybe up 1% sort of a trend.  And I think our view is that the primary reason for that has been a shortage of clinical personnel or insufficient personnel, particularly in a small number of markets.

***

[T]he underlying demand for 3% or 4% volume growth is there.  It's there today and it's just something that we have to make sure that we can find the resources to satisfy.

219.    At the same conference, Defendant Filton further stated:

"I think that the good news, by far, about the behavioral business is simply the underlying demand.  The problem . . . is this idea that patients are being presented to our behavioral hospitals, eligible patients, meaning they're clinically eligible for admission, they're financially eligible for admission, meaning they have insurance.  And we are, I think, in a short-term sort of situation, of being unable to treat some of those patients because of a lack of adequate staff."

220.    These statements were false and misleading.  Defendants' inpatient admissions were experiencing pressure not from a staffing shortage "in a small number of markets," but from increasing government and payer scrutiny in its facilities nationwide as a result of Defendants' widespread illicit scheme.  Defendants also were not turning away patients who were "clinically eligible for admission" due to a staffing shortage.  They were instead illicitly admitting as many patients as they could into UHS's psychiatric facilities nationwide regardless of patients' clinical eligibility, while deliberately understaffing those facilities in a concerted effort to maximize their profits from the scheme.

**H.    Statements Regarding 2016 Third Quarter Results**

221.    On October 26, 2016, UHS issued its earnings press release for Q3 2016.  Defendants again reported solid growth in the Behavioral Division, giving the impression that the Q2 2016 decline in inpatient admissions had been a mere blip.  The segment reported steady increases in same facility net revenues, adjusted inpatient admissions, adjusted patient days, net revenue per adjusted patient day and net revenue per adjusted inpatient admission.

### Third Quarter 2016

| Metric (Same Facility) | Percentage Growth |
| --- | --- |
| Net Revenues | +2.7% ($29 million) |
| Adjusted Inpatient Admissions | +1.3% |
| Adjusted Patient Days | +1.1% |
| Net Revenue Per Adjusted Patient Day | +1.5% |
| Net Revenue Per Adjusted Inpatient Admission | +1.2% |

222. The Company also reported steadily high occupancy rates at 75%, a consistently stable average length of stay, and high operating margins (with some pressure due to the purported "staffing shortage").

### Third Quarter 2016

| Metric (Same Facility) | Current Year | Prior Year |
| --- | --- | --- |
| Occupancy | 75% | 75% |
| ALOS | 12.9 days | 12.9 days |
| Operating Margins | 26% | 27.4% |

223. The Company's financial results and other metrics were reiterated in its Form 10-Q signed by the Individual Defendants and filed with the SEC on November 8, 2016, and on the Company's Q3 2016 earnings call on October 27, 2016 by Defendant Filton.

224. The statements in paragraphs 221 through 223 were false and misleading. All of these metrics depended on two things: how many patients UHS admitted to its behavioral health facilities, and how long it kept those patients. Accordingly, each of these metrics was artificially inflated by Defendants' widespread scheme to illicitly admit as many patients as they could into UHS's psychiatric facilities across the country, regardless of whether they met clinical admission criteria, and then locking them in until their insurance payments ran out, regardless of medical necessity.

225.     During the October 27, 2016 earnings call, Defendant Filton insisted that the Behavioral Division was continuing to see strong demand, and that growth would be even stronger in the long term:

> [W]e believe that again <u>the underlying demand has done nothing but increase and continues to increase</u>.   And our view of both the intermediate and long-term prospects from a demand perspective in this business remain extremely robust and we're very enthusiastic about it.

226.     During the same call, Filton also insisted that the number of "deflections"—or patients who "meet clinical criteria"—remained "high":

> We measure something we call deflections, which is when a patient is presented to us and they meet clinical criteria and they have some appropriate level of payment and effectively are eligible for admission, and we're unable to admit them either because historically the main reason we couldn't admit them is we didn't have a bed available . . . and more recently in the last year or so, because we didn't have sufficient number of staff.  <u>But the number of deflections remain high.  The number of patients who are being presented to us and meet the criteria to be admitted remains quite high and those patients are being, again, deflected or turned away</u>.

227.     Defendants' statements identified above were false and misleading.   The Behavioral Division's strong results were not the result of burgeoning demand by qualified patients, nor were Defendants turning away patients who "met the criteria to be admitted" because of a staffing shortage.  Defendants were instead admitting as many patients as they could into UHS's psychiatric facilities regardless of whether those patients met clinical admission criteria, holding them in until their insurance payments ran out, while deliberately and grossly understaffing those facilities in a concerted effort to maximize their profits from the scheme.

## I.     Defendants' Response To The BuzzFeed Report

228.     On December 7, 2016, the BuzzFeed investigative report was published, causing an immediate 12% drop in UHS's stock price.  On December 8, 2016, the Company issued a press release denying the truth of the BuzzFeed article:

We are aware of a recent story on BuzzFeed about UHS, and certain Behavioral Health affiliate facilities. <u>We dispute and deny the conclusions drawn by the reporter in relation to UHS and believe that the story misses the mark in several important ways leading to an inaccurate portrayal of UHS's behavioral health operations</u>.

229. Also on December 8, 2016, at the CitiGlobal Healthcare Conference, Defendant Filton asserted that the Company's average length of stay was not the result of any misconduct and was in fact in line with others in the industry:

> [W]e've done a lot of analysis, and used some independent sources to do this analysis, that ultimately shows that our length of stay is measurably close to industry average, you know kind of smack in the middle of the bell curve, if you will. And again, this sort of overarching notion that you can find anecdotal examples of patients who someone would argue stayed too long in the facility I think is not supported by any kind of global more macro objective information that shows that our length of stay in fact is quite comparable to everyone else in the industry.

230. Additionally, on a website UHS created specifically to respond to the BuzzFeed report, UHS claimed, among other things, that "<u>UHS categorically denies that its affiliates exaggerate symptoms or attempt to coerce patients to admitting to suicidal thoughts or plans in order to justify any admission</u>."

231. Defendants' statements were false and misleading because the BuzzFeed report— which was based on a year-long investigation that included interviews of 175 current and former UHS employees, 120 additional interviews of patients, government investigators, and industry experts, and review and analyses of a "cache" of internal Company emails and documents—was not "anecdotal" nor inaccurate in its description of UHS's illegal admission practices. Indeed, as the Company would later confirm, Defendants' illicit practices described in BuzzFeed's report were the "crux" of the federal government's criminal investigation of the Company, and those practices were ongoing, widespread, and permeated the Behavioral Division at all levels, particularly considering that the federal criminal investigation included the UHS corporate entity

itself. Further, numerous former UHS employees independently corroborated Defendants' widespread illicit admission practices described in the BuzzFeed report, as detailed further herein at ¶¶ 126-164.

**J.** **Statements Regarding 2016 Fourth Quarter and Annual Results**

232. On February 28, 2017, UHS issued an earnings press release for the fourth quarter and full year 2016.

233. For the fourth quarter, the Company again reported significant and steady growth in the Behavioral Division, with increases in same facility net revenues, adjusted inpatient admissions, adjusted patient days, and net revenue per adjusted patient day.

### Fourth Quarter 2016

| Metric (Same Facility) | Percentage Growth |
| --- | --- |
| Net Revenues | +2.2% |
| Adjusted Inpatient Admissions | +2.1% |
| Adjusted Patient Days | +1.4% |
| Net Revenue Per Adjusted Patient Day | +0.5% |
| Net Revenue Per Adjusted Inpatient Admission | -0.1% |

234. While the Company reported more or less flat growth in net revenue per adjusted inpatient admission for the fourth quarter, as shown in the Company's annual results, for the full year, this metric increased by +1.4%. The other key metrics also showed steady increases for the full year.

**Annual 2016**

| Metric (Same Facility) | Percentage Growth |
|---|---|
| Net Revenues | +3% ($112 million) |
| Adjusted Inpatient Admissions | +1% |
| Adjusted Patient Days | +0.9% |
| Net Revenue Per Adjusted Patient Day | +1.5% |
| Net Revenue Per Adjusted Inpatient Admission | +1.4% |

235. For the fourth quarter, the Company continued to report a remarkably stable average length of stay, high occupancy levels, and high operating margins.

**Fourth Quarter 2016**

| Metric (Same Facility) | Current Year | Prior Quarter |
|---|---|---|
| Occupancy | 74% | 74% |
| ALOS | 13.4 days | 13.5 days |
| Operating Margins | 26% | 26.8% |

236. While the Company's fourth quarter occupancy levels were slightly lower than 75% (at 74%), as stated above, UHS typically had lower volumes during the holiday season (indicated by Q4 2015 occupancy levels also being at 74%). As shown in the Company's annual results, the Behavioral Division's occupancy levels for the full year remained above 75%. The Company otherwise reported a remarkably stable average length of stay for the entire year at 13 days, and continued high operating margins.

**Annual 2016**

| Metric (Same Facility) | Current Year | Prior Year |
|---|---|---|
| Occupancy | 76% | 76% |
| ALOS | 13 days | 13 days |
| Operating Margins | 27% | 27.8% |

237. The Company's financial results and other metrics were reiterated in its Form 10-K signed by the Individual Defendants and filed with the SEC on the same day, and on the Company's Q4 2016 earnings call on March 1, 2017 by Defendant Filton.

238. The statements in paragraphs 232 through 237 were false and misleading. All of these metrics depended on two things: how many patients UHS admitted to its behavioral health facilities, and how long it kept those patients. Accordingly, each of these metrics was artificially inflated by Defendants' widespread scheme to illicitly admit as many patients as they could into UHS's psychiatric facilities across the country, regardless of whether they met clinical admission criteria, and then locking them in until their insurance payments ran out, regardless of medical necessity.

239. On the Company's March 1, 2017 earnings call, Defendant Filton continued to downplay the December 2016 BuzzFeed report, stating that it was neither impacting the Company's business nor having an effect on the government investigations:

> I think you see that in our Q4 volumes which incrementally improved during the quarter and continued to get a little bit better with each passing quarter. And I think we can say that in January and February that improvement continued. So, again, from an underlying operational perspective, we see no material evidence that the BuzzFeed article has had an impact on us.

240. These statements were false and misleading. In fact, Defendants knew that, in fact, the BuzzFeed story had led to both increased government scrutiny and increased pressure from payers. Indeed, soon after these statements on April 17, 2017, BuzzFeed reported on improper admissions procedures and understaffing at another facility, Shadow Mountain in Oklahoma, prompting Senator Charles Grassley to call for a federal probe into the facility.

### K. Statements Regarding 2017 First Quarter Results

241. In the first quarter after the BuzzFeed article was released, the Company's behavioral health results weakened substantially, as payers began to crack down on UHS's

fraudulent practices. On April 25, 2017, UHS issued its earnings press release for the first quarter of 2017. While the Behavioral Division reported modest increases in same facility net revenues, adjusted inpatient admissions, adjusted patient days, and net revenue per adjusted patient day, net revenue per adjusted inpatient admission *declined* 1.1%.

### First Quarter 2017

| Metric (Same Facility) | Percentage Growth |
|---|---|
| Net Revenues | +1.4% ($15 million) |
| Adjusted Inpatient Admissions | +2.4% |
| Adjusted Patient Days | +0.2% |
| Net Revenue Per Adjusted Patient Day | +1.1% |
| Net Revenue Per Adjusted Inpatient Admission | -1.1% |

242.    The Behavioral Division's decline in net revenue per adjusted inpatient admission was caused by a significant and unexpected decline in the critical average length of stay metric. Specifically—for the first time in *over a year*—the Company reported a 2.2% decline in its average length of stay, and a significant decline in its operating margins (which, at 25.6%, were at their lowest level for the Class Period).

### First Quarter 2017

| Metric (Same Facility) | Current Year | Prior Year |
|---|---|---|
| Occupancy | 77% | 77% |
| ALOS | 12.7 days | 12.9 days |
| Operating Margins | 25.6% | 27.5% |

243.    The Company's financial results and other metrics were reiterated in its Form 10-Q signed by the Individual Defendants and filed with the SEC on May 8, 2017, and on the Company's Q1 2017 earnings call on April 26, 2017 by Defendant Filton.

244.	Also during the Company's earnings call on April 26, 2017, Defendant Filton revealed that same-facility EBITDA was down 5% in the behavioral segment—a significant fact given that the segment accounted for roughly 70% of the Company's EBITDA.

245.	During the earnings call, when Defendant Filton was asked why length of stay was suddenly declining, Filton downplayed the issue, stating it was not "indicative of a continuing trend."  He then again downplayed the ongoing federal criminal investigation, stating: "[T]here's really nothing sort of a status update regarding the large government investigation. There's really nothing new there."

246.	At the Deutsche Bank Healthcare Conference on May 4, 2017, Filton reiterated that the length of stay decline was not a "trend."  He stated

> [T]he change in length of stay was relatively minor, it's about a 2% decline . . . I wasn't focused on it as a terribly substantive development, still I'm not.  But we're certainly going back to our operators and trying to make sure we're doing all the appropriate, I call it blocking and tackling what we do vis-à-vis length of stay, making sure we're sharing appropriate records, clinical records with our payers, making sure there is the appropriate level of doctor-to-doctor or clinician-to-clinician conversation between our psychiatrists and a managed care, managed Medicaid medical director . . .So we're focused on making sure that this is not a, the beginning of a trend and I think we're not convinced at all that it is.

247.	And at the Bank of America Merrill Lynch Healthcare Conference on May 18, 2017, Filton reiterated that the federal criminal investigation of the Company "has had little impact on the business":

> So we have said really at the outset that the government investigation, which has been the longest-standing dynamic, is that we're into our fifth year of this government investigation of certain of our behavioral facilities, has had little impact on the business.

248.	Defendants' statements identified above were false and misleading.  As the Company would reveal only three months later, the Behavioral Division's decline in average length of stay was not a one-time occurrence as Filton suggested, but a "continuing trend" as a

direct result of Defendants' illicit scheme. Specifically, in the wake of the BuzzFeed report and as a result of increasingly severe government scrutiny, payers had become aware of Defendants' unlawful widespread practice of admitting as many patients as they could into UHS's psychiatric facilities regardless of whether those patients met clinical admission criteria, and holding those patients longer than medically necessary, to collect higher insurance reimbursements. As a result, payers were no longer willing to tolerate Defendants' illicit practices.

249. Defendants' statements that there was "nothing new" to disclose regarding the substance of the federal government's escalating criminal investigation of the Company, and that the investigation was having "little impact on the business," were also false. First, as BuzzFeed would reveal in another exposé on the Company that would be published less than a month later on May 23, 2017, the federal criminal investigation had in fact escalated again to include the FBI and the Department of Defense, who were investigating, among other things, Defendants' illicit practices in connection with their billings to TRICARE. Second, the increasing government scrutiny was severely impacting the Behavioral Division's business, putting significant pressure on the Company's critical average length of stay metric, as would be fully revealed to investors only three months later.

## IX. ADDITIONAL ALLEGATIONS OF SCIENTER

250. As alleged above, numerous facts raise a strong inference that Defendants knew, or were severely reckless in disregarding, the true facts regarding UHS's widespread illicit practices, and specifically, that UHS facilities across the country were unlawfully admitting and detaining patients in its psychiatric inpatient facilities regardless of medical necessity, while deliberately and grossly understaffing those facilities, in order to inflate the Company's revenues. These facts include, in addition to the allegations set forth above, the following:

251.     *Prior to the Class Period, UHS was the subject of investigations and numerous* qui tam *lawsuits alleging that UHS facilities across the country were engaging in fraudulent admissions practices and deliberate understaffing.*  In 2011, an independent investigation of UHS-owned Hartgrove Hospital concluded that the Company was overfilling Hartgrove while deliberately understaffing the facility "so that UHS corporate officials could take advantage of the opportunity to maximize profits."  *See* ¶ 39.  The investigation found that this conduct was not isolated to Hartgrove, but permeated UHS facilities in a dozen other states across the country.  *Id.* ¶ 40.

252.     Additionally, from 2010 to 2013, numerous *qui tam* lawsuits were filed against the Company by former UHS employees and patients of different UHS psychiatric facilities in several states across the country, alleging that UHS was engaging in fraudulent admission practices.  Specifically:  (i) a 2010 *qui tam* lawsuit filed by a former UHS psychiatrist regarding a facility in Pennsylvania alleged that UHS "falsely and fraudulently coded patients as suicidal, when the chart did not reflect a likelihood of patient suicide" in order to inflate the Company's occupancy levels;  (ii) in 2011, relators filed a *qui tam* lawsuit regarding a facility in Massachusetts, alleging that it had insufficient qualified staff (leading to a patient death) and fraudulently billed for services that were never rendered;  (iii) in 2012, UHS settled two separate *qui tam* lawsuits filed by former employees of a facility in Virginia, both of which alleged UHS intentionally held patients in its psychiatric wards longer than medically necessary in order to collect higher insurance reimbursements, including by deliberately "provoking" or "escalating" patients to justify lengthier stays;  (iv) the same year, five former nurses filed a *qui tam* lawsuit regarding a facility in California alleging that they were directed to use "exaggerated buzz words" in patients' charts, like "agitated" or "resisting," in order to fraudulently increase

insurance payments; (v) in 2013, former therapists at a UHS facility in Florida filed a *qui tam* lawsuit alleging that the facility falsified patient records and unnecessarily admitted or detained patients. *See* ¶¶ 37-46.

253. These lawsuits, which spanned several years and implicated numerous UHS psychiatric facilities in different states across the country, show that Defendants were unquestionably on notice of UHS's illicit and coordinated practices to unlawfully admit and detain patients in its psychiatric facilities, regardless of medical necessity, while deliberately and grossly understaffing those facilities.

254. *Prior to the Class Period, CTW sent detailed written letters directly to UHS's Board raising red flags about the Company's admission practices.* CTW, a sophisticated organization that worked with institutional investors, had written detailed letters directly to UHS's board raising red flags about the Company's admissions practices in its behavioral health facilities. Specifically, CTW's April 8, 2014 letter to UHS's board informed the Company of, among other things, an independent analysis of Medicare data showing that the Company's use of the "suicide ideation code"—which justifies a patient's involuntary admission or detention— was dramatically higher than UHS's peers, to a statistically significant degree. *See* ¶¶ 47-51. UHS responded to CTW's letter dismissively, stating the issues CTW had raised were "sporadic," and limited to a "small minority of our facilities." *Id.* ¶ 52. Defendants' overly dismissive response to the serious red flags CTW had raised—which were backed by an independent analysis of aggregated Medicare data—supports a strong inference of scienter.

255. *The expanding coordinated federal civil and criminal investigation of a growing list of UHS facilities—and of UHS itself—concerned Defendants' illicit admissions practices.* In 2013, a growing coordinated federal civil and criminal investigation of UHS's illicit practices

was instituted, ultimately covering at least 25 of UHS's 200 psychiatric facilities—or over 12.5% of its facilities nationwide—in addition to the UHS corporate entity itself. *See* ¶¶ 53-55. Despite the fact that these investigations continued to escalate in both their breadth and severity during the Class Period, Defendants downplayed them, failing to disclose any facts about their substance (aside from that the civil aspect of the investigation involved the False Claims Act), and emphatically ensuring investors that the investigations were not impacting the Behavioral Division's operations. *See* ¶¶ 8, 53-56, 174, 245, 247. Defendants' downplaying of these serious and escalating federal investigations, which had been ongoing and seriously escalating for four years, is indicative of a strong inference of scienter—especially since, as Defendants would ultimately admit at the end of the Class Period, the "crux" of the investigations were Defendants' illicit admissions practices. *See* ¶ 119.

256. *During the Class Period, Defendants repeatedly emphasized the Behavioral Division's ability to maintain remarkably steady occupancy levels above 75%.* The Individual Defendants repeatedly represented that the Behavioral Division's occupancy rate of 75% or above was a "key statistic" that was "ideal" for the business' maximum profitability. ¶¶ 61-62, 188. Indeed, Defendants touted that the Behavioral Division maintained occupancy levels of 75% or higher nearly every quarter (*see, e.g.*, ¶¶ 61-63, 66, 168, 171, 181, 185, 188, 198, 203, 210, 222, 242), and emphasized to investors that the business had done so for nearly a decade. *See, e.g.*, ¶ 176 ("[w]e continue to operate at relatively high occupancy rates in our Behavioral business, in the high 70%s, 77%, 78% pretty consistently"); ¶ 178 ("if you look at our occupancy numbers in the behavioral segment, we've been really since, I would say, 2006-2007 period, running [at an] incredibly stable occupancy rate in the high-70%s, in that sort of 77%, 78% range"); ¶ 206 ("you will see that our occupancy percentage in the behavioral business in that

sort of high-70%, 76%, 77% range, has really been very consistent, I would say, for the last seven years or eight years"). These statements demonstrate that Defendants closely monitored occupancy rates, believed them to be critical to the Company's financial success, and were motivated to keep such rates as stable and high as possible.

257. The Individual Defendants further claimed that the Behavioral Division was able to maintain these steadily high occupancy levels—even as it was aggressively adding beds— because of burgeoning demand for its psychiatric services by patients who met clinical admission criteria, which they emphasized to investors throughout the Class Period every chance they got. *See, e.g.*, ¶ 176 ("[I]f we could snap our fingers or I could snap my fingers, we'd probably add another couple of thousand beds tomorrow. We think there is that much demand."); ¶ 178 ("despite the fact that we're adding beds, despite that our capacity and our occupancy numbers are high, we still, by our own measures, are turning away a measureable number of patients" and "these are patients who meet clinical admission criteria"); ¶ 206 ("The reason we're adding beds with a 76% occupancy level is because in markets and in situations, we're clearly turning away patients because of volume constraints"). Defendants' strong, emphatic and repeated statements about the Behavioral Division's ability to steadily maintain its occupancy levels above the 75% threshold because of burgeoning demand, while at the same time UHS facilities across the country were manufacturing that "demand" by engaging in the illicit admissions scheme, are indicative of a strong inference of scienter.

258. *Defendants also reported remarkably steady increases in other key metrics directly bearing on the Behavioral Division's occupancy levels every quarter—including inpatient admissions, patient days, and revenues per patient day.* Defendants reported remarkably steady increases in other key metrics that directly bore on the Behavioral Division's

occupancy levels—including adjusted inpatient admissions, adjusted patient days, and revenues per adjusted patient day—virtually every quarter. *See* ¶ 74. The steady increases in these metrics were crucial to Defendants' repeated representations to investors that the Behavioral Division was a "very reliable, very steady" and "solid" business with consistently high occupancy levels and growing revenues. *See, e.g.*, ¶¶ 60, 167, 189. Critically, the Individual Defendants repeatedly stressed to investors that the consistency and reliability of the Behavioral Division, as shown by these key metrics, was what differentiated the Company from its industry peers. *See* ¶ 60 (the Behavioral Division was "a very steadily reliably performing business for a number of years now" that was "largely immune from . . . significant headwinds that troubled a lot of others in the healthcare services industry"); ¶ 62 (the Company's consistent and growing metrics made it "quite a solid business").

259. *Defendants also prominently reported that the Behavioral Division had a remarkably stable average length of stay for the majority of the Class Period.* Defendants reported to investors that the Behavioral Division's critical average length of stay metric—which, along with the other key metrics, Defendants prominently reported every quarter—had leveled out at the outset of the Class Period, clearing the way for the Behavioral Division's strong revenue growth. *See* ¶ 70 ("our behavioral revenue growth has crept up some and exceeded, I think, 6% [in 2014 Q4 and 2015 Q1] . . . [a]nd I think the improvement is a by-product of a stabilization to some degree of that length of stay pressure"). Defendants then proceeded to report a remarkably stable average length of stay for the Behavioral Division for eighteen months straight. *See* ¶ 71.

260. Defendants were well-aware of the fact that the market was relying on these statements, as analysts published numerous reports that underscored the Behavioral Division's

strong metrics, high demand, and critical importance to the Company's overall business. For example, a February 27, 2015 RBC report stated there was "[c]ontinued strength in behavioral health," citing the increase in patient days and revenues per patient day. A March 25, 2015 UBS report lauded UHS's "outsized exposure to the attractive behavioral health segment (70% of profits)," stating it was "enjoying above average organic growth." A July 31, 2015 Avondale Partners report noted an "upswing" in the Behavioral Division's "volumes," citing increases in adjusted inpatient admissions, net revenue per adjusted inpatient admission, and adjusted patient days. Finally, an October 28, 2015 J.P. Morgan report stated: "UHS remains our only OW recommendation in the hospital sector, as we see the growth profile form its behavioral exposure as unique (~70% of OI)." The Individual Defendants knew, or were severely reckless in not knowing, that the Behavioral Division's consistently high occupancy levels and other key metrics—including same-facility revenues, adjusted inpatient admissions, adjusted patient days, net revenue per adjusted patient day, net revenue per adjusted inpatient admission, and average length of stay—were inflated by the Company's illicit admissions scheme.

261. *The December 2016* BuzzFeed *report made clear that UHS's senior executives were directly involved in the fraud.* The December 2016 BuzzFeed report revealed several facts that made clear that UHS's senior executives were aware of, and in fact orchestrators of, the fraud. Specifically, the report described how UHS corporate closely tracked facilities' "conversion rates," or the percentage of callers to the facility who became inpatients, "keeping track of [employees'] numbers as if [they] were car salesmen." ¶ 79. UHS corporate was also unquestionably aware of, and in fact responsible for, the Behavioral Division's mantra: "Don't leave days on the table," meaning employees were to not discharge patients "early," *i.e.*, before their insurance reimbursements ran out (regardless of their medical condition). Indeed, this

directive came from high-ranking UHS executives at UHS facilities across the country. BuzzFeed reported that "[t]hree former heads of UHS hospitals claimed their Divisional Vice President, Sharon Worsham," instituted the mantra across their facilities. ¶ 86.

262. The BuzzFeed report otherwise stated that the directive "trickled down to staff and doctors" through Company-wide "flash meetings," the purpose of which was, according to more than 20 executives and managers who attended those meetings in 12 states, "to review how many [insurance-approved] days [patients] have and try to use up those days." ¶ 87. The BuzzFeed report also described internal corporate documents corroborating these facts, such as a "strategic plan" it had obtained from Paul Sexton, CEO of a UHS psychiatric facility in Colorado, that stated the hospital would "implement a plan to increase average length of stay" in order to meet its financial goals. ¶ 88. This strategy was echoed by Gail Eckerd, CEO of River Point in Florida (which is under *federal criminal investigation*), who instituted a 10-day guideline as the length of time to keep patients (the same length of time before Medicare reimbursements sharply drop) – regardless of their condition. *Id.* Tellingly, in the Company's November 23, 2016 response to BuzzFeed's report (before the report was published), the Company did not deny that Eckerd had instituted this guideline, nor did it claim that it was unaware that Eckerd had done so – it instead defended the practice as being beneficial for patients. The fact that high-ranking UHS executives nationwide were engaging in the Company's illicit practices show that UHS executive management was not only involved in these practices but in fact *orchestrated the scheme*, raising a strong inference of scienter.

263. *Former employees also confirm that the Company's illicit practices were being directed by UHS corporate management.* Former employees also corroborated the BuzzFeed report, stating that UHS executive management was directly involved in the illicit admissions

scheme. The former CEO of a UHS facility in Texas described how UHS corporate "tracked everything" through an electronic system known as "MS4," which UHS corporate had continuous access to, including "conversion rates." ¶ 140; *see also* ¶ 131. UHS corporate also used "MS4" to track the number of "days on the table." ¶ 142. Additionally, former employees across several UHS psychiatric facilities in different states across the country described familiarity with the "don't leave days on the table" mantra, stating they had either heard it directly from UHS corporate (¶¶ 143, 153-54) or from their respective facilities' executive management. ¶¶ 144-154. Former employees also described the "flash" meetings mentioned in the BuzzFeed article, during which the facility's senior management would discuss pending discharges and whether there were "days on the table." ¶ 147. One former employee stated that the CFO of his facility would meet with UHS corporate monthly, in so-called "over/under" meetings – referring to the number of days over or under patients' insurance-authorized length of stay. ¶ 154. Other former employees directly attested that "everything that went on was organized by corporate, and the directors of the facility answered to corporate" – making it "impossible to see how [corporate management] wouldn't know" about UHS's nationwide illicit practices. ¶ 139.

264. *Numerous regulatory citations—including terminations of Medicare and Medicaid contracts at facilities under federal investigation—also put Defendants on notice of the scheme.* As set forth above, the Company received numerous regulatory citations for improper billing practices and understaffing throughout the Class Period—including for facilities that were under federal investigation (such as River Point in Florida and Pembroke in Massachusetts). ¶¶ 155-58. In fact, Medicare and Medicaid had suspended their contract with River Point indefinitely in April 2014, a fact UHS disclosed in its public filings—and River Point was not

only under federal investigation, but federal *criminal* investigation. ¶ 54. Defendants' knowledge of these numerous regulatory citations, resulting in serious sanctions at its facilities (some of which were under federal investigation), support a strong inference of scienter.

265. *The Individual Defendants participated directly in the setting and reporting of the Behavioral Division's financial metrics.* Defendant Filton, the Company's CFO since 2003, and Defendant Miller, the Company's founder and CEO since 1978, were personally involved in the Company's reporting of its occupancy levels and other key metrics, and personally signed Sarbanes Oxley certifications as to their accuracy, every quarter. Moreover, in light of how critical the Behavioral Division was to UHS's overall business—accounting for approximately 70% of its EBIDTA—and how crucial that business' occupancy levels were to its revenue growth, Defendants Filton and Miller closely tracked the metrics they repeatedly touted and prominently reported for that business every quarter.

266. *The magnitude and duration of UHS's widespread illicit admissions scheme is indicative of scienter.* Defendants perpetrated their illicit admissions scheme throughout the two and a half year Class Period. Moreover—as shown by the BuzzFeed report, statements from former employees, and pre-Class Period investigations and *qui tam* lawsuits—the scheme pervaded UHS psychiatric facilities nationwide. Thus, contrary to Defendants' representations, the Company's illicit practices were not "anecdotal," "sporadic," or occurring only in a "small number of our facilities." Indeed, Defendants directed UHS facilities across the country to admit and detain as many patients as they could, regardless of medical necessity, in order to meet the crucial 75% occupancy level that, according to Defendants' boasts, the Behavioral Division had steadily maintained for nearly a decade due to burgeoning patient demand. The magnitude of

Defendants' scheme, which permeated UHS psychiatric facilities nationwide—and its long duration (at least two and a half years and counting)—support a strong inference of scienter.

267. *The manner in which Defendants' illicit admissions scheme came to light supports scienter*. UHS did not voluntarily report Defendants' illicit scheme. It was instead revealed by BuzzFeed on December 7, 2016, after an extensive year-long investigation into the Company's unlawful admissions practices. Even after the publication of BuzzFeed's report, Defendants did not admit to the scheme. They instead flatly denied the report's startling revelations, dismissing them as "overly anecdotal." It was also BuzzFeed who revealed, for the first time, that the coordinated federal civil and criminal investigation of the Company (that had been ongoing for four years) concerned allegations that UHS was unlawfully admitting and detaining patients in its psychiatric facilities regardless of medical necessity—and it was again BuzzFeed who revealed, for the first time on May 23, 2017, that the federal criminal investigation had broadened to include the Department of Defense and the FBI, who were scrutinizing the Company's billings to TRICARE. Even when UHS finally revealed the truth on July 26, 2017—that it could no longer inflate its average length of stay metric by detaining patients longer than was clinically appropriate due to "aggressive payers," and that the four-year federal criminal investigation of the Company had concerned its illicit admissions practices as described in the December 2016 BuzzFeed report all along—Defendants still did not fully come clean. In fact, to date, Defendants maintain that they did nothing wrong, even as the federal criminal investigation of their conduct continues to escalate, and remains ongoing.

268. The manner in which the scheme came to light, and the escalating federal criminal investigation of UHS's behavioral facilities as well as of the corporate entity itself, suggests that UHS's widespread illicit admissions scheme was not the result of negligence, isolated

occurrences, or rogue employees.  It was instead the result of an intentional, or at minimum, severely reckless, coordinated effort to falsely portray the Company's financial and operational results.

269.    *The Company's misrepresentations were material*.  As set forth above, the Behavioral Division is critical to the Company's success, accounting for 50% of its revenues and 70% of its EBITDA.  Defendants have also claimed that the Behavioral Division, because of its purportedly steady and reliable growth, is what sets UHS apart from its peers in the hospital industry.  *See* ¶ 60.  Defendants' coordinated and widespread scheme to inflate this business' key metrics and sizeable revenues was unquestionably material.

## X.    LOSS CAUSATION

270.    During the Class Period, shares of UHS's publicly traded common stock traded on the NYSE.  The market for UHS's Class B common shares was open, well-developed and efficient at all relevant times.

271.    As detailed herein, during the Class Period, Defendants made false and misleading statements and engaged in a scheme that artificially inflated UHS's common shares. Defendants misled investors about UHS's financial health and performance and its prospects for future financial success by failing to disclose that the Behavioral Division's financial condition was dependent upon the illicit admissions scheme, which was risky and volatile, all the while falsely representing that market demand for the Behavioral Division's inpatient psychiatric care was the key factor driving the growth in the business' admissions and revenues.

272.    As a result of their purchases of UHS common stock during the Class Period based on Defendants' material misstatements and omissions, Plaintiffs and other members of the Class suffered economic loss. *i.e.*, damages, under the federal securities laws.

273.    Defendants' false and misleading statements had the intended effect, and caused UHS common stock to trade at artificially inflated levels throughout the Class Period, with UHS common stock reaching as high as $146.24 on August 4, 2015.  On the last trading day before the BuzzFeed report was published, UHS common stock traded at $126.37 per share.

274.    On July 26, 2016, for the first time during the Class Period, Defendants reported a -0.3% decrease in the Behavioral Division's adjusted inpatient admissions, despite Defendants' repeated statements about purportedly booming demand for UHS's psychiatric services.  On this news, UHS's stock dropped over $7.50 per share, from $138.28 on July 26, 2016 to $130.60 on July 27, 2016.

275.    On December 7, 2016, *BuzzFeed News* published an investigative report, based on a year-long investigation of UHS facilities nationwide, exposing Defendants' illicit admissions scheme.  Specifically, the article revealed to investors that (i) UHS was engaged in an illicit admissions scheme whereby it would manipulate patients' symptoms in order to lock them in its inpatient psychiatric facilities; (ii) it would further fabricate patients' symptoms to justify keeping them detained until their insurance payments ran out; and (iii) it was systematically understaffing its facilities in order to further fatten its profit margins, leading to woefully substandard care in its facilities across the country.

276.    In response to the December 7, 2016 *BuzzFeed* article, the price of UHS' common stock precipitously declined by 12% on unusually high trading volume, closing at $111.36 per share from a prior-day close of $126.37, representing a $15-per share decline, and wiping out approximately $1.5 billion in market capitalization in a single trading day.

277.    A week later, on December 14, 2016, Raymond James, an analyst covering the Company, downgraded UHS stock from "Outperform" to "Market Perform."  Raymond James'

stated rationale for the downgrade was "an escalation in events surrounding last week's *BuzzFeed* article," and specifically, a December 9, 2016 letter from Senator Charles Grassley to the OIG, requesting an update on that entity's investigation of UHS. Upon dissemination of this report, UHS's stock fell another 7% on unusually high trading volume, closing at $101.55 on December 14, 2016 from a prior-day close of $108.99, resulting in the elimination of a total of $2.4 billion in the Company's market capitalization since the December 7, 2016 *BuzzFeed* article was published.

278. On April 17, 2017—a week after BuzzFeed published another exposé on the Company on April 11, this time profiling a specific facility, Shadow Mountain in Oklahoma— Senator Grassley called for a federal probe of Shadow Mountain. Specifically, citing a "pattern of conduct that is extremely concerning and casts a dark cloud over UHS's ability to properly care for its patients," the senator asked the Department of Health and Human Services to "investigate UHS for the aforementioned abuses." On this news, UHS's share price dropped again, from $122.00 on April 17, 2017 to $119.89 on April 18, 2017.

279. On April 25, 2017, after market, the Company announced its first quarter results for 2017. For the first time in over a year, the Behavioral Division reported a decline in its average length of stay, of -2.2%. It otherwise reported disappointing same-facility net revenue growth of only 1.4%. On this news, UHS's stock dropped from $121.42 on April 25, 2017 to $118.47 the following day.

280. On May 23, 2017, BuzzFeed published another report on the Company that revealed, for the first time, that the federal government's criminal investigation of UHS had escalated again—this time to include the FBI and the Department of Defense, who were specifically scrutinizing the Company's illicit admission practices and its billings to TRICARE.

The report also described interviews of current employees at UHS psychiatric facilities who confirmed the Company's illicit practices described in the December 2016 BuzzFeed report were ongoing. On this news, UHS's stock declined 2.3%, from $118.84 on May 23, 2017 to $116.06 at the close of trading the following day.

281. On July 25, 2017, after the markets closed, the Company admitted the truth: the Behavioral Division's business was being dramatically, and materially, impacted by Defendants' illicit admission practices and the government scrutiny they had engendered. Specifically, Defendants reported that the Behavioral Division's crucial length of stay metric had declined again for the second consecutive quarter, this time admitting that the decline was not an isolated occurrence, but a direct result of payers aggressively insisting that the Company only hold patients for as long as was "clinically appropriate." The next morning, on a conference call to discuss the earnings released after hours the previous day, Defendants also revealed that the Behavioral Division's payer mix had shifted—instead of being able to "self-select" higher-paying commercial, TRICARE, and Medicare patients, the Company was being forced to accept more and more Medicaid patients, indicating it was no longer enjoying the burgeoning patient demand Defendants had been relentlessly touting throughout the Class Period.

282. On this news, UHS stock price plummeted over $10 per share from $122.90 on July 25, 2017, to $112.88 on July 26, 2017, on unusually high trading volume.

283. The drastic and continuing decline in UHS's stock price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the decline in the Company's share price negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market

conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## XI.    PRESUMPTION OF RELIANCE

284.    At all relevant times, the market for UHS common stock was efficient for the following reasons, among others:

a.    UHS's stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

b.    As a regulated issuer, UHS filed periodic reports with the SEC and the New York Stock Exchange;

c.    UHS regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.    UHS was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public market place.

285.    As a result of the foregoing, the market for UHS's common stock reasonably and promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of UHS's common stock. All purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of UHS shares of common stock at artificially inflated prices, and a presumption of reliance applies.

286.    A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding UHS's business

and operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XII. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

287. The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. None of the statements complained of herein was a forward-looking statement. Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about UHS's reported revenues and other financial and operational metrics pertaining to the Behavioral Division, in addition to the demand for its inpatient psychiatric business and its practices pertaining to the staffing of its facilities, among others.

288. To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted Defendants' statements regarding the financial condition of the Behavioral Division, market demand for that business, and its staffing levels, among others. Given the then-existing facts contradicting Defendants' statements, i.e., the widespread illicit admissions scheme, any generalized risk disclosures made by UHS were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

289.     To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by an executive officer of UHS who knew that the statement was false when made.

## XIII.    CLASS ACTION ALLEGATIONS

290.     Lead Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased, or otherwise acquired, the common stock of UHS between March 2, 2015 and July 25, 2017, inclusive (the "Class"), and who were damaged thereby.   Excluded from the Class are Defendants, the officers and directors of UHS at all relevant times, members of their immediate families, and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

291.     The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, UHS shares of Class B common stock were actively traded on the New York Stock Exchange.   As of July 31, 2017, UHS had over 88 million Class B shares outstanding.   While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds-of-thousands of members of the proposed Class. Class members who purchased UHS common stock may be identified from records maintained

by the Company, or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

292. Lead Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws, as complained of herein.

293. Lead Plaintiffs will fairly and adequately protect Class members' interests, and have retained competent counsel experienced in class actions and securities litigation.

294. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

    a. whether the federal securities laws were violated by Defendants' acts, as alleged herein;

    b. whether the Defendants made statements to the investing public during the Class Period that were false, misleading or omitted material facts;

    c. whether Defendants acted with scienter; and

    d. the proper method to measure damages.

295. A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIV. COUNTS AGAINST THE DEFENDANTS

## COUNT I

### For Violations Of Section 10(b) Of The Exchange Act, And SEC Rule 10b-5 Promulgated Thereunder (Against Defendants UHS, Miller, and Filton)

296.    Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

297.    This Count is asserted on behalf of all members of the Class against Defendants UHS, Miller, and Filton for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

298.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

299.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and other investors similarly situated in connection with their purchases of UHS common stock during the Class Period.

300.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the

other members of the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of UHS common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiffs and the other members of the Class, regarding, among other things, UHS's reported revenues and other financial metrics pertaining to the Behavioral Division, in addition to the demand for its inpatient psychiatric business and its practices pertaining to the staffing of its facilities; (b) artificially inflate and maintain the market price of UHS common stock; and (c) cause Lead Plaintiffs and the other members of the Class to purchase the Company's common stock at artificially inflated prices, and to suffer losses when the true facts became known.

301.    Defendants UHS, Miller, and Filton are liable for all materially false and misleading statements made during the Class Period, as alleged above.

302.    As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.  The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of UHS common stock, were either known to the Defendants, or were so obvious that the Defendants should have been aware of them.

303.    Lead Plaintiffs and the other members of the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for UHS shares of common stock, which inflation was removed from its price when the true facts became known.  Lead Plaintiffs and the other members of the Class would not have purchased UHS

common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

304.     As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of UHS common stock during the Class Period.

## COUNT II

### (For Violations Of Section 20(a) Of The Exchange Act (Against Defendants Miller and Filton)

305.     Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

306.     This Count is asserted on behalf of all members of the Class against Defendants Miller and Filton for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

307.     During their tenures as officers and/or directors of UHS, each of these Defendants was a controlling person of the Company, within the meaning of Section 20(a) of the Exchange Act.  *See e.g.,* ¶¶26-35.  By reason of their positions of control and authority as officers and/or directors of UHS, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of the public statements made by UHS during the Class Period, including its materially misleading statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

308.     In their capacities as senior corporate officers of the Company, and as more fully described above in ¶¶26-35, Defendants Miller and Filton had direct involvement in the day-to-

day operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its accounting and reporting functions. Defendants Miller and Filton signed the Company's SEC filings during the Class Period, and were directly involved in providing false information, and in certifying and approving the false statements disseminated by UHS during the Class Period. Defendants Miller and Filton were also directly responsible for controlling, and did control and were directly involved in providing false information, and in certifying and approving the false statements disseminated by UHS during the Class Period. As a result of the foregoing, Defendants Miller and Filton, as a group and individually, were controlling persons of UHS within the meaning of Section 20(a) of the Exchange Act.

309. As set forth above, UHS violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

310. By virtue of their positions as controlling persons of UHS, and as a result of their own aforementioned conduct, Defendants Miller and Filton are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs, and the other members of the Class, who purchased or otherwise acquired UHS common stock. As detailed above in ¶¶26-35, during the respective times these Defendants served as officers and/or directors of UHS, each of these Defendants was culpable for the material misstatements and omissions made by the Company.

311. As a direct and proximate result of these Defendants' conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchase or other acquisition of UHS common stock.

## XV.   **PRAYER FOR RELIEF**

312.   WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

a.   Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b.   Awarding all damages and other remedies available under the Securities Exchange Act in favor of Lead Plaintiffs and all other members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

c.   Awarding Lead Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d.   Such other and further relief as the Court may deem just and proper.

## XVI.   **JURY DEMAND**

313.   Lead Plaintiffs hereby demand a trial by jury.

Dated:  September 29, 2017                    Respectfully submitted,

By: _____
David M. Promisloff

**PROFY PROMISLOFF & CIARLANTO, P.C.**
David M. Promisloff (ID# 200971)
Joseph M. Profy (ID# 77141)
Jeffrey J. Ciarlanto (ID# 205838)
100 N. 22nd Street, Unit 105
Philadelphia, Pennsylvania 19103
Telephone: (215) 259-5156
Facsimile:  (215) 600-2642
David@prolawpa.com
Profy@prolawpa.com
Ciarlanto@prolawpa.com

*Liaison Counsel for Lead Plaintiffs*

**SAXENA WHITE P.A.**
Maya Saxena
Joseph E. White, III
Lester R. Hooker

Dianne M. Anderson
5200 Town Center Circle
Suite 601
Boca Raton, FL 33486
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com
danderson@saxenawhite.com

-and-

Steven B. Singer
Kyla Grant
Joshua Saltzman
4 West Red Oak Lane, Suite 312
White Plains, New York 10604
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
ssinger@saxenawhite.com
kgrant@saxenawhite.com
jsaltzman@saxenawhite.com

*Lead Counsel for Lead Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that the service required by Federal Rule of Civil Procedure 5(a) has been made and that, on September 29, 2017, a true and correct copy of the foregoing was filed with the Clerk of the Court. Lead Plaintiffs' counsel will serve the Amended Complaint on counsel of record via electronic mail on September 29, 2017. Defendants' counsel includes:

Steven A. Reed (steven.reed@morganlewis.com)

Jason H. Wilson (jason.wilson@morganlewis.com)

Gary A. Orseck (gorseck@robbinsrussell.com)

Matthew M. Madden (mmadden@robbinsrussell.com)

D. Hunter Smith (hsmith@robbinsrussell.com)

David M. Promisloff

**CERTIFICATION AND AUTHORIZATION OF LEAD PLAINTIFF**

I, Andy Mackle, on behalf of the Teamsters Local 456 Pension Fund ("Local 456 Pension"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am authorized in my capacity as Fund Manager to initiate litigation on Local 456 Pension's behalf and to execute this Certification.

2. I have reviewed the Amended Class Action Complaint for Violation of the Federal Securities Laws ("Complaint") in this action and authorize its filing.

3. Local 456 Pension did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

4. Local 456 Pension is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

5. Local 456 Pension's transactions in Universal Health Services, Inc. common stock are set forth in the Schedule A attached hereto.

6. Local 456 Pension has sought to serve and was appointed as lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification: *None*

7. Local 456 Pension has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff, was not appointed lead plaintiff or the lead plaintiff decision is still pending: *None*

8. Local 456 Pension will not accept any payment for serving as a representative party on behalf of the Class beyond Local 456 Pension's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.
Executed this 25 day of September 2017.

Teamsters Local 456 Pension Fund

Andy Mackle, Fund Manager

1

**Beg. Hold.**          0

| Common Stock Purchases | | |
|---|---|---|
| **Date** | **Shares** | **Price** |
| 04/02/15 | 836 | $116.77 |
| 06/18/15 | 466 | $132.10 |
| 06/29/15 | 3,495 | $142.54 |
| 11/12/15 | 267 | $117.86 |
| 04/07/16 | 140 | $123.35 |
| 08/10/16 | 75 | $126.50 |
| 08/15/16 | 336 | $126.62 |
| 11/18/16 | 585 | $123.06 |
| 12/13/16 | 40 | $111.03 |
| 02/13/17 | 275 | $116.98 |
| 02/13/17 | 865 | $116.98 |
| 07/12/17 | 461 | $123.12 |

| Common Stock Sales | | |
|---|---|---|
| **Date** | **Shares** | **Price** |
| 06/01/15 | 10 | $130.94 |
| 04/25/16 | 10 | $127.03 |
| 05/24/16 | 60 | $135.20 |
| 08/25/16 | 20 | $120.48 |
| 12/22/16 | 75 | $106.98 |
| 04/21/17 | 55 | $118.46 |
| 05/09/17 | 600 | $122.67 |
| 05/09/17 | 915 | $122.67 |

## CERTIFICATION AND AUTHORIZATION OF LEAD PLAINTIFF

I, Andy Mackle, on behalf of the Teamsters Local 456 Annuity Fund ("Local 456 Annuity"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am authorized in my capacity as Fund Manager to initiate litigation on Local 456 Annuity's behalf and to execute this Certification.

2. I have reviewed the Amended Class Action Complaint for Violation of the Federal Securities Laws ("Complaint") in this action and authorize its filing.

3. Local 456 Annuity did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

4. Local 456 Annuity is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

5. Local 456 Annuity's transactions in Universal Health Services, Inc. common stock are set forth in the Schedule A attached hereto.

6. Local 456 Annuity has sought to serve and was appointed as lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *Westchester Putnam Counties Heavy and Highway Laborers Local 60 Benefit Funds v. Brixmor Property Group, Inc. et al.*, 1:16-cv-02400 (S.D.N.Y.)

7. Local 456 Annuity has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff, was not appointed lead plaintiff or the lead plaintiff decision is still pending: *None*

8. Local 456 Annuity will not accept any payment for serving as a representative party on behalf of the Class beyond Local 456 Annuity's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.
Executed this 28 day of September 2017.

Teamsters Local 456 Annuity Fund

Andy Mackle, Fund Manager

## SCHEDULE A
### Teamsters Local 456 Annuity Fund
#### *Universal Health Services, Inc.*

**Beg. Hold.**        3,615

| Common Stock Purchases | | |
|---|---|---|
| **Date** | **Shares** | **Price** |
| 04/02/15 | 784 | $116.77 |
| 06/08/15 | 446 | $132.10 |
| 11/12/15 | 248 | $117.86 |
| 04/07/06 | 116 | $123.35 |
| 08/12/16 | 50 | $126.76 |
| 08/15/16 | 317 | $126.62 |
| 11/18/16 | 940 | $123.06 |
| 12/13/16 | 45 | $111.03 |
| 02/13/17 | 1,465 | $116.98 |
| 02/13/17 | 290 | $116.98 |
| 07/12/17 | 447 | $123.12 |

| Common Stock Sales | | |
|---|---|---|
| **Date** | **Shares** | **Price** |
| 06/30/15 | 475 | $142.03 |
| 08/11/15 | 25 | $140.63 |
| 09/09/15 | 25 | $135.97 |
| 03/04/16 | 20 | $115.99 |
| 02/14/17 | 125 | $120.39 |
| 05/09/17 | 820 | $122.72 |
| 05/09/17 | 45 | $122.84 |
| 05/09/17 | 1,280 | $122.67 |
| 06/14/17 | 20 | $116.57 |