IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TEAMSTERS LOCAL 456 PENSION FUND, et al., <br><br>            Plaintiffs, <br><br> v. <br><br> UNIVERSAL HEALTH SERVICES, et al., <br><br>            Defendants. | CIVIL ACTION <br> NO. 17-2817 |

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ................................................................................................ 4

II.  BACKGROUND ................................................................................................. 6

   A. Events Leading Up to March 2, 2015, the Start of the Class Period .................................. 10

       1.     Qui Tam Lawsuits and State Investigations ........................................................ 10

       2.     Letter from Change to Win ("CtW") About Use of Suicidal Ideation Code

             by Universal Health Services ("UHS") Behavioral Health Facilities ................... 13

       3.     Coordinated Federal Investigation of UHS Behavioral Health Facilities ............. 16

   B. Defendants' Statements from March 2, 2015 to December 7, 2016 ................................... 19

   C. Buzzfeed News Publishes First UHS Article on December 7, 2016 with Several Claims

      of Improper Conduct ........................................................................................... 23

       1.    Alleged Improper Labelling of Patients as Suicidal to Justify Admissions .............. 24

       2.    Alleged Improper Lengthening of Patient Stays ...................................................... 26

       3.    Alleged Understaffing at UHS Behavioral Health Facilities .................................... 28

D. Defendants' Statements and Representations from December 7, 2016 to July 25, 2017.... 29

E. Ten Anonymous UHS Employees Allege Misconduct ........................................................ 38

F. Lead Plaintiffs File the Amended Complaint in Federal Court ......................................... 41

III. STANDARD OF REVIEW ................................................................................................ 44

IV. ANALYSIS ........................................................................................................................ 47

A. Lead Plaintiffs Have Failed to State a Claim Under Section 10(b) of the Securities
and Exchange Act of 1934 and Rule 10b-5 ........................................................................ 48

　　1.　　Alleged Material Misrepresentations and Omissions ...................................... 49

　　　　a.　　Pre-Article Statements .................................................................. 52

　　　　　　i.　Statements About the Behavioral Health Division's Performance ......... 54

　　　　　　ii. Chief Financial Officer Filton's Statement About the Behavioral
　　　　　　Health Division's 2016 Second Quarter Results .................................... 62

　　　　b.　　Post-Article Statements ................................................................. 65

　　　　　　i.　Statements Denying the Article's Conclusions ....................................... 66

　　　　　　ii. Statements Denying the Effect of Buzzfeed I and the Federal
　　　　　　Investigation ................................................................................... 68

　　　　　　iii. Statements Regarding Updates in the Federal Investigation ................... 71

　　2.　　Scienter Has Not Been Sufficiently Pled ....................................................... 73

　　　　a.　　Alan B. Miller, the Chairman of the Board and Chief Executive Officer,
　　　　　　and Steve G. Filton, the Chief Financial Officer ..............................75

　　　　b.　　Defendant UHS ..............................................................................88

B. Count II – Section 20(a) of the Securities and Exchange Act of 1934 ................................ 92

V.   CONCLUSION ................................................................................................................. 93

<u>**OPINION**</u>

**Slomsky, J.**                                                                                      **August 19, 2019**

**I.       INTRODUCTION**

Defendant Universal Health Services ("UHS") is the largest provider of behavioral health services in the United States.  On December 7, 2016, after a year-long investigation, Buzzfeed News ("Buzzfeed") published an article that alleged that UHS behavioral health facilities were committing insurance fraud by (1) admitting healthy patients not in need of inpatient treatment to UHS behavioral health facilities by falsely stating that they were suicidal; (2) improperly lengthening patients' stays in UHS behavioral health facilities; and (3) chronically understaffing those facilities to maximize profits.  Prior to the publication of the article, UHS reported that its Behavioral Health Division was in strong financial shape and that demand for UHS behavioral health services was so high that UHS-owned facilities routinely turned away patients that met clinical admissions criteria.  In the wake of the article, UHS stock plummeted 12% in a single trading day, wiping out $1.5 billion in market capitalization.  The company immediately denied the allegations of widespread billing misconduct, and to date, UHS maintains that it did not engage in the illicit conduct profiled in the Buzzfeed article.  (<u>See</u> Doc. No. 30.)

On December 23, 2016, Plaintiff David Heed, a UHS shareholder, filed the present federal securities class action in the United States District Court for the Central District of California.  (<u>See</u> Doc. No. 1.)  Named as Defendants are UHS, Alan B. Miller, the Chairman and Chief Executive Officer of UHS, and Steve G. Filton, the Chief Financial Officer of UHS (collectively, "Defendants").  The lawsuit alleges that Defendants knowingly or recklessly made materially false and misleading statements about UHS practices and procedures and failed to disclose that the

Behavioral Health Division relied on revenue from illegal and unethical conduct.[1] On April 24, 2017, Teamsters Local 456 Pension Fund[2] and Teamsters Local 456 Annuity Fund[3] ("Lead Plaintiffs") were appointed Co-Lead Plaintiffs to represent the interests of UHS shareholders in the suit.

On June 20, 2017, the district court in California granted Defendants' unopposed Motion to Transfer the case to the Eastern District of Pennsylvania, at which point the case was assigned to former Chief Judge Lawrence F. Stengel. On September 29, 2017, Lead Plaintiffs filed the Amended Complaint on behalf of all investors who purchased or otherwise acquired UHS publicly-traded common stock between March 2, 2015 and July 25, 2017 (the "Class Period"). (Doc. No. 30.) In Count I of the Amended Complaint, Lead Plaintiffs allege that Defendants knowingly disseminated false or misleading statements about UHS's finances, policies, and procedures in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5, which was promulgated under Section 10(b). (Id. ¶¶ 296-304.) In Count II, Lead Plaintiffs allege that the conduct of Defendants Miller and Filton, individuals in positions of

---

[1] In connection with this alleged conduct, UHS, Alan B. Miller, and Steve G. Filton have been named as defendants in a consolidated shareholder derivative action pending before this Court. See In re Universal Health Services, Inc., Derivative Litigation, Civ. No. 17-2187 (E.D. Pa., filed May 12, 2017). The derivative action is being dismissed in a separate Opinion and Order.

[2] Co-Lead Plaintiff Teamsters Local 456 Pension Fund ("Local 456 Pension") is one of the nation's largest multi-employer defined benefit pension plans. It has $4 million in assets and 6,500 participants across the country. Local 456 Pension purchased UHS common stock on the New York Stock Exchange during the Class Period and allegedly suffered damages as a result of Defendants' conduct. (Doc. No. 30 ¶ 21.)

[3] Co-Lead Plaintiff Teamsters Local 456 Annuity Fund ("Local 456 Annuity") is a defined contribution plan that currently manages $180 million in assets on behalf of 1,900 participants. Local 456 Annuity purchased UHS common stock on the New York Stock Exchange during the Class Period and allegedly suffered damages as a result of Defendants' conduct. (Doc. No. 30 ¶ 22.)

control and authority over the company, violated Section 20(a) of the Exchange Act.  (Id. ¶¶ 305-311.)

On December 6, 2017, Defendants filed the present Motion to Dismiss the Amended Complaint.  (Doc. No. 34.)  On February 7, 2018, Lead Plaintiffs filed a Response in Opposition (Doc. No. 35), and on March 26, 2018, Defendants filed a Reply in support of the Motion (Doc. No. 36).  Then, on July 12, 2018, the case was reassigned from Judge Stengel to Judge Robert F. Kelly.  (Doc. No. 37.)  Two days later, the case was reassigned to this Court.  (Doc. No. 38.)  On September 12, 2018, the Court held a hearing on Defendants' Motion to Dismiss.  On October 5, 2018, in accordance with the direction of the Court at the hearing, the parties filed supplemental memoranda on matters raised during the Motion to Dismiss hearing.[4]  (Doc. Nos. 50, 51.)

The Motion to Dismiss is now ripe for review.  For reasons discussed below, Defendants' Motion to Dismiss (Doc. No. 34) will be granted.

## II.    BACKGROUND[5]

Defendant Universal Health Services ("UHS") was founded by Defendant Alan B. Miller in 1979. It is a publicly traded company[6] that owns and operates hospitals throughout the United

---

[4]    Additionally, on July 3, 2019, Lead Plaintiffs filed a Notice of Supplemental Authority in Opposition to Defendants' Motion to Dismiss the Amended Class Action Complaint.  (Doc. No. 53.)  On July 15, 2019, Defendants filed a Response to Lead Plaintiffs' Notice of Supplemental Authority.  (Doc. No. 54.)  On July 22, 2019, Defendants filed a Second Notice of Supplemental Authority.  (Doc. No. 55.)  On July 26, 2019, Defendants filed a Notice Regarding the Government's Investigation into UHS.  (Doc. No. 56.)  Finally, on August 1, 2019, Lead Plaintiffs filed a Response to Defendants' Notice.  (Doc. No. 57.)  The Court has considered the parties' supplemental briefings in deciding the Motion to Dismiss.

[5]    The facts are taken from the Amended Complaint and are accepted as true for purposes of deciding the Motion to Dismiss.  Phillips v. Cnty. of Allegheny, 515 F.3d 224, 228 (3d Cir. 2008).

[6]    UHS common stock trades on the New York Stock Exchange under the ticker symbol "UHS."  (Doc. No. 30 ¶ 25.)

States, the United Kingdom, Puerto Rico, and the U.S. Virgin Islands. The company, which is headquartered in King of Prussia, Pennsylvania, is split into two divisions: (1) the Acute Care Division, which operates general hospitals, and (2) the Behavioral Health Division,[7] which operates inpatient and outpatient psychiatric facilities. (Doc. No. 34-2 at 11.)

The Behavioral Health Division has over 200 behavioral health facilities across the country, making UHS the largest provider of behavioral health services in the United States. (Doc. No. 30 ¶ 4.) For context, in 2016, UHS behavioral health facilities admitted half-a-million patients, which resulted in six million patient-days and generated $4.43 billion in net revenue. (Id. ¶ 24.) One-third of that revenue was derived from government health insurance payers, such as Medicare, TRICARE, which is a military insurer, and Medicaid; two-thirds of the revenue came from commercial health insurance payers.[8] (Id.)

According to Defendants' filings with the United States Securities and Exchange Commission ("SEC"), each UHS behavioral health facility operates under its own leadership team, including a chief executive officer, chief financial officer, and compliance staff. (Doc. No. 34-2 at 11.) Each facility also has its own governance board, which includes members of the facility's

---

[7]  UHS's Behavioral Health Division offers an array of services to treat behavioral health issues, including depression, anxiety, psychotic disorders, bipolar disorder, post-traumatic stress, substance abuse, autism, eating disorders, and neurorehabilitation. It operates outpatient, inpatient, partial hospitalization, and residential treatment programs. See Behavioral Health, Universal Health Services, https://www.uhsinc.com/about-uhs/behavioral-health/ (last visited: June 12, 2019).

[8]  Commercial health insurance is any health care insurance that is not provided by a government program. Most commercial health insurers are publicly traded companies with the principal purpose of generating a profit for shareholders. Examples of commercial health insurers include Cigna, Aetna, and United Health Group. Understanding Commercial Health Insurance, Medical Billing & Coding, https://www.medicalbillingandcoding.org/health-insurance-guide/commercial-health-insurance/ (last visited: Apr. 16, 2019).

medical and professional staff, and is responsible for the facility's day-to-day medical, clinical, and ethical practices.  (Id.)

Also named as Defendants are Alan B. Miller and Steve G. Filton.[9]  Mr. Miller has served as Chairman of the Board and the Chief Executive Officer of UHS since he founded the company in 1979.  (Id. ¶ 26.)  According to UHS's April 6, 2017 Schedule 14A filing,[10] "the family of Alan B. Miller holds more than 95% of the shares of the Class A and C Common Stock, which is entitled to elect 80% of the entire Board of Directors and constitutes more than 50% of our aggregate voting power."  (Id.)  In the Amended Complaint, Lead Plaintiffs cite to a 2017 Axios article that states that Mr. Miller, who made over $51.3 million in 2016, is the highest-paid CEO in the hospital industry.[11]  (Id. ¶ 30.)

Mr. Filton has served as Executive Vice President and Chief Financial Officer of UHS since 2003.  (Id. ¶ 32.)  UHS's April 2017 Schedule 14A filing notes that Mr. Filton "beneficially owned

---

[9]  As noted in Footnote 1, supra, in connection with the misconduct alleged here, a consolidated shareholder derivative action is pending before this Court.  See In re Universal Health Services, Inc., Derivative Litigation, Civ. No. 17-2187 (E.D. Pa., filed May 12, 2017).  Named in the shareholder derivative action are nine UHS Officers and Directors, including Alan B. Miller and Steve G. Filton.  In this action, only Mr. Miller and Mr. Filton are named as individual Defendants.

[10]  The Securities and Exchange Commission ("SEC") requires that shareholders of a publicly traded company receive a proxy statement prior to a shareholder meeting.  The information contained in the statement must be filed with the SEC before the company solicits a shareholder vote on the election of directors or the approval of other corporate action.  That filing is known as a Schedule 14A Form and must provide shareholders with sufficient information to allow them to make an informed vote at the upcoming meeting or to authorize a proxy to vote on their behalf.  See Proxy Statement, Securities and Exchange Commission https://www.sec.gov/answers/proxy.htm (last visited: Apr. 17, 2019); 17 C.F.R. § 240.14a-101.

[11]  Bob Herman, The richest CEO in the hospital industry, AXIOS (Apr. 10, 2017) https://www.axios.com/the-richest-ceo-in-the-hospital-industry-1513301499-648b4431-6dde-4eea-b22f-f0afeef420d4.html.

over $50 million of the Company's Class B Common Stock during the Class Period." (Id.) In 2016, he received $2,533,102 in compensation. (Id. ¶ 33.)

Lead Plaintiffs allege that during the Class Period, Mr. Miller and Mr. Filton reviewed, approved, and signed UHS's quarterly and annual filings with the SEC, which contained materially false and misleading statements and omissions. Additionally, Lead Plaintiffs claim that Mr. Miller and Mr. Filton made materially false and misleading statements and omissions at health care conferences and during investor earnings calls during the Class Period. (Id. ¶¶ 31, 35.)

More specifically, in the Amended Complaint, Lead Plaintiffs allege that "UHS mental health facilities across the country manipulated and fabricated patient intake assessments—including by falsely coding them as 'suicidal'—in order to admit thousands of patients for psychiatric care that was not medically necessary," and that UHS facilities would then "keep patients locked up, regardless of medical necessity, for as many days as insurance would cover." (Id. ¶ 3.) Lead Plaintiffs further allege that Defendants knew about and approved of these practices, but made materially false and misleading statements to the public about UHS's financial health and patient intake procedures, in violation of federal securities laws.[12] (See id. ¶¶ 296-311.) Lead Plaintiffs represent investors who purchased or otherwise acquired UHS common stock on the New York Stock Exchange between March 2, 2015 and July 25, 2017, the Class Period. (Id. ¶¶ 1-2.)

To address these allegations, the Court will proceed chronologically. First, the Court will address events that occurred before the Class Period, which, as noted above, began on March 2,

---

[12] In the Amended Complaint, Lead Plaintiffs do not attempt to hold Defendants liable for knowing of or approving the alleged insurance fraud. Instead, they only allege that Defendants violated federal securities laws by knowingly or recklessly making material misstatements and omissions during the Class Period.

2015. Then, the Court will set forth the Defendants' allegedly false and misleading statements made between March 2, 2015, the start of the Class Period, and December 7, 2016, the day the first Buzzfeed article ("Buzzfeed I") was published. Finally, the Court will discuss the allegations raised in Buzzfeed I, the events that transpired in its wake, and the statements made by Defendants from December 7, 2016 through July 25, 2017, the close of the Class Period.

### A. Events Leading Up to March 2, 2015, the Start of the Class Period

Lead Plaintiffs allege that events leading up to the Class Period, which began on March 2, 2015, put UHS on notice that UHS behavioral health facilities across the country utilized fraudulent or unethical practices to maximize insurance reimbursements. Lead Plaintiffs separate these events into three categories: (1) lawsuits filed against UHS by patients and former employees, and state investigations; (2) a letter from Change to Win ("CtW"), a prominent investment group; and (3) a coordinated federal civil and criminal investigation of UHS behavioral health facilities across the country.

### 1. Qui Tam Lawsuits and State Investigations

Before March 2, 2015, at least six qui tam lawsuits[13] were filed against UHS by former employees of UHS behavioral health facilities. In 2010, Dr. Steven Klotz, a former psychiatrist at the Roxbury Treatment Facility in Pennsylvania,[14] filed a qui tam lawsuit against UHS, alleging that UHS "falsely and fraudulently coded patients as suicidal, when the chart did not reflect a

---

[13] In a qui tam lawsuit, a private party, called a "relator," brings an action on the government's behalf. Qui Tam Action, Black's Law Dictionary (10th ed. 2014). For example, the federal False Claims Act authorizes qui tam whistleblower actions against parties who have defrauded the federal government. 31 U.S.C. § 3279 et seq. If the relator succeeds, the government and the relator share the monetary award.

[14] In general, UHS-owned hospitals and facilities do not do business under the UHS name. (Doc. No. 34-3 at 7.)

likelihood of patient suicide," in order to increase occupancy levels at UHS facilities. (Id. ¶ 38.) Dr. Klotz further alleged that UHS trained employees to prioritize insurance reimbursement over patient well-being. (Id.)

In 2011, another qui tam lawsuit was filed, this time in relation to Arbour Health System, a UHS behavioral health facility in Massachusetts. That suit alleged that "UHS failed to comply with state regulations requiring [a] sufficient [number of] qualified psychiatric staff, that the facility billed Medicare and Medicaid for services that were not rendered, that the facility misrepresented the credentials of its psychiatric staff, and that these practices resulted in the death of a patient." (Id. ¶ 41.)

In 2012, UHS settled two separate qui tam lawsuits that had been filed by former employees of the Marion Youth Center in Virginia. In the first suit, which was filed in 2007, a group of therapists who once worked at the facility alleged that UHS promoted unlawful practices to increase insurance payouts, including deliberately understaffing the facility, "provoking ('escalating') residents so that the resident's reaction would serve to justify a longer length of stay in order to increase the Medicaid reimbursement for that resident," and "delaying the discharge of residents ready for discharge in order to increase Medicaid reimbursement." (Id. ¶ 42.) Federal and state authorities joined the case before it was settled for $6.85 million. (Id.) In the second suit, which was filed in 2010, Barbara Jones, the Director of Education at Marion Youth Center, alleged that the UHS management team told employees that the facility's numbers needed to be "kept up." To accomplish that goal, employees were instructed to delay discharge of patients and to admit patients who did not meet the clinical criteria for admission, "simply to get Medicaid monies." (Id. ¶ 43.)

Another qui tam lawsuit was filed in 2012 by former nurses at Verdugo Hills Hospital, a UHS behavioral health facility in California. The nurses claimed that they were instructed to admit all new patients, regardless of medical need. To effectuate that instruction, nurses were taught to "negative chart." That is, they were instructed to "make notes in patients' charts using exaggerated buzz words like 'agitated,' 'irritated,' 'aggressive,' 'resisting,' 'uncooperative,' etc.,'" because "doing this increases the amount of money the government would pay for the patient's care." (Id. ¶ 44.) Finally, in 2013, two therapists who formerly worked at the National Deaf Academy in Florida filed a lawsuit against UHS, alleging that they were instructed to falsify reports and patient records to unnecessarily admit or detain patients so that UHS could bill insurers. (Id. ¶ 45.) Plagued with reports of abuse, the facility closed its doors in 2016. (Id.)

Apart from the qui tam lawsuits, UHS faced pressure from state authorities. In 2013, the Illinois Department of Children and Family Services ("DCFS") and the Department of Psychiatry at the University of Illinois opened an investigation into Hartgrove Hospital, a UHS behavioral health facility in Chicago. (Id. ¶ 39.) After randomly observing staff-patient interactions over an eight-month period and reviewing 12,000 pages of the facility's internal documents, the investigators concluded that Hartgrove Hospital maintained a policy of not only overadmitting patients, but also understaffing the facility in order to increase revenue. (Id.) In a report, the investigators stated that UHS had been overfilling Hartgrove Hospital since 2007:

> Over the course of several years[,] hundreds of mentally ill children—DCFS wards and non-wards alike—slept on rollaway cots in an overcrowded and frequently chaotic psychiatric hospital so that UHS corporate officials could take advantage of the opportunity to maximize profits.

(Id.) Furthermore, the report emphasized that the issues observed at Hartgrove were not isolated. Rather, "[d]uring the course of the review, the [] team learned about troubling reports suggesting a pattern of quality of care issues, harm to patients or major healthcare fraud charges involving

UHS-operated facilities in a dozen other states beyond Illinois: Virginia, Tennessee, Pennsylvania, North Carolina, California, South Carolina, Massachusetts, Connecticut, Texas, Nevada, Arkansas and Missouri." (Id. ¶ 40.)

### 2. Letter from Change to Win ("CtW") About Use of Suicidal Ideation Code by Universal Health Services ("UHS") Behavioral Health Facilities

On April 8, 2014, Change to Win Investment Group ("CtW"), a prominent coalition of unions that works to hold public companies accountable for corporate fraud, sent a letter to the UHS Board of Directors, raising questions about the admissions and billing practices of UHS behavioral health facilities. The letter was signed by Dieter Waizeneggar, CtW's Executive Director. In the letter, CtW informed UHS that an independent review of Medicare data revealed that "UHS free-standing inpatient psychiatric facilities ("IPFs") utilize the suicidal ideation code much more frequently than other free-standing IPFs."[15] (Id. ¶¶ 47-48; Doc. No. 34-4 at 3.) Moreover, CtW noted that the data showed that behavioral health facilities acquired by UHS dramatically increased their use of the suicidal ideation code after they were purchased by UHS. (Doc. No. 34-4 at 3-4.) CtW also advised UHS that a substantial portion of UHS behavioral health facilities ranked above the 80th percentile nationally for suicidal ideation diagnoses as compared to similar behavioral health facilities—a level identified as "indicating a significant outlier at risk of billing errors." (Id.) On that subject, the letter stated the following:

> . . . [T]his pattern of extremely high suicidal ideation rates is particularly troubling because it seems consistent with allegations made by a former UHS doctor in 2010. In a qui tam lawsuit, Dr. Steven G. Klotz, formerly of the Roxbury Treatment

---

[15] Suicidal ideation refers to thinking about, considering, or planning suicide. Suicide, National Institute of Mental Health, https://www.nimh.nih.gov/health/statistics/suicide.shtml (last visited: Apr. 24, 2019). Billing codes are used by health care facilities to bill an insurance company for services rendered. Relevant here, patients admitted to UHS facilities because they exhibit signs of suicidal ideation are assigned the suicidal ideation billing code. Defendants emphasize that such coding does not happen at admission. Rather, a patient is assigned a code after discharge based on his or her medical records. (Doc. No. 34-2 at 15.)

Center (a UHS facility), alleged that UHS "falsely and fraudulently coded patients as suicidal, when the chart did not reflect a likelihood of patient suicide." Dr. Klotz further alleged the UHS's internal audit employees advised caregivers on how to maximize reimbursement. While the DoJ[16] declined to intervene in Dr. Klotz's suit . . . we are concerned that the Medicare data seems to point to an unusually high level of suicidal ideation coding at UHS facilities . . . .

(Id. at 4.)

After setting forth these perceived red flags, CtW lamented that "UHS's board has not disclosed any efforts by itself or the Audit Committee to determine if UHS's unusually high level of suicidal ideation diagnoses, comorbidity rates, or other billing practices, may be generating excessive regulatory and compliance risks for the company and its long-term shareholders." (Id. at 5.) In light of these issues, CtW urged UHS to create a separate compliance committee "comprised of independent directors with direct medical and regulatory experience to oversee legal and regulatory compliance." (Id. at 7.) Without better corporate governance, CtW worried that UHS shareholders were exposed to significant financial risk. (Id. at 2.)

On April 22, 2014, John Herrell, the Chairman of the UHS Audit Committee responded to CtW's concerns in a letter. (Doc. No. 34-5.) To start, Mr. Herrell, emphasized that UHS behavioral health facilities "provid[e] the highest quality of care and treatment" to patients:

First and foremost, I would like to address any misplaced quality of care concerns you may have as well as illustrate the extensive compliance mechanisms and practices in place at UHS to ensure our facilities are providing the highest quality of care and treatment to our patients under the direction of the Board of Directors. In 2013, The Joint Commission awarded 48 UHS facilities *Top Performer Status* for Quality and Patient Safety. 44 of the 48 UHS facilities that received this high quality distinction were behavioral health facilities. This equates to 40% of UHS's eligible behavioral health facilities achieving this elite quality distinction from The Joint Commission. In fact, 27% of all the behavioral health facilities in the nation which received this designation were UHS facilities. Such a measure of success does not come without a full commitment of resources of the entire company, including its Board of Directors, to providing the highest quality healthcare. UHS's facilities have also received a number of other recognitions, awards and designations for its high quality services too numerous to mention here.

---

[16] "DoJ" refers to the United States Department of Justice.

(Id. at 2) (footnotes omitted).  Mr. Herrell also addressed the qui tam lawsuits that were referenced

in CtW's letter:

> Many of the contentions in the prior letters were based on lawsuits filed against the company or its subsidiaries.  The lawsuit in Boston mentioned in the November 8th letter from your local 1199[17] and covered in the Boston Globe articles last year has since been dismissed by the court.  In addition, both the Massachusetts Attorney General's Office and the U.S. Department of Justice had previously declined to intervene.  As mentioned in the prior letters, the qui tam case filed related to the Roxbury Treatment Center was also dismissed following the government's investigation of the allegations and decision not to intervene.  Such actions and dispositions of those cases should point to their lack of basis.  We have only recently become aware of the allegations in the qui tam action at Roxbury.  I have been informed that the company is conducting its own internal review.  The preliminary investigation to date confirms that the allegations are without merit.  Further, settlements of lawsuits do not constitute admissions of liability in any circumstance but instead reflect economic realities of the costs and risks of litigation.  Any product company is often faced with the prospect of settling cases it believes it could defend due to the extremely high cost associated with litigation and the always unpredictable nature of our judicial system.

(Id. at 3.)  Mr. Herrell admitted that "a small minority of [UHS] facilities may encounter sporadic

regulatory compliance issues," but assured CtW that "those matters are always remedied."  (Id.)

Next, Mr. Herrell turned to CtW's allegations that UHS behavioral health facilities over-

utilized the billing code for suicidal ideation.  Notwithstanding CtW's statistical analysis, Mr.

Herrell strongly defended UHS's billing practices, noting that all UHS coding staff "are required

to be certified as a Registered Health Information Administrator, Registered Health Information

Technologist or Certified Coding Specialist."  (Id.)  Additionally, Mr. Herrell informed CtW that

UHS's billing and coding practices are frequently audited by outside, independent analysts:

> In addition, each of these facilities is subject to regular internal and external coding audits.  The purpose of these audits is to ensure all coding and billing at all UHS facilities is accurate and in compliance with all billing requirements for federal and

---

[17]  From Mr. Herrell's letter, it appears that UHS received a letter from "local 1199" on November 8, 2013.  That letter is not part of the record.

state healthcare programs. On a quarterly basis, an outside, independent coding consultant group reviews sample records at all UHS facilities to ensure compliance with acceptable and applicable coding guidelines as stipulated by CMS.[18]

*** 

As mentioned above, UHS engages an independent coding review company to assess our coding for accuracy. According to information provided to me by the company, not once have our independent coding reviewers referenced improper assignment of suicidal ideation as a coding designation. In addition, UHS behavioral health facilities have been subject to a number of RAC[19] audits over the past few years (like all of our competitors). Despite the RAC's pecuniary interest in obtaining recoupment from providers, not one UHS facility has ever been cited by the RACs nor had any recoupment been assessed based upon coding for suicidal ideation. This fact alone should refute any contentions you have regarding the propriety of our coding on this matter.

(Id.) (footnotes added). In conclusion, Mr. Herrell stated that the company strongly "disputes the basis of [CtW's] premise that coding of suicidal ideation by UHS facility as compared to [its] competitors is indicative of any impropriety and . . . refute[s] that contention." (Id. at 4.)

### 3. Coordinated Federal Investigation of UHS Behavioral Health Facilities

At some point during either 2012 or early 2013, the federal government opened a civil investigation into several UHS behavioral health facilities. (Id. ¶ 53.) In the company's 2012 Form 10-K filing,[20] which was filed on February 28, 2013, UHS disclosed that the Office of

---

[18] "CMS" refers to the Centers for Medicare and Medicaid Services.

[19] "RAC" refers to the Recovery Audit Contractor, a program run by the Centers for Medicare and Medicaid Services whose mission is to identify and correct improper payments. Medicare Fee for Service Recovery Audit Program, CMS.gov, https://www.cms.gov/Research-statistics-data-and-systems/monitoring-programs/medicare-FFS-compliance-programs/recovery-audit-program/index.html (last visited: June 13, 2019).

[20] The United States Securities and Exchange Commission ("SEC") requires publicly traded companies to file a comprehensive annual report about it financial performance. This filing is known as a Form 10-K. Form 10-K, U.S. Securities and Exchange Commission, https://www.sec.gov/fast-answers/answers-form10khtm.html (last visited: Apr. 24, 2019).

Inspector General for the United States Department of Health and Human Services ("OIG") had recently served subpoenas on twenty-five (25) UHS behavioral health facilities, requesting documents dating from January 2008 to present.[21]  (Id.)  At that time, several of the subpoenaed facilities were already the subject of state investigations and an investigation by the United States Department of Justice ("DOJ") Civil Division.  (Id.)

In the company's 2013 Form 10-K filing, which was filed on February 27, 2014, UHS disclosed that it had been advised by DOJ's Criminal Frauds Section[22] "that they ha[d] received a referral from the DOJ Civil Division and ha[d] opened an investigation" into two UHS behavioral health facilities.  UHS also disclosed that the criminal investigation expanded to include a third behavioral health facility in February 2014.  However, the company stated that "[a]t present, we are uncertain as to the focus, scope or extent of the investigations, liability of the facilities and/or potential financial exposure, if any, in connection with these matters."[23]

In UHS's 2014 Form 10-K filing, which was filed on February 26, 2015, the company disclosed that the government had suspended Medicaid payments to River Point Behavioral Health in Florida, one of the facilities under criminal investigation.  (Id. ¶ 54.)  That filing also explained the following:

---

[21]  UHS's filings with the Securities and Exchange Committee are publicly available on the company's website.  See Universal Health Services, Inc., Annual Report (Form 10-K), at 35 (Feb. 28, 2013) (available at: https://uhsinc.gcs-web.com/sec-filings/sec-filing/10-k/0001193125-13-084679).

[22]  In Defendants' briefings and the company's filings with the SEC, UHS refers to this agency as "DOJ's Criminal Frauds Section."  The correct name of this agency is the United States Department of Justice, Criminal Division, Fraud Section.  For consistency, the Court will mirror Defendants' use of the name "DOJ Criminal Frauds Section" in this Opinion.

[23]  Universal Health Services, Inc., Annual Report (Form 10-K), at 35 (Feb. 27, 2014) (available at: https://uhsinc.gcs-web.com/node/13336/html).

The DOJ has advised us that the civil aspect of the coordinated investigation in connection with the behavioral health facilities named above is a False Claim Act investigation focused on billings submitted to government payers in relations to services provided at those facilities. At present, we are uncertain as to potential liability and/or financial exposure of the Company and/or named facilities, if any, in connection with these matters.[24]

(Id.) (footnote added).

On March 31, 2015, about one month into the Class Period, UHS filed a Form 8-K,[25] which disclosed that "the investigation conducted by the [DOJ] Criminal Frauds Section ha[d] been expanded to include UHS as a corporate entity arising out of the coordinated investigation of the facilities described above and, in particular, Hartgrove Hospital."[26] (Id. ¶ 55.) Further, the company disclosed that at that point, the coordinated federal investigation included at least twenty-five (25) UHS behavioral health facilities. (Id.) The March 31, 2015 Form 8-K reiterated that the False Claims Act investigation focused on billings submitted to government payers in relation to services provided at certain UHS behavioral health facilities. These federal investigations remained open until very recently.

On July 26, 2019, Defendants submitted a Notice Regarding the Government's Investigation, which informed the Court that the DOJ Criminal Frauds Section had closed its investigation into the company and its behavioral health facilities. (Doc. No. 56.) Defendants also

---

[24] Universal Health Services, Inc., Annual Report (Form 10-K), at 35-36 (Feb. 26, 2015) (available at: https://uhsinc.gcs-web.com/node/13651/html).

[25] The SEC requires public companies to report unscheduled, material events or corporate changes that could be important to investors. Public companies disclose such events in a filing known as a Form 8-K. Form 8-K, U.S. Securities and Exchange Commission, https://www.sec.gov/fast-answers/answersform8khtm.html (last visited: Apr. 24, 2019).

[26] Universal Health Services, Inc., Current Report (Form 8-K), at 1-2 (Mar. 31, 2015) (available at: https://uhsinc.gcs-web.com/node/13726/html).

represented that it had reached "an agreement in principle to resolve the related civil investigation led by the Department of Justice's Civil Division for $127 million." (Id.)  This information was publicly disclosed in the company's Form 8-K, filed July 26, 2019.[27]

### B. Defendants' Statements from March 2, 2015 to December 7, 2016[28]

Despite disclosing the coordinated federal investigation, UHS publicly reported strong financial results from March 2, 2015, the start of the Class Period, through December 7, 2016, the day the first Buzzfeed article was published.  In fact, the Behavioral Health Division, which was the subject of the federal investigation, accounted for 70% of the company's earnings during that time.  (Doc. No. 30 ¶ 4.)  At a May 6, 2015 investor conference, Mr. Filton, the company's CFO, stated the following:

> [The U.S. Behavioral business] has been, as you know and anyone who follows the company or industry knows, a very steadily reliably performing business for a number of years now, including during a very difficult period through the recession when healthcare services in general I think were under great pressure both from a volume and a payer mix perspective.  The behavioral business, and our behavioral business in particular, really tended to be largely immune from those two very significant headwinds that troubled a lot of others in the healthcare services industry.

(Id. ¶ 60) (emphasis omitted).

Defendants partially attributed the company's stability and growth to a ten-year track record of maintaining occupancy rates in its inpatient psychiatric facilities at or above 75%, which Defendants claimed was the "ideal" occupancy level for maximum capacity and maximum profitability.  (Id. ¶ 61.)  At a March 11, 2015 investor conference, Mr. Miller, the company's

---

[27]  Universal Health Services, Inc. Current Report (Form 8-K) (July 26, 2019) (available at: https://uhsinc.gcs-web.com/node/16011/html).

[28]  The statements in this section are not set forth chronologically; rather, they are organized to promote clarity.  A complete, chronological list of Defendants' statements from March 2, 2015 to December 7, 2016 can be found at the conclusion of the Background section.

Chairman and CEO, stated that the 75% occupancy rate was a key metric that demonstrated that the Behavioral Health Division was stable and profitable:

> [T]his is obviously one of the key statistics, the occupancy rates are . . . at 75%. So with high occupancy, continued growth—and you'll see some of the slides later where we have been building additional beds every place we can and we have a lot of demand within our own network. 75% is pretty high and with low bad debt, high occupancy, great need for mental health services in the future, it's quite a solid business and we have been pretty much a pioneer in it.

(Id. ¶ 62) (emphasis omitted). In short, Mr. Miller told investors that UHS was a desirable investment in part because its behavioral health facilities operated at a profitable occupancy level.

Defendants also reported that the company was successful because of the average length of stay of patients at UHS inpatient behavioral health facilities. In 2013, before the start of the Class Period, Mr. Filton explained the significance of the average length of stay metric, stating that "95%-plus of our reimbursement in the behavioral space is on a per-diem basis, that is, payers pay us for the number of days that a patient is in the facility. And obviously if they spend less days in a facility, then we're going to be paid less for a single admission." (Id. ¶ 68) (emphasis omitted).

At a May 13, 2015 conference, Mr. Filton told investors that while the average length of stay metric had "experienced pressure" in prior years, they expected the metric to level out. And when that happened, Mr. Filton stated that they expected the Behavioral Health Division's revenue to grow:

> [W]hatever point that length of stay dynamic levels off, that's a pretty significant pickup just in terms of levelling off, because if you look at it, our Behavioral admission have been growing on average somewhere in the 6% to 7% range, and our Behavioral patient days have been growing only 1% to 2%, and the gap between those two metrics is the effective compression of the amount of time that patients spend in the hospital once they're admitted. So if that length of stay levels off then in theory our revenue should pick up by 300 basis points to 400 basis points just from the continued growth in our admissions. So that's a fairly significant tailwind that at least as we think about it is more just a function of predicting it's [sic] timing and it's more of an – when something happens as opposed to if.

(Id. ¶ 69) (emphasis omitted).  One month after this statement was made, the average length of stay metric levelled out and remained stable for the next eighteen months.  As a result, the Behavioral Health Division's revenue increased.  (Id.)

UHS further broke down patient admissions by tracking and reporting the following metrics: (1) the number of patients admitted to UHS behavioral health facilities; (2) net revenue per patient admission; (3) the aggregate number of days patients remained at a facility; and (4) net revenue per patient day.  (Id. ¶ 73.)  Defendants publicly reported steady growth in each of these metrics during nearly every quarter of the Class Period.  Consequently, the Behavioral Health Division's net revenue increased nearly every quarter during this period.  (Id. ¶ 74.)

Throughout the Class Period, Defendants publicly reported that these metrics experienced growth or maintained desirable levels due to significant demand for UHS behavioral health services.  In fact, UHS told investors that demand was so high that the company struggled to keep up with the current patient flow and had ceased creating new marketing campaigns to drum up new patients.  (Id. ¶ 65.)  At a May 18, 2015 investor conference, Mr. Filton told investors that the demand was so high that facilities routinely turned away potential patients who met clinical admissions criteria—that is, individuals who (1) are a danger to themselves, or suicidal; (2) are a danger to others; or (3) are gravely disabled.  (Id. ¶¶ 64-65, 177.)  He explained as follows:

> I think what it demonstrates is that we're filling the beds that we're adding pretty much at the same pace as we're adding them . . . And despite the fact that we're adding beds, despite the fact that our capacity and our occupancy numbers are high, we still, by our own measures, are turning away a measurable number of patients. And these are patients who meet clinical admission criteria . . . They have appropriate insurance and we simply, in a particular day, et cetera, that they present for admission, don't have space for them in a facility or in the facility that they presented to.  So we think the demand is still there.

(Id. ¶ 65) (emphasis omitted).  Moreover, at a May 6, 2015 investor conference, Mr. Filton told investors that the demand for beds should remain robust for several years:

> Honestly, if we could snap our fingers or I could snap my fingers, we'd probably add another couple of thousand beds tomorrow. We think there is that much demand . . . [A]ll the trends in demand that continue to be very robust, lead me to believe that this trajectory of being able to add beds at this relatively healthy clip should continue for certainly the foreseeable future. And by that, I mean maybe the next three years or five years.

(Id. ¶ 176.)

As noted above, on March 31, 2015, about one month into the Class Period, UHS reported that the federal investigations expanded to include the UHS corporate entity and 25 UHS behavioral health facilities. (Id. ¶ 55.) At the May 13, 2015 investor conference, one analyst asked Mr. Filton whether the federal investigations focused on the company's length of stay metric and if so, whether the company had adjusted its practices. In response, Mr. Filton stated that "we don't know exactly what the government's full concerns are," and expressed the following:

> [W]e've changed our practices very little[.] I think we're [sic] certainly are kind of refocused on them because [of] the investigation[,] just making sure that patients meet criteria et cetera, but at the end of the day, we still believe that the length-of-stay compression is largely a payer driven initiative, not something we're doing to ourselves.

(Id. ¶ 174) (emphasis omitted).

Throughout the rest of 2015 and 2016, UHS continued to report high demand for its behavioral health services, repeatedly affirming that UHS facilities routinely turned away patients who met clinical criteria for admission. (Id. ¶¶ 180-227.) At a March 7, 2016 conference, Mr. Filton told investors and analysts the following information:

> The problem is and what we realized when we were operating at 85% occupancy is that we were turning away a large number of patients because of a lack of beds. So, we had patients who met the clinical requirements for admission, we were adequately insured, but we were turning them away because we didn't have an available bed for them.

(Id. ¶ 199.) Defendants continued to make similar statements at investor conferences in the following months.

On July 26, 2016, the company reported a 0.3% decline in adjusted patient admissions for the second quarter of 2016. (Id. ¶ 209.) During the company's July 27, 2016 investor earnings call, Mr. Filton attributed the decline to a shortage of qualified psychiatric clinicians in certain regions of the country. (Id. ¶ 213.) In the Amended Complaint, Lead Plaintiffs challenge that rationale, alleging that "[t]he Behavioral Division's inpatient admissions were under pressure not because of a so-called national staffing shortage, but because of the escalating federal criminal investigation of the Company and increasing payer scrutiny due to Defendants' widespread illicit scheme." (Id. ¶ 217.) Further, Lead Plaintiffs claim that UHS's reported performance metrics during the Class Period "were not attributable to consistent demand for the Behavioral Health Division's psychiatric services, as Defendant's repeatedly claimed to investors." (Id. ¶ 75.) Instead, Lead Plaintiffs allege that the numbers were "artificially inflated by Defendants' illicit admissions practices and chronic understaffing of facilities nationwide, all in order to maximize their returns by any means necessary." (Id.)

## C. Buzzfeed News Publishes First UHS Article on December 7, 2016 with Several Claims of Improper Conduct

On December 7, 2016, Buzzfeed News[29] ("Buzzfeed") published a lengthy article ("Buzzfeed I")[30] that raised allegations of unlawful and unethical practices at UHS behavioral

---

[29] Buzzfeed News is the news division of Buzzfeed, Inc., a digital media company that focuses on news, entertainment, and popular culture. At the time Lead Plaintiffs filed the Amended Complaint, the Buzzfeed News staff included six (6) Pulitzer Prize-winning journalists. (Doc. No. 30 ¶ 76.)

[30] Beginning in December 2016, Buzzfeed News published several articles regarding the UHS Behavioral Health Division. Four of those articles are discussed in this Opinion. The first article, Buzzfeed I, was published on December 7, 2016. The second article, Buzzfeed II, was published on December 14, 2016. The third article, Buzzfeed III, was published on April 11, 2017. The fourth article, Buzzfeed IV, was published on May 23, 2017.

health facilities across the country.[31]  (Id. ¶ 76.)  The article, entitled <u>Intake: Locked on the Psych Ward</u>, was the result of a year-long investigation, during which Buzzfeed reporters interviewed 175 current and former UHS employees, including 18 UHS executives who managed inpatient behavioral health facilities.  (<u>Id.</u>)  Buzzfeed also interviewed more than 120 patients, government investigators, and health care experts, and reviewed a cache of internal UHS documents.  (<u>Id.</u>)  The article includes the anecdotal accounts of five former UHS patients.  The improper conduct alleged in Buzzfeed I falls into three categories: (1) UHS's alleged practice of manipulating or falsifying patient intake statements to label patients as suicidal in order to justify admissions; (2) UHS's alleged practice of improperly lengthening patient stays to maximize insurance reimbursements; and (3) alleged UHS's practice of understaffing facilities to maximize revenue.

### 1. Alleged Improper Labelling of Patients as Suicidal to Justify Admissions

Buzzfeed I states that UHS behavioral health facilities routinely exaggerated or manipulated patient symptoms to make patients appear suicidal in order to justify admitting them for inpatient care.  Once deemed suicidal, patients would be "locked in" and not permitted to leave the UHS facility.  Former and current UHS employees told Buzzfeed that they were trained to "lock patients in."  A former employee of Highlands Behavioral, a UHS behavioral health facility located in Colorado, explained that "[i]f someone came in voluntarily, I wasn't allowed to let them out of the door."  (<u>Id.</u> ¶ 80.)  Another former employee echoed this statement, telling Buzzfeed that "[t]he goal when you're on the phone with someone is to always get them into the facility within 24 hours," and then "once they stepped foot in, they are behind locked doors."  (<u>Id.</u>)

---

[31]  Rosalind Adams, <u>Intake: Locked on the Psych Ward</u>, Buzzfeed News (Dec. 7, 2016, 17:29 GMT), https://www.buzzfeednews.com/article/rosalindadams/intake.

As noted above, if a patient is considered suicidal, he meets the clinical criteria for admission to an inpatient behavioral health facility. According to Buzzfeed, UHS employees are trained to coax patients into stating that they are suicidal in order to justify admissions. (Id. ¶ 64.) As evidence of this practice, Buzzfeed I recounted the story of a woman who felt that she was manipulated into telling a UHS behavioral health facility that she was suicidal. The Amended Complaint summarizes her experience as follows:

> 81. For example, the Buzzfeed report described the case of a young accountant named Allison who called Centennial Peaks Hospital in Colorado to inquire about outpatient treatment options. However, the facility told Allison that in order to learn about those options, she had to come into the facility for an assessment. While there, the counselor insisted upon completing a formal evaluation of Allison, pressing her about whether she had thought about suicide in the last 72 hours. When Allison responded that she had had some depressive thoughts earlier in the week that had since passed, "the counselor told Allison they were going to hold her against her will." According to Buzzfeed, the counselor's evaluation stated: "Patient reported thoughts of suicidal ideation within the last 72 hours, thus she was admitted."

> 82. This was a common practice across UHS facilities. According to Buzzfeed, UHS admissions workers learned how to "turn even passing statements that people made during assessments into something that sounded dangerous." For example, according to a former clinician at Salt Lake Behavioral interviewed by Buzzfeed, "intake assessments might start with the straightforward question: 'Have you ever thought about suicide?'," followed by the far more leading question: "If you had a plan, how would you do it?" As Buzzfeed noted, "[a]lmost any answer could then be recorded as a plan." Buzzfeed stated that this was what happened to Allison, as the counselor who evaluated her noted that "OD on pills" was "always her plan," but "Allison told [Buzzfeed] she mentioned pills during the assessment only to describe some of the brief thoughts she sometimes had— not anything close to an actual plan." Buzzfeed reported that when Allison was discharged, "the doctor stated, 'During the initial two days of hospitalization it was clear that [Allison] had no intent or plan of wanting to kill herself.'"

(Id. ¶¶ 81, 82) (emphasis omitted). Another former employee explained why UHS instructs facilities to manipulate patients into stating that they are suicidal, telling Buzzfeed that "'suicidal

ideation could justify almost any admission,' and so it was 'one of those go-to formulas' that would ensure 'everything gets paid for.'"  (Id. ¶ 83.)

Buzzfeed I also echoed the claims made in the CtW letter, referenced above, stating that "UHS hospitals steadily increased the frequency with which they described patients as experiencing suicidal ideation," and "[b]y 2013, the code for suicidal ideation appeared in more than half of all of the Medicare claims submitted by UHS hospitals," at a rate "four and a half times the rate for all non-UHS psychiatric hospitals."  (Id. ¶ 84.)  The billing manager of a hospital that had been acquired by UHS told Buzzfeed that after the acquisition, her UHS superiors instructed her to "build the severity level" of potential patients during intake interviews because "[i]f you're suicidal, a threat to yourself, you're more acute, and it would better support admission."  (Id.)  Consistent with this instruction, Buzzfeed reported that in the first year after UHS purchased 100 psychiatric hospitals from Psychiatric Solutions in 2010, those facilities' "billing code for suicidal ideation in Medicare claims shot way up—more than sixfold overall." (Id.)

### 2. Alleged Improper Lengthening of Patient Stays

Buzzfeed also reported that "[t]wo dozen current and former employees from 14 UHS facilities across the country told [Buzzfeed] that the rule was to keep patients until their insurance ran out in order to get the maximum payment."  (Id. ¶ 86.)  Buzzfeed I alleged that this rule was neither sporadic nor isolated; rather, it was handed down from UHS executives.  In fact, "[t]hree former heads of UHS hospitals claimed their divisional vice president, Sharon Worsham, repeated a mantra: 'Don't leave days on the table.'"  (Id.)  Essentially, if a patient's insurance plan authorized ten days of inpatient care, UHS employees were instructed not to discharge the patient until the ten days ran out.  The Amended Complaint explains as follows:

87. Rick Buckelew, a former CEO of a UHS facility in Texas, told Buzzfeed that it was "common practice" that "[i]f an insurance company gave you so many days, you were expected to keep the patient there that many days." This practice was widespread across UHS's facilities. The Buzzfeed report stated that "[e]mployees of UHS hospitals from Utah to Pennsylvania said this message trickled down to staff and doctors through 'flash' meetings," the primary purpose of which was, according to more than 20 executives and managers who attended those meetings in 12 states, "to review how many [insurance-approved] days [patients] have and to try to use up those days." The managers leading these meetings would demand explanations for any "early discharge" if patients "still ha[d] days left."

(Id. ¶ 87.)

Relevant here, Buzzfeed I does not state that Defendants Miller or Filton "handed down" the "don't leave days on the table" mantra. In fact, Mr. Miller is only mentioned in Buzzfeed I to note that he founded the company and remains CEO and Chairman of the Board. Mr. Filton is not mentioned in the article at all.

Buzzfeed also obtained internal UHS documents to corroborate these accounts. For example, Buzzfeed reported that a 2014 strategic plan from Paul Sexton, CEO of Highlands Behavioral in Colorado, stated that the hospital intended to "develop and implement a plan to increase average length of stay" in order to meet financial targets. (Id. ¶ 88.) Buzzfeed I also stated that Gayle Eckerd, the top executive at River Point Behavioral in Florida, instituted a "ten-day guideline"—that is, the hospital detained psychiatric patients for 10-days, regardless of their medical condition or mental state, and regardless of whether they no longer required treatment. (Id.) Coincidentally, ten days was "the length of time for which Medicare will pay the full daily rate without requiring the hospital to get approval." (Id.) When asked to comment prior to the article's publication, UHS told Buzzfeed that Eckerd's ten-day guideline benefited patients and complied with company policy. Notably, River Point Behavioral was one of the UHS facilities

under criminal investigation by the DOJ. And in April 2014, the federal government suspended Medicare and Medicaid payments to the facility. (Id.)

Other internal documents reviewed by Buzzfeed established that facility executives instructed doctors to not "leave days on the table." (Id. ¶ 90.) In response to this instruction, a psychiatrist at Highlands Behavioral in Colorado told facility executives in an email that he was "deeply disturbed about the efforts to extend length of stay," describing how "[d]octors are publicly shamed by asking them to justify discharging a patient 'early' before the end of their insurance authorization." (Id.) A former manager of Salt Lake Behavioral in Utah told Buzzfeed that in response to patients' confusion regarding their length of stay, employees "were just encouraged to talk them into staying as long as insurance would cover." (Id.) Again, Buzzfeed I does not claim that Mr. Miller or Mr. Filton issued instructions to employees or encouraged employees to engage in these practices.

### 3. Alleged Understaffing at UHS Behavioral Health Facilities

Finally, Buzzfeed I reported that UHS pushed facilities to cut staff "further and further each year, regardless of the impact on employees' safety or on their ability to care for the people being admitted." (Id. ¶ 92.) The article also noted that UHS behavioral health facilities in five states had been cited by federal regulators for chronic understaffing. (Id.) One former hospital administrator told Buzzfeed that she retired in part because UHS "just seemed so hypocritical"— on the one hand, UHS promoted quality of services, but on the other hand, staffing at the UHS hospital she supervised was so inadequate that it was "almost criminal." (Id. ¶ 93.)

Another employee told Buzzfeed that UHS behavioral health facilities admit patients regardless of whether there are sufficient beds. (Id. ¶ 94.) She stated that the facilities force children to sleep on rubber mats and in seclusion rooms meant to house dangerous patients. Buzzfeed also reported that in 2014, federal inspectors discovered that River Point Behavioral had

"more patients than beds."  (Id.)  These accounts echo the report issued in 2011 by Illinois state authorities, referenced supra, which stated that UHS behavioral health facilities in at least twelve (12) states maintained "woefully inadequate" staffing levels.  (Id. ¶¶ 39-40.)

According to Buzzfeed I, such understaffing negatively affected patient care.  Clinical staff told Buzzfeed that their caseloads were so heavy that they were unable to evaluate individuals with challenging psychiatric conditions.  The understaffing even led to a death at Highlands Behavioral in Colorado.  In that case, physicians at the facility prescribed fentanyl to a 22-year old patient who had been admitted for treatment related to his opioid addiction.  (Id. ¶ 96.)  One night, a Highlands Behavioral employee gave the patient the wrong dosage of the drug, which resulted in acute fentanyl toxicity and the patient's ultimate death.  Although the facility required staff to check on patients at fifteen-minute intervals, the patient's body was not found for several hours. When interviewed, employees stated that the death was a result of understaffing and inadequate training.  (Id.)

### D. Defendants' Statements and Representations from December 7, 2016 to July 25, 2017[32]

As noted above, Buzzfeed I was published on December 7, 2016.  By the end of that day, UHS's stock price had dropped 12%, eliminating $1.5 billion in market capitalization.[33]  (Id. ¶ 97.) On December 8, 2016, UHS issued a press release that stated the following:

> We are aware of a recent story on Buzzfeed about UHS, and certain Behavioral Health affiliate facilities.  We dispute and deny the conclusions drawn by the reporter in relation to UHS and believe that the story misses the mark in several important ways leading to an inaccurate portrayal of UHS's behavioral health operations.

---

[32] A complete, chronological list of Defendants' statements from December 7, 2016 to July 25, 2017 is located at the conclusion of the Background section.

[33] By February 27, 2017, UHS's stock fully recovered and returned to its pre-Buzzfeed I closing price.  (Doc. No. 34-2 at 17.)

(Id. ¶¶ 98, 228.)  That same day, Mr. Filton told investors that "nothing about the fundamental trajectory of our business has changed" and dismissed Buzzfeed I as "overly anecdotal."  (Id. ¶ 98.)  Additionally, he assured investors that the company's average length of stay metric was comparable to that of industry competitors:

> [W]e've done a lot of analysis, and used some independent sources to do this analysis, that ultimately shows that our length of stay is measurably close to industry average, you know kind of smack in the middle of the bell curve, if you will.  And again, this sort of overarching notion that you can find anecdotal examples of patients who someone would argue stayed too long in the facility I think is not supported by any kind of global more macro objective information that shows that our length of stay in fact is quite comparable to everyone else in the industry.

(Id. ¶ 229.)  Additionally, UHS created a website to refute Buzzfeed's claims.  The website stated: "UHS categorically denies that its affiliates exaggerate symptoms or attempt to coerce patients to admitting to suicidal thoughts or plans in order to justify any admission."  (Id. ¶ 230.)

On December 9, 2016, Senator Charles Grassley (R., Iowa), the Chairman of the Senate Judiciary Committee, wrote a letter to the United States Department of Health and Human Services, requesting an update on the government's investigation of UHS.  (Id. ¶ 99.)  He wrote that "[t]he pattern of conduct described by the [Buzzfeed article] paints a picture of greed and raised serious questions about patient safety."  (Id.)  Soon thereafter, Senator Elizabeth Warren (D., Mass.) and Representative Joe Kennedy III (D., Mass.) echoed Senator's Grassley's sentiments. (Id.)

By December 14, 2016, UHS stock had fallen another 6%, wiping out a total of $2.4 billion in market capitalization in the week following Buzzfeed I.  In a related article ("Buzzfeed II"),[34]

---

[34] Matthew Zeitlin, Hospital Giant UHS Has Lost $2.4 Billion in Value in a Week, Buzzfeed News (December 14, 2016, 8:09 p.m. ET), https://www.buzzfeednews.com/article/matthewzeitlin/ healthcare-giant-uhs-has-lost-2-4-billion-in-value-in-a-week.

Buzzfeed reported that the stock continued to plummet in response to a report from Raymond James, a prominent investment bank, which downgraded UHS stock from "Outperform" to "Market Perform." (Id. ¶ 100.) The report explained the decision as follows:

> Recommendation: We are lowering our rating on UHS to a Market Perform (from an Outperform) due to an escalation in events surrounding last week's Buzzfeed article. Last Friday (12/9), Senator Grassley, Chair of the Judiciary Committee, sent a letter, which can be found here, to the office of inspector general regarding details of the current federal investigation into UHS (below). Specifically, the letter rehashes the Buzzfeed article and requests an update on the investigation by Dec. 23. Our view is that – even if UHS management is correct on the legalities – we think the entrance of the venerable Senator Grassley into the mix takes the political risk to a more dangerous level. Plus – even if "suicide ideation" doesn't generate additional revenues per admission, we think its possible that the heightened political scrutiny could invite more caution and/or red tape into the admissions process – either externally or from self-pricing. Add in the ongoing OIG investigation, and we think the risk-reward is no longer compelling.

(Doc. No. 34-12 at 2.) Notwithstanding these developments, during a March 1, 2017 earnings call to discuss UHS's 2016 fourth quarter results, Mr. Filton told investors at a health care conference that "from an underlying operational perspective" there was "no material evidence that [Buzzfeed I] has had an impact" on the company. (Doc. No. 30 ¶ 239) (emphasis omitted). To Mr. Filton's credit, the company's operational metrics during that quarter "remained remarkably stable" and the Behavioral Health Division continued to report high occupancy levels and high operating margins. (Id. ¶¶ 233-236.)

Meanwhile, Buzzfeed continued reporting on the state of UHS. On April 11, 2017, Buzzfeed published an article ("Buzzfeed III") that zeroed in on Shadow Mountain, a UHS behavioral health facility in Oklahoma.[35] (Id. ¶ 107.) Buzzfeed III echoed the findings of

---

[35] Rosalind Adams, Videos Show the Dark Side of Shadow Mountain Youth Psych Facility, Buzzfeed (April 11, 2017, 5:57 a.m. ET), https://www.buzzfeednews.com/article/rosalindadams/shadow-mountain.

Buzzfeed I—namely, that facility directors received one mandate from UHS management: "Just fill the beds." (Id.) Buzzfeed III also reported that doctors at the facility were pushed to admit high numbers of patients and that "there was special scrutiny around discharging patients before their insurance ran out." (Id.) On April 17, 2017, Senator Grassley again jumped into the fray. He demanded a federal probe into Shadow Mountain, and as a result, federal inspectors were sent to investigate the facility. (Id. ¶ 108.)

On April 25, 2017, UHS announced its first quarter results for 2017. Although most performance metrics remained stable or experienced growth, the company reported a slight decline in the Behavioral Health Division's average length of stay metric. UHS also reported that net revenue per adjusted patient admission declined by 1.1%. (Id. ¶ 241.) Still, Mr. Filton told investors that the decline was neither "indicative of a continuing trend" nor unique to UHS. (Id. ¶ 110.) Furthermore, Mr. Filton told investors that there was nothing new to report regarding the ongoing federal criminal investigation. (Id.)

On May 23, 2017, Buzzfeed published yet another article ("Buzzfeed IV"), this time reporting that the FBI and the Department of Defense had joined the DOJ's criminal investigation of UHS.[36] (Id. ¶ 111.) Moreover, Buzzfeed reported that despite the slew of Buzzfeed articles and the coordinated federal investigation, unlawful admissions practices at certain UHS behavioral health facilities continued unabated:

> Two nurses from [a Pennsylvania facility] said they had direct experience with the company holding patients longer than necessary to collect higher insurance payments. They recalled telling doctors that patients were safe to be discharged, but that the doctors would ask when their 'last covered day' was – the last day

---

[36] Rosalind Adams & Cora Lewis, The FBI and Defense Department are Investigating America's Biggest Psychiatric Hospital Chain, Buzzfeed (May 23, 2017, 5:34 p.m. ET) https://www.buzzfeednews.com/article/rosalindadams/largest-us-psychiatric-chain-faces-widening-investigation.

Medicare, Medicaid, or their private insurance would pay for – and discharge them
then, regardless of their condition."

(Id. ¶ 112.)  These nurses also told Buzzfeed that doctors routinely altered nurses' patient notes to
explain extended time at the facility.  (Id. ¶ 113.)  On May 24, 2017, UHS stock dropped 2.3%.
(Id. ¶ 115.)

On July 25, 2017, the final day of the Class Period, UHS issued a press release in which it
reported that the conduct profiled in the Buzzfeed articles had negatively affected the company's
earnings.  (Id. ¶ 116.)  Additionally, for the second consecutive quarter, UHS reported that the
average length of stay metric in the Behavioral Health Division experienced a slight decline.  The
company also told investors that same-facility growth failed to meet quarterly projections.  (Id.)
For the first time since Buzzfeed I, UHS reported that the decline was part of a developing "trend"
and resulted from "more aggressive behavior on the part of payers" regarding the lengths of stay
they were willing to authorize.  (Id.  ¶ 117.)  On that subject, Mr. Filton stated the following:

> I think that this is a push and pull sort of dynamic, the payers are always pressuring
> providers for, in our minds, the lowest possible length of stay and again, the
> ultimate decision, I think, comes down to a question of clinical appropriateness and
> certainly on our end, that's being made by a treating psychiatrist . . . Obviously, we
> suggested, or I suggested at the end of Q1 that we would hope to be able to
> potentially impact length of stay in Q2 if it was clinically necessary and that really
> didn't happen.

(Id. ¶ 118) (emphasis omitted).

UHS also disclosed for the first time that the conduct profiled in Buzzfeed I was the subject
of the federal criminal investigation.  Mr. Filton stated the following:

> [W]e believe that the crux of the government's point of view was that patients were
> either inappropriately admitted or their length of stay was inappropriately longer
> than it needed to be, or their clinical treatment was inappropriate.  We, I think, have
> said from the outset that we didn't necessarily share the government's point of view
> at all . . . But that's the nature of these investigations . . . .

(Id. ¶ 119) (emphasis omitted).

After the company's press release, UHS stocks dropped ten dollars per share in a single day. (Id. ¶ 120.) At that point, UHS also downgraded its yearly expectations. (Id. ¶ 117.) Analysts attributed the decline to weakness in the company's average length of stay metric. (Id. ¶¶ 122-23.) More specifically, analysts reported that government and commercial payers' increased pressure on UHS's length of stay metric for psychiatric patients caused the decline. (Id. ¶ 124.)

Again, as noted above, on July 26, 2019, UHS disclosed in a Form 8-K that it had been advised that the DOJ Criminal Frauds Section had closed the criminal investigation into UHS and its behavioral health facilities, without filing any criminal charges. (Doc. No. 56.) UHS also disclosed that it had reached "an agreement in principle to resolve the related civil investigation led by the Department of Justice's Civil Division for $127 million." (Id.)

In sum and for clarity, the following chart sets forth a chronological timeline of all of the relevant allegations in the Amended Complaint:

| Date | Events Prior to March 2, 2015, the Start of the Class Period |
|---|---|
| 2010 | Dr. Steven Klotz, a former psychiatrist at the Roxbury Treatment Center in Pennsylvania, files a qui tam lawsuit against UHS. |
| 2011 | Illinois Department of Children and Family Services ("DCFS") and the University of Illinois Department of Psychiatry release a report based on the conditions at Hartgrove Hospital in Chicago, Illinois. |
| July 2011 | Relators file a qui tam lawsuit against UHS in the United States District Court for the District of Massachusetts regarding Arbor Health Systems. |
| 2012 | UHS settles two separate qui tam lawsuits filed by former employees of Marion Youth Center in Virginia. |
| June 15, 2012 | Former nurses at Verdugo Hills Hospital in California file a qui tam lawsuit against UHS. |
| February 28, 2013 | UHS discloses that the Office of Inspector General for the United States Department of Health and Human Services ("OIG") had recently served subpoenas on several UHS behavioral health facilities. |

| September 6, 2013 | Two former therapists at the National Deaf Academy in Florida file a qui tam lawsuit against UHS. |
|---|---|
| February 27, 2014 | UHS discloses that the Department of Justice Criminal Frauds Section opened an investigation into three UHS behavioral health facilities. |
| April 8, 2014 | Change to Win ("CtW") Investment Group sends a letter to UHS Board of Directors, raising concerns about suicidal ideation coding. |
| April 22, 2014 | John Herrell, Chairman of UHS Audit Committee, responds to CtW's concerns in a letter. |
| February 26, 2015 | UHS discloses that the federal government had suspended Medicaid payments to River Point Behavioral Health in Florida. |
| | **Events from March 2, 2015, the start of the Class Period, to December 7, 2016, the date Buzzfeed I was published** |
| March 2, 2015 | The Class Period commences. At the Cowen & Co. Health Care Conference, Mr. Filton reported high occupancy rates at UHS behavioral health facilities, such that they often turned away clinically admissible patients. |
| March 11, 2015 | At the Barclays Capital Health Care Conference, Mr. Miller reports high occupancy rates, such that clinically admissible patients are turned away. |
| March 31, 2015 | UHS discloses that the DOJ Criminal investigation expanded to include UHS as a corporate entity. |
| April 27, 2015 | UHS issues press release for first quarter of 2015 and reports growth in the Behavioral Health Division. |
| April 28, 2015 | UHS relays first quarter results to investors in earnings call. |
| May 6, 2015 | At the Deutsche Bank Health Care Conference, Mr. Filton reports high demand from patients meeting clinical admissions criteria. |
| May 8, 2015 | UHS discloses 2015 first quarter results in its Form 10-Q. |
| May 13, 2015 | At the Bank of America Merrill Lynch Health Care Conference, Mr. Filton tells investors that UHS does not know the full extent of the federal investigation, but states that the investigation has not changed the company's practices. |
| May 18, 2015 | At the UBS Global Health Care Conference, Mr. Filton emphasizes the company's stable occupancy rate and demand from patients meeting admissions criteria. |

| | |
|---|---|
| July 30, 2015 | UHS issues press release for second quarter of 2015 and reports growth in the Behavioral Health Division. |
| July 31, 2015 | UHS relays 2015 first quarter results to investors in earnings call. |
| August 7, 2015 | UHS discloses 2015 second quarter results in its Form 10-Q. |
| October 27, 2015 | UHS issues press release for third quarter results and reports growth in the Behavioral Health Division. |
| October 28, 2015 | UHS relays first quarter results to investors in earnings call. |
| November 6, 2015 | UHS discloses 2015 third quarter results in its Form 10-Q. |
| December 3, 2015 | At the Bank of America Merrill Lynch Leveraged Finance Conference, Mr. Filton stated that behavioral health facilities maintained high occupancy rates and turned away admissible patients. |
| January 13, 2016 | At the J.P. Morgan Health Care Conference, Mr. Filton stated that the behavioral health facilities maintain high occupancy rates and that UHS will continue adding more beds for the foreseeable future. |
| February 25, 2016 | UHS issues press release for fourth quarter of 2015 results and year-end results and reports growth in the Behavioral Health Division. |
| February 25, 2016 | UHS discloses 2015 fourth quarter results and 2015 year-end results in Form 10-K. |
| February 26, 2016 | UHS relays 2015 fourth quarter results and 2015 year-end results to investors in earnings call. |
| March 7, 2016 | At the Cowen and Company Health Care Conference, Mr. Filton states that behavioral health facilities' occupancy rates are high and stable, such that the facilities often turned away admissible patients. |
| March 11, 2016 | At the Barclays Capital Global Health Conference, Mr. Miller reports high occupancy rates at UHS behavioral health facilities. |
| April 27, 2016 | UHS issues press release for first quarter of 2015 and reports growth in Behavioral Health Division. |
| April 28, 2016 | UHS discloses 2016 first quarter results to investors in earnings call. |
| May 6, 2016 | UHS discloses 2016 first quarter results in Form 10-Q. |
| May 23, 2016 | At the UBS Global Health Care Conference, Mr. Filton states that demand at UHS behavioral health facilities remains high, such that facilities often turn away clinically admissible patients. |

| | |
|---|---|
| July 26, 2016 | UHS issues press release for second quarter of 2016 and reports .03% decrease in same-facility adjusted patient admissions for the Behavioral Health Division.  UHS otherwise reports strong growth in the Behavioral Health Division. |
| July 27, 2016 | UHS discloses 2016 second quarter results to investors in earnings call.  During call, Mr. Filton blames 0.3% decline on a national staffing shortage. |
| August 5, 2016 | UHS discloses 2016 second quarter results in Form 10-Q. |
| September 7, 2016 | At the Robert W. Baird & Co. Global Health Care Conference, Mr. Filton states that demand is strong and the 0.3% decline will level out. |
| October 26, 2016 | UHS issues press release for third quarter of 2016 and reports solid growth across all metrics in the Behavioral Health Division. |
| October 27, 2016 | UHS discloses 2016 third quarter results to investors in earnings call. |
| November 8, 2016 | UHS discloses 2016 third quarter results in Form 10-Q. |
| December 7, 2016 | Buzzfeed News publishes Buzzfeed I.  By the end of the day, UHS stock drops 12%. |
| | **Events from December 8, 2016 to July 25, 2017, the end of the Class Period** |
| December 8, 2016 | UHS issues a press release, denying the allegations made in Buzzfeed I. |
| December 8, 2016 | At the CitiGlobal Health Care Conference, Mr. Filton states that the company's average length of stay was in line with industry average and was not the result of misconduct. |
| December 14, 2016 | Buzzfeed News publishes Buzzfeed II. |
| February 27, 2017 | UHS stock returns to its pre-Buzzfeed I closing price. |
| February 28, 2017 | UHS issues press release for fourth quarter of 2016 and 2016 year-end results, reporting growth in the Behavioral Health Division. |
| February 28, 2017 | UHS discloses 2016 fourth quarter results and 2016 year-end results in Form 10-K. |
| March 1, 2017 | UHS discloses 2016 fourth quarter results and 2016 year-end results to investors during an earnings call.  On the earnings call, Mr. Filton states that Buzzfeed I has not affected the Behavioral Health Division's operational performance metrics. |
| April 17, 2017 | Buzzfeed News publishes Buzzfeed III. |

| April 25, 2017 | UHS issues press release for first quarter results of 2017 and reports a 1.1% decrease in same-facility net revenue per adjusted inpatient admissions in the Behavioral Health Division. The company also reports a 2.2% decrease in its average length of stay metric. |
|---|---|
| April 26, 2017 | UHS discloses 2017 first quarter results to investors in earnings call. During the call, Mr. Filton states that the declines were not the result of a continuing trend. He also states that there was nothing new to report regarding the federal investigation. |
| May 4, 2017 | At the Deutsche Bank Health Care Conference, Mr. Filton states that the decline in the length of stay metric is not indicative of a trend. |
| May 8, 2017 | UHS discloses 2017 first quarter results in Form 10-Q. |
| May 18, 2017 | At the Bank of America Merrill Lynch Health Care Conference, Mr. Filton states that the federal investigation has had little effect on the company's business. |
| May 23, 2017 | Buzzfeed News publishes Buzzfeed IV. |
| July 25, 2017 | UHS releases a press release stating that the federal investigation put pressure on the Behavioral Health Division's performance metrics. |
| July 25, 2017 | The Class Period closes. |
| July 26, 2019 | UHS discloses that the DOJ Criminal Frauds Section closed in the criminal investigation into UHS and its behavioral health facilities. UHS also discloses that the company had reached "an agreement in principle to resolve the related civil investigation led by the Department of Justice's Civil Division for $127 million." |

### E. Ten Anonymous UHS Employees Allege Misconduct

To date, Defendants have not admitted to fraudulently admitting patients, improperly extending patient stays, or understaffing facilities to increase revenue. But in the Amended Complaint, Lead Plaintiffs also cite to testimonials from ten anonymous former UHS employees, all of whom stated that the allegations made in Buzzfeed I were true. (Id. ¶¶ 126-164.) Lead Plaintiffs solicited these testimonials for the purpose of this litigation. Although Lead Plaintiffs do not name the former employees, they have provided specific information about their identities, which the Court will summarize here:

- Former Employee 1 "was a Corporate Director of Clinical Services for UHS, a corporate divisional level position, and was assigned to several facilities across Texas, Michigan and Oklahoma. She worked for UHS for nearly two years before retiring, remaining at UHS for 'as long as [she] could stand it.'" (Id. ¶ 128 n.4.)

- Former Employee 2 "worked at Brynn Marr Hospital, a UHS facility in North Carolina, as a Masters-Level Clinician in the admissions department, from May 2015 to August 2016." (Id. ¶ 129 n.5.)

- Former Employee 3 "was a former evening shift admission worker at Highlands Behavioral Health System in Colorado from June 2014 to December 2014." (Id. ¶ 130 n.6.)

- Former Employee 4 "managed the intake department at Springwoods Behavioral Health in Arkansas for several years, from 2009 to 2014." (Id. ¶ 131 n.7.)

- Former Employee 5 "worked at Shadow Mountain Behavioral Hospital in Oklahoma as a Staffing Coordinator and House Supervisor from July 2013 to December 2016." (Id. ¶ 132 n.8.)

- Former Employee 6 "worked at Millwood Hospital in Texas in the admissions department from approximately 2013 to 2015." (Id. ¶ 132 n.9.)

- Former Employee 7 "worked for UHS for five years and was the CEO of Austin Lakes Hospital in Texas from 2012 through 2014 . . . ." (Id. ¶ 140.)

- Former Employee 8 "managed the Utilization Review department at Salt Lake Behavioral in Utah for nearly two years." (Id. ¶ 147 n.10.)

- Former Employee 9 "was a Mental Health Technician at Old Vineyard Behavioral Health in North Carolina from approximately June 2012 to August 2014. She described her job as 'being responsible for monitoring and keeping tabs' on patients." (Id. ¶ 151 n.11.)

- Former Employee 10 "was a former Admissions Counselor at Salt Lake Behavioral Center in Utah, where she worked for five years, leaving in October 2015. The facility was owned by UHS for her final two years of working there." (Id. ¶ 163 n.12.)

As seen here, only four (4) of the anonymous employees were employed by UHS during the Class Period, which, again, spanned from March 2, 2015 to July 25, 2017. Four (4) of the anonymous employees left UHS before the start of the Class Period.

Although Lead Plaintiffs did not provide the Court with transcripts of the former employees' testimony, the truncated snippets quoted in the Amended Complaint are set forth to corroborate the allegations raised in Buzzfeed I. For example, Former Employee 1 told Lead Plaintiffs that "there was an 'understanding' within the Company to engage in unethical practices" in order to "keep the beds full." (Id. ¶ 128.) Former Employee 5 recalls discussing a patient who had not been admitted to the facility for financial reasons. She asked the CEO of the facility, "What if that patient went home and killed themselves?" In response, the CEO asked, "First of all, what if we lost the money?" (Id. ¶ 132.)

Former Employee 2 detailed how patients at UHS facilities were admitted according to the amount of insurance reimbursements:

> 136. Former UHS employees also described a tiered admission policy based on the patient's insurance (i.e., on the rate of reimbursement). For instance, [employee 2] stated at Brynn Mar[r] Hospital in North Carolina, there "was a sheet in our office showing how much each insurance paid," and "that was our guide." The sheet showed that while Medicare paid approximately $400 per day, a commercial insurer would pay double that rate at $800 per day, and TRICARE, the military insurer, would pay approximately $2,000 per day. [Employee 2] stated the hospital required its employees to admit TRICARE and commercially insured patients first. If the beds were "at a good number," employees were told to "push off" admitting Medicaid patients until the "very last minute" and wait for a TRICARE or commercially insured patient. According to [employee 2] these practices went "straight up to UHS," and that they were well known throughout the corporate hierarchy.

(Id. ¶ 136.)

Former Employee 6, who worked at Millwood Hospital in Texas in the admissions department from 2013 to 2015, stated that "everything that went on was organized by corporate, and the directors of the facility answered to corporate." (Id. ¶ 139) (emphasis omitted). She also claimed that it would be "impossible to see how [corporate] wouldn't know" about issues at the behavioral health facilities. (Id.)

But significantly, Lead Plaintiffs do not cite to any testimony from Former Employee 6 that affirmatively links Mr. Miller or Mr. Filton to the alleged misconduct. Former Employee 7, who was the CEO of Austin Lakes Hospital in Texas from 2012 through 2014, noted that the UHS corporate office was very "hands-on" and routinely tracked facilities' performance metrics. (Id. ¶ 140.) Despite his position in the company, Former Employee 7 did not appear to give any testimony connecting Mr. Miller or Mr. Filton to the alleged billing fraud.

Although the former employees make vague references to "corporate" and "UHS executives," there is no testimony from the former employees that states that Mr. Miller or Mr. Filton knew about improper conduct at UHS behavioral health facilities or instructed facilities to commit insurance fraud.

**F.      Lead Plaintiffs File the Amended Complaint in Federal Court**

On September 29, 2017, Lead Plaintiffs filed the Amended Complaint in the present securities class action, alleging that Defendants knowingly or recklessly made materially false and misleading statements and omissions about UHS in violation of federal securities law during the Class Period, which again is from March 2, 2015 to July 25, 2017. They summarize these statements in Paragraphs 165 and 166 of the Amended Complaint:

> 165.    Throughout the Class Period, Defendants issued a steady drumbeat of statements emphasizing a single theme: the Behavioral Division's reliable and consistent operating metrics set UHS apart from its peers in the hospital industry, and demand for the Company's highly profitable Behavioral Division was so strong that UHS literally could not add beds fast enough to meet it. Defendants repeatedly emphasized that the burgeoning demand for the Behavioral Division's psychiatric services was from patients who had "appropriate insurance" and met the clinical criteria for admission (i.e., they were legitimately suicidal, a danger to others, or gravely disabled)—and that demand from this patient population was so strong the Company was routinely forced to turn thousands of these patients away.

> 166.    Defendants' statements were false. In reality, the Behavioral Division's purportedly strong results were artificially inflated by Defendants' illicit scheme in which they directed UHS psychiatric facilities across the country

to admit as many patients as they could—regardless of whether those patients met clinical admission criteria—and to keep those patients admitted until their insurance payments ran out, with no regard for medical necessity. Defendants also deliberately and grossly understaffed and overfilled UHS's psychiatric facilities, at the expense of patient care, all in a concerted effort to maximize their profits from the scheme.

(Id. ¶¶ 165, 166.)

Thereafter, Lead Plaintiffs list what they allege are every allegedly false and misleading statement or omission made by Defendants during the Class Period, most of which are set forth above. They first list thirty-two (32) dates between March 2, 2015 and December 7, 2016—the beginning of the Class Period to the publication of the Buzzfeed article—and allege that Defendants made materially false and misleading statements about the company on each of those days. (Id. ¶¶ 167-227.)

On eleven of those thirty-two dates, Defendants told investors and analysts at health care conferences that UHS performance metrics remained high due to burgeoning demand for the company's behavioral health services, so much so that UHS behavioral health facilities were forced to turn away patients that met clinical admissions criteria. Lead Plaintiffs allege that these statements were false and misleading because the company's strong performance metrics were not the result of high demand; rather, they were the result of (1) fraudulently labelling patients as suicidal, (2) improperly lengthening patient stays, and (3) understaffing facilities. (See id.)

On seven of those thirty-two dates, Defendants issued quarterly earnings press releases, all of which touted strong growth in the Behavioral Health Division. On seven of the thirty-two dates, Defendants conducted quarterly earnings calls with investors, during which they discussed the company's financial growth.[37] And on seven of the thirty-two dates, UHS filed Form 10-Qs with

---

[37] An earnings call is a phone conference or webcast during which a public company discusses the financial performance of the company during a reporting period.

the SEC, publicly reporting its numbers.[38]  All seven Form 10-Qs were signed by Mr. Miller, the company's CEO, and Mr. Filton, the company's CFO.  (See id.)  Here, Lead Plaintiffs claim that the statements reporting the company's quarterly earnings were false and misleading because they relied on metrics that were "artificially inflated by Defendants' widespread scheme to illicitly admit as many patients as they could into UHS's psychiatric facilities across the country, regardless of whether they met clinical admission criteria, and then locking them in until their insurance payments ran out, regardless of medical necessity."  (Id. ¶ 173.)

Next, Lead Plaintiffs allege that Defendants made the following three materially false and misleading statements in the immediate wake of the December 7, 2016 Buzzfeed article: (1) the company's press release denying the conduct profiled in the article; (2) Mr. Filton's representations at a health care conference denying the conduct; and (3) the company's statements on the UHS website created specifically to respond to the article.  (Id. ¶¶ 228-231.)

Finally, Lead Plaintiffs list eleven dates from December 8, 2016 to July 25, 2017 on which Defendants allegedly made additional false and misleading statements about the company.  (Id. ¶¶ 232-249.)  On two of those dates, Defendants told investors and analysts at health care conferences that the Buzzfeed article and the federal investigations had little impact on the company's operational metrics.  (Id. ¶¶ 246-249.)  Lead Plaintiffs claim that contrary to Defendants' statements, both events greatly impacted UHS's practices, financial growth, and profitability.  (Id.)

The remainder of the eleven post-article dates refer to earnings press releases, quarterly earnings calls, and the company's Form 10-Qs for the first two quarters of 2017.  Lead Plaintiffs

---

[38]  The SEC mandates that public companies file quarterly reports of financial performance in a filing known as Form 10-Q.  Form 10-Q, U.S. Securities and Exchange Commission https://www.sec.gov/fast-answers/answersform10qhtm.html (last visited: Apr. 25, 2019).

claim that the statements made on those dates were false and misleading because Defendants downplayed the effect of the federal investigations and the Buzzfeed article when explaining slight declines in UHS's numbers.  (Id. ¶¶ 232-249.)

Lead Plaintiffs claim that Defendants' allegedly false and misleading statements "caused UHS common stock to trade at artificially inflated levels throughout the Class Period, with UHS common stock reaching as high as $146.24 on August 4, 2015."  (Id. ¶ 273.)  But on July 26, 2016, the date on which UHS first announced a slight decrease in the Behavioral Division's adjusted inpatient admissions, UHS stock dropped by $7.50 per share.  (Id. ¶ 274.)  And in response to the December 7, 2016 Buzzfeed article, UHS stock dropped 12% in a single day, representing a $15 per share decline and a loss of $1.5 billion in market capitalization.  (Id. ¶ 275.)  By December 14, 2016, UHS stock had dropped an additional 7% after Raymond James, a prominent investment bank, downgraded the stock as a result of "an escalation in events surrounding last week's Buzzfeed article."  (Id. ¶ 277.)  On July 25, 2017, after UHS announced that the federal investigations had negatively affected the company's revenue, stock dropped another $10 per share.  (Id. ¶¶ 281-82.)  Lead Plaintiffs claim that "[t]he drastic and continuing decline in UHS's stock price was a direct result of the nature and extent and Defendants' fraud finally being revealed to investors and the market."  (Id. ¶ 283.)

## III.    STANDARD OF REVIEW

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) is set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009).  After Iqbal, it is clear that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to defeat a Rule 12(b)(6) motion to dismiss.  Id. at 678; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).  "To survive dismissal, 'a complaint must contain sufficient factual matter, accepted as

true, to state a claim to relief that is plausible on its face.'" Tatis v. Allied Interstate, LLC, 882 F.3d 422, 426 (3d Cir. 2018) (quoting Iqbal, 556 U.S. at 678). Facial plausibility is "more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Iqbal, 556 U.S. at 678). Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Iqbal, 556 U.S. at 678). Applying the principles of Iqbal and Twombly, the Third Circuit in Santiago v. Warminster Township, 629 F.3d 121 (3d Cir. 2010), set forth a three-part analysis that a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive a Rule 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

Id. at 130 (quoting Iqbal, 556 U.S. at 675, 679). The inquiry is normally broken into three parts: "(1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (citing Phillips v. County of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (alteration in original) (citation omitted). The "plausibility" determination is a

"context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id.

Further, because this is a securities fraud case, the Court must analyze the allegations in the Amended Complaint under the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the specific requirements of 15 U.S.C. § 78u-4(b), which is a section of the Private Securities Litigation Reform Act ("PSLRA").  Congress adopted these stringent pleading standards as "a check against abusive litigation," recognizing that "[p]rivate securities fraud actions . . . can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007).

The PSLRA "imposes two exacting and distinct pleading requirements."  In re Aetna, Inc. Sec. Litig., 617 F.3d 272, 277 (3d Cir. 2010).  First, with respect to false and misleading statements, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation . . . is made on information and belief . . . state with particularity all facts on which that belief is formed."  Id. (citing 15 U.S.C. § 78u-4(b)(1)).  Second, the PSLRA enhances the requirements of Federal Rule of Civil Procedure 9(b)[39] and requires the plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  Id. at 277 (citing 15 U.S.C. § 78u-4(b)(2)).  A strong inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  Tellabs, 551 U.S. at 309.  A court must consider "whether all of the facts alleged, taken collectively, give rise to a

---

[39]  Federal Rule of Civil Procedure 9(b) provides that "[i]n alleging fraud or mistake a party must state with particularity the circumstances constituting fraud or mistake."

strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Institutional Investors Grp. v. Avaya, 564 F.3d 242, 267-68 (3d Cir. 2009) (quoting Tellabs, 551 U.S. at 321.)

## IV.  ANALYSIS

Before the Court is Defendants' Motion to Dismiss the Amended Complaint for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Doc. No. 34.)  As noted above, in the Amended Complaint, Lead Plaintiffs allege that Defendants knowingly or recklessly made materially false and misleading statements and omissions about UHS in violation of federal securities laws, namely Section 10(b), Rule 10b-5, and Section 20(a), infra.  (See Doc. No. 30 ¶¶ 296-311.)

In their Motion to Dismiss, Defendants submit that Lead Plaintiffs' allegations are not sufficiently particularized under the PSLRA to state a claim under any of these three provisions. They advance three arguments in support of their position.  They first argue that Lead Plaintiffs have failed to plead facts sufficient to show that Defendants' public statements were materially false or misleading.  (Doc. No. 34-2 at 9.)  Second, they submit that Plaintiffs failed to plead the element of scienter—that is, they claim that Lead Plaintiffs did not sufficiently allege that Defendants Miller or Filton acted knowingly or recklessly when they made the allegedly false or misleading statements and omissions.  (Id. at 10.)  Third, Defendants argue that Lead Plaintiffs failed to plead the element of loss causation.  (Id.)

For the reasons that follow, the Court is persuaded by Defendants' arguments and will grant the Motion to Dismiss.

## A. Lead Plaintiffs Have Failed to State a Claim Under Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5

In Count I of the Amended Complaint, Lead Plaintiffs allege that Defendants' public statements during the Class Period violated Section 10(b) of the Securities and Exchange Act of 1934 (the "Act") and Rule 10b-5, which was promulgated by the SEC pursuant to authority granted by Section 10(b). (Doc. No. 30 ¶¶ 296-304.) Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security" a "manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). The Act broadly defines a "security" to include, among other things, stocks, bonds, debentures, a variety of other instruments, or, "in general, any instrument commonly known as a 'security.'" 15 U.S.C. § 78c(a)(10).

Rule 10b-5, which was promulgated by the SEC pursuant to the authority granted in Section 10(b), provides the following:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
>     (a)    To employ any device, scheme, or artifice to defraud,
>
>     (b)    To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
>     (c)    To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> In connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. Lead Plaintiffs only proceed under Rule 10b-5(b), which creates a private right of action for plaintiffs to recover damages for "false or misleading statements or omissions

of material fact that affect trading on the secondary market." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1417 (3d Cir. 1997).

To prevail on a claim that a defendant made material misrepresentations or omissions in violation of Section 10(b) and Rule 10b-5, a plaintiff must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 37-38 (2011) (quoting Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008)). In this case, as in most, the parties' arguments relate to only three elements: a material misstatement or omission, scienter, and loss causation. See City of Cambridge Retirement System v. Altisource Asset Management Corp, 908 F.3d 872, 879 (3d Cir. 2018). The Court will address these three elements in turn.

## 1. Alleged Material Misrepresentations and Omissions

The Court will first address Defendants' argument that Lead Plaintiffs have failed to plead any material misstatement or omission. To do so, the Court must first consider whether Lead Plaintiffs sufficiently pled misconduct at UHS behavioral health facilities. Without such misconduct, Defendants' statements would not be false or misleading, and therefore would not be actionable. Lead Plaintiffs cite to several pieces of circumstantial evidence to demonstrate that individual UHS behavioral health facilities improperly admitted patients and lengthened patients' stays to maximize insurance reimbursements.

First, Lead Plaintiffs cite to the six qui tam lawsuits filed before the start of the Class Period by former UHS employees and patients. These lawsuits, which were either settled or dismissed, never resulted in any findings of liability against UHS. But they are significant because they

alleged remarkably similar conduct at five different UHS facilities, all located in different parts of the country.

Second, Lead Plaintiffs point to the CtW letter, which echoed the qui tam allegations. As noted above, the CtW letter claimed that an independent review of Medicare data revealed that UHS free-standing inpatient psychiatric facilities ("IPFs") utilize the suicidal ideation code much more frequently than other free-standing IPFs." (Id. ¶¶ 47-48; Doc. No. 34-4 at 3.)

Third, sometime in 2012 or 2013, the federal government commenced a civil investigation into the billing practices of several UHS behavioral health facilities that eventually expanded into a coordinated civil and criminal investigation into 15 facilities and UHS as a corporate entity. (Doc. No. 30 ¶ 55.) As noted above, UHS disclosed on July 26, 2019 that it had been advised that the criminal investigation had closed. That same day, UHS disclosed that it had reached an agreement in principle to settle the civil investigation for $127 million. (Doc. No. 56.)

Fourth, Lead Plaintiffs cite extensively to the allegations made in Buzzfeed I, which apparently was the result of interviews with 175 current and former UHS employees, including 18 UHS executives who managed inpatient behavioral health facilities. (Doc. No. 30 ¶ 76.) Buzzfeed also claims that it interviewed more than 120 patients, government investigators, and health care experts, and reviewed a cache of internal UHS documents.

These allegations are relevant to whether Lead Plaintiffs sufficiently alleged misconduct for two reasons. First, Buzzfeed I is based on interviews from a wide array of employees and patients, all of whom had first-hand knowledge of UHS behavioral health facilities' practices. Second, these employees and patients all reported that similar misconduct occurred at geographically diverse behavioral health facilities.

Finally, the statements of the anonymous former employees must be considered. These ten employees allege highly particularized facts about billing and admittance practices at individual UHS behavioral health facilities.

From all these allegations, as set forth in the Amended Complaint, and when viewing them in the light most favorable to Lead Plaintiffs, it is evident that numerous employees have described misconduct at UHS behavioral health facilities with the requisite particularity. Despite the anonymity of a considerable number of the employees mentioned by Lead Plaintiffs in the Amended Complaint, the allegations of misconduct are plausible.

"[A] complaint can meet the pleading requirement [of the PSLRA] by providing sufficient documentary evidence and/or a sufficient description of the personal sources of the plaintiff's beliefs." Avaya, 564 F.3d at 261 (quoting Cal. Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 147 (3d Cir. 2004)). In a situation such as the instant one, a court should consider "the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts allege, including from other sources, the coherence and plausibility of the allegations, and similar indicia." Id. (citing Chubb Corp., 394 F.3d at 147).

Here, as noted above, Lead Plaintiffs have cited highly particularized details about the former employees. The Amended Complaint states where they worked, how long they worked there, and the positions they held. Additionally, the former employees' accounts allege conduct that is virtually identical to the conduct alleged in the qui tam suits, the investor letter, the state and federal investigations, and Buzzfeed I. Given the highly particularized and strongly corroborative nature of these allegations, the Court is convinced that Lead Plaintiffs have sufficiently pled that individual UHS behavioral health facilities improperly admitted patients and lengthened patient stays.

Having concluded that Lead Plaintiffs sufficiently pled misconduct at isolated behavioral health facilities, the Court now turns to the question of whether Defendants' statements or omissions regarding that misconduct violated federal securities law. To consider that question, the Court will separate the alleged misstatements and omissions into those made before the publication of Buzzfeed I ("pre-article statements") and those made after the publication of Buzzfeed I ("post-article statements").

### a. Pre-Article Statements[40]

Lead Plaintiffs allege two types of pre-article misstatements and omissions: (1) statements reporting the Behavioral Health Division's performance metrics and attributing those metrics to high demand, a stable average length of stay metric, and high occupancy rates; and (2) statements attributing the company's 2016 second quarter decline to a clinician shortage. (See Doc. No. 30.) Defendants argue that neither set of statements is actionable.

The following chart provides a list of the pre-article statements that Lead Plaintiffs claim are actionable:

| Date | Speaker | Statements Made Before Buzzfeed I |
|---|---|---|
| March 2, 2015 | Filton | The Class Period commences. At the Cowen & Co. Health Care Conference, Mr. Filton reported high occupancy rates at UHS behavioral health facilities, such that they often turned away clinically admissible patients. |
| March 11, 2015 | Miller | At the Barclays Capital Health Care Conference, Mr. Miller reports high occupancy rates, such that clinically admissible patients are turned away. |

---

[40] This section only deals with the alleged misstatements and omissions made during the Class Period, but before Buzzfeed I was published. That is, this section analyzes statements and omissions from March 2, 2015 to December 6, 2016. Two of the statements at issue here were made by Mr. Miller; the rest were made by Mr. Filton or the company. The SEC filings at issue in this section were signed by Mr. Miller and Mr. Filton.

| April 27, 2015 | UHS | 2016 First Quarter Press Release |
|---|---|---|
| April 28, 2015 | Filton | 2016 First Quarter Earnings Call |
| May 3, 2015 | Filton | At the Deutsche Bank Health Care Conference, Mr. Filton reports high demand from patients meeting clinical admissions criteria. |
| May 8, 2015 | UHS | 2016 First Quarter Form 10-Q |
| May 13, 2015 | Filton | At the Bank of America Merrill Lynch Health Care Conference, Mr. Filton tells investors that UHS does not know the full extent of the federal investigation, but states that the investigation has not changed the company's practices. |
| May 18, 2015 | Filton | At the UBS Global Health Care Conference, Mr. Filton emphasizes the company's stable occupancy rate and demand from patients meeting admissions criteria. |
| July 30, 2015 | UHS | 2015 Second Quarter Press Release |
| July 31, 2015 | Filton | 2015 Second Quarter Earnings Call |
| August 7, 2015 | UHS | 2015 Second Quarter Form 10-Q |
| October 27, 2015 | UHS | 2015 Third Quarter Press Release |
| October 28, 2015 | Filton | 2015 Third Quarter Earnings Call |
| November 6, 2015 | UHS | 2015 Third Quarter Form 10-Q |
| December 3, 2015 | Filton | At the Bank of America Merrill Lynch Leveraged Finance Conference, Mr. Filton stated that behavioral health facilities maintained high occupancy rates and turned away admissible patients. |
| January 13, 2016 | Filton | At the J.P. Morgan Health Care Conference, Mr. Filton stated that the behavioral health facilities maintain high occupancy rates and that UHS will continue adding more beds for the foreseeable future. |
| February 25, 2016 | UHS | 2015 Fourth Quarter and Year-End Press Release |
| February 25, 2016 | UHS | 2015 Form 10-K |
| February 26, 2016 | Filton | 2015 Fourth Quarter and Year-End Earnings Call |
| March 7, 2016 | Filton | At the Cowen and Company Health Care Conference, Mr. Filton states that behavioral health facilities' occupancy rates are high and stable, such that the facilities often turned away admissible patients. |

| March 11, 2016 | Miller | At the Barclays Capital Global Health Conference, Mr. Miller reports high occupancy rates at UHS behavioral health facilities. |
|---|---|---|
| April 27, 2016 | UHS | 2016 First Quarter Press Release |
| April 28, 2016 | Filton | 2016 First Quarter Earnings Call |
| May 6, 2016 | UHS | 2016 First Quarter Form 10-Q |
| May 23, 2016 | Filton | At the UBS Global Health Care Conference, Mr. Filton states that demand at UHS behavioral health facilities remains high, such that facilities often turn away clinically admissible patients. |
| July 26, 2016 | UHS | 2016 Second Quarter Press Release |
| July 27, 2016 | Filton | UHS discloses 2016 second quarter results to investors in earnings call. During call, Mr. Filton blames 0.3% decline in same-facility adjusted patient admissions on a national staffing shortage. |
| August 5, 2016 | UHS | 2016 Second Quarter Form 10-Q |
| September 7, 2016 | Filton | At the Robert W. Baird & Co. Global Health Care Conference, Mr. Filton states that demand is strong and the 0.3% decline will level out. |
| October 26, 2016 | UHS | 2016 Third Quarter Press Release |
| October 27, 2016 | Filton | 2016 Third Quarter Earnings Call |
| November 8, 2016 | UHS | 2016 Third Quarter Form 10-Q |

### i. Statements About the Behavioral Health Division's Performance

Lead Plaintiffs allege that Defendants' pre-article quarterly earnings reports and statements contained material misstatements and omissions. As explained earlier, UHS complied with the SEC's disclosure requirements by reporting the company's financial performance in quarterly earnings reports, press releases, and investor earnings calls. All of these disclosures touted UHS's strong financial performance. The disclosures also reported the company's performance metrics— that is, UHS reported empirical figures that tracked behavioral health facilities' net revenue,

adjusted inpatient admissions, adjusted patient days, and net revenue per adjusted patient day. The disclosures also reported facilities' occupancy rates and average length of stay metrics.

Here, Lead Plaintiffs allege that the strong numbers reported in these statements and filings were misleading because they were artificially inflated by the alleged misconduct at UHS facilities, including improper admittance and billing practices. (See Doc. No. 30.) Furthermore, Lead Plaintiffs submit that Defendants' statements at pre-article health care conferences about these numbers were false and misleading.

As noted above, Defendants reported to investors that the Behavioral Health Division experienced growth in part because UHS behavioral health facilities maintained high occupancy levels. The company then attributed these occupancy levels to a demand for UHS behavioral health services that was so strong that facilities routinely "turn[ed] away a significant number of appropriately insured and appropriately diagnosable patients." (Doc. No. 30 ¶ 167.) Lead Plaintiffs claim that these statements characterizing the source of the Behavioral Health Division's success form the basis of Section 10(b) liability. More specifically, they submit that Defendants' failure to disclose the alleged scheme to commit insurance fraud rendered these statements false and misleading, in violation of federal securities law.

A statement or omission is materially false or misleading if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available" to that investor. Matrixx Initiatives, 563 U.S. at 38 (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)). But significantly, Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary to make . . . statements made, in light of the circumstances under which they were made, not misleading."

Williams v. Globus Medical, Inc., 869 F.3d 235, 241 (3d Cir. 2017) (quoting Matrixx Initiatives, 563 U.S. at 44). "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." Basic, 485 U.S. at 239 n.17. Thus, "[e]ven non-disclosure of material information will not give rise to liability under Rule 10b-5 unless the defendant had an affirmative duty to disclose that information." Oran v. Stafford, 226 F.3d 275, 285 (3d Cir. 2000).

Relevant here, an affirmative duty to disclose arises when a party makes an inaccurate, incomplete, or misleading prior disclosure. Id. Indeed, "[o]nce a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make its disclosure misleading." Id. (citing Kline v. First W. Gov't Sec., Inc., 24 F.3d 480, 490-91 (3d Cir. 1994) ("[E]ncompassed within that general obligation [to speak truthfully] is also an obligation or 'duty' to communicate any additional or qualifying information, then known, the absence of which would render misleading that which was communicated.").

In this case, Lead Plaintiffs contend that the empirical performance metrics reported by Defendants were false and misleading because the numbers, though accurate, were artificially inflated by the alleged misconduct at UHS facilities, including improper admittance and billing practices. For their part, Defendants cite to a number of cases that stand for the proposition that there can be no Section 10(b) liability where a company's reports of past earnings are accurate. Essentially, Defendants submit that accurate statements of a company's performance do not violate securities laws, regardless of whether that performance was generated by improper means.

Defendants have correctly recited the law. The Third Circuit Court of Appeals has made it clear that corporations are not liable for "[f]actual recitations of past earnings, so long as they are accurate . . . . " In re Advanta, Corp., Sec. Litig., 180 F.3d 525, 538 (3d Cir. 1999); see also

<u>Burlington Coat Factory</u>, 114 F.3d at 1432 ("Equally well settled is the principle that an accurate report of past successes does not contain an implicit representation that the trend is going to continue, and hence does not, in and of itself, obligate the company to update the public as to the state of the quarter in process."). Lead Plaintiffs do not dispute this principle. Nor do they dispute that the performance metrics reported by Defendants were literally accurate. Instead, they submit that it is equally well-established that where defendants put "in play" the source of a company's success—the source of the accurately reported performance metrics—the law requires them to speak truthfully about the subject. (Doc. No. 35 at 24.) Here, Lead Plaintiffs assert that Defendants put the source of the company's success in play by making statements that affirmatively characterized the source of facilities' high occupancy rates, thus invoking a duty to disclose the alleged scheme to commit insurance fraud so as to not make those statements false and misleading. (Doc. No. 35 at 24.)

Several courts within this Circuit have addressed what it means to put an issue "in play," such that it triggers a duty to disclose. In <u>Shapiro v. UJB Financial Corp.</u>, the defendant bank repeatedly issued quarterly and annual reports that affirmatively characterized the company's lending policies as "prudent," "cautious," and "conservative." 964 F.2d 272, 275 (3d Cir. 1992). After the company's net income drastically declined as a result of those policies, shareholders filed a securities class action lawsuit, alleging that the company's practices were actually risky, and that the positive characterization of those practices as "cautious" violated Section 10(b). <u>Id.</u> at 276. Discussing whether the bank's statements triggered a duty to disclose the true nature of its lending practices, the court explained that "if a defendant has not commented on the nature and quality of the management practices that it has used to reach a particular statement of loan loss reserves, earnings, assets, or net worth, it is not a violation of the securities laws to fail to characterize these

practices as inadequate, meaningless, out of control, or ineffective." Id. at 281 (citing Craftmatic

Sec. Litig. v. Kraftsow, 890 F.2d 628, 633 n.5, 640 (3d Cir. 1989)). Then, the court stated that the

duty to disclose is triggered in the following situation:

> However, where a defendant affirmatively characterizes management practices as "adequate," "conservative," "cautious," and the like, the subject is "in play." For example, if a defendant represents that its lending practices are "conservative" and that its collateralization is "adequate," the securities laws are clearly implicated if it nevertheless intentionally or recklessly omits certain facts contradicting those representations. Likewise, if a defendant characterizes loan loss reserves as "adequate" or "solid" even though it knows they are inadequate or unstable, it exposes itself to possible liability for securities fraud. By addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully.

Id. at 282.

The Third Circuit again discussed this concept in Galati v. Commerce Bancorp, Inc., a case

upon which Defendants rely. 220 Fed. App'x 97 (3d Cir. 2007). There, in addition to reporting

empirical results, the defendant bank stated that "the strong performance of Commerce Capital

Markets was led by the public finance division," and that "the unique Commerce business model

continues to produce strong top-line revenue growth driven by strong deposit growth which

significantly increases our net interest income and net income." Galati, 220 Fed. App'x at 101-

02. Soon after this statement was made, the defendant announced that three company officers had

been indicted for engaging in bid-rigging with the City of Philadelphia—a practice that directly

fueled the strong deposit growth. After the company's stock dropped, shareholders sued, alleging

that the company's positive performance metrics and statements about growth put the bid-rigging

scheme into play and triggered the company's duty to disclose. Id. The Third Circuit disagreed,

explaining that the statements did not put the integrity of the bank's practices in play. Although

the defendant stated that deposits had increased, it did not affirmatively characterize the practices

or sources that led to that increase. As a result, the court found that the statements regarding the company's strong deposit growth were "factual recitations of past earnings" and mere puffery. Id.

In Steiner v. MedQuist, a case relied upon by both parties, the plaintiffs alleged that the defendant company fraudulently billed its customers and intentionally misled its investors by reporting inflated, albeit accurate, financial results without disclosing the fraudulent billing scheme. No. 04-5487, 2006 WL 2827740, at *4 (D.N.J. Sept. 29, 2006). Instead of disclosing the improper conduct, the company attributed its accurately-reported results to increased sales, new customers, and additional revenue from acquisitions. Id. Faced with the question of whether the company had a duty to disclose the alleged scheme, the court emphasized that "isolated statements of revenues cannot give rise to Section 10(b) liability, even when allegedly generated by improper activities, if the figures are factually accurate." Id. at *15. Notwithstanding this principle, the court explained that statements that put the source of the accurately-reported results at issue trigger a Section 10(b) duty to disclose the role of the improper conduct in generating the results. Id. Thus, although the company reported results that were literally accurate, the court found that the statements about the source of the growth were actionable. When the company affirmatively stated that its success was the result of new customers, increased sales, and additional revenue from acquisitions, it put the source of its numbers in play, thus triggering a duty to disclose the fraudulent scheme. Id. at *16.

Still, Steiner does not stand for the proposition that every time a company speaks about the source of its success that it acquires a duty to disclose. As recently explained by another court in the District of New Jersey, such a rule would be overbroad and inconsistent with Third Circuit precedent. In re Cognizant Technology Solutions Corp. Sec. Litig., No. 16-6509, 2018 WL 3772675, at *21-22 (D.N.J. Aug. 8, 2018). There, the plaintiff argued that a company has a duty

to disclose any improper or illegal business that contributes to its success whenever it "puts at issue the cause of its success" because "by speaking about the source of its success, a company triggers an obligation to disclose to avoid liability under Section 10(b)." <u>Id.</u> at *21.  The court found that logic to be at odds with both the Third Circuit's holding in <u>Galati</u> and the well-established rule that Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information." <u>Id.</u> (quoting <u>Matrixx Initiatives</u>, 563 U.S. at 44-45.)  Having rejected the plaintiff's broad conception of the duty to disclose, the court then explained the following:

> Like any other statement, public announcement of past earnings and sources of revenue create a duty to disclose other material information to the extent necessary to make those statements not misleading.  17 C.F.R. § 240.10b-5(b)5.  This is most likely to occur when the public statement had a close connection to the underlying misconduct. <u>See Sanqfi</u>, 155 F. Supp. 3d at 403 ("The critical consideration . . . in determining whether a corporation must disclose mismanagement or uncharged criminal conduct is whether the alleged omissions . . . are sufficiently connected to the defendants' existing disclosures to make those public statements misleading." (citations and internal quotation marks omitted)).  As example, if a company "address[es] the quality of a particular management practice" by characterizing it as "adequate," "conservative," "cautious" and the like, the subject is in play and the defendant has a duty to speak truthfully. <u>Shapiro</u>, 964 F.2d at 282.  Similarly, a statement crediting a company's revenue increase to its "customer-focused approach" is misleading if the revenue increase actually reflected fraudulent practices wherein the customers were was [sic] truly increased by misleading and defrauding customers. <u>Providian</u>, 152 F. Supp. 2d at 819, 824.

<u>Id.</u> at *22.

From these cases, a set of rules emerge.  To be sure, mere recitations of past financial performance are not actionable under Section 10(b) and Rule 10b-5, if such recitations are accurate.  And conversely, not every statement about the source of a company's success triggers the duty to disclose.  But a company's statement attributing success to certain sources may be actionable if the omissions, as alleged by plaintiffs, are sufficiently connected to the company's statement, such that the omission renders the statement false or misleading. <u>See In re Toronto-Dominion Bank Sec. Litig.</u>, No. 17-1665, 2018 WL 6381882, at *10 (D.N.J. Dec. 6, 2018) (finding that while

"recitations of past financial performance . . . do not give rise to Section 10(b) liability, attributing that financial performance to particular sources may.").

Turning to the case at hand, empirical reports of Defendants' financial performance, standing alone, are not actionable—they are isolated, accurate statements of past financial performance and cannot form the basis of Section 10(b) liability. The statements made about the source of that performance, however, are actionable because (1) they affirmatively characterize the practices that drive that success, and (2) they are sufficiently connected to the alleged omission such that failure to disclose the omission renders the statements false and misleading.

Quoted above, Defendants' statements at pre-article health care conferences put the source of the company's success in play. In those statements, Defendants attributed the Behavioral Health Division's success to high occupancy rates at UHS behavioral health facilities. According to Defendants, these rates were fueled by high demand for UHS services—demand so high that facilities routinely turned away clinically admissible patients. These statements are not simply factual recitations of past financial performance. Nor are they mere puffery. Instead, these statements are affirmative characterizations of the source driving the company's performance.

Having concluded that Defendants' statements at the health care conferences put the source of UHS's success in play, the Court now turns to whether those statements are sufficiently connected to the omission alleged by Lead Plaintiffs, such that failure to disclose the alleged omission would render Defendants' statements false and misleading. As explained above, Lead Plaintiffs allege that Defendants omitted to disclose that individual UHS behavioral health facilities improperly admitted patients and improperly lengthened patient stays to maximize insurance reimbursements. In addition, Lead Plaintiffs claim that Defendants misled investors by reporting financial results without disclosing the alleged misconduct. These alleged omissions are

sufficiently connected to Defendants' statements about the source of the company's performance. If true, the alleged misconduct would directly contradict Defendants' representations that UHS behavioral health facilities have such high demand that they routinely turn away clinically admissible patients. Such information would clearly alter the mix of information available to the public regarding the source of UHS's revenue and the success of the company's Behavioral Health Division.

In sum, Defendants' statements at pre-article health care conferences attributing the source of the Behavioral Health Division's success to demand that was so high that facilities turned away clinically admissible patients are actionable. These statements put the source of the Behavioral Health Division's performance in play by affirmatively characterizing that source as high occupancy rates at UHS facilities, driven by persistent, burgeoning demand. These statements are sufficiently connected to the omission alleged by Lead Plaintiffs. Indeed, if the misconduct alleged by Lead Plaintiffs is true, Defendants' failure to disclose that misconduct would render the statements regarding the source of the company's success false and misleading. Thus, viewing the allegations in the Amended Complaint in the light most favorable to the Lead Plaintiffs, the Court is persuaded that Lead Plaintiffs have alleged sufficiently particularized facts to plausibly show a material omission with regard to the statements made about the source of the Behavioral Health Division's success at health care conferences prior to December 7, 2016. For this reason, these statements are actionable.

### ii. Chief Financial Officer Filton's Statement About the Behavioral Health Division's 2016 Second Quarter Results

Lead Plaintiffs also allege that Defendant Filton made a false and misleading statement in connection with the Behavioral Health Division's 2016 second quarter results. On July 26, 2016, the company disclosed strong second quarter results in its quarterly earnings report; however, the

report also disclosed a 0.3% decrease in adjusted inpatient admissions on a same-facility basis for that quarter. (Doc. No. 30 ¶ 209.) The next day, the company held an investor earnings call to review the numbers. During the call, Mr. Filton attributed the 0.3% decrease in adjusted inpatient admissions to a national shortage of qualified clinicians. According to Mr. Filton, that shortage hampered certain facilities' ability to admit a steady number of patients. (Id. ¶ 213.)

In the Amended Complaint, Lead Plaintiffs contend that Mr. Filton's statement was false and misleading, alleging that "[t]he Behavioral Division's inpatient admissions were under pressure not because of a so-called national staffing shortage, but because of the escalating federal criminal investigation of the Company and increasing payer scrutiny due to Defendants' widespread illicit scheme." (Id. ¶ 217.) For their part, Defendants submit that Mr. Filton's statement is not actionable because Lead Plaintiffs' allegations fail to meet the particularized pleading standard necessary for a securities fraud claim. On this issue, the Court is persuaded by Defendants' argument.

As emphasized above, securities fraud claims are subject to the heightened pleading standard under Federal Rule of Civil Procedure 9(b), which requires plaintiffs to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Moreover, the PSLRA provides that "the complaint must specify each allegedly misleading statement, why the statement was misleading, and if an allegation is made on information and belief, all facts supporting that belief with particularity." Avaya, 564 F.3d at 252.

The allegations in the Amended Complaint are not sufficiently particularized to support the conclusion that Lead Plaintiffs suggest—that the 0.3% decrease was not due to a clinician shortage, but rather the result of the escalation in the federal government's investigation into UHS facilities. Preliminarily, Lead Plaintiffs have not pled facts to show that Mr. Filton's statement was in fact

false.  To the contrary, in the Amended Complaint, Lead Plaintiffs actually cite to a 2016 Barclays report that confirmed the clinician shortage: "The volume weakness and margin again reflected a challenging comp and a shortage of physicians and related clinical staff in certain markets, resulting in turning away patients from some facilities."  (Doc. No. 30 ¶ 216.)   Additionally, in their filings, Defendants cite to several public reports that confirm a national shortage of qualified psychiatrists and mental health counselors.  (Doc. No. 34-2 at 19 n.10, 24.)

Furthermore, Lead Plaintiffs do not sufficiently tie the 0.3% decrease in same-facility adjusted inpatient admissions during the second quarter of 2016 to the escalation, if any, of the federal investigation into UHS facilities during that time.  In Paragraph 217 of the Amended Complaint, Lead Plaintiffs allege that "[t]he Behavioral Division's inpatient admission were under pressure not because of a so-called national staffing shortage, but because of the escalating federal criminal investigation of the Company and increased payer scrutiny due to Defendants' widespread illicit scheme."  (Doc. No. 30 ¶ 217.)   But aside from this conclusory statement, there are no specific facts that link the federal investigation to the 0.3% decrease in adjusted inpatient admissions.  For example, Lead Plaintiffs claim that the federal investigation was "escalating," but they fail to allege any new developments in the investigation during the second quarter of 2016 that would have suddenly affected adjusted inpatient admissions.  Further, Lead Plaintiffs have not specifically alleged how the federal investigation led to the 0.3% decrease.  The adjusted inpatient admissions metric operates on a same-facility basis, but Lead Plaintiffs have not pled whether the facilities that were under federal investigation were the facilities that experienced decreases in this metric.

Given that Lead Plaintiffs have not sufficiently alleged that Mr. Filton's statement was actually false and considering the fact that the Amended Complaint does not contain sufficiently

particularized allegations to support Lead Plaintiffs' suggestion, the Court is persuaded that Mr. Filton's statement attributing the 0.3% decrease in adjusted inpatient admissions in the second quarter of 2016 to a clinician shortage is not actionable.

In sum, only one set of pre-article statements is false or misleading under Section 10(b) and Rule 10b-5: the statements made by Mr. Miller and Mr. Filton regarding the source of the Behavioral Health Division's success.

### b. Post-Article Statements[41]

In the Amended Complaint, Lead Plaintiffs allege three types of post-article misstatements and omissions: (1) statements denying Buzzfeed I's conclusions; (2) statements denying Buzzfeed I's effect on UHS's financial performance; and (3) statements that there was "really nothing new" to report regarding the federal investigation into the company.

The following chart provides a list the post-article statements that Lead Plaintiffs claim are actionable:

| Date | Speaker | Statements Made After Buzzfeed I |
|---|---|---|
| December 8, 2016 | UHS | Press Release denying Buzzfeed I allegations |
| December 8, 2016 | Filton | At the CitiGlobal Health Care Conference, Mr. Filton states that the company's average length of stay was in line with industry average and was not the result of misconduct. |
| December 2016 | UHS | At some point after Buzzfeed I is published, UHS creates a website to deny the Buzzfeed I allegations. |
| March 1, 2017 | Filton | 2016 Fourth Quarter and Year-End Earnings Call.  On the earnings call, Mr. Filton states that Buzzfeed I has not affected the Behavioral Health Division's operational performance metrics. |

---

[41] This section only deals with alleged misstatements and omissions made during the Class Period, but after Buzzfeed I was published.  That is, the alleged statements and omissions set forth in this section were made between December 8, 2016 and July 25, 2017.  None of the statements at issue in this section were made by Defendant Alan B. Miller.

| April 25, 2017 | UHS | 2017 First Quarter Press Release, in which UHS reports a 1.1% decline in same-facility net revenue per adjusted patients in the Behavioral Health Division. The company also reports a 2.2% decrease in its average length of stay metric. |
|---|---|---|
| April 26, 2017 | Filton | 2017 First Quarter Earnings Call. During the call, Mr. Filton states that the declines were not the result of a continuing trend. He also states that there was nothing new to report regarding the federal investigation. |
| May 4, 2017 | Filton | At the Deutsche Bank Health Care Conference, Mr. Filton states that the decline in the length of stay metric is not indicative of a trend. |
| May 18, 2017 | Filton | At the Bank of America Merrill Lynch Health Care Conference, Mr. Filton states that the federal investigation has had little effect on the company's business. |

### i.    Statements Denying the Article's Conclusions

After Buzzfeed I was published on December 7, 2016, Defendants made several statements denying its conclusions. As noted above, on December 8, 2016, UHS issued the following statement:

> We are aware of a recent story on Buzzfeed about UHS, and certain Behavioral Health affiliate facilities. We dispute and deny the conclusions drawn by the reporter in relation to UHS and believe that the story misses the mark in several important ways leading to an inaccurate portrayal of UHS's behavioral health operations.

(Doc. No. 30 ¶¶ 98, 228.) That same day, Mr. Filton told investors that "nothing about the fundamental trajectory of our business has changed" and dismissed Buzzfeed I as "overly anecdotal." (Id. ¶ 98.) Additionally, UHS created a website to refute Buzzfeed's claims. The website stated: "UHS categorically denies that its affiliates exaggerate symptoms or attempt to coerce patients to admitting to suicidal thoughts or plans in order to justify admission." (Id. ¶ 230.)

Lead Plaintiffs argue that these denials were "false and misleading because the Buzzfeed report . . . was not 'anecdotal' nor inaccurate in its description of UHS's illegal admission practice."

(Id. ¶ 231.)  Defendants disagree.  They contend that the denials cannot form the basis of Section 10(b) liability because the statements were merely expressions of opinion, and therefore not material.  (Doc. No. 43-2 at 27.)

As noted above, a statement or omission is materially false or misleading if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available" to that investor.  Matrixx Initiatives, 563 U.S. at 38 (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)).  "Opinions are only actionable under the securities laws if they are not honestly believed and lack a reasonable basis."  City of Edinburgh Council v. Pfizur, Inc., 754 F.3d 159, 170 (3d Cir. 2014) (citing In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig., 543 F.3d 150, 166 (3d Cir. 2008)).  Based on this principle, Defendants argue that the statements denying the conclusions of Buzzfeed I are not actionable because they were opinions that were honestly believed and that had a reasonable basis in fact.  (Doc. No. 34-2 at 27.)

But Defendants' denials were not subjective expressions of opinion; rather, they were objective statements of fact.  Such denials have been found to be actionable in the Third Circuit.  In Avaya, shareholders brought a securities class action against a defendant company that sells communications products and services.  564 F.3d at 248.  The shareholders alleged that the company offered unusual discounts for some of its products, which negatively impacted profit margins, but then denied the discounting in violation of federal securities law.  Id.  There, the court held that the company's denials were actionable because they directly conflicted with well-pleaded, particularized allegations that the company did in fact offer unusual discounts.  Id. at 264, 269.

Like the denials in <u>Avaya</u>, Defendants' denials in this case are actionable. They directly conflict with Lead Plaintiffs' allegations that individual UHS behavioral health facilities engaged in improper admittance and billing practices. As noted above, these allegations include the <u>qui tam</u> lawsuits and the state investigations, the coordinated federal investigation, the investor letters, Buzzfeed I, and the statements from anonymous former UHS employees. If true, these allegations of misconduct at individual UHS behavioral health facilities would render Defendants' denials materially false and misleading, in violation of Section 10(b) and Rule 10b-5.

### ii. Statements Denying the Effect of Buzzfeed I and the Federal Investigation

Lead Plaintiffs also allege that Mr. Filton violated securities laws by making two false and misleading statements that denied the impact of the Buzzfeed article and the federal investigation on the company. First, on March 1, 2017, UHS held an investor earnings call to review UHS's 2016 fourth quarter and year-end performance, during which Mr. Filton stated the following:

> I think you see that in our Q4 volumes which incrementally improved during the quarter and continued to get a little bit better with each passing quarter. And I think we can say that in January and February that improvement continued. So, again, from an underlying operational perspective, we see no material evidence that the Buzzfeed article has had an impact on us.

(Doc. No. 30 ¶ 239) (emphasis omitted). Lead Plaintiffs claim that this statement was false and misleading because "Defendants knew that . . . the Buzzfeed story had led to both increased government scrutiny and increased pressure from payers." (<u>Id.</u> ¶ 240.)

Second, on May 18, 2017, Mr. Filton made the following statement at a health care conference in regard to the company's 2017 first quarter results:

> So we have said really at the outset that the government investigation, which has been the longest-standing dynamic, is that we're into our fifth year of this government investigation of certain of our behavioral facilities, has had little impact on the business.

(Id. ¶ 247) (emphasis omitted). Lead Plaintiffs claim that this statement was false and misleading because "the increasing government scrutiny was severely impacting the Behavioral Division's business, putting significant pressure on the Company's critical length of stay metric, as would be fully revealed to investors only three months later." (Id. ¶ 249.) For their part, Defendants submit that neither statement is actionable because the Amended Complaint does not contain sufficiently particularized allegations to support Lead Plaintiffs' contention that these statements were false and misleading under the PSLRA. Having reviewed these statements, the Court is persuaded by Defendants' argument.

As an initial matter, Lead Plaintiffs contend that Mr. Filton's statements were false, but they offer only conclusory allegations to support that contention. As evidenced above, Mr. Filton's assertion that Buzzfeed I and the federal investigation had little impact on the company relates to the company's operational metrics—that is, Mr. Filton's statement refers to the operational performance metrics reported by the company each quarter, such as occupancy rates, average length of stay, and net revenue per adjusted patient. Judging by UHS's reported operational metrics for the fourth quarter of 2016, Buzzfeed I and the federal investigation appear to have had little impact on UHS's numbers. Despite claiming that Mr. Filton's statements were false, Lead Plaintiffs concede that in the final quarter of 2016, "the Company again reported significant and steady growth in the Behavioral Division, with increases in same facility net revenues, adjusted inpatient admissions, adjusted patient days, and net revenue per adjusted patient day." (Doc. No. 30 ¶ 233.) The Amended Complaint also states that "[f]or the fourth quarter [of 2016], the Company continued to report a remarkably stable average length of stay, high occupancy levels, and high operating margins." (Id. ¶ 235.) Then, in the first quarter of 2017—the first full quarter following Buzzfeed I—Lead Plaintiffs admit that "the Behavioral Division reported modest

increases in same facility net revenues, adjusted inpatient admissions, adjusted patient days, and new revenue per adjusted patient day." (Id. ¶ 241.) Thus, Mr. Filton's statements that Buzzfeed I and the federal investigation had little material impact on the company's operational metrics were not false.

Equally fatal, Lead Plaintiffs proffer only conclusory allegations in support of their contention that Buzzfeed I led to increased government scrutiny and payer pressure. The Amended Complaint notes that the company reported marginal decreases in two metrics during the first quarter of 2017—average length of stay and net revenue per adjusted inpatient admissions. Lead Plaintiffs attribute these decreases to increased pressure by the government and health care payers as a result of Buzzfeed I. (Id. ¶ 248.) But Lead Plaintiffs do not plead specific facts to support this theory. Apart from vague claims that these marginal decreases were the result of "escalating" scrutiny, the Amended Complaint is devoid of any particularized allegations that such escalation actually occurred. From the pleadings, it is wholly unclear what new actions, if any, the government or payers took during the first quarter of 2017 that caused slights declines in average length of stay and net revenue per adjusted inpatient admissions.

Further, Lead Plaintiffs have not alleged how they came to learn that the government and health care payers decided to put additional pressure on UHS facilities. When allegations in a securities fraud action are made upon information and belief, the PSLRA requires that those allegations provide the "who, what, when, where, and how of the sources, as well as the who, what, when, where and how of the information those sources convey." Avaya, 564 F.3d at 253. Here, the allegations regarding these two statements do not meet this particularized standard. For this reason, neither Mr. Filton's March 1, 2017 statement nor his May 18, 2017 statement are actionable under Section 10(b) and Rule 10b-5.

### iii.     Statements Regarding Updates in the Federal Investigation

Finally, Lead Plaintiffs allege that Defendants failed to properly update the public on the state of the coordinated federal investigation during the Spring of 2017. More specifically, they challenge Mr. Filton's statement during the April 26, 2017 investor earnings call. During the call, Mr. Filton told investors that the decrease in the average length of stay metric in the first quarter of 2017 was not "indicative of a continuing trend." (Doc. No. 30 ¶ 245.) He then stated that at that time, there was no "status update regarding the large government investigation" because there was "really nothing new there." (Id.)

Lead Plaintiffs contend that Mr. Filton's statement that there was "nothing new" to report in the government investigation was false and misleading. In support of this assertion, they point to Buzzfeed IV, which was published on May 23, 2017 and revealed that "the federal criminal investigation had in fact escalated again to include the FBI and the Department of Defense, who were investigating, among other things, Defendants' illicit practices in connection with their billings to TRICARE." (Id. ¶ 249.) In response to this contention, Defendants submit that Mr. Filton's statement is not actionable because it was not false. And even if the statement were true, Defendants assert that the Amended Complaint lacks sufficiently particularized facts to support Lead Plaintiffs' explanation as to why the statement was false and misleading. (Doc. No. 34-2 at 29.) After reviewing the relevant allegations, the Court agrees with Defendants.

First, Lead Plaintiffs have not pled plausible facts sufficient to show that Mr. Filton's statements were false. As emphasized by Defendants, UHS disclosed as early as 2015 that the federal investigation involved billings to government payers, including TRICARE, which is used by the Department of Defense. (Id.) Additionally, UHS repeatedly disclosed in its SEC filings that UHS was under investigation by the Department of Justice, which conducts investigations

through the FBI. (Id.) Thus, Buzzfeed IV's "revelation" that the Department of Defense and the FBI had joined the investigation into UHS was not actually revelatory; to the contrary, as stated by Mr. Filton, it was "nothing new."

Second, even if Mr. Filton's statement was false, the Amended Complaint does not contain sufficient facts to support Section 10(b) liability. According to Lead Plaintiffs, Mr. Filton stated that there was nothing new to report during an investor earnings call on April 27, 2016. Then, on May 23, 2017, Buzzfeed IV stated that the Department of Defense and the FBI had joined the investigation into UHS. Lead Plaintiffs' theory that Mr. Filton's April 26, 2017 statement was false is entirely premised on Buzzfeed IV. But even if it were true that these two agencies jumped into the fray for the first time during the first quarter of 2017, the Amended Complaint lacks sufficient facts to sustain that theory. For one, Lead Plaintiffs fail to allege that Mr. Filton knew about the involvement of the Department of Defense or the FBI during the April 26, 2017 earnings call. Nor do they allege when these agencies first became involved in the investigation. Without those crucial, particularized allegations, it is plausible (1) that Mr. Filton did not know about the two agencies' involvement at the time he made the statement, or (2) that the agencies joined the investigation after the April 26, 2017 earnings call, but before Buzzfeed IV, which was published on May 23, 2017. Consequently, Mr. Filton's statement that there was nothing new to report about the federal investigation cannot form the basis of securities fraud liability.

In sum, only two sets of statements are actionable under Section 10(b) and Rule 10b-5: (1) the pre-article statements made by Mr. Miller and Mr. Filton regarding the source of the Behavioral Health Division's success; and (2) the post-article denials issued by the company in the days immediately following the article's publication.

## 2. Scienter Has Not Been Sufficiently Pled

Next, the Court turns to whether the Amended Complaint contains sufficiently particularized allegations of scienter. "To establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" Tellabs, 551 U.S. at 319 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193-94 & n.12 (1976)). Scienter may be established by showing that the defendant intended to mislead investors or that the defendant acted recklessly in the face of a danger of misleading investors. Belmont v. MB Inv. Partners, Inc., 708 F.3d 470, 493 (3d Cir. 2013). Thus, to demonstrate scienter, a plaintiff must show that the defendants acted consciously or recklessly when making the two sets of actionable statements, as set forth above. Avaya, 564 F.3d at 267.

As noted above, allegations in a securities fraud complaint are subject to the PSLRA's heightened pleading standards. To adequately plead scienter under that standard, a plaintiff must allege specific facts for each statement or omission that "giv[e] rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). At this point in the analysis, the Court will consider whether Lead Plaintiffs alleged specific facts that give rise to a sufficiently strong inference of scienter with respect to the two sets of statements found to be actionable in the preceding section: (1) the pre-article statements about the source of the Behavioral Health Division's success, and (2) the post-article denials of the allegations raised in Buzzfeed I.

"A complaint adequately pleads a strong inference of scienter 'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" In re Hertz Global Holdings, Inc., 905 F.3d 106, 114 (3d Cir. 2018) (quoting Tellabs, 551 U.S. at 324). To engage in this inquiry, the United States Supreme Court instructs courts to weigh "plausible nonculpable explanations for the defendant's conduct"

against the "inferences favoring the plaintiff." <u>Avaya</u>, 564 F.3d at 267 (quoting <u>Tellabs</u>, 551 U.S. at 324). This is a holistic analysis—a court must examine the complaint as a whole and consider whether the allegations in the complaint "taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." <u>Rahman v. Kid Brands, Inc.</u>, 736 F.3d 237, 247 (3d Cir. 2013) (quoting <u>Tellabs</u>, 551 U.S. at 323).

Significantly, the PSLRA's scienter standard does not require a plaintiff to produce "smoking-gun" evidence. <u>Tellabs</u>, 551 U.S. at 324. Indeed, "[s]cienter may also be established if a Plaintiff 'set[s] forth facts that constitute circumstantial evidence of either reckless or conscious behavior.'" <u>In re Viropharma Inc. Sec. Litig.</u>, 21 F. Supp. 3d 458, 473 (E.D. Pa. 2014) (quoting <u>Advanta</u>, 180 F.3d at 534). However, "it is not enough for plaintiffs to merely allege that defendants 'knew' their statements were fraudulent or that defendants 'must have known' their statements were false." <u>GSC Partners CDO Fund v. Washington</u>, 368 F.3d 228, 239 (3d Cir. 2004).

Similarly, a plaintiff cannot rely solely on an allegation "that imputes knowledge to a defendant because of his or her position within the company." <u>SEC Investment Management AB v. Endo International, PLC</u>, 351 F. Supp. 3d 874, 905 (3d Cir. 2018) (quoting <u>Oran</u>, 226 F.3d at 290). Instead, the PSLRA requires a plaintiff to allege specific facts constituting strong circumstantial evidence that the defendants actually knew or recklessly disregarded the false or misleading nature of the statement at issue. <u>Id.</u> (citing <u>In re Urban Outfitters, Inc. Sec. Litig.</u>, 103 F. Supp. 3d 635, 653 (E.D. Pa. 2015)).

Here, the Court will first consider whether Lead Plaintiffs have pled that Defendants Miller and Filton, the individual Defendants, acted with scienter. Second, the Court will address the doctrine of corporate scienter, as it applies to Defendant UHS.

### a. Defendants Alan B. Miller, the Chairman of the Board and Chief Executive Office, and Steve G. Filton, the Chief Financial Officer

Here, Lead Plaintiffs have not submitted any smoking gun evidence with respect to Mr. Miller or Mr. Filton. That is, they have not proffered any direct evidence that Mr. Miller or Mr. Filton knew of or recklessly disregarded any improper misconduct when they made statements about the source of the Behavioral Health Division's growth or when they denied the allegations in the Buzzfeed article. There are no allegations that these individuals participated in the misconduct, heard about the misconduct from internal sources, or instructed others to engage in misconduct. But, as noted above, the United States Supreme Court has emphasized that a plaintiff need not produce such smoking-gun evidence to establish scienter. Tellabs, 551 U.S. at 324. Thus, the Court's inquiry "ultimately rest[s] not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the [Amended] Complaint, it is at least as likely as not that defendants acted with scienter." Avaya, 564 F.3d at 269.

In the absence of direct evidence, Lead Plaintiffs' claims are premised on an array of circumstantial evidence to raise an inference of scienter. To start, Lead Plaintiffs point to the qui tam lawsuits that were filed by former UHS employees prior to the start of the Class Period. As noted above, at least six qui tam lawsuits were filed against UHS before 2015. In one suit, Dr. Steven Klotz, a former psychiatrist at the Roxbury Treatment Facility in Pennsylvania, alleged that UHS "falsely and fraudulently coded patients as suicidal, when the chart did not reflect a likelihood of patient suicide," in order to increase occupancy levels at UHS facilities. (Doc. No. 30 ¶ 38.) Another lawsuit alleged that nurses at UHS behavioral health facility in Virginia were trained to provoke residents to justify longer lengths of stays, and a lawsuit in connection with a facility in California alleged that nurses were instructed to "make notes in patients' charts using exaggerated

buzz words like 'agitated,' 'irritated,' 'aggressive,' 'resisting,' 'uncooperative,' etc.,' because "doing this increases the amount of money the government would pay for the patient's care." (Id. ¶ 44.) Apart from these qui tam lawsuits, an Illinois state investigation found that a UHS facility in Chicago routinely over-admitted patients to "maximize profits." (Id. ¶¶ 39-40.) Lead Plaintiffs submit that Mr. Miller, the company's CEO, and Mr. Filton, the company's CFO, must have known about these lawsuits and investigations. But, as explained below, scienter requires more than mere knowledge of allegations of misconduct.

To combat Lead Plaintiffs' allegations, Defendants cite to Bartesch v. Cook, a case in which a court in this Circuit found that qui tam lawsuits cannot form the basis of securities fraud liability. 941 F. Supp. 2d 501, 507 (D. Del. 2013). In that case, shareholders brought a securities fraud lawsuit against an energy company, alleging that the company made material misstatements and omissions about certain operational failures and developments. Id. at 506-07. In support of the claim, the shareholders cited to a single qui tam lawsuit that had been filed against the company. Allegations from the qui tam action were copied in the securities fraud complaint. Id. at 507. The court, however, found that the single qui tam lawsuit did not raise a strong inference of scienter, reasoning as follows:

> The qui tam complaint is also an unreliable source. It is devoid of any information concerning the qui tam plaintiff's relationship to [the defendant company] or whether the plaintiff has firsthand knowledge of his allegations against [the defendant company. As other courts in the Third Circuit have held, "it [is] not appropriate for the Court to give weight to the allegations in [a] qui tam case," Gaer v. Educ. Mgmt. Corp., 2011 WL 7277578, at *2 (W.D. Pa. Sept. 29, 2011), because such allegations "are unproven and contested [and] do not amount to 'facts' sufficient to establish a strong inference of scienter." In re Apollo Grp., Inc. Secs. Litig., 2011 WL 5101787, at *10 n.5 (D. Ariz. Oct. 27, 2011).

Id. Similarly, in Gaer v. Education Management Corp., which was cited in Bartesch, the court afforded no weight to allegations of a single qui tam lawsuit, finding that the mere existence of a

lawsuit, without any finding of liability or wrongdoing, does not raise a strong inference of scienter. No. 10-1061, 2011 WL 7277447, at *2 (W.D. Pa. Sept. 29, 2011).

Although the Court is inclined to agree with the reasoning of <u>Bartesch</u> and <u>Gaer</u>, it is worth noting that those cases are distinguishable from the case at hand. In <u>Bartesch</u> and <u>Gaer</u>, the respective plaintiffs cite to a single <u>qui</u> <u>tam</u> lawsuit. Here, Lead Plaintiffs cite to six. Moreover, in <u>Bartesch</u>, the court found fault with the fact that the plaintiff only pled vague, ambiguous allegations about the <u>qui</u> <u>tam</u> lawsuit and the relationship between the <u>qui</u> <u>tam</u> plaintiff and the defendant company. But in this case, Lead Plaintiffs provide specific, particularized details about the <u>qui</u> <u>tam</u> suits and the relationship of the <u>qui</u> <u>tam</u> plaintiffs with UHS. In all six suits, the <u>qui</u> <u>tam</u> plaintiffs were doctors, therapists, nurses, and management personnel who once worked for the company. Additionally, although the six lawsuits focused on UHS behavioral health facilities in five different states, each lawsuit alleged remarkably similar misconduct. These factors make the <u>qui</u> <u>tam</u> lawsuits cited here more reliable than those cited in <u>Bartesch</u> and <u>Gaer</u>.

Notwithstanding these distinguishing factors, the Court cannot ignore the fact that the allegations raised in the <u>qui</u> <u>tam</u> cases are just that—allegations. None of the <u>qui</u> <u>tam</u> lawsuits resulted in findings against UHS. Liability was not admitted, and thus, the allegations made in those suits remain unsubstantiated. For this reason, the Court is not persuaded by Lead Plaintiffs' contention that the <u>qui</u> <u>tam</u> lawsuits constitute evidence that Mr. Miller or Mr. Filton knew about the alleged billing scheme. At most, the lawsuits demonstrate that the individual Defendants were aware of allegations circling the Behavioral Health Division; they do not show that Mr. Miller or Mr. Filton knew the allegations to be true or recklessly disregarded them.

Next, Lead Plaintiffs point to the CtW letter as circumstantial evidence that Defendants acted consciously or recklessly when they made the two sets of actionable statements. As noted

above, on April 8, 2014, the Change to Win Investment Group ("CtW") sent a letter to the UHS Board of Directors that raised concerns about the Behavioral Health Division's billing practices. In the letter, CtW informed UHS that an independent review of Medicare data found that "UHS free-standing inpatient psychiatric facilities ("IPFs") utilize the suicidal ideation code much more frequently than other free-standing IPFs." (Doc. No. 30 ¶¶ 47-48.)

Then, on April 22, 2014, John Herrell, the Chairman of the UHS Audit Committee and a member of the Board, responded to CtW's concerns in a letter. In the letter, Mr. Herrell addressed the qui tam lawsuits cited by CtW, stating that all of the lawsuits had either settled or had been dismissed. None resulted in charges of wrongdoing or liability for UHS. (Doc. No. 34-5 at 2-3.) Further, although Mr. Herrell admitted that "a small minority of [UHS] facilities may encounter sporadic regulatory compliance issues," he assured CtW that "those matters are always remedied." (Id. at 3) Relevant here, Mr. Herrell also informed CtW that the company disagreed with the allegation that UHS behavioral health facilities over-utilized the suicidal ideation code. In fact, he informed CtW that UHS coding practices are audited by internal professionals and external, independent auditing analysts. (Id.) According to Mr. Herrell, not a single external or government audit agreed with CtW's conclusions. (Id. at 3-4.)

The CtW letter raises the same inference as that raised by the qui tam lawsuits—that individual Defendants, as members of the Board, were aware that outside sources had raised concerns about the Behavioral Health Division's billing practices. At the same time, the letter supports an equally, if not more plausible inference that the Board of Directors acknowledged CtW's concerns, but based on internal investigations and a series of external audits, determined that such concerns were unfounded.

In addition to the qui tam lawsuits and the CtW letter, Lead Plaintiffs point to the coordinated federal investigation as evidence of scienter. As explained above, at some point during 2012 or early 2013, the federal government opened a civil investigation into several UHS behavioral health facilities. (Doc. No. 30 ¶ 53.) The matter was then referred to the Department of Justice Criminal Frauds Section. By 2015, the investigation included at least fifteen (15) UHS behavioral health facilities and the UHS corporate entity. (Id. ¶ 55.) At that point, the company disclosed the following: "The DOJ has advised us that the civil aspect of the coordinated investigation in connection with the behavioral health facilities named above is a False Claim Act investigation focused on billings submitted to government payers in relations to services provided at those facilities." (Id. ¶ 54.) On July 26, 2019, UHS disclosed in a Form 8-K that it had been advised that the DOJ Criminal Frauds Section had closed the criminal investigation without filing charges. UHS also disclosed that it had reached an agreement in principle with the federal government to settle the civil investigation. (Doc. No. 56.)

As stressed by Defendants, it is well-established that an "investigation that has not resulted in charges or any finding of wrongdoing does not support an inference of scienter." In re Hertz Global Holdings, Inc. Sec. Litig., No. 13-7050, 2017 WL 1536223, at *17 n.6 (D.N.J. Apr. 27, 2017) (citing Brophy v. Jiangbo Pharm., Inc., 781 F.3d 1296, 1304 (11th Cir. 2015) ("The 'mere existence of an SEC investigation' likewise does not equip a reviewing court to explain which inferences might be available beyond a general suspicion of wrongdoing."), aff'd, 905 F.3d 106 (3d Cir. 2018)). Such an investigation "is not evidence of fraud, or even negligence or mistake." Southeastern Pennsylvania Transportation Authority v. Orrstown Financial Services, Inc., No. 12-00993, 2016 WL 7117455, at *11 (M.D. Pa. Dec. 7, 2016) (citing Meyer v. Greene, 710 F.3d 1189, 1201 (11th Cir. 2013) ("The announcement of an investigation reveals just that—an

investigation—and nothing more.")); see also Utesch v. Lannett Company, Inc., 316 F. Supp. 3d 895, 903-04 (E.D. Pa. 2018) (holding that the existence of a government inquiry alone is not sufficient to raise a strong inference of scienter).

In a supplemental brief submitted on July 3, 2019, Lead Plaintiffs argue that Utesch v. Lannett Company, No. 16-5932, 2019 WL 2136467, at *9 (E.D. Pa. May 15, 2019) ("Utesch II"), stands for the proposition that government investigations raise a strong inference of scienter. (Doc. No. 53.) In Utesch II, investor plaintiffs filed a securities fraud class action against a pharmaceutical company, its CEO, and its CFO, alleging that the defendants made materially false or misleading statements about the competitive nature of the pharmaceutical market. There, the plaintiffs alleged that the defendants knew about price-fixing conspiracies in the generic drug industry when they made statements that the market was still competitive. Id. at *3-4.

With respect to scienter, the court in Utesch II found that the "ongoing investigations into anticompetitive pricing in the market may represent a 'piece of the puzzle when taking a holistic view of the purported facts as they relate to scienter.'" Id. at *9 (quoting In re Gentiva Sec. Litig., 932 F. Supp. 2d 353, 380 (E.D.N.Y. 2013) (internal quotation marks omitted)). Based on that precept, the court held that "[w]hile not dispositive, so many different governmental entities investigating pricing in the industry provides support—at this stage of the litigation—for an inference of scienter." Id.

Despite Lead Plaintiffs' reliance on Utesch II, the scienter allegations in that case stand in stark contrast with the scienter allegations in this case. For one, in Utesch II, despite the company stating that the generic drug market was very competitive, forty-five states had opened criminal investigations into the defendant company's competitors for anti-competitive conduct. Additionally, at the time when those statements were made, one competitor had been convicted for

the very conduct that the company stated was not occurring.  Furthermore, the plaintiffs in <u>Utesch</u>

<u>II</u> made specific allegations of the defendants' own participation in the anti-competitive conduct—

they cited to the criminal convictions of competitors in the market for anti-competitive conduct,

phone calls between competitors about whether and how to collude, and specific agreement among

competitors to raise prices in the market.  <u>Id.</u> at *6.  Placed in that context, the ongoing government

investigations into the defendant company did contribute to an inference of scienter.

Unlike in <u>Utesch II</u>, the coordinated federal investigation has not resulted in any charges

or findings of misconduct.  In fact, on July 26, 2019, UHS disclosed that the federal government

had closed the criminal investigation.  Additionally, the company announced that it had reached

an agreement in principle to settle the civil investigation.  (Doc. No. 56.)  For these reasons, the

government investigations into UHS are not enough to support an inference of scienter under the

PSLRA.

Next, Lead Plaintiffs cite to the Buzzfeed I allegations to demonstrate that Mr. Miller and

Mr. Filton knew about the misconduct at behavioral health facilities at the time they made

statements about the company's financial position.  But Buzzfeed I does not give rise to a strong

inference of scienter on the part of Mr. Miller or Mr. Filton.  Although Buzzfeed I makes a case

for the existence of misconduct at individual behavioral health facilities, the article does not state

whether Mr. Miller or Mr. Filton knew about the alleged scheme or recklessly disregarded it.  Mr.

Miller is only mentioned in the article to note that he founded the company and serves as the

Company's Chairman and CEO.  Mr. Filton is not mentioned at all.  Further, apart from the five

anecdotal patient accounts, Buzzfeed I does not allege anything that was not already alleged in the

<u>qui</u> <u>tam</u> lawsuits, the government investigations, or the CtW letter.

In <u>Chan v. New Oriental Education & Technology Group Inc.</u>, a case cited by Defendants in their supplemental briefing, the court dismissed a securities class action that alleged that the defendant's business model was to "ghost-write" university applications, rather than advise college-bound students, which is what the company told investors. No. 16-9279-KSH-CLW, 2019 WL 2865452, at *2 (D.N.J. July 3, 2019). There, the plaintiffs' scienter allegations were largely based on a Reuters article that purported to reveal the company's misconduct. At the motion to dismiss stage, the court found that neither the complaint nor the article could withstand PSLRA scrutiny:

> From the foregoing, plaintiffs' claim the Reuters article revealed that [defendant] "routinely ghost-wrote personal statements and application essays for its customers." But on close examination, the contents of the Reuters article do not meet the heightened particularity required of claims under Section 10(b) and Rule 10b-5). As to Shi, Qui, and Li, "the who, what, when, where, and how" of how they came to learn of what they say happened is missing. The article is devoid of information about when specifically Shi and Qiu worked at [defendant], for example. And as to Qui's application, there are no specifics about who the "they" are who "wrote everything" and what the "everything" consisted of.
>
> In its motion to dismiss, [defendant] noted the Reuters article "raises more questions than it answers: Did these employees work at [defendant] during the Class Period? Was this based on first-hand knowledge? How widespread was the practice? Where and when did it take place? Was the alleged ghost-writing known to or endorsed by management, and what is the basis for any such conclusion? This is not surprising; Reuters is not a securities fraud plaintiff, and while newspaper articles can certainly alert investors to wrongdoing, "the <u>complaint</u> must rise or fall on allegations about defendant['s] conduct and not on wide-eyed citation to the gratuitous commentary of outsiders." <u>Hershfang v. Citicorp</u>, 767 F. Supp. 1251, 1255 (S.D.N.Y 1991) (emphasis added).
>
> The statements in the Reuters article also fail to support a conclusion that the scienter requirement is adequately pleaded. None of the former employees' claims in the article alleges that anyone in a management role at New Oriental endorsed or even knew of ghost-writing practices. The statements these former employees did make, even in conjunction with the other allegations and sources to which plaintiff points, are insufficient to give rise to any reasonable inference of scienter, much less one that is at least as compelling as the opposing inference.

Id. at *7-8 (internal citations omitted).  Similarly, in this case, the allegations in Buzzfeed I are not sufficiently particularized to raise an inference of scienter against Mr. Miller or Mr. Filton.

Finally, Lead Plaintiffs claim that the inferences of scienter raised by the qui tam lawsuits, the investor letter, the government investigation, and Buzzfeed I are corroborated and bolstered by the accounts of the ten anonymous former UHS employees.  As noted above, these ten employees "confirmed that UHS facilities engaged in widespread improper admission practices, misleading patients and fabricating symptoms to justify institutionalizing them."  (Doc. No. 30 ¶ 127.)  Lead Plaintiffs claim that these accounts "all independently corroborate that Defendants engaged in a massive, Company-wide and reprehensible admissions scheme at UHS facilities across the country."  (Id. ¶ 164.)

The allegations regarding the confidential former employees, which the Court found reliable in a preceding section, span thirty-seven (37) paragraphs in the Amended Complaint. These paragraphs are laden with allegations that "senior officers," "corporate bosses," "UHS executives," "UHS executive management," "corporate," and the "highest levels of corporate management" knew about the billing scheme or directed UHS employees to effectuate the scheme. But noticeably absent from the Amended Complaint are specific allegations that either Mr. Miller or Mr. Filton were involved in the misconduct.  Their names are never mentioned in these accounts. Even testimony from a facility CEO who would have had contact with UHS corporate executives does not affirmatively link the misconduct to Mr. Miller or Mr. Filton.  Thus, while the testimony from the former employees is enough to raise an inference of misconduct at several UHS behavioral health facilities, they are not enough to raise an inference of scienter.

Lead Plaintiffs claim that the qui tam lawsuits, the CtW letter, the government investigations, Buzzfeed I, and the testimony of the former UHS employees all demonstrate that

Mr. Miller and Mr. Filton either knew about the existence of the alleged misconduct or recklessly disregarded significant red flags that demonstrated the existence of the alleged billing scheme. On the other hand, Defendants posit that the qui tam suits, the CtW letter, the investigations, Buzzfeed I, and the employees' testimony are unsubstantiated allegations that do not prove that Mr. Miller or Mr. Filton knew of or recklessly disregarded anything. To the contrary, Defendants submit that these matters demonstrate that UHS acknowledged the existence of the allegations, investigated them, and determined that they were unfounded.

Having reviewed the allegations in the Amended Complaint, the Court is not convinced that Lead Plaintiffs have pled facts that raise a strong inference of scienter. Based on the allegations, it is clear that Mr. Miller and Mr. Filton were likely aware that allegations of misconduct at individual facilities existed. What is not clear or plausible from the confluence of the allegations is that Mr. Miller or Mr. Filton knew the allegations to be true or participated in the misconduct at the time the actionable statements were made. In fact, the Board's behavior suggests the opposite. In the letter sent to CtW, the Board clearly stated that the independent contractors employed by the company to audit the suicidal ideation data found nothing fraudulent about UHS's billing practices.

Furthermore, even viewed as a whole, the allegations raised by Lead Plaintiffs in the Amended Complaint do not show that Mr. Miller or Mr. Filton recklessly disregarded significant red flags that indicated the existence of the alleged misconduct. "To plead recklessness, the plaintiff must allege that the reckless statement or omission 'involved not merely simple, or even excusable negligence, but an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so

obvious that the actor must have been aware of it.'" <u>SEB Investment Mgmt.</u>, 351 F. Supp. 3d at 905 (quoting <u>Belmont</u>, 708 F.3d at 493).

Even if the red flags alleged by Lead Plaintiffs—the <u>qui</u> <u>tam</u> suits, the letters, and the investigations—were significant, there are no allegations that Defendants ignored them. To the contrary, in response to CtW's concerns about UHS's use of the suicidal ideation code, the UHS Board of Directors sent CtW a letter that explained that the company internally analyzes billing practices and employs external, independent auditors to review billing practices. (Doc. No. 34-5.) Likewise, the <u>qui</u> <u>tam</u> lawsuits and the government investigations were not ignored; instead, they were immediately disclosed in the company's public filings. These disclosures significantly detract from any inference of scienter. <u>See</u> <u>Owens v. Jastrow</u>, 789 F.3d 529, 540-41 (5th Cir. 2015) ("[T]he red flags were disclosed to the public, which negates the inference that defendants acted with scienter."); <u>Fire & Pension Ass'n of Colo. v. Simon</u>, 778 F.3d 228, 244 (1st Cir. 2015) (holding that a company's disclosures of red flags "undercut any inference of scienter"); <u>Ziemba v. Cascade Int'l, Inc.</u>, 256 F.3d 1194, 1211 (11th Cir. 2001) (explaining that the disclosures of red flags "undermine[d] any hint of fraud").

Still, Lead Plaintiffs contend that the "edict" to effectuate the alleged misconduct came from the top—i.e., Mr. Miller and Mr. Filton. But scienter cannot be imputed to Mr. Miller and Mr. Filton by virtue of their positions alone. It is well-established that "allegations that a securities-fraud defendant, because of his position in the company, 'must have known' a statement was false or misleading are . . . inadequate." <u>Advanta</u>, 180 F.3d at 539 (quoting <u>Maldonado v. Dominguez</u>, 137 F.3d 1, 10 (1st Cir. 1998)). "A plaintiff cannot establish scienter on the part of defendant executives by 'loosely describing the managerial hierarchy by which fraudulent conduct could have come to their attention.'" <u>City of Roseville</u>, 686 F. Supp. 2d 404, 422 (E.D. Pa. 2009)

(quoting <u>Clark v. Comcast Corp.</u>, 582 F. Supp. 2d 692, 706 (E.D. Pa. 2008)). Based on that principle, the Court cannot infer that Mr. Miller or Mr. Filton were aware that the alleged misconduct was occurring simply because they held high-level positions within the company.

To overcome this impediment, Lead Plaintiffs cite to several cases that stand for the proposition that knowledge may be imputed to high-level officers or directors if the misstatements or omissions involve the company's "core business." (Doc. No. 35 at 34.) For example, in <u>In re Viropharma Inc. Sec. Litig.</u>, shareholders brought a securities fraud action against a manufacturer of the drug Vancocin, alleging that the manufacturer misrepresented that Vancocin would qualify for three additional years of marketing exclusivity based on pending FDA approval for new conditions of use. 21 F. Supp. 3d 458, 473 (E.D. Pa. 2014). At the heart of the complaint was the allegation that the company's directors had information showing that the drug would not be approved for new uses, in direct contradiction of the company's public statements. <u>Id.</u> at 473. To combat that allegation, the directors argued that knowledge cannot be imputed to them based on their positions alone. <u>Id.</u> But the court found it relevant that the alleged misstatements and omissions concerned the company's core business, and reasoned as follows:

> Furthermore, the fact that sales of Vancocin comprised ViroPharma's "core business," also supports the inference that Defendants either knew or should have been aware of the issues concerning the drug's approval. <u>See, e.g.</u>, <u>Avaya</u>, 564 F.3d at 271. It is undisputed that, during the class period, sales of Vancocin accounted for more than 50% of ViroPharma's revenue and profit margins. This ties directly to Plaintiff's theory of Defendants['] motive—that Defendants knew that the exclusivity was not forthcoming, so they sought to mislead investors and delay the ultimate denial of exclusivity. The strong inference of scienter is supported by Plaintiff's several confidential witnesses, and the allegations supported by documentation in the Complaint.

<u>Id.</u>

Based on this logic, Lead Plaintiffs claim that scienter can be imputed to the individual Defendants based on the core business doctrine because the alleged misstatements concerned the

Behavioral Health Division, which accounts for 70% of the company's business. But this claim overlooks several key differences between UHS and the company in ViroPharma. In ViroPharma, the drug testing was a major issue that affected the viability of a large percentage of the company's business and would have come before that company's Board of Directors. But here, the alleged billing scheme occurred at the day-to-day, operational level. Although the Board of UHS surely issued directives and set company policies and values, it is highly improbable that it micro-managed the daily operations of over 200 behavioral health facilities.

Lead Plaintiffs' claim is made more improbable by the fact that each UHS behavioral health facility operates under its own leadership, including a chief executive officer, chief financial officer, and compliance staff. (Doc. No. 34-2 at 11.) Each facility also has its own governance board, which includes members of the facility's medical and professional staff. Each governance board is responsible for the facility's medical, clinical, and ethical practices. (Id.) Although the corporate office regularly monitors each facility's quarterly performance, day-to-day operations— like admitting patients, charting, and coding—are monitored by the individual facility's executives. Thus, while it is likely that the Board of Directors knew about the allegations raised in the qui tam suits, the investor letter, the government investigations, and Buzzfeed I, it is not plausible that Mr. Miller and Mr. Filton were micromanaging a handful of facilities with compliance issues. For this reason, Lead Plaintiffs' core business theory is unpersuasive.

Having reviewed the allegations in the Amended Complaint as a whole,[42] the Court is not convinced that Lead Plaintiffs have pled particularized facts sufficient to raise a strong inference

---

[42] Although the Court analyzed Lead Plaintiffs' scienter allegations one-by-one, it considered the Amended Complaint as a whole, as required by Tellabs. See In re Hertz Global Holdings, Inc., 905 F.3d 106, 115 (3d Cir. 2018) ("We have explicitly approved of scienter analyses that assess individual categories of scienter allegations individually when it is clear, as it is here, that a district court ultimately considered the allegations as a whole."); OFI Asset Mgmt. v. Cooper

of scienter against Mr. Miller or Mr. Filton, as required by the PSLRA. Even viewed in the light most favorable to Lead Plaintiffs, the allegations proffered in the Amended Complaint do not demonstrate that Mr. Miller or Mr. Filton acted consciously or recklessly when they made statements about the source of the Behavioral Health Division's revenue or when they denied the allegations raised in Buzzfeed I and other complaints received by the company. Any inferences of scienter are outweighed by the plausible, nonculpable explanation that Mr. Miller and Mr. Filton acknowledged concerns about the billing scheme, investigated the matter, but determined that the concerns were unfounded. Accordingly, the facts alleged in the Amended Complaint fail to raise the requisite inference of scienter against the individual Defendants. Next, the Court will consider the applicability of the doctrine of corporate scienter to this case.

### b. Defendant UHS

In the Motion to Dismiss, Defendants contend that because "Miller and Filton are alleged to have made each of the alleged misstatements . . . it is their scienter that matters for the purposes of determining whether [Lead] Plaintiffs have met the heightened pleading standard under the PSLRA." (Doc. No. 34-2 at 29 n.17.) Essentially, they argue that if Lead Plaintiffs fail to allege scienter with respect to Mr. Miller or Mr. Filton, they have also failed to allege scienter against UHS as a corporation.

The Third Circuit Court of Appeals has not yet decided whether scienter allegations against a corporation require scienter allegations against individual corporate defendants. Utesch v. Lannett Company, Inc., 316 F. Supp. 3d 895, 902 n.2 (E.D. Pa. 2018)) (citing Rahman v. Kid Brands, Inc., 736 F.3d 237, 246 (3d Cir. 2013) ("We, however, neither have accepted not rejected

---

Tire & Rubber, 834 F.3d 481, 493 (3d Cir. 2016) (explaining that just because a court is "thorough in explaining why it found scienter lacking as to each asserted misrepresentation does not suggest that it did not consider the allegations as a whole").

the doctrine of corporate scienter in securities fraud actions, and we do not do so now . . . ."); <u>City of Roseville</u>, 442 Fed. App'x 672, 676-77 (3d Cir. 2011).

In decisions that touch upon the doctrine of corporate scienter, the Third Circuit has recognized that other circuits are split on the issue of whether a plaintiff can plead corporate scienter without reference to particular individuals. For example, in <u>City of Roseville</u>, a case in which a plaintiff brought a securities fraud claim against a company and individual executives of the company, the court noted that the Fifth Circuit Court of Appeals held that in determining whether a corporation had the scienter to make misstatements:

> It [is] appropriate to look to the state of mind of the individual corporate official or officials who make or issue the statement . . . rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment.

442 Fed. App'x at 676 (quoting <u>Southland Securities Corp. v. INSpire Insurance Solutions, Inc.</u>, 365 F.3d 353, 366 (5th Cir. 2004)). Essentially, the Fifth Circuit held that a plaintiff can impute scienter to a corporation by demonstrating that individual corporate defendants acted with scienter. Using this approach, the district court in <u>City of Roseville</u> dismissed the case, finding that "[b]ecause there was no individual at [the company] who made actionable statements, . . . plaintiff had not pled scienter against [the company]." <u>Id.</u>

On appeal, the plaintiff argued that lack of scienter against individual defendants was not prohibitive; rather, it claimed that under the doctrine of corporate scienter, it could plead scienter against a corporation without successfully pleading scienter against an individual. <u>Id.</u> In support of this argument, the plaintiff pointed to authority from the Seventh Circuit Court of Appeals and the Sixth Circuit Court of Appeals. As explained in <u>City of Roseville</u>, the Seventh Circuit has found that "[i]t is possible to draw a strong inference of corporate scienter without being able to name the individuals who connected and disseminated the fraud." <u>Makor Issues & Rights, Ltd. v.</u>

<u>Tellabs Inc.</u>, 513 F.3d 702, 710 (7th Cir. 2008). In that case, the Seventh Circuit posed a hypothetical where corporate scienter would exist:

> Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero. There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.

<u>Id.</u>

Similarly, the Sixth Circuit has recognized the ability to plead corporate scienter without reference to particular individuals. <u>City of Roseville</u>, 442 Fed. App'x at 676 (discussing <u>City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.</u>, 399 F.3d 651 (6th Cir. 2005)). In <u>Bridgestone</u>, the court explained that corporate scienter was warranted without reference to particular individuals because the scope of the wrongdoing was "extraordinary." <u>Id.</u> There, <u>Bridgestone</u> and its subsidiary "had information that their tires were rupturing and causing, among other things, a significant number of rollover accidents" but "engaged in a variety of tactics . . . to keep the scope of the problem from safety regulators in the United States . . . as well as from investors." <u>Id.</u>

After setting forth the Sixth and Seventh Circuit approaches to the doctrine of corporate scienter, the Third Circuit declined to adopt either approach. Because the facts in <u>City of Roseville</u> were a "far cry" from those pled in <u>Bridgestone</u> or those imagined in the Seventh Circuit's hypothetical, the court found that it "need not" decide whether a plaintiff can plead corporate scienter without successfully pleading scienter against individual defendants. <u>Id.</u> at 676-77.

Similarly, in <u>Rahman</u>, the Third Circuit again declined to decide whether a plaintiff had the ability to successfully plead scienter against a corporation without successfully pleading scienter against an individual. 736 F.3d at 246. There, the court stated the following:

> In considering the adequacy of the [complaint] under the PSLRA, we must address the doctrine of "corporate scienter," alternatively referred to as "collective

scienter." A plaintiff can use corporate or collective scienter to plead an inference of scienter against a corporate defendant without raising the same inferences required to attribute scienter to an individual defendant. See Glazer Capital Mgmt., LP v. Magistri, 549 F.3d 736, 743 (9th Cir. 2008). We, however, neither have accepted nor rejected the doctrine of corporate scienter in securities fraud actions, and we do not do so now because the allegations in the [complaint] cannot support the existence of corporate or collective scienter. For comparison, we refer to City of Monroe Emp. Ret. Sys. v. Bridgestone Corp., 399 F.3d 651 (6th Cir. 2005), a case that does recognize the adequacy of a claim of corporate scienter. In Bridgestone, the plaintiff alleged that a corporate subsidiary of the defendant engaged in a massive cover-up to hide the fact that tires it manufactured were rupturing and causing a high number of accidents. Id. at 656-59. But in this case, there is no credible evidence to suggest that [the defendant company] covered up the customs violations at its subsidiaries. Quite to the contrary, when U.S. Customs notified [the defendant company] of the Focused Assessment, [the defendant company] hired an outside law firm to conduct an internal investigation and, when it received a report from the firm, it publicly disclosed both the existence of the Focused Assessment and the remedial steps it had taken. Thus, even if we recognize the doctrine of corporate scienter, this case would not come within the doctrine and the [complaint] would not survive the motion to dismiss.

Id.

Likewise, in this case, the Court need not determine whether Lead Plaintiffs can successfully plead corporate scienter against UHS without successfully pleading scienter against Mr. Miller or Mr. Filton. Here, there are no particularized allegations of a company-wide scheme or a widespread cover-up that rise to the level of the coverup in Bridgestone or the hypothetical posed by the Seventh Circuit. To the contrary, when CtW sent a letter to UHS, raising concerns about the company's use of the suicidal ideation code, the Board sent CtW a letter that explained that the company internally audits billing practices and also employs external auditors to review coding at facilities. Likewise, the company did not ignore or cover up the qui tam lawsuits and government investigations; instead, these matters were immediately disclosed in the company's public filings. Consequently, even if the Third Circuit had recognized the doctrine of corporate scienter, the allegations in the Amended Complaint would not fall under that doctrine.

In sum, the facts alleged in the Amended Complaint fail to raise the requisite inference of scienter against Mr. Miller or Mr. Filton, the individual Defendants, under the PSLRA. And even if the Third Circuit recognized the doctrine of corporate scienter, the Amended Complaint does not contain facts that would give rise to liability under that doctrine. Thus, because Lead Plaintiffs have not adequately pled scienter against any Defendant, Count I of the Amended Complaint will be dismissed. As a result, the Court need not consider whether Lead Plaintiffs have adequately pled the element of loss causation.[43]

## B. Count II – Section 20(a) of the Securities and Exchange Act of 1934

In Count II of the Amended Complaint, Lead Plaintiffs allege that Defendants Miller and Filton, as individuals with control over the company, violated Section 20(a) of the Act. (Doc. No. 30 ¶¶ 305-311.) Section 20(a) of the Act imposes joint and several liability upon individuals who control violators of Section 10(b). 15 U.S.C. § 78t(a). To prevail under this provision of the Act, a plaintiff must establish that (1) the defendant was in control of another person or entity, and (2) that person or entity violated Section 10(b). See In re Suprema Specialties, Inc. Securities Litigation, 438 F.3d 256, 284 (3d Cir. 2006). "[L]iability under Section 20(a) is derivative of an underlying violation of Section 10(b) by the controlled person." Williams v. Globus Medical, Inc., 869 F.3d 235, 246 (3d Cir. 2017) (quoting Avaya, 564 F.3d at 252). Because Lead Plaintiffs have

---

[43] To plead loss causation, a plaintiff "must plead that the very misrepresentation at issue proximately caused them an economic loss." Nat'l Junior Baseball League v. Pharmanet Development Group, Inc., 720 F. Supp. 2d 517, 559 (D.N.J. 2010) (citing Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 345 (2005)). Typically, a plaintiff shows loss causation by pleading that a company's stock price dropped in response to a "corrective disclosure" of new information that directly demonstrates that the defendant's representations were false. See In re Intelligroup Sec. Litig., 527 F. Supp. 2d 262, 326 (D.N.J. 2007). Here, Defendants argue that the two alleged corrective disclosures—Buzzfeed I and UHS's discussion of the 2017 second quarter results— did not disclose any new information that corrected a previously made false representation. (Doc. No. 34 at 35-36.) They submit that all of the information "revealed" in those two instances had already been publicly available. (Id.)

failed to sufficiently plead that Defendants Miller or Filton violated Section 10(b), they have likewise failed to state a claim under Section 20(a). <u>See</u> <u>id.</u> (affirming the dismissal of a plaintiff's Section 20(a) claims because dismissal of the plaintiff's Section 10(b) claims was appropriate). As a result, Count II of the Amended Complaint will be dismissed.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (Doc. No. 34) will be granted and the Amended Complaint will be dismissed in its entirety. An appropriate Order follows.