IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TEAMSTERS LOCAL 456 PENSION FUND, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNIVERSAL HEALTH SERVICES, et al., <br><br> Defendants. | CIVIL ACTION <br> NO. 17-2817 |

**TABLE OF CONTENTS**

I.   INTRODUCTION ........................................................................................................... 3

II.  BACKGROUND ............................................................................................................ 4

   A.  The First Amended Complaint ("FAC") and Dismissal of the FAC................................... 4

      1.  Count I of the FAC........................................................................................................ 5

      2.  Count II of the FAC..................................................................................................... 12

   B.  The Second Amended Complaint ("SAC") ...................................................................... 12

      1.  Former Employees ...................................................................................................... 12

      2.  Sharon Worsham ......................................................................................................... 14

      3.  Suicide Ideation Coding and Coding Audits................................................................ 15

      4.  Settlement with United States Department of Justice ("DOJ") ...................................... 17

III. STANDARD OF REVIEW ............................................................................................. 18

IV. ANALYSIS ................................................................................................................... 21

   A.  Undue Delay ............................................................................................................... 21

   B.  Prejudice .................................................................................................................... 24

C.  Futility ............................................................................................................ 26

   1.  Former Employees ........................................................................................ 30

   2.  Sharon Worsham ........................................................................................... 31

   3.  Suicide Ideation Coding and Coding Audits ................................................ 32

   4.  DOJ Settlement ............................................................................................. 33

   5.  Consideration Of The SAC As A Whole ...................................................... 34

V.  CONCLUSION ...................................................................................................... 37

<u>OPINION</u>

**Slomsky, J.**                                                                                          **April 29, 2020**

## I.      INTRODUCTION

This is a securities fraud class action that was originally filed on December 23, 2016 by Plaintiff David Heed in the United States District Court for the Central District of California. Named as Defendants are Universal Health Services ("UHS"), the largest provider of behavioral health services in the United States, Alan B. Miller, the Chairman and Chief Executive Officer of UHS, and Steve F. Filton, the Chief Financial Officer of UHS (collectively, "Defendants").  On April 24, 2017, Teamsters Local 456 Pension Fund and Teamsters Local 456 Annuity Fund (collectively, "Lead Plaintiffs") were appointed Co-Lead Plaintiffs to represent the interests of UHS shareholders in this suit.  On June 20, 2017, the district court in California granted Defendants' unopposed Motion to Transfer the case to the Eastern District of Pennsylvania, and the case was assigned to former Chief Judge Lawrence F. Stengel.  On September 29, 2017, Lead Plaintiffs filed an Amended Complaint ("First Amended Complaint" or "FAC") on behalf of all investors who purchased or acquired UHS publicly traded common stock between March 2, 2015 and July 25, 2017 ("the Class Period").  (Doc. No. 30.)

Defendants filed a Motion to Dismiss the FAC on December 6, 2017.  (Doc. No. 34.)  On July 12, 2018, the case was reassigned from Judge Stengel to Judge Robert F. Kelly.  (Doc. No. 37.)  Two days later, the case was assigned to this Court.  (Doc. No. 38.)  On August 19, 2019, the Court granted Defendants' Motion to Dismiss the FAC.  (Doc. Nos. 58, 59.)

Presently before the Court is Lead Plaintiffs' Rule 59(e) Motion to Alter or Amend the Court's Order Dismissing Their Complaint, [and] Requesting Leave for Lead Plaintiffs to Amend the Complaint Pursuant to Fed. R. Civ. P. 15(a).  (Doc. No. 62.)  Lead Plaintiffs ask this Court to (1) reconsider the Order dismissing the FAC under Federal Rule of Civil Procedure 59(e), and

(2) give Lead Plaintiffs leave to amend the FAC and file the attached Second Amended Complaint ("SAC") under Rule 15(a)(2).  Because the Court finds that the claims in the SAC fail on the ground of futility, the Court will deny Lead Plaintiffs' Motion to Alter or Amend and Request for Leave.

## II.      BACKGROUND

### A.      The First Amended Complaint ("FAC") and Dismissal of the FAC

On August 19, 2019, the Court granted Defendants' Motion to Dismiss the FAC.  (Doc. Nos. 58, 59.)  In its Opinion, the Court set forth the comprehensive factual assertions included in the FAC.  (See Doc. No. 58 at 6-44.)  These facts, which were accepted as true for purposes of deciding the Motion to Dismiss, are incorporated herein.[1]  The claims in the FAC, and the Court's disposition of those claims, are described below.

---

[1]    The Introduction to the prior Opinion provides the following overview:

> [UHS] is the largest provider of behavioral health services in the United States.  On December 7, 2016, after a year-long investigation, Buzzfeed News ("Buzzfeed") published an article that alleged UHS behavioral health facilities were committing insurance fraud by (1) admitting healthy patients not in need of inpatient treatment to UHS behavioral health facilities by falsely stating that they were suicidal; (2) improperly lengthening patients' stays in UHS behavioral health facilities; and (3) chronically understaffing those facilities to maximize profits.  Prior to the publication of the article, UHS reported that its Behavioral Health Division was in strong financial shape and that demand was so high that UHS-owned facilities routinely turned away patients that met clinical admissions criteria.  In the wake of the article, UHS stock plummeted 12% in a single trading day, wiping out $1.5 billion in market capitalization.  The company immediately denied the allegations of widespread billing misconduct, and to date, UHS maintains that it did not engage in the illicit conduct profiled in the Buzzfeed article.  (See Doc. No. 30.)

(Doc. No. 58 at 4.)

      **1.**        **Count I of the FAC.**

The FAC alleges two claims against Defendants.  In Count I, Lead Plaintiffs assert that Defendants' public statements during the Class Period violated Section 10(b) of the Securities and Exchange Act of 1934 (the "Act")[2] and Rule 10b-5, which was promulgated by the SEC pursuant to authority granted by Section 10(b).[3]  (Doc. No. 30 ¶¶ 296-304.)  Lead Plaintiffs proceeded under Rule 10b-5(b), which creates a private right of action for plaintiffs to recover damages for "false or misleading statements or omissions of material fact that affect trading on the secondary market."  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1417 (3d Cir. 1997).  To prevail on a claim that a defendant made material misrepresentations or omissions in

---

[2]    Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security" a "manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."  15 U.S.C. § 78j(b).  The Act broadly defines a "security" to include, among other things, stocks, bonds, debentures, a variety of other instruments, or "in general, any instrument commonly known as a 'security.'"  15 U.S.C. § 78c(a)(10).

[3]    Rule 10b-5 provides as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> > (a) To employ any device, scheme, or artifice to defraud,
> >
> > (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> >
> > (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> In connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

violation of Section 10(b) and Rule 10b-5, a plaintiff must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." <u>Matrixx Initiatives, Inc. v. Siracusano</u>, 563 U.S. 27, 37-38 (2011) (quoting <u>Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.</u>, 552 U.S. 148, 157 (2008)).  The Opinion dismissing the FAC noted that the parties' arguments dealt with only three elements: a material misstatement or omission, scienter, and loss causation.  (Doc. No. 58 at 49.)

### i.  Material Misstatements or Omissions

In the Opinion dismissing the FAC, the Court first addressed Defendants' argument that Lead Plaintiffs failed to plead any material misstatement or omission.  In doing so, the Court initially considered whether Plaintiffs sufficiently pled misconduct at UHS behavioral health facilities. Lead Plaintiffs cited to five items of circumstantial evidence in the FAC to demonstrate that individual UHS behavioral health facilities improperly admitted patients and lengthened patients' stays to maximize insurance reimbursements: (1) six <u>qui</u> <u>tam</u> lawsuits filed before the start of the Class Period by former UHS employees and patients;[4] (2) a letter from Change to Win Investment Group ("CtW");[5] (3) the federal government's civil investigation into billing

---

[4]   Even though these suits did not result in any finding of liability against UHS, the Court found them to be significant because they alleged similar conduct at five UHS facilities located in different areas of the country.  (Doc. No. 58 at 49-50.)

[5]   On April 8, 2014, Change to Win Investment Group ("CtW") sent a letter to the UHS Board of Directors that raised concerns about the Behavioral Health Division's billing practices. In the letter, CtW informed UHS that an independent review of Medicare data found that "UHS free-standing inpatient psychiatric facilities ("IPFs") utilize the suicidal ideation code much more frequently than other free-standing IPFs."  (Doc. No. 58 at 50; Doc. No. 30 ¶¶ 47-48.)

practices at several UHS behavioral health facilities in 2012 or 2013;[6] (4) allegations in the Buzzfeed article published on December 7, 2016 ("Buzzfeed I");[7] and (5) statements of anonymous former employees.[8] Ultimately, the Court concluded that Lead Plaintiffs sufficiently pled misconduct at isolated behavioral health facilities. (Doc. No. 58 at 52.)

The Court next considered whether Defendants' statements or omissions regarding the misconduct violated federal securities law. After analyzing the applicable law, the Court found that the following statements were actionable: (1) Mr. Miller and Mr. Filton's statements at health care conferences before the publication of Buzzfeed I attributing the source of the Behavioral Health Division's success to demand that was so high that facilities turned away

---

[6]   This investigation eventually expanded into a coordinated civil and criminal investigation of 15 facilities and UHS as a corporate entity. (Doc. No. 30 ¶ 55.) UHS disclosed on July 26, 2019 in a filing with the Court that it had been advised that the criminal investigation had closed. (Doc. No. 58 at 50; Doc. No. 56.) UHS also disclosed it had reached an agreement in principle to settle the civil investigation for $127 million. (Id.)

[7]   Buzzfeed I, titled Intake: Locked on the Psych Ward, claimed 175 current and former UHS employees, including 18 UHS executives who managed inpatient behavioral health facilities, were interviewed. Buzzfeed also claimed that more than 120 patients, government investigators, and health care experts were interviewed, and a cache of internal UHS documents were reviewed. The article includes anecdotal accounts from five former UHS patients. The improper conduct alleged in Buzzfeed I falls into three categories: (1) UHS's alleged practice of manipulating or falsifying patient intake statements to label patients as suicidal in order to justify admissions; (2) UHS's alleged practice of improperly lengthening patient stays to maximize insurance reimbursements; and (3) UHS's alleged practice of understaffing facilities to maximize revenue. (Doc. No. 30 ¶ 76; Doc. No. 58 at 24-25.)

The Court found the allegations in Buzzfeed I were relevant to whether Lead Plaintiffs sufficiently alleged misconduct because the article was based on interviews from a wide array of employees and patients, all of whom had first-hand knowledge of UHS behavioral health facilities' practices, and who reported similar misconduct occurred at geographically diverse behavioral health facilities. (Doc. No. 58 at 50.)

[8]   The Court noted that ten anonymous employees alleged highly particularized facts about billing and admittance practices at individual UHS behavioral health facilities. (Doc. No. 58 at 51.)

clinically admissible patients; and (2) post-article denials issued by the Company in the days immediately following Buzzfeed I. (Id. at 72.) Thus, the alleged misstatements and omissions fell into two categories: (1) those made during the Class Period, but before Buzzfeed I was published ("pre-article statements"); and (2) those made after the publication of Buzzfeed I ("post-article statements"). (Id. at 52.)

   ii. **Scienter**

   The Court then addressed whether the FAC contained sufficiently particularized allegations of scienter. First, the Court considered whether Lead Plaintiffs pled that Defendants Miller and Filton, the Individual Defendants, acted with scienter, and concluded that Plaintiffs had not proffered any direct evidence that Mr. Miller or Mr. Filton knew of or recklessly disregarded any improper misconduct when they made statements about the source of the Behavioral Health Division's growth or when they denied the allegations in the Buzzfeed article. (Doc. No. 58 at 75 (stating "There are no allegations that these individuals participated in the misconduct, heard about the misconduct from internal sources, or instructed others to engage in misconduct.").)

   The Court also recognized that Lead Plaintiffs' claims regarding whether Mr. Miller and Mr. Filton acted with scienter were premised on circumstantial evidence. First, the Court looked at Lead Plaintiffs' allegations regarding the qui tam lawsuits that were filed by former UHS employees prior to the start of the Class Period. (Id. at 75-77.) Lead Plaintiffs cited to six qui tam lawsuits and submitted that Mr. Miller, the company's Chief Executive Officer ("CEO"), and Mr. Filton, the company's Chief Financial Officer ("CFO"), must have known about these lawsuits and investigations. The Court, however, could not "ignore the fact that the allegations raised in the qui tam cases [were] just that – allegations" and "[n]one of the qui tam lawsuits

resulted in findings against UHS.  Liability was not admitted, and thus, the allegations made in those suits remain unsubstantiated."  (Id. at 77.)  As a result, the Court was not persuaded that the qui tam lawsuits constituted evidence that Mr. Miller or Mr. Filton knew about the alleged billing scheme, and at most, the lawsuits only demonstrated that the individual Defendants were aware of allegations about the Behavioral Health Division.  (Id.)  But, the lawsuits did not show that Mr. Miller or Mr. Filton knew the allegations were true or recklessly disregarded them.  (Id.)

Second, Lead Plaintiffs pointed to a Change to Win Investment Group ("CtW") letter as circumstantial evidence that Defendants acted consciously or recklessly when they made the two sets of actionable statements.  (Id. at 77-78.)  As previously mentioned, CtW sent a letter to the UHS Board of Directors on April 8, 2014 raising concerns about the Behavioral Health Division's billing practices.  On April 22, 2014, John Herrell, the Chairman of the UHS Audit Committee and a member of the Board, responded to the letter.  The response addressed the qui tam lawsuits and stated that they either had been settled or dismissed, and none of the lawsuits resulted in charges of wrongdoing or liability against UHS.  (Doc. No. 34-5 at 2-3.)  Mr. Herrell also stated that the company disagreed with the contention that UHS behavioral health facilities over-utilized the suicidal ideation code, and UHS coding practices are audited by internal professionals and external, independent auditing analysis.  (Id. at 3.)  The Court found that the CtW letter raised the same inference as the qui tam lawsuits, namely that the Individual Defendants, as members of the Board, were aware that outside sources had raised concerns about the Behavioral Health Division's billing practices.  (Doc. No. 58 at 78.)  The Court concluded, however, that the response letter indicated that the Board of Directors acknowledged CtW's concerns, but based on internal investigations and external audits, such concerns were unfounded.  (Id.)

Third, Lead Plaintiffs relied on the coordinated federal investigation as evidence of scienter. (Id. at 79-81.) However, the Court recognized that the investigation did not result in charges or findings of misconduct, and the federal government had closed the criminal investigation and the Company had reached an agreement in principle to settle the civil investigation. (Id. at 81.) As a result, the Court determined that the government investigations into UHS were not enough to support an inference of scienter. (Id.)

Fourth, Lead Plaintiffs cited to the Buzzfeed I allegations to show that Mr. Miller and Mr. Filton knew about the misconduct at behavioral health facilities at the time they made statements about the company's financial position. (Id. at 81-83.) The Court, however, concluded that the article did not give rise to a strong inference of scienter on the part of Mr. Miller or Mr. Filton. (Id. at 83.) The Court noted that while Buzzfeed I made a case for the existence of misconduct at individual behavioral health facilities, the article did not state whether either Defendant knew about the alleged scheme or recklessly disregarded it. (Id. at 81.)

Finally, Lead Plaintiffs contended that the inferences of scienter raised in the qui tam lawsuits, the CtW letter, the government investigation, and Buzzfeed I were corroborated and bolstered by the accounts of ten anonymous former UHS employees. (Id. at 83.) According to the FAC, these ten employees "confirmed that UHS facilities engaged in widespread improper admission practices, misleading patients and fabricating symptoms to justify institutionalizing them." (Doc. No. 30 ¶ 127.) Lead Plaintiffs asserted that these accounts "all independently corroborate that Defendants engaged in a massive, Company-wide and reprehensible admissions scheme at UHS facilities across the country." (Id. ¶ 164.) The Court noted that the allegations regarding the confidential former employees spanned thirty-seven paragraphs in the FAC, but did not include specific allegations that either Mr. Miller or Mr. Filton were involved in the

misconduct.  (Doc. No. 58 at 83.)  The Court noted that their names are never mentioned, and testimony from a facility CEO, who would have had contact with UHS corporate executives, did not affirmatively link the misconduct to Mr. Miller or Mr. Filton.  (Id.)  As a result, the Court concluded that the testimony from the former employees was not enough to raise an inference of scienter against Mr. Miller or Mr. Filton.  (Id.)

After taking Lead Plaintiffs' allegations into consideration, and the FAC as a whole, the Court ultimately concluded that the FAC did not contain facts that raised a strong inference of scienter.  The Court stated the following:

> Even viewed in the light most favorable to Lead Plaintiffs, the allegations proffered in the [FAC] do not demonstrate that Mr. Miller or Mr. Filton acted consciously or recklessly when they made statements about the source of the Behavioral Health Division's revenue or when they denied the allegations raised in Buzzfeed I and other complaints received by the company.  Any inferences of scienter are outweighed by the plausible, nonculpable explanation that Mr. Miller and Mr. Filton acknowledged concerns about the billing scheme, investigated the matter, but determined that the concerns were unfounded.

(Id. at 88.)

Therefore, the Court determined that the FAC failed to raise the requisite inference of scienter against the Individual Defendants.  Moreover, the Court concluded that there were no particularized averments of a company-wide scheme or cover up implemented by the Company, and no facts would give rise to liability by UHS based on a showing of corporate scienter.  (Id. at 91-92.)  As a result, the Court dismissed Count I of the FAC because Lead Plaintiffs did not adequately plead scienter against any Defendant.[9]

---

[9]   Because scienter was not established, the Court did not need to consider whether Lead Plaintiffs adequately pled the element of loss causation.  (Id. at 92, n. 43.)

2.      **Count II of the FAC.**

In Count II of the FAC, Lead Plaintiffs averred that Defendants Miller and Filton, as individuals with control over the company, violated Section 20(a) of the Securities and Exchange Act of 1934.   (Doc. No. 30 ¶¶ 305-11.)   Section 20(a) of the Act imposes joint and several liability upon individuals who control violators of Section 10(b).   15. U.S.C. § 78t(a).   As the Court noted in the Opinion dismissing the FAC,

> To prevail under this provision of the Act, a plaintiff must establish that (1) the defendant was in control of another person or entity, and (2) that person or entity violated Section 10(b).   See In re Suprema Specialties, Inc. Securities Litigation, 438 F.3d 256, 284 (3d Cir. 2006).   "[L]iability under Section 20(a) is derivative of an underlying violation of Section 10(b) by the controlled person." Williams v. Globus Medical, Inc., 869 F.3d 235, 246 (3d Cir. 2017) (quoting Avaya, 564 F.3d at 252).

(Doc. No. 58 at 92.)

The Court found that because Lead Plaintiffs failed to sufficiently plead that Defendants Miller or Filton violated Section 10(b), they also failed to state a claim under Section 20(a).   As a result, the Court dismissed Count II of the FAC.

B.      **The Second Amended Complaint ("SAC")**

Attached to Lead Plaintiffs' Motion for Leave to Amend is the proposed SAC, which adds assertions not present in the FAC.   Notably, the SAC includes allegations that attempt to cure Lead Plaintiffs' failure to plead scienter with particularity in the FAC.   The new allegations, as offered by Lead Plaintiffs' in their Motion, fall into four categories, which are described below.

1.      **Former Employees**

The SAC identifies new confidential witnesses, identified as FE 11 and FE 12, and provides additional information from an existing witness, identified as FE 8.

FE 11 was a Director of Clinical Services at Streamwood Behavioral Health in Streamwood, Illinois, from March 2014 until April 2018. (Doc. No. 62-3 ¶ 160.) FE 11 described daily "flash" meetings where the facility Chief Executive Officer, Ron Weglarz, ordered that beds be kept filled, even with patients that might not need continued care. (Id. ¶ 184.) FE 11 stated that in or around 2016, UHS installed teleconference equipment in their facility so management could supervise and participate in the facility's flash meetings. (Id. ¶ 186.) Corporate-level executives would attend the "flash" meetings in person, including John Hollinsworth who was one of four Divisional Vice Presidents for UHS's Behavioral Health Division who reported to Debra Osteen, President of the Behavioral Division, and who in turn reported to Defendants Miller and Filton. (Id.) FE 11 also explained that Mr. Weglarz had three immediate supervisors from corporate who he answered to regularly and who were occasionally on site at the facility, including Martin Schappel, the sole Senior Vice President of the Behavioral Health Division during Mr. Schappell's tenure at UHS, Geoff Botak, one of three Senior Vice Presidents of the Behavioral Health Division during Mr. Botak's tenure at UHS, and John Hollinsworth. (Id. ¶ 187.) Each of these executives reported to Debra Osteen, the President of the Behavioral Health Division, who in turn reported to Defendants Miller and Filton. (Id.)

FE 12 was the CFO at Streamwood Behavioral Health in Streamwood, Illinois, from May 2011 through May 2015. (Id. ¶ 188.) FE 12 also stated that Mr. Weglarz led daily "flash" meetings, and those meetings were also attended by the Chief Nursing Officer, the Chief Medical Office, and a member of Utilization Management. (Id.) Higher-level UHS executives would attend the "flash" meetings if they were making an on-site visit, and at the meetings, Mr. Weglarz would question early discharges. (Id.) FE 12 also stated that UHS corporate management

directed her team to keep them informed about the "average length of stay" metric by providing weekly updates, in addition to written monthly reports.  (Id. ¶ 189.)

FE 8, a former head of UHS's Utilization Review department for UHS's Salt Lake Behavioral Health facility in Utah from 2011 through October 2014,[10] provided additional information for the SAC.  FE 8 elaborated on monthly "over/under" meetings with UHS corporate (the regional CFO, the facility CFO, the Executive Director of the facility, and department heads), where the number of days over or under a patient's insurance-authorized length of stay was discussed.  (Id. ¶ 199.)  FE 8 stated that a regional CFO at UHS, who would have reported to Debra Osteen, and who would in turn have reported to Defendants Filton and Miller, regularly attended these meetings.  (Id.)

### 2.    Sharon Worsham

The SAC also contains additional allegations that Sharon Worsholm had a "days left on the table" mantra when she communicated with hospital CEOs.  (Id. ¶ 175.)[11]  Ms. Worsham was a Divisional Vice President of the Behavioral Health Division during the Class Period who reported to Debra Osteen, who reported to Defendants Filton and Miller.  (Id.)  A confidential witness, FE 7, stated that Ms. Worsham held weekly conference calls with UHS's CEOs, which is where he first heard the "days left on the table" mantra.  (Id.)  Ms. Worsham held these calls weekly with all of the CEOs of the ten to fifteen UHS hospitals in FE 7's region.  (Id.)

Additionally, the SAC contains allegations that Ms. Worsham was demoted to "Regional Vice President" by 2017, shortly after BuzzFeed I was published.  (Id. ¶ 310.)  In this regard,

---

[10]   The period FE 8 worked at UHS ended "only a few months before the Class Period."  (Id. ¶ 181.)

[11]   The mantra, "Don't leave days on the table," is a reference to a directive not to discharge a patient "early," that is, before their approved insurance days all had been used, without regard to medical necessity.  (Id. ¶ 3.)

Lead Plaintiffs assert in the SAC as follows: "[A]s UHS would later unequivocally represent there was no truth to the BuzzFeed report's detailed accounts and nothing wrong with the 'days on the table' directive, there would have been no reason for the Company to demote Worsham." (Id.)

### 3.      Suicide Ideation Coding and Coding Audits

The SAC elaborates on the CtW letter regarding the suicide ideation code.  The CtW letter stated that an independent analysis of Medicare data showed that UHS free-standing inpatient psychiatric facilities ("IPFs") utilize the suicide ideation code more than four times higher than UHS's competitors.  (Id. ¶ 50.)  The suicide ideation code was critical to UHS's business because, pursuant to guidelines issued by CMS and commercial payers, for a psychiatric patient's admission to an inpatient facility to be deemed "medically necessary," such that it would warrant reimbursement, the patient had to be diagnosed as suffering from a psychiatric disorder that could be treated at the facility and the patient had to meet one of three essential admission criteria: (1) the patient was suicidal as evidenced by documentation of suicidal thoughts and evidence of a specific plan to commit suicide, which was denoted to the insurance billing department via the "suicide ideation code;" (2) the patient was a harm to others, or had "homicidal ideation;" or (3) the patient was gravely disabled such that she was unable to care for herself.  (Id. ¶ 51.)

If one of these three admission criteria was not met, UHS would not receive reimbursement because the patient's condition would not be deemed sufficiently "severe."  (Id.) UHS would then have to "recertify" that the patient continued to meet the admission criteria to establish medical necessity for lengthening a patient's stay.  (Id.)  As a result, Defendants Miller and Filton were "directly confronted with CtW data demonstrating that UHS represented to Medicare that Company-wide inpatient admissions were "medically necessary" on the basis that

its patients were suicidal, meaning they had suicidal thoughts and a specific plan to commit suicide, at a rate that was over 400% higher than its competitors.  (Id. ¶ 53.)

UHS, in response, dismissed any claims that it was involved in wrongdoing and denied the need for additional compliance controls.  (Id. ¶ 57.)  UHS responded that "CtW's analysis of UHS billing practices did not imply any significant, unaddressed risks going forward, and that the creation of a separate, dedicated compliance committee was unnecessary."  (Id.)  UHS also insisted that the compliance issues CtW had identified were "sporadic," occurred only in a "minority of our facilities," and that "[w]hile a small minority of [the] facilities may encounter sporadic regulatory compliance issues, those matters are always remedied."  (Id.)  Lead Plaintiffs in the SAC assert, however, that Defendants' response omitted the fact that the suicide ideation billing code had an impact on reimbursements that UHS facilities received from Medicare. (Id. ¶ 58.)   Further, UHS could not provide a credible explanation for why UHS's for-profit competitors coded patients at a lower rate than UHS.  (Id. ¶ 59.)

Lead Plaintiffs also allege that UHS stated that its suicide ideation coding need not be scrutinized because it had been sanctioned by internal and external auditors.   (Id. ¶ 60.) However, the internal auditors, as alleged in the qui tam lawsuits, played an active part in implementing the improper admission and length of stay scheme, and both internal and external auditors only evaluated UHS's suicide ideation coding after the fact, or post-discharge.  (Id.) The audits were reliant upon UHS's own documentation of patients' medical conditions, which had been alleged to be fraudulent in the qui tam lawsuits.  (Id.)  The external auditor, which had the unique name nThrive, clarified that it could only speak to the quality and accuracy of the coding based on the documentation provided.  (Id. ¶ 116.)  The auditor was not in a position to say whether UHS's underlying documentation regarding the intake process was being

manipulated, or whether patients were being improperly directed to say they were suicidal.  (Id.)
UHS did not claim that it had conducted any internal audit or investigation where it tasked
auditors to review the actual intake process and the clinical determinations being made for
inpatient admissions.  (Id.)

### 4.    Settlement with United States Department of Justice ("DOJ")

Finally, the SAC contains additional allegations regarding UHS's settlement with the
Department of Justice's False Claims Act ("FCA") investigation of the Company's admission
and length of stay practices.   The DOJ's investigation expanded to include ten additional
facilities between the time of the filing of UHS's 2018 Form 10-K and its Form 10-Q in the first
quarter of 2019, equaling 34 total facilities nationwide.  (Id. ¶ 147.)  UHS also announced an
increase in its reserve for the investigation, from $22 million in 2017 to $123 million in 2018.
(Id.)   On the Company's earnings calls, Mr. Filton explained that UHS was "adjust[ing] our
reserves periodically, pretty much lately, every quarter – to reflect whatever our latest offer is" in
response to the DOJ's increasing demand.  (Id.)  On July 25, 2019, UHS announced in a Form 8-
K filed with the SEC that it reached an agreement in principal with the DOJ for $127 million, an
amount over 50% of its 2019 second quarter net income of $238 million and nearly 20% of the
net annual income that UHS reported during the class period.  (Id. ¶ 148-49.)  Lead Plaintiffs in
the SAC allege that this is "highly compelling evidence" that the DOJ uncovered substantial
evidence of misconduct "at the highest levels of UHS" because to establish a claim under the
FCA, the DOJ had to show that UHS knowingly submitted false claims to the Government
regarding patients' medical necessity for admission and length of stay in order to obtain payment.
(Id. ¶ 149.)

In addition to the monetary settlement, the Form 8-K also announced that UHS would be
required to enter into a corporate integrity agreement ("CIA") with the Office of Inspector

General ("OIG"). (Id. ¶ 150.) "The OIG negotiates CIAs in FCA settlements with healthcare providers in exchange for the OIG not prohibiting those providers from continuing to participate in the Medicare program due to their fraudulent conduct." (Id.) CIAs implement monitoring efforts to ensure the subject company "does not defraud the Government again," such as hiring a compliance officer and instituting written standards and policies. (Id.) CIAs are not common, and CIAs are only required when the OIG determines that the future risk of fraud is moderately high. (Id. ¶ 151.) On September 4, 2019, Mr. Filton stated that UHS provided information about its compliance programs to the OIG and was waiting to receive a draft agreement. (Id. ¶ 152.) At the time of the SAC's filing, a final settlement had not been finalized or publicly filed. (Id. ¶ 153.)

## III.   STANDARD OF REVIEW

The Federal Rules of Civil Procedure afford plaintiffs the opportunity to amend an initial complaint once as a matter of course for the reasons set forth in Rule 15(a).[12] See Fed. R. Civ. P. 15(a)(1-2). However, after a judgment dismissing the complaint is entered, a party may seek to amend the complaint, and thereby disturb the judgment, only under Federal Rules of Civil

---

[12]   The pertinent provisions of Rule 15 provide as follows:

(a)(1)   Amending as a Matter of Course. A party may amend its pleading once as a matter of course within:

(A) 21 days after serving it, or

(B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.

(a)(2)   Other Amendments. In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires.

Procedure 59(e)[13] and 60(b).[14]   <u>Burtch v. Milberg Factors, Inc.</u>, 662 F.3d 212, 230 (3d Cir. 2011).

Rule 60(b) motions must be filed within one year after the entry of judgment.  <u>Id.</u> at n. 7 (citing

Fed. R. Civ. P. 60(c)).  Since under Rule 59(e) a motion to alter or amend judgment must be filed

within 28 days after entry of judgment, the one-year time limit under Rule 60(b) is rendered

moot.  <u>See id.</u>  For this reason, Rule 59(e) would govern.  <u>See id.</u>  Here, Lead Plaintiffs filed their

Rule 59(e) motion within 28 days of judgment.  Consequently, Rule 60(b) does not apply in this

case.

In the Third Circuit, when a timely motion to amend judgment is filed under Rule 59(e),

factors under Rule 15(a) come into play.  As the Third Circuit in <u>Burtch</u> stated,

> Generally, motions for reconsideration under Rule 59(e) must rely
> on one of the following three grounds: "(1) an intervening change in
> controlling law; (2) the availability of new evidence; or (3) the need
> to correct clear error of law or prevent manifest injustice."
> <u>Lazaridis v. Wehmer</u>, 591 F.3d 666, 669 (3d Cir.2010) (citation
> omitted).  The factors that guide our review in a Rule 59(e) motion

---

[13]   Federal Rule of Civil Procedure 59(e) states, "A motion to alter or amend a judgment must be
filed no later than 28 days after the entry of judgment."

[14]   Federal Rule of Civil Procedure 60(b) states as follows:

> (b) Grounds for Relief from a Final Judgment, Order, or Proceeding. On motion
> and just terms, the court may relieve a party or its legal representative from a final
> judgment, order, or proceeding for the following reasons:
>
> (1) mistake, inadvertence, surprise, or excusable neglect;
> (2) newly discovered evidence that, with reasonable diligence,
> could not have been discovered in time to move for a new trial
> under Rule 59(b);
> (3) fraud (whether previously called intrinsic or extrinsic),
> misrepresentation, or misconduct by an opposing party;
> (4) the judgment is void;
> (5) the judgment has been satisfied, released, or discharged; it is
> based on an earlier judgment that has been reversed or vacated; or
> applying it prospectively is no longer equitable; or
> (6) any other reason that justifies relief.

> may be affected by the underlying judgment.  See <u>Adams v. Gould</u>,
> 739 F.2d 858, 864 (3d Cir.1984).  In this Circuit, " 'where a timely
> motion to amend judgment is filed under Rule 59(e), the Rule 15
> and 59 inquiries turn on the same factors.' "  <u>Adams Golf</u>, 381 F.3d
> at 280 (quoting <u>Cureton v. NCAA</u>, 252 F.3d 267, 272 (3d Cir.
> 2001)); <u>see also Gould</u>, 739 F.2d at 864.  The Rule 15(a) factors
> include "undue delay, bad faith, prejudice, or futility."  <u>Adams Golf</u>,
> 381 F.3d at 280 (citation omitted).

<u>Id.</u> at 230-31.

Moreover, Rule 15(a)(2) provides that courts have discretion to permit additional amendments "when justice so requires," and that such leave to amend should be "freely given." Fed. R. Civ. P. 15(a)(2).  However, when a party seeks to amend a complaint after an adverse judgment, it faces a higher burden than the one for a traditional motion under Federal Rule of Civil Procedure 15(a).  See <u>Garrett v. Wexford Health</u>, 938 F.3d 69, 86 (3d Cir. 2019); <u>Ahmed v. Dragovich</u>, 297 F.3d 201, 207-08 (3d Cir. 2002) ("Although Rule 15 vests the District Court with considerable discretion to permit amendment 'freely . . . when justice so requires,' Fed. R. Civ. P. 15(a), the liberality of the rule is no longer applicable once judgment has been entered.").  This restriction is imposed because Rule 15(a) and 59(e) should not be employed in a manner contrary to "favoring finality of judgments and the expeditious termination of litigation . . . that would render those provisions meaningless."  <u>Ahmed</u>, 297 F.3d at 208 (citation and internal quotation marks omitted).  However, the Third Circuit did not interpret this higher burden as a requirement that a plaintiff must show an intervening change in law or present new evidence under Rule 59(e) and Rule 15(a).  See <u>Burtch</u>, 662 F.3d at 231 (finding "<u>Ahmed</u> is not inconsistent with this Court's other precedent requiring that we consider Rule 15(a) and Rule 59(e) motions together and apply the analysis typical to Rule 15(a)").  As the Third Circuit in <u>Burtch</u> stated, "Procedurally, . . . the appropriate manner to dispose of [Rule 59(e) and Rule 15(a) motions] is to

consider the motions together and determine what outcome is permitted by consideration of the Rule 15(a) factors." Id.

In sum, the Third Circuit has held that a district court may deny a motion to amend a complaint if the record reflects that "(1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party." Lake v. Arnold, 232 F.3d 360, 373 (3d Cir. 2000) (citing Foman v. Davis, 371 U.S. 178 (1962)). But this list is not exhaustive. District courts may also take into account considerations of judicial economy in making their assessments. Mullin v. Balicki, 875 F.3d 140, 149-50 (3d Cir. 2017).

## IV.   ANALYSIS

Lead Plaintiffs argue two Rule 15(a) factors in their Motion for Leave to Amend. First, Lead Plaintiffs contend that Defendants will not suffer any cognizable prejudice should amendment be permitted. Second, they argue that amendment would not be futile because allegations in the SAC, when viewed in conjunction with existing allegations, establish a strong inference of scienter. (See Doc. No. 62.) Defendants claim, conversely, that Lead Plaintiffs' Motion for Leave to Amend should be denied because amendment would be futile. They also argue that amendment at this point would be the product of undue delay by Lead Plaintiffs and unfairly prejudice them. (See Doc. No. 63.) The Court will analyze the factors of undue delay, prejudice, and futility in turn.

### A.   Undue Delay

Defendants claim that Lead Plaintiffs' Motion for Leave to Amend should be denied based on their undue delay in seeking to file a new complaint.[15] (Doc. No. 63 at 11.) "In the Third Circuit, delay alone does not justify denying a motion to amend." Synthes, Inc. v. Marotta,

---

[15]   Defendants do not argue that Lead Plaintiffs acted with bad faith or dilatory motives.

281 F.R.D. 217, 225 (E.D. Pa. 2012).  Rather, it is only where delay becomes "undue," that is, placing an unwarranted burden on the court, before denial of a motion to amend is appropriate. Id.  "Implicit in the concept of 'undue delay' is the premise that Plaintiffs, in the exercise of due diligence, could have sought relief from the court earlier."  Id.  Therefore, the court is required to focus on the movant's reasons for not amending sooner, "while bearing in mind the liberal pleading philosophy of the federal rules."  Id. (internal quotations omitted).

"Tactical decisions and dilatory motives may lead to a finding of undue delay."  Id. There is not a presumptive period where a motion for leave to amend is deemed "timely" or when delay becomes "undue;" rather, whether delay is undue depends on the facts and circumstances of the case.  Id.  "Ultimately, the obligation of the district court in its disposition of the motion is to articulate the imposition or prejudice caused by the delay, and to balance those concerns against the movant's reason for delay."  Id.

Here, Defendants claim Lead Plaintiffs' should not be permitted to amend the FAC on the grounds of undue delay because they "indisputably knew that Defendants were moving to dismiss the [FAC] because its allegations were insufficient to give rise to a strong inference of Defendants' scienter."  (Doc. No. 63 at 11.)  In addition, Defendants assert that Lead Plaintiffs knew about UHS's settlement with DOJ, had communicated with FE 8 and other FEs, and had access to public reporting of Sharon Worsham's changed job title while Defendants' Motion to Dismiss was pending.  (Id.)  Despite this knowledge, Lead Plaintiffs chose to stand on their existing complaint and did not seek amendment.

In response, Lead Plaintiffs contend that they had no indication that the Court intended to grant Defendants' Motion to Dismiss the FAC, and they had no actual notice of the perceived deficiencies in the FAC until after the Court ruled on the Motion to Dismiss.  They claim that

once the Court granted the Motion to Dismiss and they had notice, they promptly moved for leave to amend.  (Doc. No. 67 at 7-9.)  The Court agrees with the position of Lead Plaintiffs.

"[T]he mere fact that a defendant files a motion to dismiss is not necessarily sufficient to put a plaintiff on notice that the court will find his complaint to be deficient."  United States ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co., 839 F.3d 242, 249 (3d Cir. 2016).  The Third Circuit in Victaulic noted that since the United States Supreme Court's decisions in Twombly and Iqbal, there has been a general increase in the number of motions to dismiss filed against plaintiffs.  Id.  Rather than plaintiffs' complaints being worse or less meritorious, the Third Circuit recognized that in the years since Twombly was decided, defendants have more of an incentive to challenge the sufficiency of complaints more frequently.  Id.  The Third Circuit in Victaulic also emphasized that even if there is a hearing on a motion to dismiss, "in the context of a typical Rule 12(b)(6) motion, a plaintiff is unlikely to know whether his complaint is actually deficient – and in need of revision – until after the District Court has ruled."  Id.

In this case, similar to the plaintiffs in Victaulic, Lead Plaintiffs likely did not know whether the District Court was going to dismiss the FAC before the ruling on the Motion to Dismiss.  First, the Court did find some merit in the FAC in concluding that Lead Plaintiffs sufficiently pled misconduct at isolated behavioral health facilities (Doc. No. 58 at 52) and that two statements regarding the misconduct were actionable (Id. at 72).[16]  Second, at the hearing on the Motion to Dismiss on September 12, 2018, the Court invited the parties to submit additional briefing on the Motion to Dismiss, which both parties promptly filed.  (See Doc. Nos. 50, 51.)

---

[16]   The two statements are (1) Mr. Miller and Mr. Filton's statements made at health care conferences, before the publication of the article, attributing the source of the Behavioral Health Division's success to demand that was so high that facilities turned away clinically admissible patients; and (2) post-article denials issued by the Company in the days immediately following Buzzfeed I.

Moreover, after the Court dismissed the FAC, Lead Plaintiffs timely filed the instant Rule 59(e) Motion to Alter the Judgment and for Leave to Amend.  Therefore, given that the Court found some merit in the FAC and welcomed additional briefing on the Motion to Dismiss, Lead Plaintiffs did not have notice of the FAC's perceived deficiencies until after the Court ruled on the Motion to Dismiss.  Once they did have notice of the deficiencies, they promptly moved for leave to amend.  Thus, Lead Plaintiffs' Motion will not be denied based on undue delay.[17]

### B.  Prejudice

Defendants have not met their burden to show they would be prejudiced if Lead Plaintiffs were allowed to amend the FAC.  "Prejudice to the nonmoving party is the touchstone for the denial of an amendment."  Heraeus Med. GmbH v. Esschem, Inc., 321 F.R.D. 215, 217 (E.D. Pa. 2017).  The issue of prejudice focuses on the hardship to defendants if the amendment were permitted.  Synthes, Inc. v. Marotta, 281 F.R.D. 217, 228 (E.D. Pa. 2012). "To state a cognizable claim of prejudice, the defendant must establish that it would be 'unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered' had the allegations in the amended complaint been timely made."  Id. (quoting Pegasus Int'l, Inc. v. Crescent Mfg. Co., No. Civ.A.06–2943, 2007 WL 1030457, at *5 (E.D.Pa. Apr. 2, 2007)).  A defendant may also be burdened if they must defend against new facts or theories that require new defenses.  Id.  In determining whether prejudice exists, courts consider whether allowing an amendment would result in additional discovery, cost, and preparation to defendant against new facts or new theories.  Heraeus Med. GmbH, 321 F.R.D. at 217 (internal quotations omitted).  "Ultimately, the non-moving party bears the burden of demonstrating prejudice."  Synthes, 281 F.R.D. at 228.

---

[17]   For these reasons, Lead Plaintiffs also did not act with bad faith or dilatory motives.

Lead Plaintiffs contend that amendment would not result in prejudice to Defendants because "this action is still in its beginning stages." (Doc. No. 62-1 at 10.) Lead Plaintiffs assert that discovery in this case is stayed, and if they are permitted to file the SAC, Defendants still can move to dismiss the SAC. (Id.) Defendants claim that they would be prejudiced if amendment was permitted because they have an interest "in the finality of judgments and expeditious termination of litigation," and Lead Plaintiffs' attempt to "walk back to square one, after the case has been dismissed with prejudice, would make the finality of judgments an interim concept and risk turning Rules 59 and 60 into nullities." (Doc. No. 63 at 12.) (quotations omitted) However, a defendant's interest in finality alone is not enough to make a showing of prejudice. See Adams v. Gould Inc., 739 F.2d 858, 869 (3d Cir. 1984) (concluding defendants who argued there must be "finality" in the litigation process were not prejudiced by plaintiffs' attempt to amend their complaint where defendants failed to identify any particular prejudice).

Here, Defendants have not met their burden to show they would be prejudiced if Lead Plaintiffs were allowed to amend the FAC. Defendants assert no particular prejudice except the argument that there must be "finality" in the litigation process. The SAC does not contain new facts or theories that would make this suit more difficult for Defendants to defend. Rather, the SAC attempts to bolster existing factual allegations regarding the scienter element of their claim that Defendants made material misrepresentations or omissions in violation of Section 10(b) and Rule 10b-5. While the SAC contains new facts to strengthen the scienter argument, there would be no need for the Defendants to respond with an entirely new defense. Additionally, this case is in its early stages following the Court's dismissal of the FAC, and Defendants' ability to present their case would not be impaired if amendment were allowed. Therefore, given the procedural

posture of this case at this time and the failure of Defendants to describe any form of prejudice, Defendants' claim is without merit.

### C.  Futility

The Court may deny a motion for leave to amend a complaint if the amendment would be futile.  "Futility" means the complaint, as amended, would fail to state a claim upon which relief could be granted.  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997). In determining "futility," the district court applies the same standard that applies under Federal Rule of Civil Procedure 12(b)(6).  Id.  Therefore, before allowing Lead Plaintiffs to amend the FAC, the Court must find Lead Plaintiffs' amendments sufficient to state a claim upon which relief could be granted.

Lead Plaintiffs first argue that the FAC was sufficient to establish scienter and the allegations in the FAC were enough to survive a motion to dismiss.  (Doc. No. 62-1 at 11-13.) As discussed and analyzed in the lengthy Opinion dismissing the FAC, the Court found that the FAC failed to raise the requisite inference of scienter against the Individual Defendants.  (Doc. No. 58.)  The Court also concluded that there was no particularized allegations of a company-wide scheme or cover up, and the FAC did not contain facts that would give rise to liability of UHS under corporate scienter.  Lead Plaintiffs' instant arguments that the FAC was sufficient are unavailing, for the reasons previously stated by the Court.

Lead Plaintiffs also argue that the SAC includes additional assertions that strengthen the claim that they have shown the Individual Defendants' scienter. The Court has described these allegations in detail supra.  Generally, Lead Plaintiffs contend that the SAC adds specific allegations that (1) UHS's improper admission and length of stay practices were directly overseen by UHS "Senior Management," (2) FE 8, the head of the Utilization Review Department, which evaluated medical necessity for inpatient stays at Salt Lake Behavioral, stated

that a Regional CFO at UHS regularly attended monthly "over/under" meetings with the facility's CFO and executive management during which they would discuss the number of days over or under a patient's insurance-authorized length of stay with the goal of lengthening or shortening patients' stays for financial gain,  (3) Sharon Worsham, Divisional Vice President of the Behavioral Health division, was demoted by UHS to Regional Vice President, which undercuts UHS's public response to the BuzzFeed report that there was supposedly nothing wrong with discussing "days on the table," (4) UHS's internal and external audits of suicide ideation coding were either highly questionable, complicit, or designed simply to approve of UHS's already-doctored, post-discharge documentation, and (5) that UHS's announcement of the $127 million settlement with the DOJ is a highly material amount that Defendants would not have agreed to absent the DOJ's presentment of compelling evidence of Defendants' scienter. Defendants argue that Lead Plaintiffs' allegations in the SAC are "reformulations of allegations the Court has already rejected" and the new allegations do not serve to give a strong inference of scienter.

To determine whether amendment would be futile, the Court will review the new averments in the SAC and determine whether they meet a Rule 12(b)(6) standard, that is, whether they are sufficient to support the relief requested.  In Count I of the SAC, Lead Plaintiffs allege that Defendants' public statements during the Class Period violated Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5, which was promulgated by the SEC pursuant to authority granted by Section 10(b).  (Doc. No. 62-3 ¶¶ 355-63.)  To prevail on a claim that a defendant made material misrepresentations or omissions in violation of Section 10(b) and Rule 10b-5, a plaintiff must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the

purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 37-38 (2011) (quoting Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008)). "To establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" Tellabs, 551 U.S. at 319 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193-94 & n.12 (1976). Scienter may be established by showing that the defendant intended to mislead investors or that the defendant acted recklessly in the face of a danger of misleading investors. Belmont v. MB Inv. Partners, Inc., 708 F.3d 470, 493 (3d Cir. 2013).

Allegations in a securities fraud complaint are subject to the Private Securities Litigation Reform Act's ("PSLRA") heightened pleading standard.[18]  To adequately plead scienter under that standard, a plaintiff must allege specific facts for each statement or omission that "giv[e] rise

---

[18]  Because this is a securities fraud case, the Court must analyze the allegations in the SAC under the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the specific requirements of 15 U.S.C. § 78u-4(b), which is a section of the PSLRA.  Congress adopted these stringent pleading standards as "a check against abusive litigation," recognizing that "[p]rivate securities fraud actions . . . can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007).

With respect to scienter, the PSLRA enhances the requirements of Federal Rule of Civil Procedure 9(b) and requires the plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." In re Aetna, Inc. Sec. Litig., 617 F.3d 272, 277 (3d Cir. 2010) (citing 15 U.S.C. § 78u-4(b)(2)).  "Scienter may also be shown by a knowing or reckless state of mind, which in this securities context would be demonstrated by pleading an extreme departure from the standards of ordinary care." Fan v. StoneMor Partners LP, 927 F.3d 710, 718 (3d Cir. 2019) (internal quotations omitted).  A strong inference of scienter "must be more than merely plausible or reasonable—it must be at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314.  A court must consider "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Institutional Investors Grp. v. Avaya, 564 F.3d 242, 267-68 (3d Cir. 2009) (quoting Tellabs, 551 U.S. at 321).

to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  "A complaint adequately pleads a strong inference of scienter 'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'"  In re Hertz Global Holdings, Inc., 905 F.3d 106, 114 (3d Cir. 2018) (quoting Tellabs, 551 U.S. at 324).  To engage in this inquiry, the United States Supreme Court instructs courts to weigh "plausible nonculpable explanations for the defendant's conduct" against the "inferences favoring the plaintiff."  Avaya, 564 F.3d at 267 (quoting Tellabs, 551 U.S. at 324). This is a holistic analysis—a court must examine the complaint as a whole and consider whether the allegations in the complaint "taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  Rahman v. Kid Brands, Inc., 736 F.3d 237, 247 (3d Cir. 2013) (quoting Tellabs, 551 U.S. at 323).

The PSLRA's scienter standard does not require a plaintiff to produce "smoking-gun" evidence.  Tellabs, 551 U.S. at 324. Indeed, "[s]cienter may also be established if a Plaintiff 'set[s] forth facts that constitute circumstantial evidence of either reckless or conscious behavior.'"  In re Viropharma Inc. Sec. Litig., 21 F. Supp. 3d 458, 473 (E.D. Pa. 2014) (quoting Advanta, 180 F.3d at 534).  However, "it is not enough for plaintiffs to merely allege that defendants 'knew' their statements were fraudulent or that defendants 'must have known' their statements were false."  GSC Partners CDO Fund v. Washington, 368 F.3d 228, 239 (3d Cir. 2004).

Similarly, a plaintiff cannot rely solely on an allegation "that imputes knowledge to a defendant because of his or her position within the company."  SEC Investment Management AB v. Endo International, PLC, 351 F. Supp. 3d 874, 905 (3d Cir. 2018) (quoting Oran, 226 F.3d at

290).   Instead, the PSLRA requires a plaintiff to allege specific facts constituting strong circumstantial evidence that the defendants actually knew or recklessly disregarded the false or misleading nature of the statement at issue.  Id. (citing In re Urban Outfitters, Inc. Sec. Litig., 103 F. Supp. 3d 635, 653 (E.D. Pa. 2015)).

Here, the Court will consider whether Lead Plaintiffs have sufficiently pled in the SAC that Defendants Miller and Filton, the Individual Defendants, acted with scienter.  Lead Plaintiffs claim that the allegations added to the SAC will cure any failure to plead scienter with particularity that was omitted in the FAC.  Defendants disagree.  For the reasons below, the SAC does not state with particularity facts that give rise to a strong inference that Defendants acted with scienter, or that Defendants had a knowing or reckless state of mind.

### 1.    Former Employees

Lead Plaintiffs included in the SAC statements from two additional confidential witnesses and from an existing witness.  The new witnesses, FE 11 and FE 12, state that UHS corporate employees sometimes attended flash meetings if they were making an onsite visit. (Doc. No. 62-3 ¶ 186.)  Moreover, UHS installed teleconference equipment in their facility so that management could directly supervise and participate in the facility's flash meetings.  (Id.) The SAC also noted that UHS corporate would receive the "average length of stay" metric via a report on a weekly basis.  (Id. ¶ 189.)  But the SAC makes clear that Defendant Miller and Filton did not attend the corporate flash meetings, and the corporate flash meeting participants did not report to Defendants Miller or Filton.   (See id. ¶ 186.)  Instead, the SAC alleges that John Hollinsworth, one of four Divisional Vice Presidents of the Behavioral Health Division during the Class period, attended the "flash" meetings, and he reported to Debra Osteen, who in turn reported to Defendants Filton and Miller.  (Id.)  Further, the SAC alleges that Mr. Hollinsworth, Martin Schappel, Senior Vice President of the Behavioral Health Division, and Geoff Botak, one

of three Senior Vice Presidents of the Behavioral Health Division, were "supervisors from corporate" who were "occasionally on site at the facility[,]" all of whom reported to Debra Osteen, who reported to Defendants Miller and Filton. The additional allegations obtained from FE 8, who did not work at UHS during the class period, state that a regional CFO, who would have reported to Debra Osteen, regularly attended monthly "over/under" meetings with the facility's CFO and executive management where they would discuss the number of days over or under a patient's insurance-authorized length of stay, with the goal being lengthening or shortening patients' stays for financial gain. (Id. ¶ 199.)

While these assertions attempt to connect Defendants Miller and Filton to the alleged billing scheme, absent from the SAC are any contentions that either Defendant was involved in any of the alleged misconduct. The tenuous connections of various employees to other employees, who then reported to Defendants, do not give rise to an inference that either Defendant Miller or Filton were aware of, or recklessly disregarded, the alleged facility-level wrongdoing. Similar to the allegations in the FAC, the additional statements from new witnesses FE 11 and FE 12, and additional statements from FE 8, are not enough to raise an inference of scienter.

### 2.    Sharon Worsham

The SAC contains assertions regarding Sharon Worsham, who was a Divisional Vice President of the Behavioral Health division during the Class Period, responsible for at least 15 UHS facilities. The FAC also had allegations regarding Ms. Worsham. She was identified as issuing the directive to UHS hospital CEOs, "Don't leave days on the table." (Doc. No. 30 ¶¶ 86, 90, 142, 261.) Lead Plaintiffs claim that the SAC "clarif[ies] Ms. Worsham's role in this regard." (Doc. No. 62-1 at 20.) The SAC also contains allegations regarding Ms. Worsham's demotion to Regional Vice President (Doc. No. 62-3 ¶ 310), which Lead Plaintiffs claim

undercuts UHS's public response to BuzzFeed I that there was nothing wrong with discussing "days on the table" (Doc. No. 62-1 at 20).  However, Ms. Worsham's change in job title does not implicate Defendants Miller or Filton in the alleged scheme.  As a result, the additional allegations regarding Sharon Worsham do not raise an inference of scienter.

### 3.     Suicide Ideation Coding and Coding Audits

As discussed above, Change to Win Investment Group ("CtW") sent a letter to the UHS Board of Directors raising concerns regarding the Behavioral Health Division's billing practices and informing UHS that an independent review of Medicare data found that "UHS free-standing inpatient psychiatric facilities ("IPFs") utilize the suicidal ideation code much more frequently than other free-standing IPFs."  (Doc. No. 62-3 ¶ 50.)

Lead Plaintiffs argue that "the SAC adds allegations clarifying the import of the compelling data in the CtW letter regarding UHS's dramatic overuse of the suicide ideation code–a code that is critical for UHS to establish medical necessity to payers for inpatient admission and therefore reimbursement."  (Doc. No. 62-1 at 16.)  Lead Plaintiffs also contend that the SAC adds allegations that establish UHS's internal and external audits of that coding were "highly questionable, complicit[,] or designed to simply approve of UHS's already-doctored, post-charge documentation."  (Id.)  Further, allegations in the SAC state that prior qui tam suits assert that UHS internal auditors were part of the scheme, and outside auditors relied on UHS's own documentation of patients' conditions and its analysis was limited to verifying coding.  (Id. at 16-17.)

Here, however, the SAC does not make any particularized factual averments that the coding data gives rise to an inference of scienter on the part of Defendant Miller or Filton.  As the Court previously stated when it dismissed the FAC, "[a]ny inferences of scienter are outweighed by the plausible, nonculpable explanation that Mr. Miller and Mr. Filton

acknowledged concerns about the billing scheme, investigated the matter, but determined that the concerns were unfounded."  (Doc. No. 58 at 88.)  Further, while the SAC attempts to discredit the internal audits on UHS coding practice in stating that "the facts alleged in the qui tam action made clear [that] UHS's 'internal' auditors had been alleged to have played an active part in implementing the improper admission and length of stay scheme . . ." (Doc. No. 62-3 ¶ 60), the Court made clear in its Opinion dismissing the FAC that "allegations raised in the qui tam cases are just that–allegations."  (Doc. No. 58 at 77.)  The qui tam lawsuits did not result in findings against UHS, and UHS did not admit liability.  (Id.)  As a result, the Court concluded that the allegations in the qui tam suits did not constitute evidence that Defendants Miller or Filton knew about the billing scheme.  (Id.)  The SAC also attempts to discredit the external audits because they were reliant on UHS's own documentation of patients' medical conditions, "which had already been alleged to be fraudulent by qui tam lawsuits . . . ." (Doc. No. 62-3 ¶ 60.)  Again, the Court found that allegations in the qui tam lawsuits do not give rise to an inference of scienter on the part of Defendant Miller or Filton.  Therefore, the SAC allegations regarding the internal and external audits, which are essentially reformulations of allegations originating from the qui tam lawsuits, do not contribute to an inference of scienter.

### 4.    DOJ Settlement

Lead Plaintiffs contend that UHS's agreement to settle the DOJ civil investigation for $127 million, which is over 50% of UHS's 2019 second quarter net income of $238 million and nearly 20% of the net annual income that UHS reported during the class period, is evidence of scienter because Defendants would not have agreed to pay that amount absent compelling evidence of Defendants' scienter.  (Doc. No. 62 at 17.)  Lead Plaintiffs also point to allegations in the SAC that the OIG will require UHS, as part of the settlement, to enter into a Corporate

Integrity Agreement ("CIA") that implements rigorous monitoring procedures to prevent fraudulent practices from re-occurring.  (Id. at 17-18.)

In the Opinion dismissing the FAC, the Court noted that the federal government closed the criminal investigation, and UHS announced it had reached an agreement in principle to settle with the DOJ.  (Doc. No. 58 at 81.)  For these reasons, the Court concluded that the allegations in the FAC regarding government investigations into UHS were not enough to support an inference of scienter under the PSLRA.  (Id.)  Examining the SAC, Lead Plaintiffs' new allegations also do not give rise to support an inference of scienter.  Settlement agreements are not enough to meet the pleading requirements of the PSLRA.  See Glazer Capital Mgmt., LP v. Magistri, 549 F.3d 736, 748–49 (9th Cir. 2008).  Even if the settlement agreement had stated that someone at UHS had actual knowledge of the alleged violations, that mere fact would not be sufficient to support that either Mr. Miller or Mr. Filton had actual knowledge of any violations.  See id.  Accordingly, the SAC, even with the addition of the settlement terms, is insufficient to support an inference of scienter by Mr. Miller or Mr. Filton.

### 5.    Consideration Of The SAC As A Whole

Reviewing the factual allegations in the SAC collectively, Lead Plaintiffs have not pled facts that raise a strong inference of scienter.  Similar to the Court's finding in the Opinion dismissing the FAC, the SAC does not clearly or plausibly state that Defendants Miller or Filton knew the allegations regarding the alleged billing scheme were true or participated in the claimed misconduct at the time the actionable statements were made.  The SAC also does not demonstrate that Defendants Miller or Filton recklessly disregarded the existence of the alleged misconduct that reached a level of an extreme departure from the standards of ordinary care.  The additions to the SAC, discussed supra, which include averments regarding statements from former employees, Sharon Worsham, suicide ideation coding, and the DOJ settlement, do not

override the fact that UHS responded to CtW's concerns about their use of the suicidal ideation code and explained how their billing practices are audited by internal and external auditors. Lead Plaintiffs' issues with the audits, which stem from allegations in the <u>qui tam</u> suits, are unpersuasive for the reasons discussed <u>supra</u>. It also remains true that the <u>qui tam</u> lawsuits and the DOJ investigations were disclosed in the company's public filings, which significantly detract from an inference of scienter. <u>See Owens v. Jastrow</u>, 789 F.3d 529, 540-41 (5th Cir. 2015) ("[T]he red flags were disclosed to the public, which negates the inference that defendants acted with scienter.")  Here, there is not a strong inference of scienter by Defendants Miller and Filton that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent," <u>Tellabs</u>, 551 U.S. at 314.

Thus, even viewing the facts in the SAC in the light most favorable to Lead Plaintiffs, the allegations taken as a whole do not show that Defendants Miller or Filton acted consciously or recklessly in making statements regarding the source of the Behavioral Health Division's revenue when they denied allegations in Buzzfeed I and other complaints the Company received. Accordingly, the facts stated in the SAC fail to raise the requisite inference of scienter and amendment would be futile. [19]

---

[19]   UHS is the third named Defendant in this case.  In the Opinion dismissing the FAC, the Court concluded the following regarding UHS's scienter:

> Likewise, in this case, the Court need not determine whether Lead Plaintiffs can successfully plead corporate scienter against UHS without successfully pleading scienter against Mr. Miller or Mr. Filton. Here, there are no particularized allegations of a company-wide scheme or a widespread cover-up that rise to the level of the coverup in <u>Bridgestone</u> or the hypothetical posed by the Seventh Circuit. To the contrary, when CtW sent a letter to UHS, raising concerns about the company's use of the suicidal ideation code, the Board sent CtW a letter that explained that the company internally audits billing practices and also employs external auditors to review

> coding at facilities.  Likewise, the company did not ignore or cover up the <u>qui tam</u> lawsuits and government investigations; instead, these matters were immediately disclosed in the company's public filings.  Consequently, even if the Third Circuit had recognized the doctrine of corporate scienter, the allegations in the Amended Complaint would not fall under that doctrine.

(Doc. No. 58 at 91.)

As discussed in the Opinion dismissing the FAC, the Sixth Circuit in <u>City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.</u>, explained that corporate scienter was warranted without reference to particular individuals because the scope of the wrongdoing was "extraordinary." 399 F.3d 651 (6th Cir. 2005).  In <u>Bridgestone</u>, the company and its subsidiary "had information that their tires were rupturing and causing, among other things, a significant number of rollover accidents" but "engaged in a variety of tactics . . . to keep the scope of the problem from safety regulators in the United States . . . as well as from investors."  <u>Id.</u>  Also discussed in the Opinion dismissing the FAC was <u>Makor Issues & Rights, Ltd. v. Tellabs Inc.</u>, a Seventh Circuit case that offered a hypothetical where corporate scienter would exist:

> Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero. There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.

513 F.3d 702, 710 (7th Cir. 2008).

Here, while Lead Plaintiffs do not explicitly make arguments regarding corporate scienter in their Motion or Reply, they do argue that Defendants Miller and Filton were aware of UHS's misconduct because it was "Company-wide."  (Doc. No. 67 at 8.)  Lead Plaintiffs contend that the SAC contains allegations of Company-wide misconduct because senior UHS executives directly participated in the misconduct.  (<u>Id.</u>)  They claim that (1) Sharon Worsham directly issued the "days on the table" mantra on a weekly call with fifteen UHS hospital CEOs, and (2) John Hollinsworth physically attended "flash meetings" which were "regularly" used to pressure employees not to leave "days on the table."  (<u>Id.</u> at 8-9.)

Although Lead Plaintiffs argue that there was Company-wide misconduct, they did not argue in the Motion to Alter or Amend the Order Dismissing the FAC that this misconduct was part of a scheme or cover up implemented by the Company, Mr. Miller, or Mr. Filton.  The new facts presented simply do not rise to the level of strong inference of scienter by UHS.  The contention that high-level executives at UHS participated in the misconduct based on the "days on the table" mantra were present in the FAC, which the Court found to be inadequate to amount to corporate scienter.  The FAC contained the allegation that "UHS corporate was also unquestionably aware of, and in fact responsible for, the Behavioral Division's mantra:

**V.      CONCLUSION**

For the foregoing reasons, Lead Plaintiffs' Motion Pursuant to Rule 59(e) to Alter or Amend the Court's Order Dismissing Lead Plaintiffs' Complaint, [and] Requesting Leave for Lead Plaintiffs to Amend the Complaint Pursuant to Fed. R. Civ. P. 15(a) (Doc. No. 62) will be denied.  An appropriate Order follows.

---

'Don't leave days on the table' . . . ."  (Id. ¶ 261.)  The allegation that Ms. Worsham issued the "days on the table" mantra also appeared in the FAC.  (Doc. No. 30 ¶¶ 86, 90, 142, 261.)  While Mr. Hollinsworth's attendance at "flash meetings" was an addition to the SAC, the FAC did contain statements pertaining to the existence of the "flash meetings" where senior management would discuss pending discharges and whether they would be "days on the table."  (Id. ¶¶ 10, 87, 147, 150, 262, 263.)  Given the Court's findings based on the content of the FAC, when combined with all the new additions to the SAC, Lead Plaintiffs' assertions do not reach the level of the cover-up in Bridgestone, the hypothetical posed by the Seventh Circuit, or meet the requirement of the strong inference of scienter.